**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

PHOENIX LIGHT SF LIMITED, in its own right and
the right of BLUE HERON FUNDING IX LTD.,
C-BASS CBO XIV LTD., C-BASS CBO XVII LTD.,
KLEROS PREFERRED FUNDING V PLC, SILVER
ELMS CDO PLC and SILVER ELMS CDO II
LIMITED; and each of BLUE HERON FUNDING IX
LTD., KLEROS PREFERRED FUNDING V PLC,
SILVER ELMS CDO PLC and SILVER ELMS CDO II
LIMITED, in their own right,

Plaintiffs,

-against-

DEUTSCHE BANK NATIONAL TRUST COMPANY,

Defendant.

-------------------------------------------------------------------x

Index No. 14 CV 10103



**COMPLAINT**

**DEMAND FOR JURY TRIAL**

RECEIVED
DEC 23 2014
U.S.D.C. S.D. N.Y.

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ..................................................................................................1

PARTIES .....................................................................................................................6

JURISDICTION AND VENUE ....................................................................................8

FACTUAL ALLEGATIONS ........................................................................................9

I.      THE SECURITIZATION PROCESS.................................................................9

II.     DEUTSCHE BANK'S DUTIES AND OBLIGATIONS ..................................11

     A.    Deutsche Bank Had a Duty to Take
           Physical Possession of Complete Mortgage Files .................................12

     B.    Deutsche Bank Had a Duty to Provide Notice of Defaults
           and Enforce Repurchase Obligations Triggered by Such Notice ..........18

     C.    Deutsche Bank Had a Duty to Exercise Due Care to Enforce
           Repurchase Obligations and Avoid Conflicts of Interest ......................19

     D.    Deutsche Bank Had a Duty to Provide Accurate
           Remittance Reports and Certifications Under Regulation AB .............20

     E.    Deutsche Bank Had a Duty to Address the Master Servicers'
           and Servicers' Failure to Meet Prudent Servicing Standards ...............21

     F.    Deutsche Bank Is Liable for Negligence in Performing Its Duties .......23

III.    DEUTSCHE BANK BREACHED ITS CONTRACTUAL, FIDUCIARY AND
      STATUTORY DUTIES....................................................................................25

     A.    Deutsche Bank Failed to Take Possession of Complete Mortgage Files...............25

          1.    The Servicers' and Master Servicers' Cover-up of the Sponsors'
                Document Delivery Failures .....................................................27

               a.    American Home Mortgage Investment Corp., IndyMac
                    Bank F.S.B., Option One Mortgage Corporation, Ocwen
                    Loan Servicing, LLC, HomEq Servicing Corporation and
                    Sutton Funding LLC .....................................................29

               b.    Ameriquest Mortgage Company.....................................33

c.      Countrywide Home Loan Servicing, LP.........................................35

d.      GMAC Mortgage Corporation.........................................................39

e.      Goldman Sachs Mortgage
        Company and Litton Loan Servicing LP ......................................45

f.      HSBC Bank USA, National Association ......................................46

g.      Midland Loan Services, Inc. ........................................................47

h.      Saxon Mortgage Services, Inc. ...................................................49

i.      Wells Fargo Bank, N.A..................................................................50

B.      Deutsche Bank Was Aware of but Failed to Provide Notice of Defaults ........53

1.      The Originators' and Sponsors' Pervasive Breaches of Representation
        and Warranties ..............................................................................64

a.      Aames Capital Corp..................................................................67.

b.      Aegis Funding Corporation and Aegis Lending Corporation........70

c.      American Home Mortgage
        Investment Corp. and Option One Mortgage Corporation ...........73

d.      Ameriquest Mortgage Company
        and Argent Mortgage Company, L.L.C.  ......................................79

e.      Bank of America, N.A. and Countrywide Home Loans, Inc........83

f.      First Franklin Financial Corporation ...........................................92

g.      Fremont Investment & Loan.........................................................97

h.      Goldman Sachs Mortgage Company ..........................................101

i.      Household Financial Services, Inc.
        and HSBC Bank USA, National Association .............................106

j.      Impac Mortgage Holdings, Inc. . .................................................107

k.      IndyMac Bank, F.S.B..................................................................108

3

l.      Meritage Mortgage Corporation .................................................114

m.    MILA, Inc. ....................................................................................117

n.     NC Capital Corporation and
New Century Mortgage Corporation ...........................................119

o.     Paul Financial, LLC ....................................................................125

p.     RBS Financial Products, Inc. ......................................................127

q.     SouthStar Funding, LLC .............................................................130

r.      Sutton Funding LLC ...................................................................133

s.      WMC Mortgage Corp. ...............................................................134

C.    Deutsche Bank Failed to Exercise Due Care and Enforce Repurchase
Obligations ...........................................................................................140

    1.    Events of Default Under the PSAs Relating to Document Delivery
Failures ......................................................................................141

    2.    Events of Default Under the Indentures.......................................144

    3.    Deutsche Bank Received Formal Notice of Representation
and Warranty Violations Which Ripened into Events of Default...........146

D.    Deutsche Bank Provided False Regulation AB Certifications and Remittance
Reports .................................................................................................147

E.    Deutsche Bank Failed to Address the Master Servicers' and Servicers' Looting
of Trust Assets .....................................................................................149

    1.    American Home Mortgage Investment Corp., IndyMac Bank
F.S.B., Option One Mortgage Corporation, Ocwen Loan Servicing,
LLC, HomEq Servicing Corporation and Sutton Funding LLC's
Servicing Scams.........................................................................151

    2.    Ameriquest Mortgage Company's Servicing Scams .............................154

    3.    Countrywide Home Loan Servicing, LP's Servicing Scams .................157

    4.    GMAC Mortgage Corporation's Servicing Scams .................................159

    5.    Litton Loan Servicing, LP's Servicing Scams.........................................161

      6.      Midland Loan Services, Inc.'s Servicing Scams .....................................162

      7.      Saxon Mortgage Services, Inc.'s Scams ...................................................162

      8.      Wells Fargo Bank, N.A. ............................................................................163

IV.     DEUTSCHE BANK'S CONDUCT INJURED PLAINTIFFS........................................166

CAUSES OF ACTION ........................................................................................................168

FIRST CAUSE OF ACTION
(Violation of Section 315(b) of the TIA (15 U.S.C. § 77ooo(b))) ...............................................168

SECOND CAUSE OF ACTION
(Violation of Section 315(c) of the TIA (15 U.S.C. § 77ooo(c))) ...............................................170

THIRD CAUSE OF ACTION (Breach of Contract) ....................................................................171

FOURTH CAUSE OF ACTION (Breach of Fiduciary Duty)........................................................173

FIFTH CAUSE OF ACTION (Negligence and Gross Negligence)...............................................174

SIXTH CAUSE OF ACTION (Negligent Misrepresentation) ......................................................175

SEVENTH CAUSE OF ACTION (Violation of the Streit Act).....................................................177

PRAYER FOR RELIEF .......................................................................................................179

Phoenix Light SF Limited as a holder of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below) and in the right of Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC and Silver Elms CDO II Limited; and each of Kleros Preferred Funding V PLC, Silver Elms CDO PLC and Silver Elms CDO II Limited as holders of RMBS issued by other Covered Trusts (collectively, "Plaintiffs"), by and through their attorneys, bring this action against Defendant Deutsche Bank National Trust Company ("Deutsche Bank" or "Defendant"), and allege as follows:

### NATURE OF ACTION

1.      This action arises out of Deutsche Bank's role as trustee for 21 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against Deutsche Bank for breach of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2.      The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2005 to 2007.  Five of the RMBS transactions were sponsored by RBS Financial Products, Inc. (the "RBS Trusts"), four were sponsored by Goldman Sachs Mortgage Company (the "Goldman Trusts"), three were sponsored by IndyMac Bank F.S.B. (the "IndyMac Trusts"), two were sponsored by HSBC Bank USA, National Association (the "HSBC Trust"), two were sponsored by Impac Mortgage Holdings, Inc. (the "Impac Trusts"), one was sponsored by Aegis Mortgage Corporation (the "Aegis Trust"), one was sponsored by American Home Mortgage Acceptance, Inc. (the "American Home Trust"), one was sponsored by Ameriquest Mortgage Company (the "Ameriquest Trust"), one was

sponsored by First Franklin Financial Corporation (the "First Franklin Trust") and one was sponsored by Sutton Financing LLC (the "Sutton Trust") (IndyMac Bank F.S.B., RBS Financial Products, Inc., Goldman Sachs Mortgage Company, Ameriquest Mortgage Company, HSBC Bank USA, National Association, Impac Mortgage Holdings, Inc., Aegis Mortgage Corporation, American Home Mortgage Acceptance, Inc., First Franklin Financial Corporation and Sutton Financing LLC are referred to collectively as the "Sponsors").

3.      Plaintiffs purchased, and currently hold, RMBS certificates with an original face value over $456 million issued by the Covered Trusts identified in Exhibit B (the "Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The Certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to Deutsche Bank.

5.      The Certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon their trustee representative, Deutsche Bank, to police the deal and protect their contractual and other legal rights.

6.      The Sponsors and Deutsche Bank typically had very close business relationships.  Nevertheless, as Trustee, Deutsche Bank was obligated to act against the financial interest of the Sponsors when demanded by the circumstances.  The principal protections received by investors in the Covered Trusts were their contractual rights to have the Sponsors or the parties who originated the mortgage loans (the "Originators") replace or repurchase defective mortgage loans and the duties of Deutsche Bank to enforce such obligations and the other rights of investors in the Covered Trusts.  Deutsche Bank, however, abandoned its obligations and breached its statutory, fiduciary and contractual obligations to protect the rights of investors such as Plaintiffs.  As a result, Plaintiffs have suffered very material damages, which they seek to recover in this action.

7.      As the trustee for the Covered Trusts, Deutsche Bank owes Plaintiffs and the other Certificateholders certain contractual and fiduciary duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts. Among these duties are those set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs"),[1] which were incorporated by reference into the Certificates Deutsche Bank signed and under applicable state and federal laws.

8.      Deutsche Bank breached its contractual, fiduciary and statutory duties in at least five different ways.

9.      First, the PSAs purported to transfer title to the mortgage loans to the Covered Trusts for the benefit of Certificateholders.  To ensure that the rights, title and interest in the mortgage loans were perfected and properly conveyed to Deutsche Bank, the PSAs imposed

---

[1] Five of the Covered Trusts (AABST 2006-1, AHM 2006-1, IMM 2005-7, IMM 2005-8, and INABS 2006-H1) were structured using indentures, servicing agreements, trust agreements and mortgage loan purchase agreements, which together are the functional equivalent of a PSA.  Unless expressly noted herein, when the term PSA is used it is also referring to aforementioned governing agreements executed in connection with those securitizations.

on Deutsche Bank a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete.  The relevant Sponsors or Depositors (defined below) were required to substitute compliant for the loans with incomplete files or repurchase the loans.  Deutsche Bank, however, systematically disregarded its contractual and fiduciary duties to enforce its rights on behalf of Certificateholders to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the Certificates.  If Deutsche Bank had met its contractual, fiduciary and statutory duties with respect to the non-compliant loans, which now constitute the overwhelming majority of the defaulted loans, Plaintiffs would not have incurred their very significant losses.  And if Plaintiffs had been aware of these Events of Default or defaults they would not have continued to invest in RMBS throughout 2005-2007.

10. <u>Second</u>, Deutsche Bank is obligated to provide Certificateholders with notice of defaults under the PSAs.  Deutsche Bank violated this requirement by failing to give Certificateholders any notice of repeated breaches by the Master Servicers or Servicers designated under the PSAs or of systemic breaches by the Sponsors, Originators or affiliates that served as the depositors (the "Depositors").  For example, the Master Servicers or Servicers routinely failed to provide Certificateholders with notice of the Sponsors' or Originators' numerous breaches of representation and warranty provisions in the PSAs and loan purchase agreements that the mortgage loans had been underwritten in accordance with applicable underwriting guidelines.  If adequate notice of such breaches had been provided, the Sponsors or Originators would have been required to repurchase the mortgage loans that

did not comply with the applicable underwriting guidelines and which ultimately caused a significant portion of Plaintiffs' losses.

11.     <u>Third</u>, Deutsche Bank failed to exercise due care and avoid conflicts of interest as required under common law, the TIA and the Streit Act.  Having notice of the Master Servicers' and Servicers' numerous defaults and Events of Default under the PSAs and breaches of representations and warranties provided by the Sponsors and Originators, Deutsche Bank should have exercised due care to ensure that Certificateholders were adequately compensated.  If Deutsche Bank had exercised due care, it would have issued repurchase demands years ago and, if necessary, commenced repurchase litigation forcing the Sponsors or Originators to repurchase defective loans.

12.     <u>Fourth</u>, Deutsche Bank had a duty to provide accurate certifications and remittance reports as required under the PSAs and applicable federal law.  Deutsche Bank negligently failed to do so.  If it had accurately reported the facts regarding its knowledge of defective mortgage loans, the Sponsors or Originators would have been forced to repurchase the non-compliant loans that have caused Plaintiffs losses.  Accurate certifications also could have prevented subsequent mortgage loan securitizations from including large numbers of defective and non-compliant loans.

13.     <u>Fifth</u>, the PSAs required Deutsche Bank to take steps to protect Plaintiffs whenever it became aware of uncured loan servicing failures by the Covered Trusts' Master Servicers or Servicers.  The Master Servicers and Servicers were supposed to ensure the proper servicing and administration of the mortgage loans in the Covered Trusts for the benefit of Plaintiffs and other Certificateholders.  The PSAs required the Master Servicers and Servicers (and their subservicers) to exercise customary and "prudent" loan servicing

practices in servicing the mortgage loans.  The Master Servicers and Servicers failed to meet prudent servicing standards because they regularly overcharged for various default services provided in connection with the mortgage loans and failed to (i) promptly collect payments from borrowers and remit them to the Covered Trusts; (ii) promptly send delinquency notices to borrowers who were late on their payments; (iii) ensure the proper maintenance and reporting of accurate information regarding the mortgage loans; (iv) ensure the proper and prudent modification of mortgage loans when necessary; and (v) ensure the proper, prudent, correct and truthful institution and prosecution of foreclosure proceedings. Deutsche Bank failed to take steps to address these defaults.

14.     By failing to perform these duties, Deutsche Bank has caused Plaintiffs to suffer over $183 million in damages.

## PARTIES

15.     Plaintiff Phoenix Light SF Limited ("Phoenix Light") is a private limited company incorporated under the laws of Ireland.  Phoenix Light brings this action first in its own right as a collateralized debt obligation ("CDO") that holds Certificates that were issued by certain of the Covered Trusts.

16.     Plaintiff Blue Heron Funding IX Ltd. is a special purpose company incorporated under the laws of the Cayman Island.  Blue Heron Funding IX Ltd.  Blue Heron Funding IX brings action in its own right as a CDO that holds Certificates that were issued by certain of the covered trusts.

17.     Plaintiff Kleros Preferred Funding V PLC is a public limited company incorporated and existing under the laws of Ireland.  Kleros Preferred Funding V PLC brings

this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

18.     Plaintiff Silver Elms CDO PLC is a special purpose company incorporated under the laws of Ireland.  Silver Elms CDO PLC brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

19.     Plaintiff Silver Elms CDO II Limited is a private limited company incorporated under the laws of Ireland.  Silver Elms CDO II Limited brings this action in its own right as a CDO that holds Certificates that were issued by certain of the Covered Trusts.

20.     Plaintiffs bring their claims against Defendant as assignees of claims regarding Certificates that were initially purchased by WestLB AG ("WestLB").  During the relevant time period, WestLB was a German corporation with its principal place of business in Düsseldorf, Germany.  On July 1, 2012, WestLB underwent a restructuring, pursuant to which WestLB transferred the majority of its remaining assets to a public winding-up agency known as Erste Abwicklungsanstalt.  As a result of the restructuring measures, WestLB discontinued its banking business and now operates solely as a global provider of portfolio management services, under the name of Portigon AG.

21.     Plaintiffs have standing to sue Defendant to recover those damages pursuant to Section 13-107 of the New York General Obligations Law and assignees of all rights, title, interest, causes of action and claims regarding securities initially purchased by the assignor identified above.  Plaintiffs acquired the legal claims at issue in this case in exchange for rescue financing and other good and valuable consideration.  The certificates at issue in this case were severely damaged on or before the day they were transferred to Plaintiffs, and continue to be

damaged, in an amount to be proven at trial.  Use of the term "Plaintiffs" herein shall also refer to WestLB.

22.      In addition, Phoenix Light holds more than 50% of the controlling class of notes issued by, and thus is the Controlling Party and/or the Majority for, each of the following other CDOs that purchased Certificates from other Covered Trusts: (i) Blue Heron Funding IX Ltd.; (ii) Kleros Preferred Funding V PLC; (iii) Silver Elms CDO PLC; (iv) Silver Elms CDO II Limited; (v) C-BASS CBO XIV Ltd., an exempted company organized with limited liability under the laws of the Cayman Islands.; and (vi) C-BASS CBO XVII Ltd., an exempted company organized with limited liability under the laws of the Cayman Islands.

23.      Defendant Deutsche Bank is a national banking association organized and existing under the laws of the United States.  Deutsche Bank does business throughout the United States, and its main office is in California.  It serves as the trustee for the Covered Trusts.

24.      For each of these Covered Trusts, Deutsche Bank signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, Deutsche Bank owed Certificateholders certain statutory, contractual and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## **JURISDICTION AND VENUE**

25.      This Court has jurisdiction over the common law claims asserted in this matter and the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C.A. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship

between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

26.　Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as Deutsche Bank resides and transacts business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

27.　This Court has personal jurisdiction over Deutsche Bank because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the Covered Trusts are New York trusts and, in the majority of the PSAs at issue in this litigation, New York law governs and Deutsche Bank expressly consented to this Court's jurisdiction.

## FACTUAL ALLEGATIONS

## I.　THE SECURITIZATION PROCESS

28.　The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

29.　The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as IndyMac, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

30.　The depositor then conveys the pool of loans to a trustee, such as Deutsche Bank, pursuant to a "pooling and servicing agreement" that establishes various prioritized "tranches" of interests in payments made by borrowers on the loans.  The trust issues

certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, Deutsche Bank acted as the trustee in connection with the relevant RMBS transactions.

31.     Pursuant to the PSA for each trust, a "servicer" is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation and managing and selling foreclosed properties.

32.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

33.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the "waterfall."

34.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the collateral securing, the underlying loans, which often number in the thousands.

## II.     DEUTSCHE BANK'S DUTIES AND OBLIGATIONS

35.     Deutsche Bank's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs or, as was the case for the Aegis Trust, the American Home Trust, the Impac Trusts, and one of the IndyMac Trusts (INABS 2006-H1), an Indenture, and under applicable state and federal law.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  Deutsche Bank entered into the PSAs or Indentures with:

> (A)  For the Aegis Trust: (i) the Trust as Issuer; and (ii) Wells Fargo Bank, N.A. as Administrator;
>
> (B)  For the American Home Trust: (i) the Trust as Issuing Entity; and (ii) Wells Fargo Bank, N.A. as Securities Administrator;
>
> (C)  For the Ameriquest Trust: (i) Argent Securities Inc. as Depositor; and (ii) Ameriquest Mortgage Company as Master Servicer;
>
> (D) For the First Franklin Trust: (i) HSI Asset Securitization Corporation as Depositor; (ii) First Franklin Financial Corporation as Mortgage Loan Seller; and (iii) Wells Fargo Bank, N.A. as Servicer, Master Servicer, Securities Administrator and Custodian;
>
> (E)  For one of the Goldman Trusts (GSAMP 2005-HE5): (i) GS Mortgage Securities Corp. as Depositor; (ii) Litton Loan Servicing LP as Servicer; and (iii) J.P. Morgan Trust Company, National Association as Custodian;
>
> (F)  For one of the Goldman Trusts (GSAMP 2005-WMC2): (i) GS Mortgage Securities Corp. as Depositor; (ii) Litton Loan Servicing LP as Servicer; and (iii) Wells Fargo Bank, N.A. as Custodian;

(G)  For one of the Goldman Trusts (GSAMP 2006-HE1)[2]: (i) GS Mortgage Securities Corp. as Depositor; (ii) Litton Loan Servicing LP as Servicer; and and (iii) J.P. Morgan Trust Company, National Association and U.S. Bank National Association as Custodians;

(H)  For one of the HSBC Trusts (HASC 2006-HE1): (i) HIS Asset Securitization Corporation as Depositor; (ii) Wells Fargo Bank, N.A. as Master Servicer, Securities Administrator and Custodian; (iii) Deutsche Bank National Trust Company as Trustee; and (iv) Clayton Fixed Income Services, Inc. as Credit Risk Manager;

(I)  For one of the HSBC Trusts (HASC 2006-OPT3): (i) HIS Asset Securitization Corporation as Depositor; (ii) Option One Mortgage Corporation as Originator and Servicer; and (iii) Wells Fargo Bank, N.A. as Master Servicer, Securities Administrator and Custodian;

(J)  For the Impac Trusts: the Trust as Issuer;

(K)  For two of the IndyMac Trusts (INDX 2006-AR2 and RAST 2006-A15): (i) IndyMac MBS, Inc. as Depositor; (ii) IndyMac Bank, F.S.B. as Seller and Servicer; and (iii) Deutsche Bank National Trust Company as Trustee;

(L)  For one of the IndyMac Trusts (INABS 2006-H1): the Trust as Issuer;

(M)  For four of the RBS Trusts (FHLT 2005-1, FHLT 2005-2, SVHE 2005-3 and SVHE 2006-1): (i) Financial Asset Securities Corp. as Depositor; and (ii) Litton Loan Servicing LP as Servicer;

(M)  For one of the RBS Trusts (MMLT 2005-2): (i) Financial Asset Securities Corp. as Depositor; and (ii) Saxon Mortgage Services, Inc. as Servicer; and

(O)  For the Sutton Trust: (i) Securitized Asset Backed Receivables LLC as Depositor; (ii) Barclays Capital Real Estate Inc. d/b/a HomEq Servicing as Servicer; and (iii) NC Capital Corporation as Responsible Party;

### A.  Deutsche Bank Had a Duty to Take Physical Possession of Complete Mortgage Files

36.  Each PSA sets forth a process for conveying the mortgage loans to the

Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered

Trusts.  Then the Depositor conveyed the mortgage loans to Deutsche Bank in its capacity

---

[2] The PSA for GSRPM 2006-1 is not publicly available.

as the trustee for the Covered Trusts to hold for the benefit of the Certificateholders.  This

process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the IndyMac

PSA,[3] which provides in relevant part:

> The Seller, concurrently with the execution and delivery of this
> Agreement, hereby transfers to the Depositor, without recourse,
> all the interest of the Seller in each Mortgage Loan, including all
> interest and principal received or receivable by the Seller on each
> Mortgage Loan after the Cut-off Date and all interest and
> principal payments on each Mortgage Loan received before the
> Cut-off Date for installments of interest and principal due after
> the Cut-off Date but not including payments of principal and
> interest due by the Cut-off Date. . . . The Depositor, concurrently
> with the execution and delivery of this Agreement, hereby (i)
> transfers to the Trustee for the benefit of the Certificateholders,
> without recourse, all the interest of the Depositor in the Trust
> Fund, together with the Depositor's right to require the Seller to
> cure any breach of a representation or warranty made in this
> Agreement by the Seller or to repurchase or substitute for any
> affected Mortgage Loan in accordance with this Agreement.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC,

Impac, RBS and Sutton Trusts set forth a substantially similar process.  *See* Exhibit C § I.

37.     In addition, Section 2.02 of the IndyMac PSA ("Acceptance by the Trustee of

the Mortgage Loans") provides that Deutsche Bank is required to take physical possession

of the mortgage loans and the accompanying mortgage files for the exclusive use and

benefit of all current and future Certificateholders.  It provides:

> The Trustee acknowledges receipt of the documents identified in
> the Initial Certification in the form of Exhibit G-1, and declares
> that it holds and will hold such documents and the other documents
> delivered to it constituting the Mortgage Files for the Mortgage
> Loans, and that it holds or will hold such other assets as are

---

[3] Quotations to the IndyMac PSA herein are to the PSA executed in connection with the INDX 2006-AR2 securitization.  RAST 2006-A15, as well as the other trusts in this action, were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in the Complaint.  The relevant provisions of the governing agreements for each trust are set forth in Exhibit C hereto and are substantially similar.

> included in the Trust Fund, in trust for the exclusive use and
> benefit of all present and future Certificateholders.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC,

Impac, RBS and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § II.

      38.    Section 2.01 of the IndyMac PSA also specifically sets forth the operative

documents that must be contained in the mortgage file for the mortgage loans.  It provides:

> In connection with the transfer and assignment of each Mortgage
> Loan, *the Depositor has delivered* (or, in the case of the Delay
> Delivery Mortgage Loans, will deliver to the Trustee within the
> time periods specified in the definition of Delay Delivery
> Mortgage Loans), *for the benefit of the Certificateholders the
> following documents or instruments with respect to each
> Mortgage Loan so assigned*:
>
> (i) *The original Mortgage Note*, endorsed by manual or facsimile
> signature in blank in the following form: 'Pay to the order of
> _____ _____without recourse,' *with all
> intervening endorsements showing a complete chain of
> endorsement from the originator to the Person endorsing the
> Mortgage Note* (each endorsement being sufficient to transfer all
> interest of the party so endorsing, as noteholder or assignee
> thereof, in that Mortgage Note) or a lost note affidavit for any Lost
> Mortgage Note from the Seller stating that the original Mortgage
> Note was lost or destroyed, together with a copy of the Mortgage
> Note.
>
> (ii) except as provided below and for each Mortgage Loan that is
> not a MERS Mortgage Loan, *the original recorded Mortgage* or a
> copy of such Mortgage certified by the Seller as being a true and
> complete copy of the Mortgage . . . and in the case of each MERS
> Mortgage Loan, the original Mortgage, noting the presence of the
> MIN of the Mortgage Loans and either language indicating that the
> Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM
> Loan or if the Mortgage Loan was not a MOM Loan at origination,
> the original Mortgage and the assignment thereof to MERS, with
> evidence of recording indicated thereon, or a copy of the Mortgage
> certified by the public recording office in which such Mortgage has
> been recorded.
>
> (iii) In the case of a Mortgage Loan that is not a MERS Mortgage
> Loan, *a duly executed assignment of the Mortgage* (which may be

included in a blanket assignment or assignments), together with, except as provided below, ***all interim recorded assignments of the mortgage*** . . . .

(iv) The original or copies of ***each assumption, modification, written assurance, or substitution agreement***.

(v) Except as provided below, ***the original or duplicate original lender's title policy*** and all its riders. . . .

*       *       *

In addition, in connection with the assignment of any MERS Mortgage Loan, the Seller agrees that it will cause, at the Seller's expense, the MERS(R) System to indicate that the Mortgage Loans sold by the Seller to the Depositor have been assigned by the Seller to the Trustee in accordance with this Agreement for the benefit of the Certificateholders by including (or deleting, in the case of Mortgage Loans that are repurchased in accordance with this Agreement) in such computer files the information required by the MERS(R) System to identify the series of the Certificates issued in connection with such Mortgage Loans.

(Emphasis added.)  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts set forth a substantially similar process. *See* Ex. C § III.

39.    Physical possession of these documents by Deutsche Bank was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

40.    Deutsche Bank had a contractual and common law obligation under the PSAs to review each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete.

41.    The first step in the certification process was the preparation of an initial certification acknowledging that Deutsche Bank (or the custodian acting on behalf of Deutsche Bank) had received and reviewed the two key documents for the mortgage loan:

(i) the original mortgage note with a complete chain of endorsements from the originator to Deutsche Bank as the trustee for the Covered Trusts; and (ii) a duly executed assignment of mortgage.

42.     Deutsche Bank (or the custodian acting on behalf of Deutsche Bank) was then required to attach to the certification a mortgage loan schedule identifying those loans for which it had obtained the original mortgage note with endorsements and a duly executed assignment of mortgage, and a schedule identifying the mortgage loans for which it had not obtained the original mortgage note with endorsements or the assignment of mortgage.  This is spelled out in Section 2.02 of the IndyMac PSA, which provides:

> The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Servicer and the Seller an Initial Certification in the form of Exhibit G-1. Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their face and relate to such Mortgage Loans.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts set forth substantially similar requirements.  *See* Ex. C § IV.

43.     After a designated period, Deutsche Bank was required to issue a Final Certification.  The "Form of Final Certification of Trustee," which was attached to the IndyMac PSA as Exhibit H-1, provides:

> Gentlemen:
>
> In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the 'Pooling and Servicing Agreement'), the undersigned, as *Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received*:
>
> (i) The *original Mortgage Note*, endorsed in the form provided in Section 2.01(c) of the Pooling and Servicing Agreement, with all

intervening endorsements showing a complete chain of endorsement from the originator to the Seller.

(ii) The ***original recorded Mortgage***.

(iii) A ***duly executed assignment of the Mortgage*** in the form provided in Section 2.01(c) of the Pooling and Servicing Agreement; . . .

(iv) The original or duplicate ***original recorded assignment or assignments of the Mortgage showing a complete chain of assignment from the originator to the Seller***.

(v) The original or duplicate original ***lender's title policy*** and all riders thereto or, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company.

Based on its review and examination and only as to the foregoing documents, (a) such documents appear regular on their face and related to such Mortgage Loan, and (b) the information set forth in items (i), (ii), (iii), (iv), (vi) and (xi) of the definition of the 'Mortgage Loan Schedule' in Section 1.01 of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File.

\*     \*     \*

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee

(Emphasis added.)  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts set forth a substantially similar form of Final Certification.  *See* Ex. C § V.

44.    The Final Certification is the key certification that Deutsche Bank was required to prepare for the Covered Trusts.  In this document, Deutsche Bank certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) Deutsche Bank had not obtained complete required documentation for those loans identified

on the document exception report.  If there was a defect with any mortgage file, then

Deutsche Bank was obligated to demand that the Sponsor cure the defect leading to the

exception (typically within 90 days) or repurchase or substitute the defective loans.  This is

set forth in Section 2.02 of the IndyMac PSA, which provides:

> If, in the course of its review, the Trustee finds any document
> constituting a part of a Mortgage File that does not meet the
> requirements of Section 2.01, the Trustee shall list such as an
> exception in the Final Certification. . . . The Seller shall promptly
> correct any defect that materially and adversely affects the interests
> of the Certificateholders within 90 days from the date it was so
> notified of the defect and, if the Seller does not correct the defect
> within that period, the Seller shall either (a) substitute for the
> related Mortgage Loan a Substitute Mortgage Loan, which
> substitution shall be accomplished in the pursuant Section 2.03, or
> (b) purchase the Mortgage Loan at its Purchase Price from the
> Trustee within 90 days from the date the Seller was notified of the
> defect in writing.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC,

Impac, RBS and Sutton Trusts set forth substantially similar requirements.  *See* Ex. C § VI.

45.     In some of the Covered Trusts, after the passage of a specified period of time,

the Trustee could not seek substitution of loans and could merely demand repurchase.  For

example, Section 2.03(c) of the IndyMac PSA provides that substitution is not an available

remedy after two years from closing.  The PSAs for the Aegis, Ameriquest, First Franklin,

Goldman, HSBC, Impac, RBS and Sutton Trusts set forth similar cutoffs.  *See* Ex. C § VI.

### B.     Deutsche Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice

46.     Congress enacted the TIA to ensure, among other things, that investors in

certificates, bonds and similar instruments, have adequate rights against, and receive

adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

47.     Under Section 315(b) of the TIA, Deutsche Bank was required to give the Certificateholders notice of a default under the PSAs within 90 days of learning of such default. 15 U.S.C. § 77ooo(b). As set forth in Section III hereof, Deutsche Bank failed to give notice of numerous defaults as required under the TIA.

### C.     Deutsche Bank Had a Duty to Exercise Due Care to Enforce Repurchase Obligations and Avoid Conflicts of Interest

48.     Under the PSAs and applicable law, Deutsche Bank owed a fiduciary duty to Certificateholders upon the occurrence of an Event of Default. Deutsche Bank's post-default fiduciary duty is described in Section 8.01 of the IndyMac PSA, which provides in relevant part, "[i]n case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts impose substantially similar obligations on Deutsche Bank. *See* Ex. C § VII.

49.     Every trustee—including Deutsche Bank—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors. This duty is non-waivable and arises independently of the PSAs.

50.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a default the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. 15 U.S.C. § 77ooo(c).

51.     The Streit Act provides that upon the occurrence of an "Event of Default," as that term is defined in the trust indenture, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  The Streit Act also requires trustees to avoid conflicts of interest.

52.     Section 124 of the Streit Act further requires that a trustee carry out its duties under the applicable indenture with reasonable care.

53.     As set forth in Section III hereof, Deutsche Bank failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.     Deutsche Bank Had a Duty to Provide Accurate
Remittance Reports and Certifications Under Regulation AB**

54.     Each PSA requires Deutsche Bank (or in the case of the Aegis, American Home, First Franklin, and HSBC Trusts, the Securities Administrator, which was also the Master Servicer) to forward to rating agencies and to make available to Certificateholders monthly remittance reports describing the performance of underlying loans.  For example, Section 4.05 of the IndyMac PSA provides that "[n]ot later than each Distribution Date, the Trustee shall prepare and make available on its website at https://www.tss.db.com/invr to each Certificateholder, the Certificate Insurer, the Servicer and the Depositor a statement for the related distribution."  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts contain substantially similar requirements. *See* Ex. C § VIII.

55.     Under item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial breaches of pool asset representations or warranties or transaction covenants." *See* 17 C.F.R. § 229.1121(a)(12).

56.     Regulation AB also requires the Depositor and Trustee to certify on a Form 10-K filed a year after each RMBS transaction that "[p]olicies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements," and collateral securing the loans held by the Covered Trust had been maintained as required by the relevant transaction agreements, pool assets and related documents were safeguarded and the remittance reports provided to investors comply with the SEC rules.  *See* 17 C.F.R § 229.1122(d)(1)(i), (4)(i) and (ii).  The Trustee further provides a similar certification annually that covers all trusts that it administers.

57.     As set forth in Section III(D) hereof, Deutsche Bank breached its statutory, fiduciary and contractual duties by failing to provide accurate remittance reports and certifications under Regulation AB.

### E.     Deutsche Bank Had a Duty to Address the Master Servicers' and Servicers' Failure to Meet Prudent Servicing Standards

58.     Each PSA required the Master Servicer or Servicer to service the loans underlying the Covered Trusts prudently.

59.     For example, Section 3.01 of the IndyMac PSA provides:  "For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and the Servicing Standard."  "Servicing Standard" is defined in the IndyMac PSA as "[t]hat degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others."

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts contain substantially similar requirements.  *See* Ex. C § IX.

60.    The Aegis, American Home, HSBC, Impac and IndyMac PSAs provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a specified period after notice of the default.  *See* Ex. C § X.

61.    Further, for the Aegis and IndyMac Trusts, if the default relates to a failure to deliver mortgage files to the Covered Trust, the Event of Default is triggered immediately upon service of the exception report that identifies the document delivery failure.

62.    For example, Section 7.01(b) of the IndyMac PSA provides that an Event of Default is triggered by:

> any failure by the Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders and continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Servicer by the Trustee or the Depositor, or to the Servicer and the Trustee by the Holders of Certificates of any Class evidencing not less than 25% of the Percentage Interests of the Class; provided that the sixty-day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to repurchase or substitute in lieu thereof.

63.    The PSAs for the Ameriquest, First Franklin, Goldman, RBS and Sutton Trusts provide that the failure to follow prudent servicing standards is an Event of Default if it remains uncured for a specified period after a Servicing Officer becomes aware of such breach, without regard to whether notice was provided.  *See* Ex. C § X.

64.    Upon a Master Servicer or Servicer default or Event of Default, Deutsche Bank was obligated to act.  For example, the IndyMac PSA provides that once an Event of

Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations of the Servicer," *see* IndyMac PSA § 7.01 (*see also* Ex. C § X), and "be subject to all the responsibilities, duties and liabilities relating thereto," *see* IndyMac PSA § 7.02.  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts impose substantially similar obligations on Deutsche Bank.  *See* Ex. C § XI.  More generally, Deutsche Bank, as Trustee, had a duty to exercise all rights available under the PSAs to protect Certificateholders' interests and do so with due care.

65.     As set forth in Sections III(A) and (C) hereof, Deutsche Bank breached its statutory, fiduciary and contractual duties by failing to take actions to address Master Servicer and Servicer defaults and Events of Default.

**F.     Deutsche Bank Is Liable for Negligence in Performing Its Duties**

66.     Under the plain language of the PSAs, the TIA, the Streit Act and applicable common law, Deutsche Bank had a duty to perform its duties under the PSAs competently and is liable for its negligent failure to do so.  Section 8.01 of the IndyMac PSA provides in relevant part:

> ***No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct***; provided, however, that, unless an Event of Default known to the Trustee has occurred and is continuing,
>
> (a) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of the duties and obligations specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee, and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee

and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;

(b) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, *unless it is finally proven that the Trustee was negligent in ascertaining the pertinent facts*; and

(c) the Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of Holders of Certificates evidencing not less than 25% of the Voting Rights . . . relating to the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement.

(Emphasis added.)  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts contain substantially similar provisions.  *See* Ex. C § VII.

67.   The PSAs make clear that Deutsche Bank can be held liable for its own negligence in failing to perform its duties, including, among other things, its responsibilities to: (i) take physical possession of the operative documents for the mortgage loans in the Covered Trusts; (ii) identify those mortgage loans for which there was missing, defective or incomplete documentation on the document exception report attached to the final certification; (iii) make accurate representations in the certifications provided; (iv) render accurate reports under Regulation AB; (v) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation; (vi) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitizations trust loans which breached such representations and warranties; and (vii) make prudent decisions

concerning the exercise of appropriate remedies following Events of Default under the PSAs relating to repeated failures by the Master Servicer to require the repurchase or substitution of mortgage loans by the Sponsors' or Originators.  These are duties that Deutsche Bank was required to perform under the PSAs, and Deutsche Bank can be held liable for its own negligence when performing these duties on behalf of the Certificateholders.

### III.   DEUTSCHE BANK BREACHED ITS CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES

#### A.   Deutsche Bank Failed to Take Possession of Complete Mortgage Files

68.   Deutsche Bank breached its contractual and fiduciary duties under the PSAs and its obligations under the TIA and the Streit Act by failing to take physical possession of many of the operative documents for the mortgage loans in the Covered Trusts.  Indeed, there is substantial evidence showing that Deutsche Bank accepted incomplete mortgage files without requiring the Sponsors or Originators to cure document defects or to substitute or repurchase those loans.

69.   Deutsche Bank's failure to take physical possession of the key mortgage loan documents, and its failure to review the mortgage files for missing documents or irregularities and then ensure that identified irregularities were corrected, was not a mere technicality, as explained by Georgetown Law School Professor Adam Levitin in his testimony before the House Financial Services Committee in November 2010.  *Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before S. Comm. on Banking, Housing, and Urban Affairs* (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).  Professor Levitin described the implications of the failure by a securitization trustee such as Deutsche Bank to take physical possession of the key documents in the loan file:

If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.

*     *     *

Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts.  This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee.  If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

*     *     *

If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities.  In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate).  Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

*Id.*

70.     Deutsche Bank failed to exercise due care in reviewing the mortgage files for missing, incomplete and defective documentation.  If Deutsche Bank had performed a reasonable review, it would have identified additional non-compliant mortgage loans and listed them on the final document exception report.  It also would have ensured that the Sponsors or Originators either cured the documentation problems or repurchased or substituted another mortgage loan for the improperly documented mortgage loan within the deadlines set forth in the PSAs.

71.     That the original mortgage note was missing from the loan file, or there was a missing link in the chain of endorsements from the originator to Deutsche Bank, or there was no duly executed assignment of the mortgage to Deutsche Bank, or the original lender's title policy was missing would have been obvious to a reasonably competent trustee performing its contractual duties with due care.  In many cases, Deutsche Bank did identify these obvious defects and noted them on the final exception reports for the Covered Trusts, but it did not require that they be corrected.

72.     On the same basis, Deutsche Bank knew of (or failed to identify) numerous instances where it did not receive the original mortgage note with all intervening endorsements that showed a complete chain of endorsement from the Originator to the Sponsor or Depositor or a lost mortgage note affidavit, as well as a duly executed assignment of mortgage for each loan that was not a MERS loan, the original recorded mortgage for each loan that was not a MERS loan, the original mortgage for those loans that were MERS loans, or the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

### 1.     The Servicers' and Master Servicers' Cover-up of the Sponsors' Document Delivery Failures

73.     The chart below identifies each of the entities disclosed to be Sponsors, Servicers and Master Servicers of the Covered Trusts, each of which engaged in a cover-up of the relevant Sponsors' and Depositors' document delivery failures (as fully described below).

|  | **Trusts** | **Sponsor** | **Servicer(s)** | **Master Servicer** |
|---|---|---|---|---|
| 1 | AABST 2006-1 | Aegis Mortgage Corporation | Ocwen Loan Servicing, LLC | Wells Fargo Bank, N.A. |

| 2 | AHM 2006-1 | American Home Mortgage Acceptance, Inc. | American Home Mortgage Investment Corp. | Wells Fargo Bank, N.A. |
|---|---|---|---|---|
| 3 | ARSI 2006-W2 | Ameriquest Mortgage Company | | Ameriquest Mortgage Company |
| 4 | FFML 2006-FF11 | First Franklin Financial Corporation | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 5 | FHLT 2005-1 | RBS Financial Products, Inc. | Litton Loan Servicing LP | Freemont Investment & Loan; RBS Financial Products, Inc. |
| 6 | FHLT 2005-2 | RBS Financial Products, Inc. | Litton Loan Servicing LP | Freemont Investment & Loan; RBS Financial Products, Inc. |
| 7 | GSAMP 2005-HE5 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 8 | GSAMP 2005-WMC2 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 9 | GSAMP 2006-HE1 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 10 | GSRPM 2006-1 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 11 | HASC 2006-HE1 | HSBC Bank USA, National Association | Countrywide Home Loan Servicing, LP.; Wells Fargo Bank, N.A. | HSBC Bank USA, National Association; Countrywide Home Loans, LP |
| 12 | HASC 2006-OPT3 | HSBC Bank USA, National Association | Option One Mortgage Corporation | Wells Fargo Bank, N.A. |
| 13 | IMM 2005-7 | Impac Mortgage Holdings, Inc. | GMAC Mortgage Corporation | Impac Funding Corporation |
| 14 | IMM 2005-8 | Impac Mortgage Holdings, Inc. | GMAC Mortgage Corporation; Midland Loan Services, Inc. | Impac Funding Corporation |
| 15 | INABS 2006-H1 | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. |
| 16 | INDX 2006-AR2 | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. |
| 17 | MMLT 2005-2 | RBS Financial Products | Saxon Mortgage Services, Inc. | |

| 18 | RAST 2006-A15 | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. | |
| 19 | SABR 2007-NC2 | Sutton Funding LLC | HomEq Servicing Corporation | |
| 20 | SVHE 2005-3 | RBS Financial Products | Litton Loan Servicing LLC | |
| 21 | SVHE 2006-1 | RBS Financial Products, Inc. | Litton Loan Servicing LP | |

> **a. American Home Mortgage Investment Corp., IndyMac Bank F.S.B., Option One Mortgage Corporation, Ocwen Loan Servicing, LLC, HomEq Servicing Corporation and Sutton Funding LLC**

74.     In or about April 2008, Option One Mortgage Corporation ("Option One") was acquired by American Home Mortgage Servicing, Inc., a subsidiary of American Home Mortgage Investment Corp. (together with Option One and its affiliates, "American Home").  In or about March 2009, One West Bank ("One West") acquired IndyMac Bank's servicing business.  In or about February 2012, Ocwen Loan Servicing ("Ocwen") acquired American Home and in 2013, Ocwen acquired One West's mortgage servicing business.

75.     Prior to May 2010, HomEq Servicing ("HomEq") was Barclays Bank's U.S. mortgage servicing business.  In or about May 2010, Barclays sold HomEq to Ocwen Loan Servicing.  Sutton Funding LLC ("Sutton") operates as a subsidiary of Barclays Group US Inc.

76.     American Home, IndyMac, OptionOne, Ocwen, HomEq and Sutton have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which American Home, IndyMac, OptionOne, Ocwen and HomEq were Servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

77.     These Servicers utilized robo-signers who executed tens of thousands of foreclosure affidavits a month, all necessarily false because they were purportedly based on

29

personal knowledge when the robo-signers lacked any such knowledge, and many of the false affidavits lacked proper documentation including evidence of possession of the underlying mortgage note.  These robo-signers sometimes attempt to execute assignments retroactive to the closing date of the relevant securitization in an attempt to circumvent state laws governing assignment.

78.     In Florida, one homeowner that was being foreclosed on decided to fight back and investigate the practices of IndyMac and One West. During the case, the borrower's attorneys discovered that affidavits used to file foreclosures were signed by robo-signer Erica A. Johnson-Seck, who routinely signed 6,000 documents per week related to foreclosures.  The court decided that Johnson-Seck could not have possibly thoroughly reviewed the facts of the homeowner's foreclosure case, as required by law.

79.     At deposition during the foreclosure proceeding, Johnson-Seck admitted to signing approximately 750 documents per day.  She stated that she spent only 30 seconds signing documents and did not read them before she signed.  She also admitted that the witnesses and notaries were not in her office when she signed the documents and she never took an oath before signing.

80.     In October 2010, the Texas Attorney General ordered HomEq to stop all foreclosures in the state of Texas due to improprieties relating to HomEq's practice of using robo-signers.

81.     In November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearing

in Foreclosure Proceedings (2010), *available at* http://www.lsnj.org/NewsAnnouncements/ Foreclosure/materials/LSNJReport.pdf (hereinafter "Report to the New Jersey Supreme Court"). The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents and other evidence of fraud concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings." *Id*. The report specifically implicated IndyMac/OneWest. *Id*. at 11.

82.     On December 20, 2010, Judge Jacobson of the Superior Court of New Jersey in Mercer County issued an order to show cause directed at IndyMac (through OneWest Bank). *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. F-059553-10 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011). Judge Jacobson ordered OneWest to show cause why Judge Jacobson "should not suspend the processing of all foreclosure matters involving" them. *Id*. at 2. The order to show cause further held that OneWest was selected for scrutiny because of its "public record of questionable practices that this court must address now in its supervisory capacity over the processing of foreclosure matters." *Id*. **The order was also directed at Deutsche Bank**, because it had been involved in numerous questionable foreclosures. *Id*.

83.     The OTS issued a Consent Order dated April 13, 2011 finding that One West engaged in improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon underlying mortgage loans. *In re OneWest Bank, FSB*, Consent Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf.

84.     One West stipulated to the OTS's findings. *Id*. The Consent Order required One West to undertake a sweeping review of its foreclosure practices. *Id*. Upon information and

belief, this review uncovered substantial additional evidence demonstrating that Deutsche Bank's representations concerning proper assignment of mortgages and delivery of mortgage files were false.

85.     Ocwen engaged in substantially similar misconduct.  In December of 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in 49 states and the District of Columbia settled with Ocwen for $2 billion dollars.  *CFPB v. Ocwen Financial Corp.*, Consent Order (Dec. 11, 2013), *available at* http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ocwen.pdf.  CFPB released a Consent Order which addressed systemic misconduct at every stage of the mortgage servicing process.  *Id.*  In the complaint, CFPB stated that Ocwen robo-signed foreclosure documents, including preparing, executing, notarizing and filing affidavits in foreclosure suits with courts and government agencies without verifying any information.  The order required Ocwen to stop robo-signing official documents and to ensure that facts asserted in its documents are accurate and reliable and that all affidavits and sworn statements are based on personal knowledge.  *Id.* at A-1.

86.     Lynn Szymoniak, a Florida attorney and fraud expert who reached a settlement on behalf of the government after investigating robo-signing, has stated that document mills operated by American Home produced phony documents that trusts used to foreclose.  In addition, American Home provided false assignments to at least 500 trusts.

87.     In November 2011, the New York Department of Financial Services entered into an agreement with American Home, which redressed the servicers' unlawful practices.  Press Release, Dep't of Fin., Superintendent Lawsky Announces Agreements with Morgan Stanley, Saxon, AHMSI & Vericrest on Groundbreaking New Mortgage Practices (Nov. 10, 2011), *available at* http://www.dfs.ny.gov/about/press/pr1111101.htm.  The agreement required

American Home to cease robo-signing and impose staffing and training requirements to prevent future robo-signing.  *Id.*  The agreement also required American Home to withdraw from any pending foreclosure proceedings in which the filed affidavits were robo-signed or inaccurate.  *Id.*

### b.  Ameriquest Mortgage Company

88.     Ameriquest Mortgage Company ("Ameriquest") was formerly known as Long Beach Mortgage Company ("Long Beach"), which is a subsidiary of Washington Mutual Bank ("WaMu").  In or about September 2008, JPMorgan Chase Bank, N.A. ("JPMorgan") acquired WaMu.

89.     Ameriquest and its affiliates or agents have engaged in widespread foreclosure misconduct in an attempt to cover-up the fact that they failed to properly assign mortgages and transfer notes and mortgage loan files to the issuing trusts.  This pervasive misconduct indicates a systemic failure that infected many mortgage-backed securitizations, including the Covered Trusts.

90.     Courts have concluded that Ameriquest, WaMu and their affiliates have committed outright fraud to cover-up the fact that they failed to properly assign mortgages or maintain mortgage documentation.  For example, in *JP Morgan Chase Bank, N.A. v. Pocopanni*, No. 16-2008-CA-3989 (Fla. Cir. Ct. Aug. 9, 2010), the court stated as follows:

> The Court finds by clear and convincing evidence that WAMU, Chase and [counsel for JPMC Bank] committed fraud on this Court. . . .  Throughout the litigation, WAMU and Chase and [their counsel] have represented to this Court that plaintiff owns and holds the note and mortgage.  Moreover, WAMU and [counsel] created a false Assignment of Mortgage dated April 11, 2008 as evidence of these assertions. . . .  The Court finds by clear and convincing evidence that these acts committed by WAMU, Chase and [counsel] amount to a "knowing deception intended to prevent the defendants from discovery essential to defending the claim" and are therefore fraud.

91.      One of WaMu's robo-signers was a woman named Martha Kunkle.  Kunkle

died in 1995, but WaMu continued to use her name on robo-signed documents until 2010,

foreclosing upon many homes where WaMu or its affiliates served as the Servicer.  *See* Jessica

Silver-Greenberg, *Dead Soul Is a Debt Collector*, Wall St. J.,

http://online.wsj.com/news/articles/SB10001424052970204204004576049902142690400?mod=

WSJ_hp_LEFTWhatsNewsCollection&mg=reno64-wsj&url=http%3A%2F%2Fonline.

wsj.com%2Farticle%2FSB10001424052970204204004576049902142690400.html%3Fmod%3

DWSJ_hp_LEFTWhatsNewsCollection&fpid=2,7,121,122,201,401,641,1009 (last updated Dec.

31, 2010 12:01 AM).

92.      A former Ameriquest employee commented on Ameriquest's business practices

in an excerpt from the book "The Monster," by Michael W. Hudson,

> A few weeks after he started working at Ameriquest Mortgage,
> Mark Glover looked up from his cubicle and saw a coworker do
> something odd.  The guy stood at his desk on the twenty-third floor
> of downtown Los Angeles's Union Bank Building.  He placed two
> sheets of paper against the window.   Then he used the light
> streaming through the window to trace something from one piece
> of paper to another.  Somebody's signature.

Michael W. Hudson, *The Monster* (2010), *available at* http://dailybail.com/home/how-to-forge-

a-clients-signature-and-other-lessons-from-insi.html.

93.      Another excerpt from "The Monster" provides that

> [a]t the downtown L.A. branch, some of Glover's coworkers had
> a flair for creative documentation.   They used scissors, tape,
> Wite-Out, and a photocopier to fabricate W-2s, the tax forms that
> indicate how much a wage earner makes each year.  It was easy:
> Paste the name of a low-earning borrower onto a W-2 belonging
> to a higher-earning borrower and, like magic, a bad loan prospect
> suddenly looked much better.  Workers in the branch equipped
> the office's break room with all the tools they needed to
> manufacture and manipulate official documents.  They dubbed it
> the "Art Department."

34

*Id.*

94.    JPMorgan was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

### c.    Countrywide Home Loan Servicing, LP

95.    In August 2007, Bank of America acquired Countrywide Financial Corporation, including Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc. (collectively, "Countrywide").

96.    Countrywide and its affiliates or agents, both before and after Bank of America's acquisition thereof, have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Countrywide was Servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

97.    The Board of Governors of the Federal Reserve System ("Federal Reserve"), OCC, Federal Deposit Insurance Corporation ("FDIC") and Office of Thrift Supervision ("OTS") issued a report finding that Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions. Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  In the

report, the regulators noted that their review of the mortgage servicers' loan files showed

that there may be "disputes over note ownership or authority to foreclose." *Id.* at 6. The

regulators also noted "concerns about the prevalence of irregularities in the documentation

of ownership [that] may cause uncertainties for investors of securitized mortgages." *Id.*

98.     As a direct result of this misconduct, in September 2010 Bank of America and

its affiliates had to suspend foreclosures in 23 states to allow the company to undertake a

review of internal procedures while publicly acknowledging that tens of thousands of

foreclosure proceedings were improperly filed. Robbie Whelan, *WSJ: Bank of America*

*Suspends Foreclosures*, Wall St. J., http://online.wsj.com/articles/SB100014240

52748703859204575526491393115712 (last updated Oct. 2, 2010 10:41 AM). On October 9,

2010, Bank of America and its affiliates' documentation failures and lack of internal

controls forced them to suspend foreclosures nationwide. David Streitfeld & Nelson D.

Schwartz, *Largest U.S. Bank Halts Foreclosures in All States*, N.Y. Times, Oct. 9, 2010,

A1.

99.     On April 13, 2011, the OCC issued a Consent Order finding that Bank of

America, including in its role as successor to Countrywide, engaged in improper foreclosure

practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon

underlying mortgage loans. *In re Bank of Am., N.A.*, Consent Order, AA-EC-11-12 (Apr. 13,

2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-

47b.pdf.

100.    On August 4, 2011, the New York State Attorney General ("NYAG") filed

fraud claims against The Bank of New York Mellon ("BNY Mellon"), as trustee for

securitizations created and serviced by Bank of America and its affiliates.

101.   The NYAG found that the blatant disregard for the rules governing assignment by Bank of America and its affiliates has caused, and is continuing to cause, serious harm to Certificateholders.  As the NYAG stated in his petition in *In re Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures)*, No. 651786/2011 (N.Y. Sup. Ct. Aug. 5, 2011) (the "BNY Article 77 Proceeding"):

> [Assignment] provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse.  Any action to foreclose requires proof of ownership of the mortgage.  This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership.  Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon.  The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example, 'robo-signing.'

102.   The NYAG's petition reported that an extensive review of foreclosure proceedings commenced by Bank of America and its affiliates found widespread misconduct.  For example, Bank of America admitted in *Bank of N.Y. v. Kirkland*, No. 07-16839 (N.Y. Sup. Ct. Dec. 11, 2007) that an action to foreclose on a mortgage had been commenced despite the fact that the promissory note had not been assigned to the trust that purportedly owned the note.  Similarly, in *Bank of N.Y. v. Gioio*, No. 08-9865 (N.Y. Sup. Ct. Sept. 22, 2008), Bank of America admitted that a note assignment had been executed two days prior to commencement of the action, contrary to requirements of state law.

103.   The NYAG reported in documents filed in the BNY Article 77 Proceeding, that the "failure of Countrywide to transfer complete mortgage loan documentation to the trusts hampered the trusts' ability to foreclose on delinquent mortgages thereby impairing the

value of the notes secured by those mortgages." Schneiderman Verified Pleading ¶ 23, *In re Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct. Aug. 5, 2011).

104.     In 2012, Bank of America, including as successor to Countrywide, was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of their robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

105.     On March 12, 2012, the U.S. Department of Housing and Urban Development ("HUD") Office of Inspector General issued a report of its examination of Bank of America's and Countrywide's and their affiliates' foreclosure process from October 1, 2008 to September 30, 2010.  Bank of America Corporation Foreclosure and Claims Process Review (2012), *available at* http://www.hudoig.gov/sites/default/files/Audit_Reports/2012-FW-1802.pdf  The f inspector performed a review of loan or foreclosure files and determined that they were "consistently" deficient because they were missing documentation.  *Id.* at 5, 12.  HUD found that Bank of America relied on "foreclosure mills" and "routinely signed foreclosure documents" that falsely claimed the affiant had personal knowledge of the facts contained therein.  *Id.* at 5.  HUD also reported that Bank of America and Countrywide "significantly hindered" HUD's investigation by refusing to cooperate.  *Id.* at 4.

106.     As a result of Countrywide's systemic failure to transfer essential mortgage documentation to securitization trusts, Phillip R. Burnaman II, an expert retained by BNY Mellon in the BNY Article 77 Proceeding, issued an expert report revealing that BNY Mellon's exception reports for Countrywide securitizations as of June 2011 showed ***117,899*** loans lacking complete documentation.  Burnaman Expert Report at 50, *In re Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct. Mar. 14, 2013) (emphasis added).  The document cure provisions in the Countrywide-Bank of America Settlement Agreement apply to only 1,116 of the 117,899 loans with defective documentation.  *Id*.

### d.      GMAC Mortgage Corporation

107.     GMAC Mortgage Corporation ("GMAC") and its affiliates or agents have engaged in in widespread foreclosure misconduct in an attempt to cover-up the fact that it failed to properly assign mortgages and transfer notes and mortgage loan files to the issuing trusts. This pervasive misconduct indicates a systemic failure that infected many mortgage-backed securitizations including the Covered Trusts.  GMAC utilized so-called robo-signers who execute tens of thousands of foreclosure affidavits a month, all necessarily false because they are allegedly based on their own personal knowledge, and many of them without proper documentation, including evidence of possession of the underlying mortgage note.  The robo-signers sometimes attempted to execute assignments retroactive to the closing date of the relevant securitization in order to circumvent state laws governing assignment.

108.     The Federal Reserve issued a Consent Order dated April 13, 2011 finding that GMAC failed to document mortgage loans properly and has attempted to cover-up this failure. *In re Ally Financial Inc., Ally Bank & GMAC Mortg., LLC*, Consent Order, 11-20-B-HC, 11-

020-B-DEO (Apr. 13, 2011), *available at* https://www.fdic.gov/bank/individual/

enforcement/2011-04-77.pdf.  The Federal Reserve found that GMAC:

> Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees of the Mortgage Servicing Companies or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

> Filed or caused to be filed in courts in various states and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; [and]

> Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party . . . .

109.     GMAC stipulated to the Consent Order.  *Id.*

110.     One of GMAC's robo-signers, Jeffrey Stephan, is the leader of GMAC's

document execution unit.  On December 10, 2009, in a deposition taken in a foreclosure

proceeding commenced by GMAC in Circuit Court in Palm Beach County, Florida, Stephan

testified that he robo-signed 10,000 foreclosure documents per month without reviewing them or

verifying their accuracy.  Stephan Dep. at 7, *GMAC Mortg. LLC v. Ann M. Neu a/k/a Ann

Michelle Perez*, No. 50 2008 CA 040805XXXX MB, (Fla. Cir. Ct. Dec. 10, 2009).  Stephan

further testified under oath that the 13 individuals who reported to him similarly "do not go into

the system and verify the information as accurate" before documents are executed in connection with foreclosures commenced by GMAC.  *Id.*

111.    An internal GMAC document containing a record of Stephan's discussions with outside counsel was publicly released.  Paul Kiel, *Internal Doc Reveals GMAC Filed False Document in Bid to Foreclose*, ProPublica (July 27, 2011 12:07 PM), http://www.propublica.org/article/gmac-mortgage-whistleblower-foreclosure.  The document provides additional evidence that GMAC committed acts of forgery or otherwise filed false documentation in foreclosure proceedings nationwide in order to cover-up their monumental failure to deliver valid title to the trusts.  The document establishes that on April 4, 2010, Stephan explained to outside counsel that GMAC sought to foreclose upon a mortgage on a property in New York City that was originated by Ameriquest and sold to a securitization trust. The mortgage was never assigned to the trust and Ameriquest went bankrupt in 2007.  Stephan explained that GMAC wanted Ameriquest to agree to a retroactive assignment, but it was impossible to get Ameriquest to agree because it was defunct.  As Stephan put it:  "The problem is we do not have signing authority—are there any other options?"

112.    Stephan and GMAC apparently concluded that their only option was to create and file forged documentation.  On July 7, 2010, GMAC forged an assignment from Ameriquest to the relevant trust which stated that it was "effective as of" August 2005.  This was a total fabrication that GMAC filed in New York State court.  Stephan was purportedly the Ameriquest officer who authorized the assignment.  ProPublica, a public watchdog group, performed a review of hundreds of foreclosure cases in New York involving Ameriquest originated loans and found that GMAC had prepared many other similar forgeries.

113.    In October 2010, the Ohio Attorney General commenced a lawsuit against GMAC alleging the loan servicer and its agents filed fraudulent foreclosure affidavits to mislead courts in hundreds of cases.  *See Ohio v. GMAC Mortg., LLC*, No. 10-cv-02537-JZ (N.D. Ohio 2010). After an extensive inquiry, the Ohio Attorney General concluded that:

> GMAC has caused Assignments of Mortgage to be prepared and executed by agents of GMAC that improperly purport to assign the note from MERS to the trustee and falsely claim that the GMAC employee executing the Assignment has authority to assign the note on behalf of MERS.

114.    The Ohio Attorney General further found that GMAC conspired to specifically mislead Ohio courts noting:

> *The agents of GMAC Mortgage prepared these affidavits to mislead the courts in Ohio on such matters as who kept the applicable records, who the holder of the note was, the amount due to whoever the holder of the note was, and whether proper notice alleging default had been sent to the borrower.*

(Emphasis added.)   Brief for Petitioner at 15, *Blank v. GMAC Mortg., LLC*, No. 10-cv-02709 (Ohio Oct. 13, 2011).

115.    The Ohio Attorney General made it abundantly clear that Stephan's actions were not isolated incidents and instead reflected a pervasive pattern of practice within GMAC.  As the Ohio Attorney General put it:  "Ally and GMAC Mortgage had authority over and the right to control the actions of Stephan and benefited financially from the actions of Stephan.  The actions of Stephan . . . were part of the business plans of Ally and GMAC Mortgage." *Id*. at 16.

116.    GMAC's misconduct has been recognized by multiple courts.  For example, GMAC was sanctioned by a Maine court in *Fed. Nat'l Mortg. Ass'n v. Bradbury*, No. BRI-RE-09-65 (Me. Dist. Ct. Sep. 24, 2010) for its robo-signing cover-up.  In awarding the sanctions, the Honorable Keith A. Powers wrote:

> The Court is particularly troubled by the fact that Stephan's deposition in this case is not the first time that GMAC's high-volume and careless approach to affidavit signing has been exposed. Stephan himself was deposed six months earlier, on December 10, 2009, in Florida. His Florida testimony is consistent with the testimony given in this case: except for some limited checking of figures, he signs summary judgment affidavits without first reading them and without appearing before a notary. Even more troubling, in addition to that Florida action, in May, 2006 another Florida court not only admonished GMAC, it sanctioned the Plaintiff lender for GMAC's affidavit signing practices. As part of its order, the Florida court required GMAC to file a Notice of Compliance, indicating its commitment to modify its affidavit signing procedures to conform to proper practices. The experience of this case reveals that, despite the Florida Court's order, GMAC's flagrant disregard apparently persists. It is well past the time for such practices to end.

117.   As a direct result of the aforementioned blatant misconduct, in September 2010, GMAC had to suspend foreclosures in 23 states and undertake a review of internal procedures, publicly acknowledging that it systemically commenced foreclosure proceedings based on forged or otherwise improper documentation.

118.   In November 2010, Legal Services of New Jersey provided the Report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation. Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearing in Foreclosure Proceedings (2010), *available at* http://www.lsnj.org/NewsAnnouncements/Foreclosure/materials/LSNJReport.pdf. The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents and other evidence of fraud concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and

certifications at various stages of foreclosure proceedings." The report specifically implicated GMAC. *Id.* at 9.

119.    Thereafter, on December 20, 2010, Judge Mary C. Jacobson of the Superior Court of New Jersey issued an order to show cause to GMAC. The order to show cause required GMAC and the others to "show cause at a hearing scheduled for January 19, 2011, why the court should not suspend the processing of all foreclosure matters involving [the banks] and appoint a Special Master to review their past and proposed foreclosure practices." *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. F-059553-10 (Super. N.J. Dec. 20, 2011). **The order was also directed at Deutsche Bank**, because it had been involved in numerous questionable foreclosures.

120.    A Special Master was subsequently appointed and GMAC and the other banks reportedly suspended foreclosures in New Jersey. On August 17 and August 19, 2011, after considering submissions by the parties, the Special Master recommended that all of the banks except GMAC be allowed to resume foreclosures and that the proposed restrictions in the order to show cause should not be enacted as against them. Judge Jacobson accepted the Special Master's reports. GMAC's misconduct was so egregious the Special Master could not lift the suspension. These events also caused Deutsche Bank to know that there were Events of Default by the Master Servicers and Servicers with respect to the mortgage loans in the Covered Trusts.

121.    Additionally, in January 2011, GMAC agreed to dismiss 10,000 foreclosure proceedings filed in the State of Maryland because they relied upon forged or false documentation.

122.    Finally, in 2012, Ally Financial (formerly GMAC) was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-

signing misconduct.  The agreement requires servicers to implement comprehensive new

mortgage loan servicing standards to remedy violations of state and federal law.  These

violations included servicers' use of robo-signed affidavits, improper documentation and lost

paperwork.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys

General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address

Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at*

http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

> **e.    Goldman Sachs Mortgage
> Company and Litton Loan Servicing LP**

123.    As of 2007, Litton Loan Servicing LP ("Litton") was a wholly owned

subsidiary of C-BASS.  Thereafter, in or about December 2007, Goldman Sachs acquired

Litton from C-BASS.  From January 2009 to December 31, 2010 alone, Litton initiated over

135,000 foreclosure actions.

124.    Goldman Sachs, Litton and their affiliates and agents have engaged in widespread

misconduct to cover-up the systemic failure of depositors and sponsors (including Goldman

Sachs) for securitizations in which Litton was Servicer to properly assign the underlying

mortgage loans to the issuing trusts, including through the use of robo-signers.

125.    For example, Litton utilized so-called robo-signers who executed tens of

thousands of foreclosure affidavits a month, all necessarily false because they were purportedly

based on personal knowledge when the robo-signers lacked any such knowledge, and many of

the false affidavits lacked proper documentation including evidence of possession of the

underlying mortgage note.

126.    In one proceeding, *MTGLQ Investors, L.P. v. Chasteen*, No. 09-cv-02726

(C.P. Montgomery Cnty. Apr. 3, 2009), Litton submitted an assignment purporting to

transfer a mortgage to MTGLQ Investors L.P. (a Goldman Sachs affiliate) c/o Avelo.  Litton employee Marti Noriega falsely signed the assignment as an assistant secretary of MERS.

127.    Litton employee Denise Bailey testified in a deposition that she routinely executed mortgage assignments as an officer of MERS, but could not explain how she came to be an officer of MERS (which she never was) nor exactly what MERS did.  Bailey Dep. at 22–32, 41, *U.S. Bank Nat'l Assoc'n v. Austin*, CACE0847335 (Fla. Cir. Ct. June 8, 2009).

128.    Again in *MTGLQ Investors, L.P. v. Chasteen*, No. 09-cv-02726 (C.P. Montgomery Cnty. Apr. 3, 2009), Litton submitted an assignment purporting to transfer a mortgage to MTGLQ Investors L.P., this time falsely signed by Bailey as a vice president of MERS.

129.    On September 1, 2011, the Federal Reserve sanctioned Goldman for "a pattern of misconduct and negligence relating to deficient practices," including robo-signing.  Press Release, Board of Governors of the Federal Reserve System Press Release (Apr. 13, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110413a.htm. After an investigation undertaken by the Federal Reserve, Goldman entered into a Consent Order that required Goldman to retain an independent consultant to review foreclosure proceedings (commenced by Goldman or any of its affiliates and subsidiaries including Litton) pending at any time in 2009 or 2010, and to compensate borrowers who suffered financial injury as a result of wrongful foreclosures.  *In re Goldman Sachs Grp., Inc. & Goldman Sachs Bank*, Consent Order, 11-112-B-HC, 11-112-B-SM (Sept. 1, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20110901f1.pdf.

### f.    HSBC Bank USA, National Association

130.     HSBC Bank USA, National Association ("HSBC") and its affiliates or agents have engaged in in widespread foreclosure misconduct in an attempt to cover-up the fact that it failed to properly assign mortgages and transfer notes and mortgage loan files to the issuing trusts.  This pervasive misconduct indicates a systemic failure that infected many mortgage-backed securitizations including the securitizations at issue in the present action.  HSBC utilized so-called robo-signers who execute tens of thousands of foreclosure affidavits a month, all necessarily false because they are allegedly based on their own personal knowledge, and many of them without proper documentation, including evidence of possession of the underlying mortgage note.  The robo-signers sometimes attempted to execute assignments retroactive to the closing date of the relevant securitization in order to circumvent state laws governing assignment.

131.     On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. 01-2010 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011).  The order was directed at HSBC.  ***The order was also directed at Deutsche Bank***, because it had been involved in numerous questionable foreclosures.

132.     HSBC stipulated to the OCC's April 13, 2011 Consent Order based upon the OCC's findings that HSBC tried to cover-up that issuing trusts did not have legal title sufficient to allow them to foreclose upon the underlying mortgage loans by engaging in fraudulent or improper foreclosure practices.  *In re HSBC Bank USA, N.A.*, Consent Order, AA-EC-11-14 (Apr. 13, 2011).

g.       **Midland Loan Services, Inc.**

133.     Midland Loan Services, Inc. ("Midland") is a division of PNC Real Estate (together with its affiliates and subsidiaries, "PNC").

134.     Midland, PNC and their affiliates and agents have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Midland was Servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

135.     The Attorney General of the State of Minnesota sued Midland for using robo-signed affidavits in foreclosure actions against Minnesota residents.

136.     In an article from the Washington Post, "One Midland employee, Ivan Jimenez, testified in a 2009 civil lawsuit against the firm that he signed 200 to 400 affidavits a day. He said that 'very few' documents were checked for accuracy, a claim that mirrors accusations of mortgage servicers 'robo-signing' foreclosure documents." Danielle Douglas, *Taking on the Country's Biggest Debt Buyer*, Washington Post, http://www.washingtonpost.com/business/economy/taking-on-the-countrys-biggest-debt-buyer/2014/05/09/fbd65a24-a94d-11e3-b61e-8051b8b52d06_story.html (last updated May 9, 2014).

137.     The OCC issued a Consent Order dated April 13, 2011, finding that PNC engaged in improper foreclosure practices, including by filing in state courts affidavits executed by its employees making various assertions related to the ownership of the mortgage note and mortgage which were not based on personal knowledge, filing in state courts affidavits executed by its employees that were not properly notarized, and failing to devote adequate resources and oversight to its mortgage foreclosure practices and

procedures.  *In re PNC Bank*, Consent Order, No. AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf.

138.    PNC also improperly commenced foreclosure proceedings without any evidence that the note and mortgage were physically delivered or assigned to PNC and submitted court documents containing false and misleading information that made it appear that PNC had the authority to bring a foreclosure action when in fact it did not.  *See, e.g.*, *PNC Bank Nat'l Ass'n v. Giovanni*, No. 18963/2011 (N.Y. Sup. Ct. Apr. 30, 2013).

139.    On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. 01-2010 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011).  The order was directed at PNC (and therefore Midland).  ***The order was also directed at Deutsche Bank***, because it had been involved in numerous questionable foreclosures.

### h.    Saxon Mortgage Services, Inc.

140.    Saxon Mortgage Services, Inc.  ("Saxon") was a servicing subsidiary of Morgan Stanley, until it was acquired by Ocwen Financial Corp (collectively with its affiliates, "Ocwen") in April 2012.

141.    Morgan Stanley, Saxon and their affiliates and agents have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Saxon was Servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

142.    In November 2011, the New York Department of Financial Services entered into an agreement with Morgan Stanley and Saxon which redressed the unlawful practices that servicers had been engaging in.  Press Release, Dep't of Fin., Superintendent Lawsky Announces Agreements with Morgan Stanley, Saxon, AHMSI & Vericrest on Groundbreaking New Mortgage Practices (Nov. 10, 2011), *available at* http://www.dfs.ny.gov/about/press/pr1111101.htm.  The agreement required Morgan Stanley and Saxon to cease robo-signing and impose staffing and training requirements to prevent future robo-signing.  *Id*.  The agreement also required Morgan Stanley and Saxon to withdraw from any pending foreclosure proceedings in which the filed affidavits were robo-signed or inaccurate.  *Id*.

143.    In April 2012, the Federal Reserve released a Consent Order against Morgan Stanley to address patterns of misconduct and negligence in residential mortgage loan servicing and foreclosure processing at Saxon.  *In re Morgan Stanley*, Consent Order, 12-015-B-HC (Apr. 2, 2012), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20120403a1.pdf.

144.    The Consent Order maintains that Morgan Stanley, through Saxon, filed or caused to be filed in courts in various states numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary.  *Id*.  It also required Morgan Stanley to retain an independent consultant to review foreclosure proceedings.  *Id*.  The Consent Order was in response to allegations that Morgan Stanley and Saxon engaged in robo-signing.

145.    In addition, in 2013, Morgan Stanley agreed to pay $97 million into a settlement fund and $130 million for other assistance in a settlement between ten banks and Federal regulators.  The settlement stemmed from foreclosure abuses due to robo-signing.  James

O'Toole, *Goldman Sachs, Morgan Stanley in $557 Million Foreclosure Settlement*, CNN (Jan. 16, 2013), http://money.cnn.com/2013/01/16/news/companies/goldman-morgan-stanley/.

### i.     Wells Fargo Bank, N.A.

146.    Wells Fargo Bank, N.A. and its affiliates (collectively "Wells Fargo") have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Wells Fargo was Servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

147.    One of Wells Fargo's robo-signers is a woman named Xee Moua who admitted that she executes hundreds of foreclosure documents every day without reading them.  Marshall Eckblad, *"Signer" Issue Raised for Wells Fargo*, Wall St. J., http://online.wsj.com/articles/SB10001424052748704361504575552192790748342 (last updated Oct. 15, 2010 12:01 AM).  Moua admitted she reviewed up to 500 foreclosure documents on a daily basis.  *Id.*

148.    After Moua disclosed Wells Fargo's widespread practice of filing false mortgage documents, Wells Fargo admitted that it had filed false foreclosure documentation in 55,000 foreclosure proceedings.

149.    The Ohio Attorney General commenced an investigation in the wake of Moua's admission and asked Wells Fargo to voluntarily vacate all foreclosures based on improper paperwork.

150.    Wells Fargo also utilized the forgery mill—DOCx.  60 Minutes reported that Wells Fargo and other servicers retained a firm named DOCx to falsify mortgage loan documentation in an effort to cover-up the fact that there was a systemic failure to deliver mortgage loan documents and assign mortgage notes to issuing trusts in connection with securitization transactions.  *The Next Housing Shock* (CBS 60 Minutes Apr. 3, 2011),

*available at* http://www.cbsnews.com/videos/the-next-housing-shock.  Robo-signers

employed by DOCx were required to robo-sign 340 documents an hour and 4,000

documents per day for Wells Fargo and other bank clients.

151.    In April 13, 2011, the OCC filed a Consent Order based upon findings that

Wells Fargo engaged in fraudulent and improper foreclosure practices to cover-up the fact that

issuing trusts lacked legal title sufficient to foreclose upon the underlying mortgage loans.  *In re*

*Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011).  Wells Fargo stipulated

to the OCC consent order.  *Id.*

152.    On December 1, 2011, the Massachusetts Attorney General commenced an action

against Wells Fargo (and others) alleging "rampant violations" of state law in foreclosure

proceedings.  *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct. Dec. 1,

2011).

153.    Further, the complaint filed by the NYAG on February 3, 2012 ("NYAG

Complaint") charged various loan servicers, including Wells Fargo, with persistent fraud and

deceptive acts in connection with mortgage foreclosure proceedings.  Compl., *New York v. JP*

*Morgan*, No. 2768/12 (N.Y. Sup. Ct. July 12, 2012).  As the NYAG Complaint points out: "[The

defendant loan servicers] have repeatedly submitted court documents containing false and

misleading information that made it appear that the foreclosing party had the authority to bring a

case when in fact it may not have."  Press Release, N.Y. Attorney Gen., A.G. Schneiderman

Announces Major Lawsuit Against Nation's Largest Banks for Deceptive & Fraudulent Use of

Electronic Mortgage Registry (Feb. 3, 2012), *available at* http://www.ag.ny.gov/press-

release/ag-schneiderman-announces-major-lawsuit-against-nation%E2%80%99s-largest-banks-

deceptive.

154.     On March 17, 2014, *The Washington Post* reported on a foreclosure lawsuit filed in the Southern District of New York in which an internal Wells Fargo "foreclosure manual" was filed.  Danielle Douglas, *Wells Fargo Foreclosure Manual Under Fire*, Wash. Post (Mar. 17, 2014), http://www.washingtonpost.com/business/economy/wells-fargo-foreclosure-manual-under-fire/2014/03/17/25cd383c-ae00-11e3-96dc-d6ea14c099f9_story.html.  According to *The Washington Post*, "[t]he manual, reviewed by The Washington Post, outlines steps for obtaining the missing [endorsement] after the bank has initiated foreclosure proceedings. It also lays out what lawyers must do in the event of a lost affidavit or if there is no documentation showing the history of who owned the loan, paperwork the bank should already have." *Id*.

155.     On May 23, 2014, Wells Fargo agreed to pay $67 million to settle a derivative action by its shareholders against Wells Fargo executives alleging they allowed foreclosure abuses to occur, including improper robo-signing and the filing of false affidavits not based on personal knowledge. *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank*, No.10-cv-04372 (D. Minn. Aug. 18, 2014).

156.     Wells Fargo was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork. *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

**B.     Deutsche Bank Was Aware of but Failed to Provide Notice of Defaults**

157.    As set forth above, Deutsche Bank was aware that the Sponsors, Depositors, Servicers and/or Master Servicers breached the PSAs by failing to provide complete mortgage files in their possession.  These breaches constituted defaults under the PSAs, and all parties to the PSAs (but not Certificateholders) received notice of the defaults in the form of Deutsche Bank's document exception reports.  Deutsche Bank was required to provide notice of these defaults to Certificateholders, among others.  It did not.  If it had, the Sponsors or Originators would have been forced to repurchase or replace many of the loans that ultimately caused Plaintiffs' losses.

158.    Deutsche Bank also failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005–2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

159.    For example, for the IndyMac Trusts, IndyMac represented and warranted in the IndyMac PSA that "[e]ach Mortgage Loan has been underwritten and serviced substantially in accordance with the Seller's guidelines."  IndyMac PSA Schedule III § 44.  IndyMac further represented and warranted the following:

> (1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Mortgage Loan is true and correct in all material respects as of the Closing Date.
>
> (2) All regularly scheduled monthly payments due with respect to each Mortgage Loan up to and including the Due Date before the Cut-off Date have been made; and as of the Cut-off Date, no Mortgage Loan had a regularly scheduled monthly payment that was 60 or more days Delinquent during the twelve months before the Cut-off Date.

(3) With respect to any Mortgage Loan that is not a Cooperative Loan, each Mortgage is a valid and enforceable first lien on the Mortgaged Property . . . .

(4) Immediately before the assignment of the Mortgage Loans to the Depositor, the Seller had good title to, and was the sole owner of, each Mortgage Loan free and clear of any pledge, lien, encumbrance or security interest and had full right and authority, subject to no interest or participation of, or agreement with, any other party, to sell and assign the same pursuant to the Pooling and Servicing Agreement. . . .

(9) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws and regulations. . . .

(10) The Seller has not modified the Mortgage in any material respect . . . ; satisfied, cancelled or subordinated such Mortgage in whole or in part; released the related Mortgaged Property in whole or in part from the lien of such Mortgage; or executed any instrument of release, cancellation, modification or satisfaction with respect thereto.

(11) A lender's policy of title insurance . . . was effective on the date of the origination of each Mortgage Loan and each such policy is valid and remains in full force and effect.

(13) To the best of the Seller's knowledge, all of the improvements which were included for the purpose of determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property. . . .

(15) The Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law. . . .

(22) There is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material non-monetary default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note; and the Seller has not waived any material non-monetary default, breach, violation or event of acceleration.

(23) Each Mortgage File contains an appraisal of the related Mortgaged Property in a form acceptable to FNMA or FHLMC.

(25) Each Mortgage Loan was selected from among the outstanding one- to four-family mortgage loans in the Seller's portfolio at the Closing Date as to which the representations and warranties made with respect to the Mortgage Loans set forth in this Schedule III can be made. No such selection was made in a manner intended to adversely affect the interests of the Certificateholders. . . .

(28) None of the Mortgage Loans is a 'high cost' loan, 'covered' loan . . . 'high risk home' or 'predatory' loan or any other similarly designated loan as defined under any state, local or federal law, as defined by applicable predatory and abusive lending laws.

(29) Each Mortgage Loan at the time it was made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, all applicable predatory and abusive lending laws. . . .

(36) The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles that relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had a reasonable ability to make timely payments on the Mortgage Loan. . . .

(41) To the best of the Seller's knowledge, there was no fraud involved in the origination of any Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan.

(42) Each Loan is a 'qualified mortgage' under Section 860G(a)(3) of the Code.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC, Impac, RBS and Sutton Trusts contain substantially similar provisions.  *See* Ex. C § XII.

160.    Each party had an obligation to provide notice of breaches of these representations and warranties, and such notice triggered the Sponsor's or Originator's

56

obligation to repurchase or substitute the defective loan.  For example, Section 2.03(c) of the

IndyMac PSA provides:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty made pursuant to Section 2.03(b) that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. The Seller covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty made pursuant to Section 2.03(b) which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if the 90-day period expires before the second anniversary of the Closing Date, remove the Mortgage Loan (a 'Deleted Mortgage Loan') from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in accordance with this Section 2.03; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, Goldman, HSBC,

Impac, RBS and Sutton Trusts contain substantially similar provisions.  *See* Ex. C § VI.

161.    Deutsche Bank knew that the Sponsors and Originators regularly disregarded their

underwriting guidelines and representations and warranties made to securitization trusts long

before Certificateholders.

162.    Evidence has come to light showing that Deutsche Bank was engaged in the

same type of shoddy origination and imprudent securitization practices that are set forth

below.  For example, on December 20, 2010, Judge Mary C. Jacobson of the Superior Court of

New Jersey issued an order requiring Deutsche Bank to "show cause at a hearing scheduled for

January 19, 2011, why the court should not suspend the processing of all foreclosure matters

involving [the banks] and appoint a Special Master to review their past and proposed foreclosure

practices."  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. F-

059553-10 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011). A Special Master was subsequently appointed and Deutsche Bank reportedly suspended foreclosures in New Jersey.

163. Moreover, according to the April 2011 Senate Report, starting as early as 2005, Deutsche Bank began internally disparaging the quality of the loans it was securitizing. Further, as Clayton, a third-party due diligence vendor, disclosed to the FCIC, Deutsche Bank securitized almost half of the loans Clayton rejected for failing to comply with underwriting guidelines.

164. The obvious result of these poor practices was a spate of lawsuits. DBSP has been sued by a number of trustees who have sought to enforce DBSP's representations and warranties. When trustees re-examined the loans securitized by DBSP they found astonishingly high breach rates sometimes greater than 90%. For instance, between March 2012 and May 2013, HSBC, as trustee, filed at least sixteen complaints against Deutsche Bank in its capacity as sponsor of sixteen different trusts from the ACE and DBALT shelves. In each of these actions, HSBC cited forensic reviews of the loan files which revealed that Deutsche Bank "dumped into the Trust a massive number of defective loans – loans that blatantly breached DBSP's representations and warranties." HSBC asserted that Deutsche Bank's "*inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident*."

165. Not surprisingly, DBSP's complete disregard for proper loan underwriting has also spawned numerous private lawsuits, where plaintiffs have performed forensic analyses and re-underwritten entire loan files and discovered a staggering number of loans breaching the associated representations and warranties. *See, e.g.*, Compl., *FHFA v. Deutsche Bank AG*, No. 11-cv-06192-DLC (S.D.N.Y. Sept. 2, 2011); Compl., *Sealink Funding Ltd. v. Deutsche Bank AG*, No. 652174/2012 (N.Y. Sup. Ct. May 1, 2013); Compl., *Royal Park Investments v. Merrill*

*Lynch*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); Compl., *Phoenix Light SF Ltd. v. Ace Sec. Corp.*, No. 650422/2012 (N.Y. Sup. Ct. May 14, 2012).

166.    Deutsche Bank failed and unreasonably refused to take action to protect the Covered Trusts and Certificateholders against sponsor breaches and servicer violations because doing so would have exposed that Deutsche Bank itself was engaged in the same servicing misconduct in its role as servicer for other mortgages and RMBS trusts.

167.    Moreover, Deutsche Bank served as trustee of thousands of RMBS trusts from 2004–2007, including many transactions involving the Sponsors and Originators.   In the course of administering these trusts, Deutsche Bank learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending and failed to ensure mortgage loans complied with state and federal laws.

168.    For example, while serving as trustee for various RMBS trusts, Deutsche Bank was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here and foreclosures were commenced often in Deutsche Bank's name.

169.    Indeed, Deutsche Bank commenced foreclosure actions between 2005 and 2008 for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

> (a)  Ameriquest Mortgage Company served as Originator.  *See, e.g.*, *Deutsche Bank Nat'l Trust Co. v. El-shabazz*, No. 2006-09-5831 (C.P. Summit Cnty 2006); *Deutsche Bank Nat'l Trust Co. v. Moore*, No. 2008-02-1459 (C.P. Summit Cnty 2008); *Deutsche Bank Nat'l Trust Co. v. Wilt*, No. 2006-10-6953 (C.P. Summit Cnty 2006);

> (b)  First Franklin served as Originator.  *See, e.g.*, *Deutsche Bank National Trust Company v. Payne*, No. 2006-09-5922 (C.P. Summit Cnty 2006);

> (c)  Goldman Sachs Mortgage Company served as Sponsor.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Hicks*, No. 2007-01-0638 (C.P. Summit Cnty. Jan. 24, 2007) (initiating action for loan included in the GSAMP Trust

2005-WMC2 Trust); Compl., *Deutsche Bank Nat'l Trust Co. v. McCahan*, No. 2006-10-6692 (C.P. Summit Cnty. Oct. 19, 2006) (initiating action for loan included in the GSAMP 2006-HE1 Trust); Compl., *Deutsche Bank Nat'l Trust Co. v. Diehl*, No. 2006-09-6112 (C.P. Summit Cnty. Sept. 27, 2006) (initiating action for loan included in the GSRPM Mortgage Loan Trust Series 2006-1); Compl., *Deutsche Bank Nat'l Trust Co. v. Gilbert*, No. 2008CH000955. (DuPage Cnty. Cir. Ct. Mar. 10, 2008) (initiating action for loan included in GSAMP Trust 2005-WMC2);

(d) HSBC Bank USA, National Association served as Sponsor.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Stevenson*, No. 2006-09-5613 (C.P. Summit Cnty. Sept. 8, 2006) (initiating action for loan included in the HSI Asset Securitization Corporation Trust 2006-OPT3); Compl., *Deutsche Bank Nat'l Trust Co. v. Russo*, No. F03238407 (N.J. Super. Ct. Ch. Div. Nov. 27, 2007) (initiating action for loan included in the HSI Asset Securitization Corporation Trust 2006-OPT3);

(e) Option One Mortgage Corporation served as Originator.  *See, e.g.*, *Deutsche Bank National Trust Company v. Smith*, No. 2006-10-6858 (C.P. Summit Cnty 2006); and

(f) RBS Financial Products as Sponsor. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Tylecek*, No. CA08-1666 (Fla. St. John's Cnty. Ct.  July 31, 2008) (initiating action for loan included in Meritage Mortgage Loan Trust 2005-2).

170.    Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, Deutsche Bank had a duty to examine foreclosure filings.  *See, e.g.*, IndyMac PSA § 8.01 ("The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they are in the form required by this Agreement").

171.    Through its review of these filings, Deutsche Bank knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

172.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed below, demonstrated that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans and failed to meet state and federal lending guidelines.  While investors such as Plaintiffs lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, Deutsche Bank had knowledge of specific problems with specific loans as well as access to the mortgage files. At a minimum, in its role as trustee to more than a thousand RMBS trusts, Deutsche Bank was privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, Deutsche Bank had statutory and common law duties requiring it to "nose to the source."

173.     For instance, in or around August 2009, Deutsche Bank, as Trustee, filed a Complaint and Proof of Claim against the FDIC, as receiver for Washington Mutual, for representation and warranty violations and servicing misconduct related to 8 securitization trusts sponsored by Long Beach (*formerly Ameriquest*) and Washington Mutual.  In April 2011, the Court denied JPMorgan's motion to dismiss that action.  This demonstrates Deutsche Bank's knowledge of misconduct by Ameriquest as well as the widespread breaches and systemic misconduct of the other Sponsors and Originators at issue, which Deutsche Bank failed to address.

174.     Deutsche Bank also commenced repurchase actions against Sponsors or Originators at issue here.  However, these actions did not include the Covered Trusts despite

allegations by Deutsche Bank that the Sponsors' and Originators' misconduct was widespread and systemic.  For example, at the direction of certain certificateholders, Deutsche Bank, in its role as trustee, commenced actions against, among others, HSBC Bank USA, N.A. (the Sponsor of loans for two of the Covered Trusts) and WMC Mortgage, LLC (the Originator of loans for three of the Covered Trusts) to compel repurchase of loans that breached representations and warranties.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*, No. 12-cv-00933 (D. Conn. Mar. 31, 2014); Compl., *Deutsche Bank Nat'l Trust Co., solely as Trustee for HSI Asset Securitization Corp. Trust 2007-NC1 v. HSBC Bank USA, N.A.*, No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013).  In each of the repurchase actions brought by Deutsche Bank, loan level reviews were conducted which identified breach rates in excess of 80% with respect to loans originated during the same period as the loans in the Covered Trusts.

175.    Deutsche Bank also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

176.    Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

177.    Monoline insurers have filed many complaints against the Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in

connection with other RMBS trusts.  Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

178.    For example, in *CIFG Assurance N.A., Inc. v. Goldman, Sachs & Co.*, No. 652286/2011 (N.Y. Sup. Ct. Aug. 16, 2011), the monoline insurer CIFG Assurance sued Goldman Sachs and GS Mortgage Securities, reporting that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  Of the 491 loan files that were reviewed by CIFG, 393, or approximately 80%, contained one or more breaches of the mortgage loan representations. *Id.* ¶ 67.

179.    Deutsche Bank received notice of the Goldman Sachs monoline action as it was the trustee for the trusts in those action.

180.    Because the monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan sellers' systemic and pervasive violations of underwriting and securitization guidelines, Deutsche Bank discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

181.    The Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Most of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase. *See* Ex. D.  Now most are "junk" bonds that do not qualify for any investment grade rating.

*See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  *See* Ex. E.

182.    Deutsche Bank should have provided Certificateholders notice of these defaults.  Instead, Deutsche Bank did nothing.  If Deutsche Bank had provided notice to Certificateholders, it could not have avoided forcing the Sponsors or Originators to repurchase or replace the relevant loans and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.

## 1.    The Originators' and Sponsors' Pervasive Breaches of Representation and Warranties

183.    Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts with respect to the individual mortgage loans.

184.    The Master Servicers' or Servicers' failure to provide notice of their breaches of representations and warranties constituted a default that would have ripened into Events of Default had Deutsche Bank provided notice of the defaults.

185.    The chart below identifies each of the entities disclosed to be the Sponsors, Originators and obligors of the loans included in the Covered Trusts:

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 1 | AABST 2006-1 | Aegis Mortgage Corporation | Aegis Funding Corporation; Aegis Lending Corporation | Aegis REIT Corporation |
| 2 | AHM 2006-1 | American Home Mortgage Acceptance, Inc. | American Home Mortgage Investment Corp. | American Home Mortgage Acceptance, Inc. |

| 3 | ARSI 2006-W2 | Ameriquest Mortgage Company | Argent Mortgage Company, L.L.C. | Ameriquest Mortgage Company |
|---|---|---|---|---|
| 4 | FFML 2006-FF11 | First Franklin Financial Corporation | First Franklin Financial Corporation | First Franklin Financial Corporation |
| 5 | FHLT 2005-1 | RBS Financial Products, Inc. | Fremont Investment & Loan | Fremont Investment & Loan; RBS Financial Products, Inc. |
| 6 | FHLT 2005-2 | RBS Financial Products, Inc. | Fremont Investment & Loan | Fremont Investment & Loan; RBS Financial Products, Inc. |
| 7 | GSAMP 2005-HE5 | Goldman Sachs Mortgage Company | SouthStar Funding, LLC | Goldman Sachs Mortgage Company; SouthStar Funding, LLC |
| 8 | GSAMP 2005-WMC2 | Goldman Sachs Mortgage Company | WMC Mortgage Corp. | Goldman Sachs Mortgage Company; WMC Mortgage Corp. |
| 9 | GSAMP 2006-HE1 | Goldman Sachs Mortgage Company | SouthStar Funding, LLC; MILA, Inc. | Goldman Sachs Mortgage Company |
| 10 | GSRPM 2006-1 | Goldman Sachs Mortgage Company | Ameriquest Mortgage Company; Bank of America; WMC Mortgage Corp.; Household Financial Services, Inc. | |
| 11 | HASC 2006-HE1 | HSBC Bank USA, National Association | Countrywide Home Loans, Inc.; WMC Mortgage Corp. | HSBC Bank USA, National Association; Countrywide Home Loans, Inc.; WMC Mortgage Corp. |
| 12 | HASC 2006-OPT3 | HSBC Bank USA, National Association | Option One Mortgage Corporation | Option One Mortgage Corporation |
| 13 | IMM 2005-7 | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. |
| 14 | IMM 2005-8 | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. |
| 15 | INABS 2006-H1 | IndyMac Bank | IndyMac Bank F.S.B.; Paul Financial, LLC | IndyMac Bank F.S.B. |
| 16 | INDX 2006-AR2 | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. |

| 17 | MMLT 2005-2 | RBS Financial Products | Meritage Mortgage Corporation | Meritage Mortgage Corporation; RBS Financial Products |
| 18 | RAST 2006-A15 | IndyMac Bank F.S.B. | IndyMac Bank | IndyMac Bank F.S.B. |
| 19 | SABR 2007-NC2 | Sutton Funding LLC | NC Capital Corporation | NC Capital Corporation |
| 20 | SVHE 2005-3 | RBS Financial Products | Finance America LLC; New Century Mortgage Corporation | Finance America LLC; New Century Mortgage Corporation |
| 21 | SVHE 2006-1 | RBS Financial Products, Inc. | Aames Capital Corp.; Finance America LLC | RBS Financial Products, Inc.; Aames Capital Corp.; Finance America LLC |

186.   As detailed below, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

187.   The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to Deutsche Bank that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.  Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors. These lawsuits, in conjunction with the poor performance of the underlying loans (which

Deutsche Bank was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among all originators, were more than sufficient to provide Deutsche Bank with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

188.    Deutsche Bank was aware of these reports, investigations, lawsuits, and it also had additional information concerning representation and warranty violations it learned of in the course of administering the Covered Trusts.  It also had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if Deutsche Bank had conducted even a limited investigation.  Thus, Deutsche Bank was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

### a.    Aames Capital Corp.

189.    In October 2006, Accredited Home Loans, Inc. ("Accredited") acquired a smaller sub-prime lender, Aames Capital Corp. ("Aames").  Aames originated mortgage loans included in the SVHE 2006-1 Trust.

190.    A complaint filed by Allstate Insurance Company contains allegations based on confidential witness statements in which former Accredited employees confirm that Accredited blatantly disregarded its underwriting standards.  *See* Compl., *Allstate Ins. Co. v. Morgan Stanley*, No. 651840/2011 (N.Y. Sup Ct. July 5, 2011).

191.    One confidential witness, who served as a corporate underwriter for Accredited in San Diego, California between May 2002 and November 2006, reported that "underwriters were consistently pressured by upper management to approve loans where there was no mitigating value except to get the loan on the books." *Id*. ¶ 125.  That same former Accredited employee

"explained that certain underwriters with problem loan ratios above 45% 'were favored [by upper-level management] because they produced more loans.'" *Id.*

192.    Another confidential witness, who served as a corporate underwriter at Accredited between August 2003 and February 2006 in Tampa, Florida reported that "[t]he problem with the whole system was the overrides.  The overrides were rampant. . . .  If the borrower breathed, he got the loan." *Id.* ¶ 126.

193.    Similarly, a former chief appraiser at Accredited between 2002 and June 2007 in San Diego, California explained that Accredited's misconduct extended to artificial inflation of property appraisal values.  According to the former appraiser, "Accredited established a policy whereby sales managers had the authority to manipulate a professional appraiser's final opinion of market value by utilizing the values of properties that were not comparable to the property serving as collateral for the loan . . . . '[a]s of June 2006, between 12% and 15% of [Accredited's] business was being done through management overrides.'" *Id.* ¶ 127.

194.    Additionally, the Complaint in *Bayerische Landesbank v. Goldman Sachs Group, Inc.*, No. 653111/2012 (NY Sup. Ct. Sept. 5, 2012) cited confidential sources formerly employed by Accredited.

195.    According to a former corporate underwriter at Accredited in San Diego, California and Austin, Texas from June 2000 through March 2007, "inflated income on stated income loans was a most common problem and it was not unusual to see housekeepers who claimed to make $8,000 per month or landscapers who claimed to make $10,000 or $12,000 per month." *Id.* ¶ 177.

196.     A former Accredited employee from 1998 until December 2006 in loan underwriting and sales explained that underwriters were "strongly encouraged to push loans through regardless of quality." *Id.* ¶ 176.

197.     Further, as set forth in the amended complaint in *Prudential Insurance Company of America v. J.P. Morgan Securities LLC*, No 12-cv-03489 (D.N.J. Aug. 30, 2012), according to a real estate appraiser from Nevada, the appraisals demanded by Aames were 15% to 25% over the actual market. *Id*. ¶ 271.

198.     The amended class action complaint filed in *Public Employees' Retirement System of Mississippi v. Merrill Lynch*, No. 08-cv-10841 (S.D.N.Y. July 6, 2010) cited the following based on additional information provided by confidential sources:

- According to CW16, the number of overrides grew so large that Accredited was forced to institute a system to track such overrides. The system included a box on the loan file that an underwriter needed to check if a higher-level manager approved the loan 'as a business decision' over the recommendation of the underwriter.

- According to CW17, a Corporate Underwriter at Accredited between June 2000 and March 2007 in both the San Diego, California, and Austin, Texas, offices, 'At the end of the month, we were handed loan files and told to just sign them with no audit.'

*Id*. ¶¶ 158–59.

199.     Additionally, the class action complaint filed in *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-488 H (RBB) (S.D. Cal. Aug. 24, 2007) provides testimony by former Aames and Accredited employees, as follows:

- According to CW11, [the Western Retail Operations Manager at Accredited from October 2006 until March 2007,] 'Accredited got very loosey goosey on credit. It was common to see four, five or six exceptions on a loan. . . . At Accredited, they actually pushed making the exceptions. . . . .'

- [Further,] [a]ccording to CW11, 'I was frequently overridden on loans that I thought were pieces of crap. They wanted units and dollar volume and didn't care how they got there.'

- CW12, a Senior Underwriter at Accredited from October 2006 through March 2007 in its Irvine office, . . . [reported that] '[a]t Accredited, we were told to make exceptions on everything.' . . . according to CW12, it wasn't until February 2007 that Accredited finally tightened its lending guidelines. According to CW12, 'it was too late by then.'

*Id*. ¶¶ 83–88.

200.    The Court in *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1154 (S.D. Cal. 2008) sustained allegations that "Defendants' statements regarding Accredited's underwriting practices were allegedly false and misleading because Defendants had caused Accredited to deviate from its publicly professed standards."

201.    On September 17, 2008, Aames' license to make residential mortgage loans and to service those loans was revoked by the California Department of Corporations for its failure to comply with the requirements of the California Residential Mortgage Lending Act.  Pursuant to that Act, Aames was required to submit annual reports on its principal amount of loans and aggregate amount of loans serviced, but failed to do so.  *See* Order Revoking Aames' Residential Mortgage Lender License and Residential Mortgage Loan Servicer License, No. 413-0648 (Sept. 17, 2008), *available at* http://www.dbo.ca.gov/ENF/pdf/a/AamesCapital_order-revoke.pdf.

### b.    Aegis Funding Corporation and Aegis Lending Corporation

202.    Aegis Funding Corporation and Aeigis Lending Corporation are wholly owned subsidiaries of Aegis Mortgage Corporation (collectively, "Aegis").  Aegis was founded in 1993 and initially operated as a privately held mortgage banking company owned by three individuals. By 1998, the company was generating $1 billion in annual loan volume.  Aegis originated mortgage loans included in the AABST 2006-1 Trust.

203.     By 2006, Aegis was ranked as the 13th largest subprime lender in the country, generating close to $20 billion in annual originations.  In eight years, the company's subprime originations grew by an incredible 1,750%.

204.     Aegis' growth was primarily fueled by Wall Street's demand for mortgages.  As the need for these mortgages increased, loan underwriting standards were loosened to the point of nearly abandoning them by 2006.  A large portion of the loans Aegis originated during this time were purchased from unlicensed mortgage brokers.  Because Aegis was feeding all the loans it originated to investment banks on Wall Street, underwriting standards were disregarded and quantity became more important than quality.

205.     In November 2008, Aegis was named as one of the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas in a report issued by the OCC.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005–2007 originations.  *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Nov. 13, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf.

206.     In addition, the complaint filed in *Royal Park Investments v. Merrill Lynch*, No. 12-cv-652607 (N.Y. Sup. Ct. Dec. 14, 2012) (the "*Royal Park* Complaint"), details the deterioration of Aegis' origination practices.  *Id*. ¶¶ 687–92.  The *Royal Park* complaint contains statements from a former Aegis Area Sales Manager and Account Executive, who worked at the company from 2005 through 2007, who stated in 2006 Aegis' underwriting standards "loosened up a lot."  *Id*. ¶ 687.  The former Aegis employee recounted that Aegis was approving and extending loans to borrowers who "ha[ve] never paid anybody, that's just the way it [wa]s."  *Id*. (alterations in original).

71

207.     In addition, the former Aegis employee reported that, "during his tenure at the company, approximately 25% to 30% of the appraisals were questionable." *Id.* ¶ 688.

208.     "The demand from Wall Street for residential mortgage loans was extreme during the relevant time period.  Aegis originated loans without regard to whether borrowers could afford to repay them because [the investment banks that] purchased the loans did not care whether borrowers could repay the loans." *Id.* ¶ 689.  Again, according to the former Aegis Area Sales Manager and Account Executive "[i]n 2005 the Wall Street banks wanted to know how much we could sell to them, and in 2006 they were saying 'get me more.' . . . [T]he faucet was on full force."  Wall Street's incredible demand for mortgages resulted in Aegis abandoning its stated lending guidelines.  *Id.* (alterations in original).

209.     The *Royal Park* complaint also notes that "a former Aegis Wholesale Regional Underwriting Manager, who worked for the company from 2003 through 2006, [stated that] he regularly declined to approve stated income loans because the stated incomes were bogus. However, when he rejected loans for these reasons, his District Underwriting Manager routinely signed off on these loans, approving them for funding." *Id.* ¶ 690.

210.     "According to the Aegis Wholesale Regional Underwriting Manager, Aegis had an employee who did nothing but 'scrub' loan files, *i.e.*, remove income documentation for borrowers who initially applied for a full documentation loan but did not qualify, and then re-apply the borrowers for stated income loans with inflated income amounts."  Moreover, "the former Aegis Underwriting Manager also reported that he was aware of instances where originating mortgage brokers told appraisers what value the appraisal needed to come in at and, if the appraiser could not do it, the broker would take the business elsewhere." *Id.* ¶¶ 691–92.

211.    Other lawsuits have raised similar allegations concerning Aegis' underwriting practices.  *See, e.g.*, Am. Compl. ¶¶ 153–156, *N.J. Carpenters Health Fund v. Structured Asset Mortg. Invs. II*, No. 08-cv-08093 (S.D.N.Y. May 15, 2009); Am. Compl. ¶¶ 142, 188, *Fed. Hous. Fin. Agency v. Ally Fin. Inc.*, No-11-cv-7010 (S.D.N.Y. June 12, 2012).

**c.    American Home Mortgage Investment Corp., American Home Mortgage Corp. and Option One Mortgage Corporation**

212.    As set forth above, in or around April 2008, Option One was acquired by American Home.  American Home Mortgage Investment Corp. and its subsidiary American Home Mortgage Corp. originated mortgage loans included in the AHM 2006-1 Trust.  American Home Mortgage Acceptance, Inc. served as the Sponsor of the AHM 2006-1 Trust and Option One originated mortgage loans included in the HASC 2006-OPT3 Trust.  Collectively, American Home and Option One are referred to as "American Home."

213.    An October 2005 American Home "Credit Update" outlined the company's conscious decision to promote increasingly lax underwriting standards.  Under the heading "Guideline Interpretation," the presentation set forth 30 pages of revised credit factors that made clear that American Home's underwriting guidelines were to be relaxed substantially or rendered essentially meaningless in order to allow the company to make loans to high-risk borrowers.  Specifically, on each page American Home set forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What We Observed in [Our] Prior History" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new interpretations included:  (i) not requiring verification of income sources on stated income loans; (ii) reducing the required documentation for self-employed borrowers; and (iii) broadening the acceptable use of second and third loans to cover the full property value.

214.     That same document also set forth American Home's "Quality Control Philosophy" regarding its lending practices.  As that document made clear, underwriters and loan officers were to adhere to a philosophy that "Very few things are actually NIQ's [Not Investment Quality]" when making and approving loans.

215.     Edmund Andrews, an economics reporter for *The New York Times*, recounted his own experience using American Home as a lender.  Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. Times, May 17, 2009, at MM46.  According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home.  *Id*.  The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed.  *Id*.  Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife.  *Id*.  Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.  One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were 'Alt-A' customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

> I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.

> [The American Home loan officer] called back the next morning.  'Your credit scores are almost perfect,' he said happily.  'Based on your income, you can qualify for a mortgage of about $500,000.'

> What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic

> withholdings in my paycheck?  No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.
>
> 'I am here to enable dreams,' he explained to me long afterward.  [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence.  'Who am I to tell you that you shouldn't do what you want to do?  I am here to sell money and to help you do what you want to do.  At the end of the day, it's your signature on the mortgage—not mine.'

*Id.*

216.    The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child support obligations.  *Id.*  The loan officer wanted to limit disclosure of Andrews's alimony and child support payments when an existing mortgage showed up under Andrews's name.  *Id.* Although his ex-wife was solely responsible for that mortgage under the terms of the couple's separation agreement, the only way Andrews could explain that fact would be to produce the agreement, which would also reveal his alimony and child support obligations.  *Id.*  According to Andrews:

> [The American Home loan officer] didn't get flustered.  If Plan A didn't work, he would simply move down another step on the ladder of credibility.   Instead of 'stating' my income without documenting it, I would take out a 'no ratio' mortgage and not state my income at all.  For the price of a slightly higher interest rate, American Home would verify my assets, but that was it.  Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt.  I could have had four other mortgages, and it wouldn't have mattered.  American Home was practically begging me to take the money.

*Id.*

217.    American Home ultimately approved Andrews's application.  *Id.*  Not surprisingly, Andrews was unable to afford his monthly mortgage payments.  *Id.*

218.    American Home's poor lending practices resulted in numerous civil lawsuits. These lawsuits contained firsthand accounts from former employees and re-analysis of the loans themselves.  When re-underwritten, a significant portion of American Home originated loans were found to be breaching the associated representations and warranties.  Some of these complaints include *Royal Park Investments SA/NV v. Merrill Lynch*, 652607/12 (N.Y. Sup. Ct. Dec. 14, 2012) and *N.J. Carpenters Health Fund v. Structured Asset Mortgage Investments II*, No. 08-cv-08093 (S.D.N.Y. May 15, 2009).

219.    American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed June 4, 2008.  Am. Compl., *In re American Home Mortg. Sec Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y. June 4, 2008).  Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness.  *See id*.

220.    In the *American Home* Amended Complaint, former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied.  *See id*. ¶¶ 120–21.

221.    Former American Home employees also reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud.  *See id*.

222.     Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions. Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval. *See id*. ¶ 123.

223.     A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id*. ¶ 124.

224.     The parties settled the litigation on January 14, 2010, for $37.25 million.

225.     In addition, according to a complaint filed by the SEC on April 28, 2009, senior executives of American Home made false and misleading disclosures designed to conceal American Home's financial condition from investors and violated various anti-fraud provisions of the federal securities laws. *SEC v. Strauss*, No. 09-cv-4150 (RB), April 28, 2009 (S.D.N.Y. Apr. 28, 2009).

226.     Significantly, the SEC complaint alleged that American Home issued public statements misleadingly omitting the fact that American Home originated a large portion of mortgage loans without verifying the borrowers' incomes. *Id*.

227.     In September 2011, the Federal Housing Finance Agency (the "FHFA") filed an action against various investment banks in which FHFA performed a review of loans from one of the Covered Trusts—HASC 2006-OPT3. Compl., *FHFA v. HSBC N. Am. Holdings Inc.*, No. 11-cv-6189 (S.D.N.Y. Sept. 2, 2011). FHFA found that the offering materials had understated the

actual amount of loans with LTV ratios of: (i) 80% or greater by more than 14%; and (ii) 100%

or greater by 11-17%. *Id.* ¶ 100. FHFA further found that the offering materials overstated the

actual percentage of owner occupied properties by over 9%, and that 32–38% of the sampled

loans were in default, had been foreclosed upon, or were delinquent as of July 2011. *Id.* ¶¶ 96,

100, 125.

228.    Additionally, in October 2013, Royal Park filed an action against various

investment banks in which Royal Park performed a review of loans from the AHM 2006-1 Trust.

Compl., *Royal Park Invs. SA/NV v. Barclays Bank PLC*, No. 653464/2013 (N.Y. Sup. Ct. Oct. 7,

2013). Royal Park found that the offering materials had understated the actual amount of loans

with LTV ratios of: (i) 80% or greater by more than 40%; and (ii) 100% or greater by more than

18%. *Id.* ¶ 61. Royal Park further found that the offering materials overstated the actual

percentage of owner occupied properties by more than 10%, and that approximately 37% of the

sampled loans were currently in default. *Id.* ¶¶ 61, 63, 66. *See also* Compl., *Royal Park v.*

*Merrill Lynch*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012).

229.    Further, as set forth in the complaint filed in *Massachusetts Mutual Life Insurance*

*Co. v. Goldman Sachs*, No. 11-cv-30126 (D. Mass. May 5, 2011), American Home regularly

disregarded its underwriting standards to grow its market share. American Home's senior

management imposed intense pressure on its underwriters to approve mortgage loans, and

American Home's incentive commission structure was designed to encourage a high volume of

closed loans rather than scrutiny of loan quality and underwriting. "For example, an internal

presentation called 'Incentive Compensation' discussed new compensation features to be

implemented in 2005. Per the company's new rules, underwriters were required to approve a

certain minimum number of loans – five per day and 100 per month – in order to qualify for

incentive compensation.  Loan 'Validators' and 'Closers' were similarly paid by volume, with a minimum of closed loans (18 and 80, respectively) required in order to qualify for bonuses." *See id.* ¶ 113.

230.     A former American Home Executive Vice President stated that American Home's "underwriting practices became increasingly lax during the 2005 to 2007 time frame [and American Home] grant[ed] an ever-increasing number of loans to people unlikely to repay them. According to this former employee, 'American Home followed Countrywide' . . . in offering 'fast and sleazy products' that had very questionable underwriting requirements and were of low quality." *Id.* ¶ 114.

231.     As set forth in the *Massachusetts Mutual* Complaint, "[a] former American Home Wholesale Account Executive who worked at AHM from January 2005 through July 2007 stated that at American Home 'anybody could buy a house with zero percent down and no proof of ability to pay it [the loan] back.'" *Id.*

232.     Ultimately, American Home's loan origination and underwriting practices were so suspect that in a 2010 report, the Officer of the Comptroller of the Currency, United States Department of Treasury, identified American Home as the 10th worst subprime lender in the entire nation.  *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Mar. 31, 2010), http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf.

**d.     Ameriquest Mortgage Company
and Argent Mortgage Company, L.L.C.**

233.     Argent Mortgage Company, L.L.C. and Ameriquest Mortgage Company were subsidiaries of ACC Capital Holdings (collectively, "Ameriquest").  In 2007, Citigroup acquired Ameriquest.   Ameriquest originated mortgage loans included in the GSRPM 2006-1

Trust and also served as Sponsor of the ARSI 2006-W2 Trust for which Argent originated mortgage loans.

234.    Ameriquest systemically violated its mortgage underwriting guidelines, including by, among other things, disregarding or misstating income, assets and employment information of borrowers.

235.    As a result of a multi-state investigation by the state attorney generals, many states commenced litigation against Ameriquest on the basis of Ameriquest's systemic disregard for its underwriting standards and predatory lending.  For example, in *Washington v. ACC Capital Holdings*, the complaint alleged that Ameriquest engaged in unfair or deceptive acts or practices by making deceptive representations or omissions regarding loan terms, prepayment penalties, repeat financing, inflated appraisals and income and loan unsuitability, among other things.

236.    In connection with the multi-state investigation, the Connecticut Attorney General stated that:

- Ameriquest pressured appraisers to inflate property values so borrowers could get bigger loans, imposed upfront fees without reducing interest rates as promised and told borrowers to ignore written information about interest rates because they would give them lower rates later.  The company is alleged to have given them higher interest rates instead.

- Ameriquest also assured some borrowers their loans would have no prepayment penalties, then inserted such payments into the final loan documents; delayed the time period between the loan closing and the funding; and misrepresented fees and costs.

- Other Ameriquest predatory practices included telling consumers that the initial fixed rate on an adjustable rate loan lasted longer than it did, and instructing them to ignore or disparaging federal truth in lending requirements.

- The company routinely fabricated consumers' income by claiming that recipients had phony "sewing" or "lawn" businesses.  In one instance, the company falsely claimed that an elderly Connecticut woman operated a sewing business, even though she was blind.

News Release, Conn. Dep't of Banking, Conn. Dep't of Consumer Protection, & The Attorney Gen., Ameriquest to Pay $325 Million for Predatory Lending Practices that Bilked Consumers (Jan. 23, 2006), *available at* http://www.ct.gov/dob/cwp/view.asp?a=2245&q=309018.

237.    Illinois Attorney General Lisa Madigan testified before the Financial Crisis Inquiry Commission ("FCIC") that Ameriquest engaged in fraudulent practices, which included inflating including home appraisals, increasing the interest rates on borrowers' loans from fixed to adjustable interest rates at closing, and promising borrowers that they could refinance costly loans with better terms in a short period of time, despite having equity to absorb another refinance.  *See* Financial Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2010), *available at* http://www.gpo.gov/fdsys/pkg/GPO-FCIC/content-detail.html.

238.    Ed Parker, the former head of Ameriquest's Mortgage Fraud Investigations Department, testified before the FCIC that he detected and reported fraud "at the company within one month of starting his job there . . . but senior management did nothing."  *See id.* at 12.

239.    According to Prentiss Cox, a former Minnesota Assistant Attorney General, he reviewed a sampling of Ameriquest loan files and "found blatant misrepresentations of employment."  *See id.*

240.    Based on a 2010 OCC report, Ameriquest was ranked as the 9th worst mortgage originator based on the number of foreclosures.  Press Release, John C. Dugan, Comptroller of the Currency, Appendix B: Activities of National Banks Related to Subprime

Lending, remarks before the FCIC, Washington, D.C. (Apr. 8, 2010), *available at* http://www.occ.treas.gov/ftp/release/2010-39d.pdf.

241.    Private litigations also highlight Ameriquest's violations of its underwriting guidelines. See*, e.g.*, Compl., *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, No. 10-cv-11376-NMG (D. Mass, Aug. 13, 2010); Am. Compl., *N.J. Carpenters Health Fund v. Structured Asset Mortg. Invs. II*, No. 08-cv-08093 (S.D.N.Y. May 15, 2009).

242.    Additionally, in November 2013, Deutsche Zentral-Genossenschaftsbank AG ("DZ Bank") filed an action against various investment banks in which it performed a review of loans from one of the Covered Trusts—ARSI 2006-W2.  Compl., *Deutsche Zentral-Genossenschaftsbank AG v. Citigroup Inc.*, No. 654566/2013 (N.Y. Sup. Ct. July 11, 2013).  DZ Bank found that the offering materials (i) had understated the actual amount of loans with LTV/CLTV ratios of 100% or greater by more than 48% and (ii) had understated LTV/CLTV ratios by more than ten percentage points in more than 36% of the sampled loans in the ARSI 2006-W2 Trust.  *Id*. ¶ 90. IMSDZ Bank further found that the offering materials overstated the actual percentage of owner occupied properties by more than 34% for the ARSI 2006-W2 Trust. *Id*. ¶ 104.

243.    Finally, in November 2013, JPMorgan entered into a $13 billion settlement with the Department of Justice to resolve federal and state civil claims arising out of the fraudulent packaging, marketing, sale and issuance of RMBS by JPMorgan and WaMu.  As part of the settlement, JPMorgan acknowledged it made serious misrepresentations to the public about numerous RMBS transactions.  The resolution required JPMorgan to provide much needed relief to underwater homeowners and potential homebuyers.  Under the terms of the settlement, JPMorgan receives credit for modifying loans, including securitized loans.  JPMorgan has

modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not JPMorgan would bear the loss.

244.    Defendant is and was aware of JPMorgan's and Bear Stearns' misconduct, including their effort to shift the cost of their regulatory fines to investors, such as Plaintiffs, and yet has failed to act to protect their interests.

e.    **Bank of America, N.A. and Countrywide Home Loans, Inc.**

245.    As set forth above, Bank of America acquired Countrywide in August 2007. Countrywide originated mortgage loans included in the HASC 2006-HE1 Trust and Bank of America originated mortgage loans included in the GSRPM 2006-1 Trust.

246.    From 2000–2003, Countrywide rose to prominence as a mortgage lender originating hundreds of billions of dollars' worth of loans annually and securitizing them for sale.  Business expanded so rapidly that Countrywide's founder and CEO, Angelo Mozilo, stated publicly that, by 2006, Countrywide would be the Nation's "dominant" home-mortgage lender.  By 2004, however, Countrywide recognized that it would be unable to reach its lofty goals if it limited itself to lending to borrowers who qualified under prudent loan underwriting standards.

247.    In order to fuel Countrywide's growth, Countrywide resolved to approve any loan that could be securitized for sale to third parties, without regard to whether the loan complied with Countrywide's already lax underwriting standards.  As Countrywide's CFO, David Sambol, stated in a February 13, 2005 email (which was not made public until years later): "We should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal." Amanda Bransford, *MassMutual Brings New RMBS Suit Against Countrywide Execs*,

Law360 (Apr. 24, 2012), http://www.law360.com/articles/333621/massmutual-brings-new-rmbs-suit-against-countrywide-execs.

248.     Additionally, the SEC has released documents showing that Countrywide adopted a "matching" strategy whereby it would provide any mortgage product feature offered by a competitor.  This "matching" strategy could only be implemented through abandonment of Countrywide's supposed credit-risk-reducing underwriting guidelines.  To get around its own requirements, Countrywide set up a system whereby any loan could be approved by way of underwriting "exceptions" and coached borrowers on how to apply for loan products that required little or no income or asset verification.

249.     Internal documents show that "exceptions" were involved in upwards of one-third of all loans, and were based purely on the desire to increase loan volume (and profits) and not on "compensating factors" as represented.  Countrywide deliberately offloaded the worst of these loans to securitizations sold to investors such as Plaintiffs.

250.     In 2006, Countrywide internal reviews concluded that one third of all Countrywide loans violated its underwriting guidelines.  As set forth in the complaint in *American Fiduciary Assurance Company v. Countrywide Financial Corporation*, "Frank Aguilera, a Countrywide Managing Director responsible for risk management, reported the 'particularly alarming' result . . . that 23% of the subprime loans," which were often included as prime or Alt-A loans in Countrywide's securitizations,

> were generated as exceptions, even taking into account 'all guidelines, published and not published, approved and not yet approved.'  The exception rate for '80/20' products (which [were] particularly risky because they required 100% financing) was even higher.  Aguilera wrote at the time: '[t]he results speak towards our inability to adequately impose and monitor controls on production operations.'

Compl. ¶ 124, *Am. Fid. Assurance Co. v. Countrywide Fin. Corp.*, No. 11-361D (W.D. Okla. Apr. 1, 2011). Another internal review conducted around the same time concluded that "approximately 40% of the Bank's reduced documentation loans . . . could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more." *See id.* ¶ 116 (omitted text in original).

251.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan,*" Dateline NBC reported on March 27, 2009:

- To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the 'Fast and Easy loan.'

- As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

- He said the loans were 'an invitation to lie' because there was so little scrutiny of lenders. 'We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified.'

- He said they joked about it: 'If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan.'

- Partow said that the practice of pushing through loans with false information was common and was known by top company officials. 'It's impossible they didn't know.'

- He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. According to former senior account executive Bob Feinberg, Countrywide's problem was not limited to stated income loans. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

- In many instances, Feinberg said, that meant borrowers were getting loans that were 'guaranteed to fail.'

*If You Had a Pulse, We Gave You a Loan* (Chris Hansen, NBC Dateline Mar. 22, 2009),

*available at* http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-

the_hansen_files_with_chris_hansen.

252.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.

*See* Compl., *SEC v. Mozilo*, No. 09-cv-3994-JFW (C.D. Cal. June 4, 2009).  Mozilo and the

other executives settled the charges with the SEC for $73 million on October 15, 2010.  *See*

Walter Hamilton, E. Scott Reckard & Angelo Mozilo, *Other Former Countrywide Execs Settle*

*Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

253.    Internal Countrywide e-mails the SEC released in connection with its lawsuit

show the extent to which Countrywide systematically deviated from its underwriting guidelines.

For example, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives,

Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for

process, compliance with guidelines and irresponsible behavior relative to meeting timelines."

E-mail from Angelo Mozilo, CEO, Countrywide Financial, to Eric Sieracki, Stan Kuland, Dave

Sambol, David Spector & John Murray, Managing Directors, Countrywide Financial (Apr. 23,

2006 7:42 PM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Mozilo also wrote that he had

"personally observed a serious lack of compliance within our origination system as it relates to

documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.*

254.    Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market.  With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo Mozilo, CEO, Countrywide to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide Financial (Sept. 1, 2004 8:17 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

255.    To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

256.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO, Countrywide Financial, Jim Furash, former President, Countrywide Bank, Stan Kurland & Dave Sambol, Managing Directors, Countrywide Financial (June 1, 2006 10:38 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

257.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

258.    Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail from Angelo Mozilo to David Sambol, Managing Director, Countrywide Financial (Sept. 26, 2006 10:15 AM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Yet such loans were securitized and passed on to unsuspecting investors such as the Plaintiffs.

259.    With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank."  E-mail from Angelo Mozilo to Carlos Garcia, former Managing Director, Countrywide Financial (Nov. 3, 2007 5:33 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans.  Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."  *Id*.

260.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both

judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product.  This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

261.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed.  He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines."  *Id.*  Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice.

262.    "It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions.  I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this

unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . ." *Id.*

263.    Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

264.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

265.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly."  E-mail from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

266.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors.  After reviewing

many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

267.    Not surprisingly, Countrywide and Bank of America's complete disregard for proper loan underwriting has spawned numerous lawsuits.  As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files.  The staggering number of loans breaching the associated representations and warranties discovered in these cases would have alerted even the most casual of observers that Countrywide and Bank of America loans breached the associated representations and warranties.  *See, e.g.*, Compl., *Mass. Mutual Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-cv-10414 (D. Mass. Sept. 1, 2011); Compl., *Allstate Ins. Co., v. Countrywide Fin. Corp.*, No. 10-cv-9591 (S.D.N.Y. Dec. 27, 2010); Compl., *AIG v. Bank of Am.*, No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011).

268.    In August 2014, Bank of America reached a $16.65 billion settlement with the Department of Justice to resolve federal and state claims against Bank of America and its former and current subsidiaries, including Countrywide and Merrill Lynch.  The resolution required Bank of America to provide much needed relief to underwater homeowners and potential homebuyers.  Under the terms of the settlement, Bank of America receives credit for modifying loans, including securitized loans.  JPMorgan has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not JPMorgan would bear the loss.

269.     Countrywide's and Bank of America's failure to adhere to applicable underwriting guidelines constituted a default under the PSAs because they represented and warranted that the loans included in the Covered Trusts complied with their underwriting guidelines.  The Master Servicer, the Depositors, Countrywide and Deutsche Bank failed to provide notice of those breaches as they were required to do under the PSAs.  If Deutsche Bank had provided notice, Countrywide and Bank of America would have had to replace or repurchase the relevant loans and stop including large numbers of defective and non-compliant loans in mortgage loan securitizations.

### f.     First Franklin Financial Corporation

270.     First Franklin Financial Corporation ("First Franklin") served as the Sponsor of and originated loans included in the FFML 2006-FF11 Trust.

271.     One of the earliest lawsuits naming First Franklin was filed on February 17, 2009.  Compl., *Public Employees' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, No. 09-cv-1392 (S.D.N.Y. Feb. 17, 2009) (the "Mississippi PERS Complaint").  The complaint explicitly alleged that First Franklin "systematically ignored, or abandoned their stated and pre-established underwriting and appraisal standards. . . ."  *Id*. ¶ 11.

272.     The Mississippi PERS Complaint was amended in 2010 to include additional support for these allegations. Am. Compl., *Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, No. 09-cv-1392 (S.D.N.Y. July 6, 2010).  In particular, the amended complaint contained statements from a confidential witness who worked as a Corporate Underwriter at First Franklin from 2006 until June 2007.  The confidential witness recounted serious deficiencies in First Franklin's underwriting processes including inflated appraisals and approval of loans initially rejected by underwriters.  *Id.* ¶ 107.  The litigation was eventually settled.

273. First Franklin was named in another 2010 class action suit that alleged it systemically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See* Corrected Am. Compl., *Fed. Home Loan Bank of Chicago v. Banc of Am.*, No. 10-ch-45033 (Cook. Cnty. Cir. Ct. Apr. 8, 2011) ("FHLB Chicago Amended Complaint").

274. Statements from confidential witnesses in the FHLB Chicago Amended Complaint represented that First Franklin originated mortgage loans in violation of its stated underwriting standards. *Id.* ¶ 157.

275. According to one confidential witness who was an underwriter at a First Franklin branch in Georgia from March 2004 to November 2007, "[a]ccount executives at First Franklin were making '$100,000 a month in commissions,[]'" which was based off of the number and dollar amount of loans processed. Due to this incentive structure, account executives would often pressure underwriters to approve loans that should not have been approved. The executives would simply override the underwriter's decision so that, according to this confidential witness, "Nine out of ten times, the loan went through." *Id.* ¶¶ 383, 387–88.

276. That same confidential witness explained that First Franklin used contract appraisers who inflated property values. "The[r]e were homes with busted out windows and the meter boxes [] missing" that were appraised for $300,000. He also knew that many fake W-2s had been attached to loan applications because the tax withholdings did not match the income. Further, he knew that mortgage brokers who referred loan applications to First Franklin were "'whiting out or faxing over' the actual numbers and writing in new numbers so that the loans would work." *Id.* ¶¶ 400, 402.

277.    Another confidential witness was an underwriter and account executive at a
First Franklin branch in Ohio from 2000 until 2007.  Account executives were responsible for
maintaining relationships with mortgage brokers that referred loan applications to the originating
banks.  This confidential witness stated that "[a]ccount executives paid processors cash under the
table to help them get loans closed," and went on to describe how one loan processor was caught
manipulating the loan documents in order to close more loans.  *Id.* ¶¶ 384, 389.

278.    One confidential witness, who was an underwriter at a First Franklin branch in
Washington from 2005 until November 2007, described how the systematic disregard for
underwriting standards grew worse after First Franklin purchased OwnIt Mortgage and OwnIt
employees began working with the confidential witness.  She stated that "OwnIt employees
'were used to approving anything.  They'd say, 'If we don't' approve it, somebody else will. So
why lose the money?'"  This witness's manager was a former OwnIt employee who would often
override her employees' decisions to decline loans in order to meet performance goals.  The
witness also noted that First Franklin employees manipulated applications so that they would be
approved.  *Id.* ¶¶ 385, 390, 406.

279.    The confidential witness who worked at the Ohio branch represented that there
was enormous pressure from management to close loans at any cost.  "'[P]eople were working
until 8 p.m. on Saturdays and Sundays' in order to close the loans," stated the witness.  As a
result, "a lot of loans slipped through.  People were tired of being beat up.  With the rush of
loans, stuff could have been overlooked. Maybe the conditions didn't exactly meet the
guidelines."  During the last few days of the month, a drove of employees would go to the branch
manager "begging for exceptions to close their loans."  The witness recalls one instance where

"the branch manager. . . came out of his office and yelled: 'Oh f*** it!  Just close the f***ing loans.'"  *Id.* ¶ 395.

280.     Another confidential witness, who was, among other things, an account executive and underwriter at a First Franklin branch in Utah from 1996 until 2008, noted that account executives would often approach branch managers about overturning an underwriter's decision to reject a loan, and said that "some loans were approved that were not compliant with guidelines."  *Id.* ¶¶ 384, 396.

281.     That same confidential witness also encountered the "blatant fraud" first hand. She recalled a $500,000 loan application for a home that was supposed to be owner occupied even though the same borrower had purchased a $1,000,000 home in the same neighborhood a month earlier and also claimed that it would be owner occupied.  Although the underwriter was successful in blocking that particular application, her manager was mad at her for catching it. Other similar loans were approved.  *See id.* ¶ 404.

282.     When First Franklin began downsizing its mortgage operation in late 2007, it ordered all of its remaining underwriters to assist in loss mitigation.  The confidential witness from the Utah branch was one of them.  She reported that the loss mitigation group was tasked with reviewing the quality of a number of First Franklin's loans: she reported that among the loans she reviewed, fifty percent were not compliant with First Franklin's guidelines, citing problems such as inflated appraisal values, insufficient employment verification and disqualifying credit scores.  *See id.* ¶ 398.

283.     According to another confidential witness, who was an underwriter at a First Franklin branch in Florida from 1999 until 2007, loan document manipulation at First Franklin

grew to disconcerting levels.  The witness stated that "a lot of fraudulent loans were going

through. There was tons of fraud going on."  *Id.* ¶¶ 383, 401.

284.     FHLB's complaint survived the defendants' motion to dismiss, with the court

stating "the Bank has provided evidentiary facts, such as testimony, AVM analysis of appraisal

values, delinquency and foreclosure rates, and pleadings from other civil actions involving the

defendants, which demonstrate the strength of the Bank's case" that the originators

systematically disregarded their underwriting standards. Order at 7, *FHLB v. Banc of Am.*, No.

10-45033 (Cook Cnty. Cir. Ct. Sept. 19, 2012).

285.     Similar statements from confidential witnesses have appeared in other lawsuits

filed in 2011 and 2012 including a lawsuit brought by American International Group ("AIG")

against Bank of America.  *See* Compl., *Am. Int'l Grp. v. Bank of Am. Corp.*, No. 652199/2011

(N.Y. Sup. Ct. Aug. 8, 2011), *removed to* No. 11-cv-10549 (C.D. Cal.) (action based on, among

other things, misrepresentations concerning the FFML 2006-FF11).

286.     Additionally, in September 2011, FHFA filed an action against various

investment banks in which FHFA performed a review of loans from one of the Covered Trusts—

FFML 2006-FF11.  Compl., *FHFA v. HSBC N. Am. Holdings Inc.*, No. 11-cv-6189 (S.D.N.Y.

Sept. 2, 2011).  FHFA found that the offering materials had understated the actual amount of

loans with LTV ratios of: (i) 80% or greater by more than 23%; and (ii) 100% or greater by more

than 14%.  *Id.* ¶ 100.  FHFA further found that the offering materials overstated the actual

percentage of owner occupied properties by over 10%, and that more than 42% of the sampled

loans were in default, had been foreclosed upon, or were delinquent as of July 2011.  *Id.* ¶¶ 96,

125.

287.     First Franklin has also been sued by monoline insurer, Ambac Assurance

Corporation.  After paying hundreds of millions of dollars to certificate holders as a result of the

many defaults and delinquencies on First Franklin-originated loans, Ambac reviewed 1,750 First

Franklin loans.  It found that 94% had material defects, including:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property . . . ;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated appraisals; and

- Pervasive violations of the loan originator's own underwriting guidelines and prudent mortgage-lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with debt-to-income and loan-to-value ratios above the allowed maximums, or (iii) with relationships to the applicable originator or other non-arm's-length relationships.

Compl. ¶¶ 82–83, *Ambac Assurance Corp. v. First Franklin Fin. Corp*., 651217/2012 (N.Y. Sup.

Ct. Apr. 16, 2012).

### g.     Fremont Investment & Loan

288.     Fremont Investment & Loan ("Fremont") originated mortgage loans included in

the FHLT 2005-1 and FHLT 2005-2 Trusts.  Fremont was one of the country's largest subprime

lenders until March 2007, when the FDIC effectively forced Fremont out of the subprime

lending business for extending subprime credit "in an unsafe and unsound manner."  Order to

Cease and Desist, *In re Fremont Inv. & Loan,* FDIC-07-035b (Mar. 7, 2007), *available at*

https://www.fdic.gov/bank/individual/enforcement/2007-03-00.pdf.

289.     Following an extensive investigation, the FDIC issued a Cease & Desist Order to Fremont, concluding that Fremont was, in fact, "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices." *Id*. at 2–3.

290.     Further, the *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* report found that:

> from 2004 to 2007, in exchange for lucrative fees, Goldman Sachs helped lenders like . . . Fremont . . . securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system.

U.S. Senate Permanent Subcomm. on Investigations, Wall Street and the Financial Crisis: Anatomy of a Financial Collapse 377 (2011), *available at* http://www.hsgac.senate.gov//imo /media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attem2 (the "2011 Subcommittee Report").

291.     The 2011 Subcommittee Report found that Goldman Sachs commissioned a study of Fremont loans that demonstrated that 50% of Fremont loans securitized by Goldman Sachs failed to comply with stated underwriting guidelines.  The Report further stated: "Despite these and other indications of Fremont's poor quality loans, Goldman continued to underwrite and market securities backed by Fremont loans."  *Id*. at 515.

292.     Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a lender "known for poor quality loans."  *Wall Street and the Financial Crisis: The Role of Bank Regulators: Hearing Before Subcomm. On Homeland Security and Governmental Affairs Comm., Permanent Subcomm. On Investigations*, 111th Cong. 9 (Apr. 3, 2010) (statement of

Carl Levin, Chairman, Permanent Subcomm. on Investigations).  Senator Levin recounted how

an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman

Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, *a subprime lender known for loans with high rates of delinquency*.  On January 24, 2007, an analyst wrote seeking advice from two senior analysts:  "I have a Goldman deal with subprime Fremont collateral.  *Since Fremont collateral has been performing not so good, is there anything special I should be aware of*?"  One analyst responded:  '*No, we don't treat their collateral any differently.*'  The other asked:  "are the FICO scores current?"  "Yup," came the reply.  Then "You are good to go."  In other words, *the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry*.  In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of RMBS securities backed by Fremont mortgages.  By October, both companies began downgrading the CDO.  Today all five AAA tranches have been downgraded to junk status.

*Id*. (emphasis added).

293.    In August 2010, Cambridge Place Investment, Inc. ("Cambridge") brought an

action against Fremont in which Cambridge submitted testimony from numerous confidential

witnesses concerning Fremont's systemic disregard of its underwriting guidelines.  As set forth

in an August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.

> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.

> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, Myrtle Beach Sun-News, Jan. 13, 2011, at A.

294.     In that action, Cambridge performed a review of loans from one of the Covered Trusts—FHLT 2005-1.  Compl., *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Supp. Aug. 13, 2010).  Cambridge found that over 46% of the loans in FHLT 2005-1 were delinquent as of June 2010.  *Id.* ¶ 454.

295.     On September 28, 2012, the court denied in principal part Defendants' Joint Motion to Dismiss For Failure to State a Claim.  *See Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Supp. Sept. 28, 2012).

296.     On December 21, 2011, FHFA filed an amended complaint against UBS Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie Mac and Fannie Mae.  *See* Second Am. Compl., *FHFA v. UBS Americas, Inc.*, No. 11-cv- 05201 (S.D.N.Y. Dec. 21, 2011).  In the complaint, FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that 'Fremont was all about volume and profit,' and that when he attempted to decline a loan, he was regularly told 'you have signed worse loans than this.'  The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams.  He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

*See id.*  The court denied a motion to dismiss the complaint in May 2012.  *See FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012).  On July 25, 2013, FHFA announced that it had reached an agreement to settle the case for $885 million.

297.     Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions:  2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th in Bakersfield, California and Merced, California.  *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Mar. 31, 2010), http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf (the 2009 "Worst Ten in the Worst Ten" Report).

### h.     Goldman Sachs Mortgage Company

298.     Goldman Sachs frequently served as the Sponsor of securitizations, including the GSAMP 2005-HE5, GSAMP 2005-WMC2, GSAMP 2006-HE1 and GSRPM 2006-1 Trusts.

299.     Goldman Sachs and its affiliates participated in all aspects of the mortgage finance market as warehouse lender, loan originator, loan purchaser, loan servicer, financial advisor and underwriter and sponsor of RMBS and other securities linked to the mortgage market.  As a result, Goldman had a unique perspective on mortgage origination practices.

300.     Goldman Sachs provided billions of dollars in "warehouse" lines of credit to finance unsold loans held by major subprime originators, such as Countrywide, Fremont and New Century.  The originators repaid borrowings on these lines of credit with the proceeds of sales of loan pools to Goldman and other RMBS Sponsors.

301.     From 2004 to 2006, Goldman Sachs acquired $53 billion in mortgage loans from its warehouse-line borrowers and other subprime originators, including Countrywide, Fremont and New Century.

302.     From 2004 to 2006, Goldman Sachs issued 318 RMBS offerings totaling $184 billion, roughly a quarter of which were backed by subprime loans.

303.     Goldman Sachs directly owned and operated loan servicers and a loan originator. In 2005, Goldman Sachs invested in subprime mortgage servicer Avelo, acquiring it outright in 2007.  In 2005, Goldman Sachs acquired subprime mortgage originator Senderra Funding LLC. In 2007, Goldman acquired mortgage loan servicer Litton Loan Servicing.

304.     Goldman Sachs participated in mortgage securitizations as an underwriter for Countrywide and other RMBS issuers.  A senior Goldman Sachs Managing Director also served on the board of directors of Countrywide.

305.     As a purchaser and financer of mortgage loans, Goldman Sachs had unfettered access to numerous loan Originators and their loan files, and was intimately familiar with those Originators' policies and practices.

306.     As alleged herein, numerous investigations and lawsuits contain ample evidence available to Deutsche Bank and Goldman Sachs demonstrating that the Originators from whom Goldman Sachs purchased loans systematically disregarded their underwriting standards, originated mortgage loans with the goal of increasing volume, rather than evaluating the

mortgagor's ability to repay the loan and regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors.

307.    In late 2006 and early 2007, Goldman's Mortgage Department initiated an intensive review of its mortgage-loan inventory, originator relationships, warehouse lines of credit and RMBS and CDO holdings, in order to analyze its exposure to the mortgage loan market and to identify and demand repurchase of defective or fraudulent loans under its loan purchase agreements with loan originators.

308.    On February 2, 2007, Daniel L. Sparks, head of the Goldman Mortgage Department, reported to senior executives that his team was "working on putting loans in the deals back to the originators (New Century and Fremont – all real counterparties), as there seem to be issues potentially including some fraud at origination, but resolution will take months and be contentious."  2011 Subcommittee Report, 484.

309.    In response, Goldman Sachs decided to "re-underwrite" every loan purchased from specific originators, including New Century, Fremont and, later, Countrywide, in order thoroughly to identify defective or fraudulently originated loans owned by Goldman Sachs, and then demand their repurchase by their originators.

310.    Goldman Sachs initially focused on New Century and Fremont loans, finding that 26% and 50%, respectively, were defective and often fraudulent, and failed to comply with the mortgage originators' underwriting guidelines.

311.    Later, in June 2007, Goldman Sachs reviewed loans originated by Countrywide and determined that, like Fremont loans, 50% were defective and often fraudulent, and subject to repurchase.

312.     In April 2011, the Senate Permanent Subcommittee on Investigations issued the 2011 Subcommittee Report, reporting on abuses in the market for RMBS and other mortgage-related investments.

313.     The 2011 Subcommittee Report devoted over 200 pages to exposing for the first time "how Goldman engaged in securitization practices that magnified risk in the market by selling high risk, poor quality mortgage products to investors around the world." 2011 Subcommittee Report at 376.

314.     As the 2011 Subcommittee Report further revealed: "Goldman originated and sold RMBS securities that it knew had poor quality loans that were likely to incur abnormally high rates of default. At times, Goldman went further and sold RMBS securities to customers at the same time it was shorting the securities and essentially betting that they would lose value." *Id*. at 513.

315.     Goldman often relied on outside firms to conduct reviews of mortgage loans underlying its RMBS. One of the largest such firms was Clayton. As the 2011 FCIC Report concluded: "Because of the volume of loans examined by Clayton during the housing boom, the firm had a unique inside view of the underwriting standards that originators were actually applying – and that securitizers were willing to accept." Financial Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States 166 (2011), *available at* http://www.gpo.gov/fdsys/pkg/GPO-FCIC/content-detail.html (the "FCIC Report").

316.     For each loan pool they reviewed, Clayton checked (among other things) adherence to underwriting guidelines, whether non-compliant loans had sufficient "compensating factors" and accuracy of electronic loan data provided to investors. *See id*.

317.     According to Clayton, approximately 23% of the 111,999 loans that it reviewed for Goldman violated origination standards represented in Goldman disclosure documents, including the offering materials.  *Id*. at 167.  Goldman allowed one third of those non-compliant loans—about 7% of the total pool—to be included in RMBS sold to investors such as Plaintiffs.

318.     In RMBS transactions, the more junior tranches protect the most senior tranches by absorbing losses on defaulted loans.  However, this protection, or "credit enhancement," is typically limited to roughly 5% of the underlying loan principal.  As a result, a 7% defect rate among loans underlying an RMBS transaction would be more than enough to undermine the value of senior tranches such as the Certificates.

319.     Moreover, the percentage of defective loans in pools underlying Goldman RMBS was almost certainly much greater than 7%.  Goldman only rejected loans from the small samples reviewed in its "due diligence."  No loans were rejected from the un-sampled loans, and there was no system to prevent loans rejected from one sample from being included in subsequent securitizations (where they would likely remain undetected by future sampling).

320.     As the 2011 FCIC Report found:

> [M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled . . . .  [O]ne could reasonably expect [the unsampled loans] to have many of the same deficiencies, at the same rate, as the sampled loans.  Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.

FCIC Report at 167–70.

321.    As the 2011 Subcommittee Report found, Goldman "sold RMBS securities to customers at the same time it was shorting the securities and essentially betting that they would lose value." 2011 Subcommittee Report at 513.

322.    Additionally, in April 2013, IKB International S.A. and IKB Deutsche Industriebank AG (collectively "IKB") filed an action against various investment banks in which IKB performed a review of loans from one of the Covered Trusts—GSAMP 2006-HE1.  Compl., *IKB International S.A. v. Goldman Sachs Grp., Inc.*, No. 653101/2012 (N.Y. Sup. Ct. Apr. 19, 2013).  IKB found that the offering documents had understated the CLTV/LTV ratios by more than ten percentage points in over 38% of the sampled loans.  *Id.* ¶ 76.

### i.    Household Financial Services, Inc. and HSBC Bank USA, National Association

323.    Household Financial Services is n/k/a HSBC Finance Corp.  In 2003 Household International Inc. was acquired by HSBC Holdings, Inc.  In 2004 Household International Inc. merged with its subsidiary Household Financial Corporation and changed its name to HSBC Corp.  The foregoing entities are collectively referred to as "HSBC."

324.    HSBC originated mortgage loans included in the GSRPM 2006-1 Trust and served as Sponsor of the HASC 2006-HE1 and HASC 2006-OPT3 Trusts.

325.    On September 2, 2011, FHFA, as conservator for Fannie Mae and Freddie Mac, filed lawsuits against seventeen of the largest financial institutions involved in the packaging, marketing and sale of RMBS that Fannie Mae and Freddie Mac purchased during the period from 2005 to 2007, including HSBC and its affiliates.  Each of FHFA's complaints alleged that the defendants "falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans" and the "percentage of loans secured by

owner-occupied residences." *See* Compl., *FHFA v. HSBC N. Am. Holdings Inc.*, No. 06189/2011 (N.Y. Sup. Ct. Sept. 2, 2011).

326.    Additionally, in *FDIC v. Chase Mortg. Finance Corp.*, No. 12-cv-06166 (S.D.N.Y. Aug. 10, 2012), the FDIC filed an action against various investment banks including HSBC for the systemic abandonment of its underwriting guidelines.

### j.    Impac Mortgage Holdings Inc.

327.    Impac Mortgage Holdings Inc. is a mortgage company headquartered in Irvine California that acquires, purchases and sells mortgage loans ("IMH," and collectively with its affiliates "Impac"). Impac served as the Sponsor of and originated mortgage loans included in the IMM 2005-7 and IMM 2005-8 Trusts.

328.    In April 2011, the Federal Home Loan Bank of Boston (the "FHLB of Boston") filed an action against Deutsche Bank and others in which the FHLB of Boston performed a review of loans from one of the Covered Trusts—IMM 2005-7. Compl., *FHLB of Boston v. Ally Financial, Inc. f/k/a GMAC LLC,*, No. 11-1533 (Mass. Supp. Apr. 20, 2011). The FHLB of Boston found that the offering materials had understated the actual amount of loans with LTV ratios of 90% or greater by more than 23%. *Id.* ¶ 762.

329.    Additionally, Massachusetts Mutual Life Insurance Company ("Mass. Mutual"), an RMBS investor, sued Impac regarding RMBS for which Impac was the sponsor. Mass. Mutual conducted a forensic analysis of loans underlying an RMBS it had purchased. The analysis revealed that 48% of the loans tested had appraisals inflated by 10% or more, and 34% of the loans tested had LTVs that were ten or more points more than represented. Additionally, 15.45% of the loans that had been represented to be owner occupied were determined not to be

owner occupied.  *See* Compl. ¶¶ 87–88, 95, *Mass. Mutual Life Ins. Co. v. Impac Funding Corp.*, No. 11-cv-30127 (D. Mass. May 6, 2011).

330.     Impac's faulty loan origination practices were also the subject of a suit by a class of its shareholders.  The class action complaint contained detailed accounts of former employees regarding Impac's disregard of its underwriting guidelines.  *See* Third Am. Compl., *Pittleman v. Impac. Mortg. Holdings, Inc.*, No. 07-970 (C.D. Cal. Oct. 27, 2008).

331.     As set forth in the *Pittleman* Complaint, one former employee ("Employee #1") was an underwriting manager in charge of loan due diligence from October 2003 until July 2006. Employee #1's duties included performing due diligence on bulk loans by conducting a sampling of each loan pool and making recommendations as to whether or not Impac should buy particular loans and/or loan portfolios, which were then resold in the secondary markets.  "Employee #1 reported to Kevin Gillespie, Vice President of Underwriting, and Scott Hedbon, Chief Credit Officer.  Both Gillespie and Hedbon reported to William Ashmore, Impac's President, and Gillespie and Ashmore (plus [Joseph] Tomkinson, [Impac's] CEO) were members of the Loan Committee.  After conducting due diligence on a bulk loan, Employee #1 would generate a detailed report regarding that loan pool, which included an approval or rejection recommendation.  Every report was then e-mailed to Employee #1's superiors, including Tomkinson and Ashmore."  *Id.* ¶¶ 47–48.

332.     Employee #1 stated that "when bulk loan pools did not satisfy Impac guidelines, they were still approved by management on a regular basis, and specifically by Ashmore. Ashmore's rationale for constantly reversing rejection recommendations was that everyone in the industry was engaging in this type of practice.  Ashmore would justify his overriding the

underwriting department recommendations by stating that 'everybody is doing it' or 'if we didn't do it, someone else would.'" *Id.* ¶ 48.

333.    "Employee #1 left Impac out of frustration because he said the majority of loans that were being recommended for rejection were regularly approved for sale to investors.  As a result, he felt that performing due-diligence on bulk loan pools was a waste of his time when Ashmore would just override the results of the due diligence.  According to Employee #1, all management was looking for was a due-diligence officer to "'rubber-stamp' the loan pools because investors in the securitized loan pools required a certain level of quality control concerning these financial instruments." *Id.* ¶ 51.

334.    Another former employee ("Employee #2") was employed by Impac from January 2005 through October 2007, working in the Wholesale Loan Set-up Group.  "He reported that many borrowers had credit scores that were low or did not have enough income.  He also reported that whatever loan came in, the goal was to pass it on to the next step for approval, which was underwriting."  Employee #2 further reported "that a low credit score would not 'kill' the loan.  Rather, the loan would then go to the 'deal desk,' where deals were regularly made to get loans approved." *Id.* ¶ 56.  Employee #2 also explained that Impac inflated the reported incomes of applicants in order to approve loans for which the applicant would not otherwise qualify." *Id.* ¶ 57.

335.    Employee #3 further commented:

> [I]n processing 15 loans a day, there would not be enough time to check and follow the seller guides which were documented in great detail.  He confirmed that management encouraged the selling of loans to customers who should have not been eligible for Alt-A loans.  Employee #3 stated that this was accomplished because 90% of the loans done at Impac did not have documentation of income.

*Id.* ¶ 60.

336.    FHFA as conservator for Fannie Mae and Freddie Mac has also sued Bear Stearns in connection with material misstatements and omissions in RMBS Offering Documents. *See* Am. Compl., *FHFA v. JP Morgan*, No. 11-6188 (S.D.N.Y. June 13, 2012).

### k.    IndyMac Bank, F.S.B.

337.    By 2007, IndyMac was the largest savings and loan association in the Los Angeles area and the seventh largest mortgage originator in the United States.  IndyMac served as the Sponsor of and originated mortgage loans included in the INABS 2006-H1, INDX 2006-AR2 and RAST 2006-A15 Trusts.

338.    On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

339.    In June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac:  What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (2008), *available at* http://www.responsiblelending.org/mortgage-lending/researchanalysis/indymac_what_went _wrong.pdf ("CRL Report").  The CRL Report detailed the results of the CRL's investigation into IndyMac's lending practices.  CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac.  The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties.  CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

340.    CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

341.    The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id*.

342.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id*. at 3.

343.    Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id*. at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

344.    The CRL also found evidence that:  (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.  For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed. 'There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it,' Miller told CRL.  'And then they pressure you to approve it.'

> The refrain from managers, Miller recalls, was simple: 'Find a
> way to make this work.'

*Id.* at 9 (footnote omitted).

345.     Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader,

stated: "I would reject a loan and the insanity would begin.  It would go to upper management

and the next thing you know it's going to closing."  *Id.* at 1, 3.  Streater also said the "prevailing

attitude" at IndyMac was that underwriting was "window dressing—a procedural annoyance that

was tolerated because loans needed an underwriter's stamp of approval if they were going to be

sold to investors."  *Id.* at 8.

346.     Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona

during the same time period, told the CRL that IndyMac management would override his

decision to reject loans about 50% of the time.  *See id.* at 9.  According to Montilla:

> I would tell them:  "If you want to approve this, let another
> underwriter do it, I won't touch it – I'm not putting my name on
> it," Montilla says.  "There were some loans that were just blatantly
> overstated. . . .   Some of these loans are very questionable.
> They're not going to perform."

*Id.* at 10.

347.     Montilla and another IndyMac mortgage underwriter told the CRL that borrowers

did not know their stated incomes were being inflated as part of the application process.  *See id.*

at 14.

348.     On March 4, 2009, the Office of the Inspector General of the United States

Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled

"Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG

Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac

OIG Report portrays IndyMac as a company determined to originate as many loans as possible,

as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

349.     According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.  The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.  Appraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id*.

350.     IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market."  *Id*. at 11, 21.  The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment."  *Id*. at 11.

351.     IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable.  *Id*. at 2–3.

352.     IndyMac's "risk from its loan products . . . was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios."  *Id*. at 31.

353.     Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market."  *Id*. at 3.  This proved to be a weight it could not bear, and IndyMac ultimately failed.  *See id*.

354.     On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral.  *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 10-cv-04915 (C.D. Cal. July 2, 2010).  The case was tried in late 2012, and the jury entered verdict in favor of the FDIC.

355.     IndyMac currently faces or has faced additional litigation alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS.  *See, e.g.*, Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. May 14, 2009); Compl., *FHLB of Boston v. Ally Fin., Inc.*, No. 11-cv-10952-GAO (D. Mass. May 26, 2011); Compl., *Royal Park Invs. NA/SV v. Merrill Lynch*, No. 652607/2012 (N.Y. Sup. Ct. Nov. 7, 2012).

356.     IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities.  As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California and Modesto, California in 2009.  *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

### l.     Meritage Mortgage Corporation

357.     Meritage Mortgage Corporation ("Meritage"), founded in 1991, was a wholesale non-conforming mortgage provider that offered risk-based lending services.  In 2002, Meritage was acquired by NetBank, Inc. ("NetBank").  In 2006, Meritage was liquidated and sold to Lime Financial Services, which was later acquired by Credit Suisse.

358.    Meritage originated mortgage loans included in the MMLT 2005-2 Trust.

359.    As set forth in a November 2006 article, NetBank's Chief Executive Officer, Steven F. Herbert, stated that "[s]ince the beginning of October, [NetBank] [had] been working aggressively to refocus the company on its core banking and conforming mortgage competencies."  Herbert stated,

> We said then that our priorities were to exit or spin off any underperforming or non-core businesses so we could restore the company to profitability as quickly as possible and to improve the company's overall operating profile. Our decisions to exit the non-conforming mortgage and RV, boat and aircraft lending businesses contribute to those goals in a meaningful way, especially when you consider the steepness of the quarterly losses we have been incurring in the non-conforming channel.

*NetBank, Inc. Continues Strategic Reorganization with Disposition of Meritage Mortgage and Beacon Credit Services*, GlobeNewswire (Nov. 6, 2006), http://globenewswire.com/news-release/2006/11/06/350665/108148/en/NetBank-Inc-Continues-Strategic-Reorganization-With-Disposition-of-Meritage-Mortgage-and-Beacon-Credit-Services.html#sthash.YPfFCHv7.dpuf.

360.    A class action complaint filed against NetBank in 2008 contained confidential witness statements which revealed Meritage's poor underwriting guidelines and procedures.  *See* Compl., *In re NetBank, Inc. Secs. Litig.*, No. 07-cv-2298 (N.D. Ga. July 3, 2008).

361.    For example, one confidential witness, who was a senior managerial executive of Meritage from 2005 to 2007, reported that the underwriting guidelines used by Rick Baldwin, the individual in charge of the secondary marketing for Meritage, and Meritage were not uniform. *Id.* ¶ 113.  Rather, the witness stated that Baldwin and Meritage utilized unique underwriting guidelines for each investor.  *Id.*  As a result, individual agreements were reached with each investor which contained the responsibilities of the investor and Meritage including the terms under which loans could be "put back" to Meritage.  *Id.*  According to the confidential witness,

the true purpose of Meritage's underwriting guidelines was to answer the question, "at the end of the day, will the investor buy the portfolio?" *Id.* If the answer to that question was "yes," then the loan would be funded, whereas if the answer was "no," the loan would not be funded. *Id.*

362.    According to the same confidential witness, Meritage had little control over the quality of the loans available to it for purchase as a result of the manner in which Meritage generated its subprime loans.  According to that witness, rather than develop strong long-term relationships with reliable brokers to reduce the risk of purchasing low quality loans with a high risk of early default, in most instances, the brokers bringing loans to Meritage were "one-time broker[s]" for Meritage.  *Id.* ¶ 112.

363.    The same confidential witness also reported that in a March 2005 monthly, internal Meritage conference call, during which there was a discussion of how certain market conditions were working against Meritage and reducing its already thin profits, Russell Burdsall, the NetBank Head of Mortgage Operations, directed Meritage executives to "push the volume" of the subprime loans.  According to the witness, Rick Baldwin, the then-Director of Capital Markets at Meritage, stated on a May 2005 conference call that although investors were still buying the Meritage portfolios, the profits had been reduced.  As a result, by 2015, even though Meritage continued to produce loans, it either lost money doing so or generated only minimal profit.  *Id.* ¶ 118.

364.    Another confidential witness, a former high-level manager in NetBank's finance department from 2005 to 2007, was astonished at how low Meritage had allowed the quality of loans and underwriting to become, even providing subprime home loans to people who had gone bankrupt.  *Id.* ¶ 120.

116

365.    Yet another confidential witness, who was a senior managerial executive of Meritage, stated that NetBank was aware of certain difficulties with subprime mortgage underwriting guidelines which resulted in NetBank taking back mortgages that it should not have been accepting.  *Id.* ¶ 285.

366.    Additionally, in 2008, Meritage's poor underwriting practices were the subject of an Audit Report prepared by the Office of Inspector General, Department of the Treasury, dated April 23, 2008, titled "Safety and Soundness: Material Loss Review of NetBank, FSB."

367.    A 2012 complaint filed by Prudential Insurance Company of America presented forensic analysis of a sample of mortgage loans originated by Meritage and their true LTV and CLTV ratios, which revealed Meritage's systemic misrepresentations of the same.  *See* Compl. ¶ 115, *Prudential Ins. Co. of Am. v. RBS Fin. Products Inc.*, No. 12-cv-06822 (D.N.J. August 21, 2012).

368.    Prudential filed another complaint in 2012 against Goldman, Sachs & Company in which Meritage was one of the originators.  *See* Am. Compl., *Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, 2012 WL 7855854 (D.N.J. Oct. 26, 2012).  The complaint alleged that Meritage originated numerous poor quality loans in a rush to generate profits with little regard for sound underwriting practices.  *Id.* ¶ 286.

### m.    MILA, Inc.

369.    Mortgage Investment Lending Associates, Inc. ("MILA") was a wholesale mortgage lender specializing in subprime loans.  MILA failed in April of 2007 in large part because the investment banks that held its mortgages were demanding that MILA buy back those mortgages that did not meet their lending standards.  MILA originated mortgage loans included in the GSAMP 2006-HE1 Trust.

370.     MILA was an aggressive lender "catering to home buyers who for one reason or another—no down payment, unwilling to verify income, and so on—couldn't qualify for a mortgage with a bank but who were still worthy risks. . . ."  By 2006, MILA had 640 employees and $4.5 billion in mortgages (mostly subprime) distributed across 26 states.  Harold C. Barnett, And Some with a Fountain Pen: The Securitization of Mortgage Fraud (Nov. 4, 2009) (presentation to American Society of Criminology, Philadelphia, PA) (the "Barnett Report").

371.     MILA utilized a web-based interactive loan production management system developed to streamline the entire loan application process.  Like other automated underwriting systems ("AUS"), it allowed online application, automated underwriting, and the generation of a loan commitment within minutes.  The software enabled loan applications to be submitted and processed in less than a day and eventually less than four hours.  *Id.* at 15–16.

372.     Despite what might have been, MILA neither developed a procedure to match its speed of validation and verification to its speed of approval nor examined its loan history to weed out borrowers that were likely to default soon after their loans closed.  MILA increasingly approved loans that would experience early payment default, many of which were presumably fraudulent and based on misrepresentations.  *Id.* at 11.

373.     These deficiencies are evident in the growing rate of loans MILA was forced to repurchase.  It repurchased about $2.7 million loans in 2002, $8.26 million in 2003 and $37.66 million in 2004.  Repurchases represented 0.53% of loan sale in 2002 and had risen to 1.27% in 2004.  "MILA projected that its loan repurchases as a percentage of total loan sales would triple in 2005 through 2007."  *Id.* at 17.

374.     Goldman Sachs' relationship to MILA was a subject of the Barnett Report.  The Barnett Report follows a loan from origination by MILA to securitization by Goldman that Dr.

Barnett alleges was used to "fraudulently strip equity" from an elderly couple, Henderson Hall and Mary Hawthorne, in Chicago.  Hall and Hawthorne responded to a foreclosure rescue ad to try to save their home but instead their home was sold to a straw buyer, Charlotte Delaney (who was in fact the office manager of the company that would be purportedly rescuing Hall and Hawthorne from foreclosure), using a no-money-down, stated income loan from MILA.  *Id.* at 1.

375.    Dr. Barnett found that MILA approved the Delaney loan despite "obvious indications of fraud," including documentation of a prior lien, contradictory information regarding Delaney's income and no reserves.  *Id.* at 13–14.  The loan was then sold to Goldman for inclusion in the GSAMP 2006-HE3 Trust.

376.    Dr. Barnett concluded by stating that MILA's "originate to securitize" business model resulted in its demise and made victims out of "homeowners like Hall and Hawthorne who lost their equity to a fraud facilitated with a MILA loan and the investors in the Goldman Sachs RMBS [such as Plaintiffs here] who owned the foreclosed Delaney loan." *Id.* at 19.

377.    These poor origination practices partially resulted in a suit brought by the trustee in MILA's Chapter 11 bankruptcy case.  In that proceeding, the trustee exposed many of the facts cited above and accused the former CEO of MILA of fraud and other violations of state financial regulations.  *In re MILA, Inc.*, No. 07-bk-13059 (W.D. Wash. Aug. 29. 2008).

**n.    NC Capital Corporation and**
**New Century Mortgage Corporation**

378.    New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively, "New Century").  New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime

lenders—originating $60 billion in loans in 2006 alone.  New Century originated mortgage loans included in the SABR 2007-NC2 and SVHE 2005-3 Trusts.

379.    New Century failed amid revelations that its financial records contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding.  The circumstances leading to its collapse tell the story of a company that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

380.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

- The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500.  Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

- Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan.  They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

- New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus Dispatch, June 2, 2008, at 1A.

381.    New Century's foreclosure rates reflected its inattention to underwriting standards.  Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted.  Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield,

California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.  When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced, California and Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida and Vallejo-Fairfield-Napa, California.  2009 "Worst Ten in the Worst Ten" Report.

382.    The U.S. Bankruptcy Court for the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures.  The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting.  His final report to the Bankruptcy Court was unsealed and publicly released on March 26, 2008.  Final Report of Michael J. Missal Bankruptcy Court Examiner (Feb. 29, 2008), *available at* http://pdfserver. amlaw.com/ca/newcentury01_0327.pdf (the "Examiner's Report").

383.    The Examiner concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."  Examiner's Report at 2.  The Examiner summarized the findings:

- New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy.  Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006.  The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University."  Although a primary goal of any mortgage banking company is to make more loans, New

Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels. *Id*. at 3.

- The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. *Id*.

- More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as "liars' loans" because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that "we are unable to actually determine the borrowers' ability to afford a loan." *Id*.

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the "number one issue is exceptions to guidelines." Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. *Id*. at 3–4.

- Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality." Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market. *Id*. at 4.

- New Century's information technology and data entry and processing systems were not "state of the art" and were not sufficient for a business of the size and nature of New Century's. In particular, New Century's loan production processes were apparently manual and people-intensive through the fall of 2005. Up to that time, New Century apparently used an outdated DOS-based loan underwriting and appraisal operating system, which according to one

Management interviewee, allowed users to "finagle anything."
*Id*. at 54.

384.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id.* at 61–62.

385.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines.  Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id.* at 109.

386.    The Examiner found:

> New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004.  For example, in April 2004, New Century's Chief Credit Officer reported that "the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kickouts] are at an incline as well."  Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that "we have so many issues pertaining to quality and process!"

*Id*. at 110.

387.    Further adding to the problem was the fact that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id.* at 174.  With no policy in place, the granting of exceptions was arbitrary.  Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner

concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id.* at 111.

388.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC.  She testified that at New Century, risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . .  Many of the sales managers and account executives lacked any real estate or mortgage experience.  They were missing the depth of experience necessary to make an informed lending decision.  These same sales managers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. . . .

*Subprime Origination and Securitization: Hearing Before the Fin. Crisis. Inquiry Comm'n, Sect. 2* (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New Century).

389.    Ms. Lindsay also testified to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in 'at value,' fearing if they didn't, they would lose future business and their livelihoods.  They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id.*

390.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked "common sense"—that the business became "volume driven and automated" with a broker being able to get a loan pre-approved in "12 seconds or less."  *Id.*

391.    New Century's volume-driven abandonment of its underwriting guidelines resulted in enforcement actions by (and subsequent settlements with) numerous government agencies, including the SEC and Massachusetts and Ohio Attorneys General.

392.    Additionally, private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines.  For example, in the complaint in *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Supp. July 9, 2010), confidential witnesses stated that New Century abandoned underwriting guidelines to approve more loans; employees were told to do whatever they had to in order to increase volume; and loans that were not initially approved by underwriters were often later approved by superiors.

393.    Finally, in April 2012, HSH Nordbank AG and others filed an action against various investment banks in which HSH Nordbank performed a review of loans from one of the Covered Trusts—SABR 2007-NC2.  *HSH Nordbank AG v. Barclays Bank PLC*, No. 652678/2011 (N.Y. Sup. Ct. Apr. 2, 2012).  HSH Nordbank found that the offering materials overstated the actual percentage of owner occupied properties by more than 19%.  *Id.* ¶ 98.  HSH Nordbank further found that the offering materials overstated the weighted average CLTV of the sampled loans by over 10%.  *Id.* ¶ 109.

### o.    Paul Financial, LLC

394.    Paul Financial, LLC ("Paul Financial") originated mortgage loans included in the INABS 2006-H1 Trust.

395.    According to an amended complaint filed in New York state court in *Royal Park Investments NA/SV v. Merrill Lynch*, No. 652607/2012 (N.Y. Sup. Ct. Nov. 7, 2013), a

former Paul Financial Underwriting Assistant from 2004 through 2007 stated that "a lot of people were lying about their incomes." *Id*. ¶ 484. Because Paul Financial allowed borrowers to simply state their income without investigation, it ended up making loans to many borrows who could not afford the payments.

396. Moreover, the same employee stated that often when borrowers failed to qualify for loans, Paul Financial switched them to a different loan program for approval. As with other lenders at the time, Paul Financial thus "'qualified' borrowers for loans they could not actually afford." The amended complaint states that usually the change to a different loan program was to one where it was easier for the borrowers to submit false information on a loan application. *Id*. ¶ 489.

397. According to the amended complaint, Paul Financial did not conduct the appropriate due diligence to assess whether the borrower's incomes were accurate. In addition, Paul Financial simply ignored egregious examples of false information on loan applications. The *Royal Park* complaint details how a Paul Financial Post-Closing and Broker Service Representative, who worked for the company from October 2003 until June 2005, stated that he witnessed times where stated income applicants working with a mortgage broker were declined loans because of insufficient income. Yet after the mortgage broker heard from Paul Financial what the income requirement was, the applications would come back with the higher stated amount that qualified the borrowers for the loan. Paul Financial approved these loans. This employee stated that 70% to 80% of the loans he witnessed were stated income loans and that income inflation was common. *Royal Park* Complaint ¶ 486.

398. The same employee also stated that real estate appraisers working on Paul Financial loans typically appraised the property at exactly the purchase price, which was a

common lender tactic.  The Paul Financial employee stated that Paul Financial often felt that the appraisals were "inflated."  *Id.* ¶ 488.

399.     According to the , a different employee, a Paul Financial Broker Service Representative and Account Executive, who worked for Paul Financial from 2005 through 2007, confirmed that Paul Financial routinely accepted inflated reported incomes and allowed mortgage brokers to submit revised incomes for previously denied loans.  *Id.* ¶ 487.

400.     Finally, the *Royal Park* complaint alleges that Paul Financial simply "lent money to nearly any borrower regardless of repayment ability."  The complaint states that the former Paul Financial Broker Service Representative and Account Executive reported that "it was extremely rare to get loans declined" at Paul Financial.  *Id.* ¶ 490.

### p.      RBS Financial Products, Inc.

411.     In or about April 2009, Greenwich Capital Financial Products, a subsidiary of the Royal Bank of Scotland, changed its name to RBS Financial Products Inc. (collectively, "RBS"). RBS served as Sponsor of the FHLT 2005-1, FHLT 2005-2, MMLT 2005-2, SVHE 2005-3 and SVHE 2006-1 Trusts.

412.     RBS and its affiliates systematically violated its mortgage underwriting guidelines, including, among other things, disregarding or misstating income, assets and employment information of borrowers.

413.     Several state attorneys general have conducted investigations into the mortgage funding practices of RBS.  For example, the Nevada Attorney General conducted an investigation into RBS's due diligence process and for its role in assisting lenders by financing and purchasing loans where the lenders had made misrepresentations to consumers.  Press Release, Catherine Cortez Mastro, Attorney Gen., RBS Financial Products to Pay $42

Million for Securitization in Role in Nevada Subprime Mortgage Meltdown under Settlement with Attorney General Masto's Office (Oct., 24 2012), *available at* http://ag.nv.gov/uploadedFiles/agnvgov/Content/ News/PR/2012/2012-10-24_rbssettlementpr.pdf.

414.    The Nevada Attorney General found that RBS "had essentially created joint ventures with Countrywide and Option One and that its financing enabled those lenders to make reckless loans that were unlikely to be repaid."  Gretchen Morgenson, *Bank Settles Over Loans in Nevada*, N.Y. Times, Oct. 23, 2009, at B3.  In addition, RBS had bundled and sold loans after determining they were problematic and would limit the number of loans it reviewed at the lender's request.  *Id*.  RBS agreed to pay $42.5 million to settle with the Nevada Attorney General. *Id*.

415.    The Massachusetts Attorney General also investigated RBS for its role in financing, buying, and securitizing presumptively unfair mortgage loans, which RBS paid $52 million to settle.  Press Release, Martha Coakley, Attorney Gen., Royal Bank of Scotland to Pay $52 Million for Securitization in Subprime Mortgage Meltdown (Nov. 28, 2011), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2011/2011-11-28-rbs-settlement.html.

416.    RBS also paid over $150 million to settle an SEC investigation concerning RBS's misrepresentations and misconduct.  Press Release, U.S. SEC, SEC Charges Royal Bank of Scotland Subsidiary wit Misleading Investors in Subprime RMBS Offering (Nov. 7, 2013), *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/ 1370540300002#.VD8GKPnF-s4. The SEC investigation concluded that, while RBS stated the loans backing the offering "generally" met the lender's underwriting guidelines, nearly 30% of

the loans fell short of the guidelines and RBS should have excluded them.  *Id*.  The SEC further found that "RBS knew or should have known that was false because due diligence . . . showed that almost 30% of the loans underlying the offering did not meet the underwriting guidelines." *Id*.

417.    Private litigation has also highlighted RBS's violations of its underwriting guidelines and lack of due diligence.  The April 20, 2011 complaint filed by Federal Home Loan Bank of Boston described the practices of RBS through a confidential witness, CW-33, an associate in the asset-backed finance modeling group at RBS from October 2004 to February 2006.  Compl. ¶ 212, *Fed. Home Loan of Boston v. Ally Financial*, No. 11-1533 (D. Mass. Apr. 20, 2011).  CW-33 described how employees at RBS "turned a blind eye to red flags regarding the quality of the loans that were being packaged into mortgage-backed securities."  *Id*.  CW-33 described one instance where the witness tried discussing an article with his boss about an investigation into Ameriquest's lending practices, and his boss told him, "[y]ou need to sit down and shut the f*** up."  *Id*.  CW-33's explanation of this reaction was that "employees at RBS [] ignored red flags because they stood to gain significant profits from securitization: 'I knew we were destroying the economy. . . . But if you're making $40 million a year, do you care? No.'" *Id*.

418.    In *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, the class action plaintiffs alleged that RBS conducted inadequate due diligence to determine whether loans were originated in conformity with underwriting guidelines because its interest was being compensated when offerings were completed, and not in the return on the investment which depended on the creditworthiness of the borrowers.  Third Am. Class Action Compl. ¶ 11, *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*, No. 08-cv-5092

(S.D.N.Y. May 13, 2013).  RBS did not primarily conduct due diligence during the underwriting phase of the securitized offering, but rather while "inspecting smaller bulk-loans for possible purchase from third-party loan originators after successfully bidding on the loans at auction."  *Id*.  This created a disincentive to reject loans as non-conforming because the originator would be less likely to select RBS for future auctions.  Instead of rejecting the non-conforming loans, RBS negotiated lower prices. *Id*.

419.    On February 24, 2011, Massachusetts Mutual Life Insurance Company filed a complaint against RBS claiming RBS disregarded its underwriting standards in order to generate a large volume of loans for securitization and sale to investors.  Compl., *Mass. Mutual Life Ins. Co. v. RBS Financial Products Inc.*, No. 11-cv-30044 (D. Mass. Feb. 24, 2011).  The complaint alleged that the loans RBS purchased were often issued to borrowers with "overstated incomes, inflated appraisals, false verifications of employment, or exceptions to underwriting criteria that had no proper justification." *Id*. ¶ 85.  The complaint described how RBS "conducted due diligence on an expedited basis, with a very small percentage of the loan pool receiving any review."  *Id*. ¶ 84.  The complaint further alleged that RBS conducted limited oversight of the outside firms it hired to review an originator's compliance with underwriting guidelines.  *Id*.  While these firms would provide reports of loans that violated underwriting guidelines, RBS "routinely overrode exclusion of those loans from purchase and securitization."  *Id*.  RBS would then use the non-conforming loans as a mechanism to negotiate lower prices for the loans.  *Id*.

### q.    SouthStar Funding, LLC

420.    SouthStar Funding, LLC ("SouthStar") was a subprime lender based in Sandy Springs, Georgia, which offered a wide range of mortgage products but primarily specialized in funding subprime mortgages.

421.   SouthStar originated mortgage loans included in the GSAMP 2005-HE5 and GSAMP 2006-HE1 Trusts.

422.   On April 13, 2007, the New Jersey Department of Banking and Insurance issued legal documents ordering SouthStar to stop doing business in the state and took the initial step toward revoking the company's mortgage lender license.  *See Mortgage Broker Alert: SouthStar Funding, LLC*, State of N.J. Dep't of Banking & Ins., Apr. 13, 2007, *available at* http://www.state.nj.us/dobi/ocf_orders/southstarbroker_0704.html.

423.   A December 14, 2012 complaint filed by Royal Park Investments SA/NV contains allegations based on confidential witness statements by former SouthStar employees that confirm that SouthStar disregarded its underwriting standards and falsely inflated borrowers' stated incomes in order to make them appear to qualify for loans for which they otherwise would not qualify and which they could not afford to repay.  *See Royal Park* Complaint.

424.   According to one confidential witness, who was a former SouthStar Underwriter/Loan Processor from approximately late 2005 through March 2007, SouthStar routinely and falsely inflated borrowers' incomes above the amounts claimed by the borrowers to make it appear as though the borrowers qualified for the loans under SouthStar's underwriting guidelines, when in fact the borrowers did not.  *Id*. ¶ 382.

425.   The same confidential witness recalled also observing other underwriting guidelines violations at SouthStar, such as loan files that were not properly documented, and loans which were fraudulent, including loans with "straw buyers."  *Id.* ¶ 384.

426.   According to another confidential witness, who was a former SouthStar Senior Underwriting Manager from 2002 until approximately October 2006, SouthStar's actual underwriting guidelines were "handed to them" by the Wall Street investment banks that

purchased SouthStar's loans.  This witness expressed that he had numerous reservations about the quality of loans these underwriting guidelines and SouthStar generated.  The witness stated that he considered some SouthStar loans to be "a bad idea," and his reaction to making them was "are you kidding me?"  *Id.* ¶ 385.

427.    In addition, the same witness said he had considerable doubts about SouthStar's use of stated income loans for borrowers who were "W-2" employees, whose income could easily be verified via an IRS Form W-2, and SouthStar's repeated use of stated income loans for W-2 employees had reached "absurd" proportions.  The same confidential witness recalled situations where borrowers applied for full documentation loans which were denied, only to be subsequently approved for the loans after they resubmitted their loan requests as stated income loan applications.  Finally, this witness reported that SouthStar made these risky loans because it was giving the investment banks what they wanted.  *Id.*

428.    Additionally, according to the same former SouthStar Senior Underwriting Manager, it was "without a doubt" that SouthStar had some "bad" loan underwriters and that "fraud was rampant" during the relevant time period.  *Id.* ¶ 386.

429.    Another confidential witness, who was a former SouthStar Wholesale Mortgage Underwriter from November 2003 until either the summer 2004 or May 2006, reported that she "didn't like what they [SouthStar] were doing" because SouthStar was making many questionable loans while she worked there.  The same witness reported that SouthStar's underwriting guidelines were "ridiculous."  In addition, the same witness stated that the guidelines used by SouthStar were written by the investment banks that bought SouthStar's loans, which included banks such as JPMorgan (via Bear Stearns and EMC Mortgage) and Goldman Sachs.  This confidential witness also recalled instances where she personally refused

to approve questionable loans, which were later approved by other SouthStar personnel. Moreover, the same witness reported that she also observed stated income loans with stated incomes that were unreasonable.  *Id.* ¶¶ 387–88.

430.    According to another witness, who was a former SouthStar Underwriter from 2005 through 2007, SouthStar's underwriting guidelines created loans that were "designed to fail" and that loans were made to borrowers who could not afford to repay them.  *Id.* ¶ 389.

431.    Other private litigations also highlight SouthStar's violations of its underwriting guidelines.  *See, e.g.*, Compl., *Royal Park Investments SA/NV v. Goldman Sachs Grp.*, No. 652454/2013 (N.Y. Sup. Ct. July 12, 2013) (action involving misrepresentations and violations of SouthStar's underwriting guidelines); Compl., *Bayerische Landesbank v. Goldman Sachs Grp.*, No. 653111/2012 (N.Y. Sup. Ct. Sept. 5, 2012) (same); Compl., *Bayerische Landesbank v. Bear Stearns & Co.*, No. 653239/2011 (N.Y. Sup. Ct. Nov. 21, 2011) (same).

### r.    Sutton Funding LLC

432.    As set forth above, Sutton is a subsidiary of Barclays.  Sutton served as the Sponsor of the SABR 2007-NC2 Trust.

433.    As alleged herein, numerous investigations and lawsuits contain ample evidence available to Deutsche Bank and Sutton demonstrating that the Originators from whom Sutton purchased loans systematically disregarded their underwriting standards, originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and regularly made exceptions to their underwriting guidelines in the absence of sufficient compensating factors.

434.    On September 2, 2011, FHFA filed lawsuits against seventeen of the largest financial institutions involved in the packaging, marketing and sale of RMBS, including Barclays

and its affiliates.  Each of FHFA's complaints alleged that the defendants "falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans" and the "percentage of loans secured by owner-occupied properties."  *See* Compl., *FHFA v. Barclays Bank PLC*, No. 06190/2011 (N.Y. Sup. Ct. Sept. 2, 2011).

435.    On April 24, 2014 it was announced that FHFA settled with Barclays Bank PLC for $280 million to resolve claims brought in *FHFA v. Barclays Bank PLC* and *FHFA v. Ally Financial Inc*., "alleging violations of federal and state securities laws in connection with private-label mortgage-backed securities purchased by Fannie Mae and Freddie Mac during 2005–2007."  Press Release, FHFA Announces $280 Million Settlement with Barclays Bank PLC (Apr. 24, 2014), *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-$280-Million-Settlement-with-Barclays-Bank-PLC.aspx.

### s.    WMC Mortgage Corp.

436.    In 2004, General Electric ("GE") purchased WMC Mortgage Corporation ("WMC") from a private equity firm.  At that time, WMC was the sixth-largest subprime lender in the country and specialized in nonprime loans and jumbo loans of up to $1 million.  WMC originated mortgage loans included in the GSAMP 2005-WMC2, GSRPM 2006-1 and HASC 2006-HE1 Trusts.

437.    On January 20, 2012, the Huffington Post reported that the FBI and the DOJ were investigating possible fraud at WMC.  Marcus Baram, *GE's Former Subprime Unit Probed for Possible Fraud*, Huffington Post, http://www.huffingtonpost.com/2012/01/20/wmc-mortgage-corp-ge-subprime_n_1219920.html (last updated Jan. 20, 2012 5:41 PM EST).

438.    According to an article, "the government is asking whether WMC used falsified paperwork, overstated borrowers' income and other tactics to push through questionable loans"

with the probe focused on whether "senior managers condoned improper practices that enabled

fraudulent loans to be sold to investors."  Michael Hudson & E. Scott Reckard, *Feds*

*Investigating Possible Fraud at GE's Former Subprime Unit*, iWatch News,

http://www.publicintegrity.org/2012/01/20/7908/feds-investigating-possible-fraud-ge-s-former-

subprime-unit (last updated May 19, 2014 12:19 PM).  The article reports:

> The FBI's San Francisco office indicated that it has been looking
> into WMC's business practices for nearly two years, according to
> one of the people who has knowledge of the investigation.  The
> bureau has examined individual WMC loan files and has begun
> contacting former employees about how the lender handled the
> sale of mortgages to investors. . . .

*Id*.

439.    In another article, Hudson provided a lengthy report on GE's purchase of WMC

and the practices of WMC's sales staff to push through loans at any cost.  According to the

article, several ex-employees claim that many WMC sales staff "embraced fraud as a tool for

pushing through loans that borrowers couldn't afford" and that WMC ignored reports of loans

supported by falsified documents and inflated incomes.  The article continues:

> Dave Riedel, a former compliance manager at WMC, says sales
> reps intent on putting up big numbers used falsified paperwork,
> bogus income documentation and other tricks to get loans
> approved and sold off to Wall Street investors.
>
> One WMC official, Riedel claims, went so far as to declare: 'Fraud
> pays.' . . .
>
> The team, Riedel says, found many examples of fraud committed
> by in-house staffers or the independent mortgage brokers who
> helped bring in customers to the lender.  These included faking
> proofs of loan applicants' employment and faking verifications that
> would-be home buyers had been faithfully paying rent for years
> rather than, say, living with their parents.
>
> Some employees also fabricated borrowers' incomes by creating
> bogus W-2 tax forms, he says.  Some, he says, did it old-school,
> cutting and pasting numbers from one photocopy to another.

Others, he says, had software on their computers that allowed them to create W-2s from scratch. . . .

[Gail] Roman worked as a loan auditor at WMC's regional offices in Orangeburg, N.Y. She and other colleagues in quality control, she says, dug up persuasive evidence of inflated borrower incomes and other deceptions on loan applications. It did little good. Management ignored their reports and approved the loans anyway, she says.

"They didn't want to hear what you found. . . . Even if you had enough documentation to show that there was fraud or questionable activity." . . .

Argueta says one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.

"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta says. "Anything to make the loan look better than what was the real story." . . .

Management gave him a pat on the back for pointing out the problem, he says, but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

A former manager who worked for WMC in California claims that company officials transferred and essentially demoted her after she complained about fraud, including the handiwork of a sales rep who used an X-Acto knife to create bogus documents, cutting numbers from one piece of paper and pasting them onto another, then running the mock-up through a photocopier. . . .

By early 2006, Dave Riedel had begun to rebuild his career inside WMC.

He helped put together a presentation in May 2006 aimed at giving GE officials a sense of how serious WMC's fraud problems were. Riedel says an audit of soured loans that investors had asked WMC to repurchase indicated that 78 percent of them had been fraudulent; nearly four out of five of the loan applications backing these mortgages had contained misrepresentations about borrowers' incomes or employment.

Michael Hudson, *Fraud and Folly: The Untold Story of General Electric's Subprime Debacle*, iWatch News, http://www.publicintegrity.org/2012/01/06/7802/fraud-and-folly-untold-story-general-electric-s-subprime-debacle (last updated May 19, 2014 12:19 PM).

440.    On the radio program "This American Life," broadcast May 9, 2008, reporter Alex Blumberg interviewed a WMC sales manager who made over a million dollars a year by making loans to "people [who] didn't have a pot to piss in."  Blumberg reported that the manager "didn't worry about whether the loans were good. . . .  That's someone else's problem."  *This American Life, 355: The Giant Pool of Money* (May 9, 2008), http://www.thisamericanlife.org/radio-archives/episode/355/the-giant-pool-of-money.

441.    In June 2008, the Washington State Department of Financial Institutions filed a "Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees" against WMC and its owners.  The Statement of Charges stemmed from an investigation that found WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on multiple loans, understated amounts of payments made to escrow companies, understated annual percentage rates by almost 5% and committed numerous other violations of Washington State deceptive and unfair practices laws.  In July 2009, WMC entered a consent order under which it agreed to pay fines, restitution and the costs of the investigation to settle the matter.  *In re WMC Mortg. Corp.*, Consent Order, No. C-07-557-09-CO02 (July 21, 2011), *available at* www.dfi.wa.gov/CS%20Orders/C-07-557-09-CO02.pdf.

442.    In *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*, No. 11-cv-02542-PAM-TNV (D. Minn. Sept. 2, 2011), the RMBS trustee sued to require WMC to repurchase loans that were fraudulent and did not comply with the stated underwriting

guidelines.  A review of a sample of 200 loans within the trust indicated that 75% of the loans were either fraudulent, not originated pursuant to the underwriting guidelines and/or did not reflect a proper determination of whether the borrower could afford to repay the loan.  *Id.* ¶ 20.

443.      On September 2, 2011, FHFA sued GE alleging that the company made inaccurate statements about the quality of loans underlying the securities, including those issued in 2005 by WMC.  *See* Compl., *FHFA v. Gen. Elec. Co.*, No. 11-cv-07048 (S.D.N.Y. Sept. 2, 2011).  FHFA's allegations in the complaint *FHFA. v. WMC Mortgage LLC*, No. 13-cv-00584 (S.D.N.Y. Jan. 25, 2013), that WMC misrepresented approximately $1 billion in mortgages it pooled and sold were sustained by the court.  Investigations in 2011, 2012 and 2013 identified problems among at least 55% of the loans and these problems include loan documentation that understated credit risk by overvaluing properties or misstating their purpose.  These FHFA actions were widely publicized.  *See, e.g.*, Rachel Layne, *GE Says FHFA Filed Mortgage-Security Suit Without Warning*, Bloomberg (Sept. 7, 2011), http://www.bloomberg.com/news/2011-09-07/ge-plans-to-vigorously-contest-fhfa-litigation-notice.html; Nate Raymond, *FHFA Says Settlement Reached with GE in Mortgage Case*, Reuters (Jan. 23, 2013), http://www.reuters.com/article/2013/01/23/us-ge-fhfa-idUSBRE90M18R20130123.

444.      As alleged in a derivative suit:

> Bond insurance companies also filed actions to recoup losses arising from WMC's fraudulent loan originations.  For example, in *PMI Mortgage Insurance Co., et al v. WMC Mortgage Corp., et al.*, No. BC381972 (L.A. Sup. Ct. Jan. 4, 2008), WMC and GE were sued for loans made in violation of the stated underwriting standards.  There, a review of loans found "a systemic failure by WMC to apply sound underwriting standards and practices."  Reviewing a sample of the nearly 5,000 loans in the pool, PMI identified 120 "defective" loans for which borrowers' incomes and employment were incorrect or where the borrower's intention to

live in the home was incorrect. *The New York Times* reported on this action. *See If Everyone's Finger-Pointing, Who's to Blame?* N.Y. Times (Jan. 22, 2008).

Compl. ¶ 297, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y. Sup.

Ct. June 18, 2014) (citations in original).

445.    The derivative suit further alleged:

> PMI filed another lawsuit against WMC in September 2009 after a review of WMC's loan files found that WMC "followed few, if any, objective standards or criteria in underwriting [mortgage loans] and showed little concern, if any, for any borrower's ability to repay." *PMI Mortg. Ins. Co. v. WMC Mortg. Corp.*, No. BC381972 (L.A. Super. Ct.). According to PMI's complaint, a review of a sample of thousands of WMC-originated loans revealed that WMC "breached various representations and warranties [attesting that,] *inter alia*, the loan-to-value ratio at the time of origination was greater than 100%; fraud, errors, misrepresentations, or gross negligence took place on the part of WMC . . . ; the loans did not comply with WMC's own underwriting standards at the time of origination; certain documents were missing; and/or WMC had failed to utilize a methodology in underwriting the loans that employed objective mathematical principles designed to determine that, at the time of origination, the borrower had the reasonable ability to make timely payments on the [m]ortgage [l]oans." According to the PMI complaint, the investigation "demonstrate[d] a systemic failure by WMC to apply sound underwriting standards and practices which cuts across all of the [loans in the securitization]." In the defective loans, the investigation discovered "unreasonable stated income and/or misrepresentations of income and/or employment by the borrower.' Moreover, nearly a quarter of the loans sampled were shown to contain 'misrepresentations of occupancy by the borrower."

*Id*. ¶ 298 (citations and brackets in original).

446.    These are just a handful of the complaints that have alleged that WMC's loans

breached the associated representations and warranties. *See also, e.g.*, Compl., *Cambridge Place*

*Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Super. July 9, 2010); Compl.,

*Phoenix Light SF Ltd. v. Credit Suisse*, No. 653123/2013 (N.Y. Sup. Ct. Feb. 9, 2013); Compl.,

*Phoenix Light SF Ltd. v. J.P. Morgan Secs.*, No. 651755/2012 (N.Y. Sup. Ct. Oct. 5, 2012);

Compl., *Sealink Funding Ltd. v. Morgan Stanley*, No. 650196/2012 (N.Y. Sup. Ct. Jan. 20,

2012). The complaints provide direct evidence based on re-underwriting that a substantial

portion of the loans originated by WMC were likely in breach.

447.     Most tellingly, Deutsche Bank itself has commenced repurchase actions against

WMC involving other trusts. In one such repurchase action against WMC, Deutsche Bank

commissioned an expert to review the actual loan files for over 1,400 loans that were contained

with this offering. The expert found that a remarkable 99.7% of the reviewed loans breached the

one or more of WMC's representations and warranties. *See* Compl. ¶¶ 7–8, *Deutsche Bank Nat'l*

*Trust Co. v. WMC Mortg. LLC*, No. 12-cv-00933-CSH (D. Conn. June 25, 2012).

### C.     Deutsche Bank Failed to Exercise Due Care and Enforce Repurchase Obligations

448.     As set forth above, Deutsche Bank became aware of defaults under the PSAs.

Once it became aware of a default it had a duty under the TIA to exercise with due care all

rights available under the PSAs to protect Certificateholders' interests.

449.     Deutsche Bank did not exercise due care when it learned of defaults. When

Deutsche Bank provided its final exception reports to the Sponsors, Depositors and Master

Servicers (or Servicers) indicating that mortgage files were missing required documents, it

should have acted to require the Sponsors or Originators to repurchase or replace the non-

compliant loans. At a minimum, Deutsche Bank should have notified Certificateholders that

the mortgage files were incomplete and the Sponsors or Originators did not repurchase or

substitute the loans.

450.     When Deutsche Bank learned that the Master Servicers or Servicers failed to

provide notice of numerous breaches of representation and warranty provisions as required

under the PSAs, Deutsche Bank should have (i) taken action against the Master Servicers or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase the loans; and (iii) notified Certificateholders of the Master Servicers' or Servicers' defaults and the breaches of representation and warranty provisions.

451.    In addition to its duty under the TIA to exercise due care upon learning of a default, Deutsche Bank had a similar duty under the PSAs to exercise due care upon an Event of Default.  Events of Default occurred under each of the PSAs, but Deutsche Bank failed to take the required actions to protect the rights of the Covered Trusts.  As set forth above in Section III(B), Deutsche Bank was aware that the Master Servicers, Servicers, Depositors, and Sponsors failed to provide notice of representation and warranty violations that occurred in the Covered Trusts.  Deutsche Bank, however, did not provide notice of such defaults as it was required to do.  Because these defaults would have seasoned into Events of Default if notice had been provided, Deutsche Bank had the duty to act prudently to enforce repurchase provisions once it learned of such defaults.

452.    As described below, additional Events of Default occurred under the terms of the PSAs.  Deutsche Bank has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.    Events of Default Under the PSAs Relating to Document Delivery Failures

453.    As alleged in Section III(A) above, the mortgage files for the Covered Trusts were often materially incomplete, yet the affected loans were not repurchased or substituted with compliant loans.  Events of Default relating to document delivery failures occurred shortly after the closing of the RMBS transactions.

454.    Many of the loans underlying the Covered Trusts defaulted in the year following closing.  Both the Servicers and the Trustee were aware that many of the defaulted loans were listed on final exception reports because they were missing documents necessary to foreclose.  Both the Servicers and Trustee were also aware that these loans were not put-back to the Sponsors or Originators and, instead, as described in Section III(A), the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent servicer would have insisted that the loans be repurchased.

455.    Under each of the Covered Trusts, an Event of Default occurred because the Master Servicer or Servicers received formal notice of their failure to prudently service mortgage loans in the form of the final exception report from the Trustee.  For example, Section 3.01 of the IndyMac PSA provides:  "For and on behalf of the Certificateholders and the Certificate Insurer, the Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and the Servicing Standard."  "Servicing Standard" is defined in the IndyMac PSA as "[t]hat degree of skill and care exercised by the Servicer with respect to mortgage loans comparable to the Mortgage Loans serviced by the Servicer for itself or others."  Each of the PSAs for the other Covered Trusts contained similar provisions.  *See* Ex. C § IX.

456.    Once the Trustee notified the Master Servicer or Servicer of document deficiencies, these parties should not have proceeded with foreclosures, modification or other loss mitigation.  A prudent servicer would have caused the loans to be substituted for with compliant loans or repurchased.  The Master Servicers and Servicers here instead continued to proceed with foreclosures, modifications, or loss mitigation, fabricating documents and providing false statements under oath.  Under the TIA, the Trustee was required to provide

notice of such defaults and its failure to do so cannot avoid the occurrence of an Event of Default.

457.     The IndyMac PSA further provides that an Event of Default arises from the Servicer's breaches relating to its failure to enforce the Sponsor's obligation to repurchase or substitute loans identified in the final exception report for reasons other than a delay in receiving documents from a recording office.  For example, Section 7.01(b) of the IndyMac PSA provides that an event of default occurs if the Servicer fails to perform under the PSA and expressly provides that if the breach relates to "the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans [or] the failure to repurchase or substitute in lieu thereof," no notice or cure period applies.  These provisions provide an alternative and additional basis for an Event of Default under the IndyMac PSAs relating to document delivery failures. The Aegis PSA contains a substantially similar provision.

458.     As set forth in Section II(E), the PSAs for the Aegis, American Home, HSBC, Impac and IndyMac Trusts each provide that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach remains un-remedied for a specified period after notice of the breach.

459.     Further, as set forth in Section II(E), the PSAs for the Ameriquest, First Franklin, Goldman, RBS and Sutton Trusts each provide that the Servicer's failure to perform its covenant to prudently service the mortgage loans ripened into a Servicer Event of Default if it remains uncured for a specified period after a Servicing Officer learned of such failures—no formal notice is required.  An Event of Default occurred under each of these PSAs in the first year of the relevant Covered Trusts' existence because the relevant Servicing Officers were actually aware of the Servicers' practices of foreclosing, modifying,

or engaging in other loss mitigation when the loans should have been repurchased or substituted.

460.    Despite the existence of uncured Events of Default, Deutsche Bank did not adequately address the defaults and Events of Default.  If Deutsche Bank had exercised due care, it would have exercised remedies to address the document delivery failures and numerous breaches of representations and warranties by the Sponsors and Originators and caused them to repurchase or substitute the affected loans.  Its failure to do so damaged Plaintiffs.

## 2.    Events of Default Under the Indentures

461.    As noted, five of the Covered Trusts were documented using an Indenture rather than a Pooling and Servicing Agreement.  While the same type of Events of Default occurred under the Indenture as described above in Section III(C)(1), the relevant provisions are slightly different in that the Issuer's (*i.e.*, the Trust's) breach of the Indenture gives rise to an Event of Default, rather than the Master Servicer's or Servicer's breaches.

462.    For the Aegis Trust, the Issuer delegated all of its duties to Wells Fargo Bank, N.A., the Master Servicer.  For INABS 2006-H1 the Issuer delegated all of its responsibilities to Deutsche Bank.

463.    Each Indenture required the Issuer to protect the collateral of the trust.  For example, Section 3.05 of the Aegis Indenture provides in relevant part, "[t]he Issuer will . . . take such other action necessary or advisable to: . . . (iii) enforce any rights with respect to the Collateral; or (iv) preserve and defend title to the Collateral and the rights of the Indenture Trustee and the Noteholders in such Collateral against the claims of all persons

and parties." The Indentures for AHM 2006-1, IMM 2005-7, IMM 2005-8 and INABS 2006-H1 all have similar provisions. *See* Ex. C § IX.

464.   The failure to do so is an Event of Default. For example, Section 5.01 of the Aegis Indenture provides that an Event of Default occurs when the Issuer fails:

> to observe or perform any covenant or agreement of the Issuer made in this Indenture . . . and such default shall continue or not be cured, . . . for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the Outstanding Balance of the Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be  remedied and stating that such notice is a notice of Default hereunder.

The Indentures for AHM 2006-1, IMM 2005-7, IMM 2005-8 and INABS 2006-H1 all have similar provisions. *See* Ex. C § X.

465.   As discussed above, the Trustee provided written notice that the mortgage files were incomplete. The Issuers under the Indenture failed to protect the collateral, a fact the Trustee was well aware of. As a result, an Event of Default occurred under the Indentures in the first year of the existence of the Aegis, American Home, Impac Mortgage and INABS 2006-H1 Trusts.

466.   As detailed in Section III(B), the Trustee became aware of public information indicating that the Issuer failed to protect the collateral by enforcing the Sponsors' or Originators' repurchase obligations triggered by representation and warranty violations. Events of Default occurred as a result.

467.   In addition, Section 3.07(d) of the Aegis Indenture provides that the Issuer must give notice to the rating agencies and the Trustee of an Event of Default under the Transfer and Servicing Agreement. Section 7.1(a)(iii) of the Transfer and Servicing

Agreement provides that defaults relating to document delivery failures or "the Mortgage File for Delay Delivery Mortgage Loans" are deemed Events of Default as soon as the Final Certification of the Trustee is provided and an obligation to repurchase or substitute arises. The Indentures and related servicing agreements for the American Home, Impac Mortgage and INABS 2006-H1 Trusts have similar provisions.  The Issuers were aware of these Events of Default, but did not give the required notice.  The Trustee was fully aware of this fact, but failed to act.  An Event of Default occurred under this provision as well and the Trustee failed to exercise due care.

### 3.   Deutsche Bank Received Formal Notice of Representation and Warranty Violations Which Ripened into Events of Default

468.   In addition to the Events of Default discussed above, on or about December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts issued written instructions to Deutsche Bank, as Trustee, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans. Less than two years later, Deutsche Bank and other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts.  The JPMorgan putback initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including Countrywide and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Wells Fargo and Countrywide.  Deutsche Bank accepted the settlement with JPMorgan with respect to certain trusts despite that the settlement would reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct.  *See* Compl. ¶¶ 9–10, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y. Sup. Ct. June 18, 2014); Dawn Kopecki & Alexis Leondis,

*JP Morgan Sets Tentative $45 Billion Accord for Mortgage Bonds*, Bloomberg (Nov. 16, 2013 12:00 AM), http://www.bloomberg.com/news/2013-11-15/jpmorgan-reaches-4-5-billion-mortgage-bond-deal-with-investors.html.  None of the Covered Trusts are part of this settlement.

469.    Further, on January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to Deutsche Bank to investigate large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans.  The Morgan Stanley putback initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including New Century and American Home Mortgage, and identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Wells Fargo and Saxon.  *See* Compl. ¶ 397, *Blackrock Allocation Target Shares*, No 651866/2014.

470.    To date, Deutsche Bank has not exercised due care to ensure that Certificateholders' interests are protected

471.    Beginning in 2013, Deutsche Bank commenced lawsuits relating to RMBS trusts other than the Covered Trusts against certain Sponsors and Originators (including, among others, HSBC) for breaches of representations and warranties.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. HSBC Bank USA, N.A.*, No. 652001/2013 (N.Y. Sup. Ct. Nov. 12, 2013).  These lawsuits, which alleged pervasive and systemic breaches of representations and warranties demonstrate that Deutsche Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Covered Trusts, but failed to exercise due care.

**D.    Deutsche Bank Provided False Regulation AB Certifications and Remittance Reports**

472.    For the first year of their existence, all of the Covered Trusts other than GSRPM 2006-1 were reporting entities under the Securities Exchange Act of 1934.  For Covered Trusts offered 2006 and later, at the end of the trust's first year, the Depositor filed with the SEC with respect to each Covered Trust a report on Form 10-K that contained a certification from Deutsche Bank that collateral securing the loans held by the Covered Trust had been maintained as required by the relevant transaction agreements and that pool assets and related documents were safeguarded.  *See* SEC Regulation AB, 17 C.F.R § 229.1122(d)(4)(i) and (ii).  The servicers made similar certifications.  Deutsche Bank re-certified annually that the servicing requirements were met with respect to all trusts that it administered.  These filings were false and misleading in that they failed to disclose Sponsors' widespread failure to transfer complete mortgage files to the Covered Trusts and the Sponsors' and Originators' many breaches of representations and warranties regarding the underwriting of the mortgage loans and their obligations as to transfer of title.

473.    Deutsche Bank regularly made (or received) remittance reports available to Certificateholders as it was required to do under the PSAs.  Under Item 1121 of SEC Regulation AB, such reports must disclose "[m]aterial breaches of pool asset representations or warranties or transaction covenants."  *See* 17 C.F.R. § 229.1121(a)(12).  Deutsche Bank, however, did not disclose the Sponsors', Originators', Master Servicers' and Servicers' numerous breaches of representations and warranties and transaction covenants.

474.    The effect of the multiple disclosure failures concerning breach of representations and warranties and contractual requirements has been to mislead Certificateholders and conceal Deutsche Bank's breaches of its contractual, fiduciary and statutory duties.

475.     If Deutsche Bank had filed an accurate certification, as it was required to do, the Sponsors or Originators would have been forced to repurchase all of the non-compliant loans and the certificate losses would have been substantially eliminated.  Moreover, if Deutsche Bank had exercised a reasonable degree of care and issued accurate certifications, the Sponsors and Originators would not have been able to continue to unload defective and non-compliant mortgage loans in securitization transactions.

**E.     Deutsche Bank Failed to Address the Master Servicers' and Servicers' Looting of Trust Assets**

476.     The Master Servicers and Servicers failed to prudently service the mortgage loans underlying the Covered Trusts.  In addition to the Events of Default identified above in Section III(C), the Master Servicers and Servicers have also systemically refused to modify loans when it is in the Covered Trusts' interest to do so rather than foreclose.  The Master Servicers and Servicers have done so because they have engaged in a variety of scams to overcharge borrowers (and ultimately the Covered Trusts) for default related services.

477.     From 2005 until today, the Servicers and Master Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured.

478.     When a defaulting borrower's home is foreclosed upon and sold, the Servicers and Master Servicers deduct their fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred

to the securitization trust that purportedly owned the mortgage loan and was entitled to the net sale proceeds.

479.   These servicing related defaults ripened into Events of Default under the PSAs for the Covered Trusts.  As set forth in Section II(E), the PSAs for the Ameriquest, First Franklin, Goldman, RBS and Sutton Trusts provided that the Servicers' failure to perform its covenant to prudently service the mortgage loans ripened into an Event of Default if it remained uncured for a specified period after a Servicing Officer learned of such failures—no formal notice is required.

480.   These servicing related breaches were also defaults under the PSAs for the Aegis, American Home, HSBC, Impac and IndyMac Trusts.  Deutsche Bank had an obligation to provide notice of such defaults, which would have resulted in additional Events of Default, but it failed to do so.

481.   The chart below identifies each of the entities disclosed to be Servicers and Master Servicers of the Covered Trusts, each of which failed to prudently service the mortgage loans underlying the Covered Trusts.

|   | **Trusts** | **Servicer(s)** | **Master Servicer** |
|---|------------|-----------------|---------------------|
| 1 | AABST 2006-1 | Ocwen Loan Servicing, LLC | Wells Fargo Bank, N.A. |
| 2 | AHM 2006-1 | American Home Mortgage Servicing, Inc. | Wells Fargo Bank, N.A. |
| 3 | ARSI 2006-W2 | | Ameriquest Mortgage Company |
| 4 | FFML 2006-FF11 | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 5 | FHLT 2005-1 | Litton Loan Servicing LP | Freemont Investment & Loan; RBS Financial Products, Inc. |
| 6 | FHLT 2005-2 | Litton Loan Servicing LP | Freemont Investment & Loan; RBS Financial Products, Inc. |
| 7 | GSAMP 2005-HE5 | Litton Loan Servicing LP | |

| 8 | GSAMP 2005-WMC2 | Litton Loan Servicing LP | |
| 9 | GSAMP 2006-HE1 | Litton Loan Servicing LP | |
| 10 | GSRPM 2006-1 | Litton Loan Servicing LP | |
| 11 | HASC 2006-HE1 | Countrywide Home Loan Servicing, Inc.; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 12 | HASC 2006-OPT3 | Option One Mortgage Corporation | Wells Fargo Bank, N.A. |
| 13 | IMM 2005-7 | GMAC Mortgage Corporation | Impac Funding Corporation |
| 14 | IMM 2005-8 | GMAC Mortgage Corporation; Midland Loan Services, Inc. | Impac Funding Corporation |
| 15 | INABS 2006-H1 | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. |
| 16 | INDX 2006-AR2 | IndyMac Bank F.S.B. | IndyMac Bank F.S.B. |
| 17 | MMLT 2005-2 | Saxon Mortgage Services, Inc. | |
| 18 | RAST 2006-A15 | IndyMac Bank | |
| 19 | SABR 2007-NC2 | HomEq Servicing Corporation | |
| 20 | SVHE 2005-3 | Litton Loan Servicing LLC | |
| 21 | SVHE 2006-1 | Litton Loan Servicing LP | |

### 1.   American Home Mortgage Investment Corp., IndyMac Bank, F.S.B., Option One Mortgage Corporation, Ocwen Loan Servicing, LLC, HomEq Servicing Corporation and Sutton Funding LLC's Servicing Scams

482.   As set forth above, in 2008, Option One Mortgage was acquired by American Home Mortgage Servicing, Inc.  In or about March 2009, One West acquired IndyMac Bank's servicing business.  In or about February 2012, Ocwen acquired American Home and, in 2013, Ocwen acquired One West's mortgage servicing business.

483.   In May 2009, a Louisiana bankruptcy court judge held that "[t]his is not the first time Ocwen has appeared before the Court for improperly administering a loan or attempting to

collect fees and costs to which it was not entitled.  The Court has been involved with six other cases in the last four years where Ocwen either included improper fees in its claim; attempted to collect, post-discharge, fees and costs that were undisclosed but assessed during a bankruptcy; or attempted to foreclose on disallowed or discharged debt." *See In re McKain*, No. 08-10411, 2009 Bankr. LEXIS 2519, at \*5–8, \*10–11 (Bankr. E.D. La. May 1, 2009), *rev'd on other grounds*; *Ocwen Loan Servicing, LLC v. McKain*, No. 09-3662, slip op. (E.D. La. Aug. 15, 2011).

484.    The OTS issued a Consent Order dated April 13, 2011 finding One West failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.  One West stipulated to the OTS's findings.  *In re OneWest Bank, FSB*, Consent Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ.gov/static/ots/misc-docs/consent-orders-97665.pdf.

485.    In addition, the Consent Order detailed One West's practice of charging excessive fees.  The Consent Order requires One West to enact a Compliance Program to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage.  The order also requires One West to review whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the loan documents and were otherwise reasonable and customary.  Further, One West is required to review whether the frequency that fees were assessed to borrowers' accounts was excessive.  Finally, One West is required to remediate all injury to borrowers by reimbursing or otherwise appropriately remediating borrowers for impermissible of excessive penalties, fees, or expenses.

486.    In August 2010, a borrower commenced an action against HomEq and Sutton for continuously forcing over-priced insurance policies on a property and charged for unnecessary insurance when the home-owner already had a policy in place.  Compl., *Lee v. Equifirst Corp.*, No. 10-cv-809 (M.D. Tenn. Aug. 27, 2010).  The parties settled that action.

487.    American Home has engaged in similar practices.  According to Bloomberg, the Texas Attorney General has stated that American Home falsely claimed borrowers did not make payments so as to justify late fees and refused to accept payments, forcing the borrower to incur late charges.  *See* David McLaughlin, *Wilbur Ross's American Home Mortgage Faces Servicing Lawsuits*, Bloomberg (Oct. 28, 2010 5:49 PM), http://www.bloomberg.com/news/2010-10-28/wilbur-ross-s-american-home-sued-by-homeowner-texas-for-mortgage-practice.html.

488.    In November 2011, the New York Department of Financial Services entered into an agreement with American Home and Ocwen, which aimed to redress the unlawful servicing practices.  The agreement required that any force-placed insurance be reasonably priced in relation to claims incurred and prohibited force-placing insurance with an affiliated insurer.  In addition, the agreement required a strengthening of oversight on third party vendors and imposed new obligations to conduct reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose documents practices were problematic.

489.    *The New York Times* reported in 2012 that state and federal regulators questioned whether mortgage servicers, including American Home, placed high-priced policies on borrowers' loans in the hopes of receiving financial incentives.  At hearings held by the New York State Department of Financial Services, a representative for American Home Mortgage Servicing acknowledged that a company affiliate receives 15 percent commissions from QBE First, a major provider of lender-placed insurance, for policies placed on its loans.  *See* Lisa

Prevost, *The High Price of 'Forced' Insurance*, N.Y. Times, Oct. 4, 2012,

http://www.nytimes.com/2012/10/07/realestate/mortgages-the-high-price-of-forced-

insurance.html?_r=0.

490.    On February 18, 2014, *The New York Times* reported that "[s]hoddy paperwork,

erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks

and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms

[such as Ocwen], according to dozens of foreclosure lawsuits and interviews with borrowers,

federal and state regulators and housing lawyers."  Jessica Silver-Greenberg & Michael Corkery,

*Loan Complaints by Homeowners Rise Once More*, N.Y. Times (Feb. 18, 2014 9:16 PM),

http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/.

491.    On December 22, 2014, Ocwen announced a settlement with New York's

Department of Financial Services wherein Ocwen admits that it mishandled requests for

modifications, failed to pursue loss mitigation processes competently, failed to maintain

adequate servicing systems, and failed to ensure that its affiliated companies did not charge

excessive fees to defaulted borrowers.  Ocwen was forced to pay $150 million and its chairman,

William C. Erbey, was forced to resign.  Evan Weinberger, *Ocwen Chairman Forced out in*

*$150M NY Servicing Settlement*, Law360 (Dec. 22, 2014),

https://www.law360.com/articles/606868.

### 2.    Ameriquest Mortgage Company's Servicing Scams

492.    As set forth above, Ameriquest, formerly known as Long Beach, is a subsidiary of

WaMu.  In or about September 2008, JPMorgan acquired WaMu.

493.    The OCC issued a Consent Order dated April 13, 2011 finding that, in connection

with certain foreclosures of loans in its residential mortgage servicing portfolio, JPMorgan,

including WaMu Mortgage, filed with state and federal courts affidavits executed by its

employees concerning the fees and expenses chargeable to the borrower when, in many cases,

the allegations were not based on personal knowledge or review of the relevant books and

records. *In re JP Morgan Chase Bank*, Consent Order, No. AA-EC-11-15 (Apr. 13, 2011),

*available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

494.    JPMorgan stipulated to the Consent Order. *Id*.

495.    The OCC ordered JPMorgan, including WaMu Mortgage, to undertake a

sweeping review of its foreclosure practices, including (i) instating processes to ensure that all

fees, expenses, and other charges imposed on the borrower are assessed in accordance with the

terms of the underlying mortgage and in compliance with all applicable Legal Requirements and

OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account

was only charged fees and/or penalties that were permissible under the terms of the borrower's

loan documents, applicable state and federal law, and were reasonable and customary; and (b)

whether the frequency that fees were assessed to any delinquent borrower's account was

excessive under the terms of the borrower's loan documents, and applicable state and federal

law. *Id*. at 4–6.

496.    In April 2011, the Federal Reserve, the FDIC the OCC and the OTS issued a

report concerning foreclosure-processing reviews of 14 servicers, including JPMorgan.

Interagency Review of Foreclosure Policies and Practices (2011), *available at*

http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  The report

found that the foreclosure governance processes were underdeveloped and insufficient and that

weaknesses included (i) lack of sufficient audit trails to show how information set out in servicer

affidavits (including the amount of fees and penalties charged) was linked to servicers' internal

records, (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed, and (iii) lack of sufficient oversight of default management service providers.  *Id*. at 3.

497.    Further, private litigation has brought to light that JPMorgan charged marked-up and unnecessary servicing fees (including through the use of default-related service vendors) and assessed them against borrowers' accounts for profits.  *See, e.g.*, *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062 (N.D. Cal. 2013).

498.    Additionally, JPMorgan was part of the investigation involving 49 State Attorneys General and eventually entered into the Coalition Settlement amidst claims that JPMorgan committed unfair and deceptive practices including overcharge borrowers for default related services.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

499.    JPMorgan also ran an insurance scam involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happened, JPMorgan and its affiliate, Chase Insurance Agency, Inc., replaced the borrowers' homeowner policies with policies underwritten by insurance affiliates of JPMorgan or other insurance companies that agreed to provide authorized benefits—*i.e.*, kickbacks—to JPMorgan.  The force-placed insurance providers charge substantially above-market premiums for these so called force-placed insurance policies, typically several times the premium under the original policy.  When a defaulted loan is foreclosed upon, the cost of the inflated force-placed insurance premiums are charged to the Covered Trusts.

500.    In January 2014, JPMorgan agreed to pay over $22 million to settle class action lawsuits involving force-placed flood insurance for loans serviced by WaMu.

501.    In March 2014, the United States District Court for the Southern District of Florida approved a $300 million settlement of claims by a class of mortgage borrowers against JPMorgan for inflated force-placed insurance premiums they were charged.  That settlement did not address force-placed insurance premiums charged to RMBS trusts.

### 3.    Countrywide Home Loan Servicing, LP's Servicing Scams

502.    After Countrywide was acquired by Bank of America in 2008, Countrywide Home Loans Servicing L.P. ("CHLS") was renamed BAC Home Loans Servicing L.P. ("BAC Servicing") and merged into Bank of America ("BAC").

503.    When a borrower defaults, the servicer is supposed to take action to preserve the value of the mortgaged property.  For example, BAC may order a property inspection for the purpose of verifying the occupancy status of defaulting borrower's home.  When homes are in the foreclosure process, BAC may provide maintenance services such as lawn mowing and security.

504.    BAC uses affiliated entities, including LandSafe Default, Inc. (also known as LandSafe National Default, "LandSafe"), and ReconTrust Company, N.A. ("ReconTrust"), to hire third party vendors to perform default-related services.  BAC in turn charges the defaulting borrowers.  Notwithstanding that mortgage loan documents require BAC to charge no more than actual cost, it routinely marked up its servicing charges by up to 100%.

505.    David Sambol, former CEO of Countrywide, touted this profiteering from default-related services during an October 2007 earnings call:

> Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs.  And what we point out is, as I will now, is that increased operating

> expenses in times like this tend to be fully offset by increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services.

Lesley Fair, *$108 Million for Homeowners in Distress*, Bureau of Consumer Protection Business Center, http://www.business.ftc.gov/blog/2011/07/108-million-homeowners-distress (last updated July 20, 2011 11:27 AM).

506.    On June 7, 2010, the Federal Trade Commission ("FTC") commenced a lawsuit against Countrywide and BAC for gouging borrowers for default-related services. Countrywide and BAC eventually paid $108 million to settle the charges.

507.    The FTC has found that Countrywide and BAC committed numerous frauds in bankruptcy proceedings.  According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts."  Press Release, Fed. Trade Comm'n, Countrywide Will Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy (June 7, 2010), *available at* http://www.ftc.gov/news-events/press-releases/2010/06/countrywide-will-pay-108-million-overcharging-struggling.

508.    Countrywide and BAC also ran an insurance scam involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happened, BAC replaced the borrowers' homeowner policies with policies underwritten by Balboa Insurance Company ("Balboa"),

which until recently was an affiliate of Bank of America.  Balboa charges substantially above-market premiums for these so called force-placed insurance policies, typically several times the premium under the original policy.  This force-placed insurance scam violated Countrywide and BAC's obligation to service loans prudently.

509.    Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of 49 State Attorneys General, the Departments of Justice, Treasury and HUD (collectively, the "Coalition") reached a settlement with, among others, Bank of America (the "Coalition Settlement").  In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers; and (d) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

### 4.    GMAC Mortgage Corporation's Servicing Scams

510.    In October 2012, Ocwen and Green Tree Servicing LLC ("Green Tree") won a joint bid in the United States Bankruptcy Court of the Southern District of New York for GMAC's mortgage servicing platform.

511.    As set forth above, the OCC issued a Consent Order dated April 13, 2011 finding, in part, that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, GMAC filed with state and federal courts affidavits executed by its employees

concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records.

512.   In April 2012, a class of homeowners commenced a class action against GMAC, targeting kickbacks paid by Balboa to GMAC related to force-placed hazard insurance policies. Compl., *Rothstein v. GMAC Mortgage LLC*, No. 12-cv-03412 (S.D.N.Y. Apr. 30, 2012). GMAC settled the action in April 2014 for $6 million.  *See* Matt Fair, *GMAC Puts Up $6M to Settle Force Placed Insurance Suit*, Law360.com (Apr. 28, 2014), *available at* http://www.law360.com/articles/532344/gmac-puts-up-6m-to-settle-force-placed-insurance-suit.

513.   A May 2014 report on servicer mortgage practices found that Green Tree's servicing practices were inadequate in light of the 2012 National Mortgage Settlement's improved servicing standards requirements.  Evan Weinberger, *$25B Mortgage Deal Monitor Says Banks Improved Practices*, Law360.com, May 14, 2014, http://www.law360.com/articles/537724/25b-mortgage-deal-monitor-says-banks-improved-practices.  The report used twenty-nine metrics, including errors in foreclosure sales, adherence to late fee guidelines and pre-foreclosure initiation notifications, to determine whether national servicing standards have improved.  Office of Mortgage Settlement Oversight, Compliance in Progress: A Report from the Monitor of the National Mortgage Settlement (May 14, 2014), *available at* http://www.assets.law360news.com/0537000/537724/monitorsummary.pdf.  Green Tree's servicing of the GMAC servicing platform fell short of the requirements for eight of these metrics.  *Id.* at 9.  In particular, Green Tree did not:

- accurately state amounts due from borrowers in proofs of claims filed in bankruptcy proceedings;

- accurately state amounts due from borrowers in affidavits filed in support of relief from stay in bankruptcy proceedings;

160

- provide borrowers with accurate information in pre-foreclosure letters;

- provide borrowers with required notifications no later than 14 days prior to referral to foreclosure, or ensure their accuracy;

- waive fees when required to do so by the Settlement;

- document policies and procedures to oversee third party vendors;

- reply to government-submitted complaints and borrower inquiries within the required timeframe; and

- notify the borrower of missing documents in the loan modification application within the required timeframe.

*Id*. The report ultimately concluded that Green Tree "has much implementation work to do." *Id*. at 2.

514.    On February 27, 2014, federal regulators notified Green Tree's parent company, Walter Investment Management Corp., of a planned action alleging violations of consumer finance laws.  The CFPB notified Green Tree that the agency was considering an action against the servicer in 2013, while the FTC demanded an investigation of Green Tree in 2010.  Andrew R Johnson & Alan Zibel, *Walter Investment Management Facing Enforcement Action*, Wall St. J. (Feb. 27, 2014), *available at* http://www.online.wsj.com/articles/SB10001424052702304709904579409033974029194.  The inquiries stemmed from discoveries that servicers mishandled loan modifications and treated borrowers erratically.  Carter Dougherty, *Consumer Bureau Finds Homeowners Harmed by Loan Companies*, Bloomberg, Oct. 29, 2014, http://www.bloomberg.com/news/2014-10-29/consumer-bureau-finds-homeowners-harmed-by-loan-companies.html.

### 5.    Litton Loan Servicing, LP's Servicing Scams

515.    In or about December 2007, Goldman acquired Litton from C-BASS.

516.    On September 1, 2011, Goldman entered into a Consent Order with the Federal Reserve that required Goldman to retain an independent consultant to review Litton foreclosure proceedings pending at any time in 2009 or 2010 and to compensate borrowers who suffered financial injury as a result of wrongful foreclosures.  *In re Goldman Sachs Grp., Inc.*, Consent Order (Sept. 1, 2011), *available* at http://www.federalreserve.gov/newsevents/press/enforcement/enf20110901f1.pdf.

517.    The Consent Order required an investigation into whether Litton charged any delinquent borrower's account fees or penalties that were not permissible under the terms of the borrower's loan documents, state or federal law, or were otherwise unreasonable.  *Id.*

518.    The Consent Order further required Goldman to reimburse or otherwise provide appropriate remediation to borrowers for any impermissible or otherwise unreasonable penalties, fees or expenses.  *Id*.

519.    In November 2012, the Central District of California enforced a settlement agreement in a class action brought against Litton for claims that, among other things, Litton (i) misapplied or failed to credit payments in a timely fashion, (ii) improperly charged erroneous late fees, (iii) prematurely referred accounts for collection, and (iv) procured insurance policies for properties that were already insured.  *See Schaffer v. Litton Loan Servicing, LP*, No. 05-cv-07673, 2012 U.S. Dist. LEXIS 189829 (C.D. Cal. Nov. 13, 2012).

### 6.    Midland Loan Services, Inc.'s Servicing Scams

520.    As set forth above, Midland is a division of PNC.

521.    On May 29, 2014, news reports stated that the U.S. Attorney's office in Manhattan is investigating five banks, including PNC for overcharging the government for expenses incurred during foreclosures on federally backed home loans.  *See* Nate Raymond & Aruna Viswanatha, *US Probes Possible Overcharging by Banks on Foreclosure Fees*, Reuters

(May 29, 2014 12:58 PM), http://www.reuters.com/article/2014/05/29/us-usa-housing-investigation-insight-idUSKBN0E91RN20140529.

### 7.      Saxon Mortgage Services, Inc.'s Servicing Scams

522.    In November 2011, the New York Department of Financial Services entered into an agreement with Morgan Stanley and Saxon, which aimed to redress the unlawful servicing practices.  Press Release, Dep't of Fin., Superintendent Lawsky Announces Agreements With Morgan Stanley, Saxon, AHMSI & Vericrest On Groundbreaking New Mortgage Practices (Nov. 10, 2011), *available at* http://www.dfs.ny.gov/about/press/pr1111101.htm.  The agreement required that any force-placed insurance be reasonably priced in relation to claims incurred and prohibited force-placing insurance with an affiliated insurer.  *Id*.  In addition, the agreement required a strengthening of oversight on third party vendors and imposed new obligations to conduct reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose documents practices were problematic.  *Id*.

523.    Further, in April 2012, the Federal Reserve released a Consent Order against Morgan Stanley to address patterns of misconduct and negligence in residential mortgage loan servicing and foreclosure processing at Saxon.  The Consent Order required Morgan Stanley to retain an independent consultant to review Saxon's foreclosure proceedings.  *In re Morgan Stanley*, Consent Order, No. 12-015-B-HC (Apr. 2, 2012), *available at* http://www.federalreserve.gov/newsevents/ press/enforcement/enf20130228a16.pdf.

### 8.      Wells Fargo Bank, N.A.'s Servicing Scams

524.    In April 2011, the Federal Reserve, the FDIC, the OCC and the OTS issued a report concerning foreclosure-processing reviews of 14 servicers, including Wells Fargo.  Interagency Review of Foreclosure Policies and Practices (2011), *available at*

http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  The report found that the foreclosure governance processes were underdeveloped and insufficient and that weaknesses included (i) lack of sufficient audit trails to show how information set out in servicer affidavits (including the amount of fees and penalties charged) was linked to servicers' internal records, (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed, and (iii) lack of sufficient oversight of default management service providers.  *Id*.

525.   The OCC issued a Consent Order dated April 13, 2011 finding, in part, that Wells Fargo engaged in fraudulent or improper foreclosure practices, including by filing in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records.  *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011).

526.   Wells Fargo stipulated to the Consent Order.  *Id*.

527.   The Consent Order required Wells Fargo to undertake a sweeping review of their foreclosure practices, including (i) instating processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable Legal Requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was

excessive under the terms of the borrower's loan documents, and applicable state and federal law.  *Id.* at 7–10.

528.    Additionally, the Coalition reached a settlement with Wells Fargo.  The Coalition Complaint alleged that Wells Fargo committed unfair and deceptive practices including (a) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (b) charging excessive or improper fees for default-related services; (c) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers; and (d) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

529.    Further, as fully set forth above in Section III(A)(1), Wells Fargo was one of the banks to agree to a $25 billion settlement with 49 state Attorneys General as a result of their robo-signing misconduct.  Under the terms of the settlement, the Servicers were to receive credit for modifying loans, including securitized loans.  Wells Fargo has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing arguments in order to receive credit because the investors, not JPMorgan would bear the loss. *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

530.    Even further, following a two week trial, on December 19, 2014, a jury verdict was rendered against Wells Fargo in the amount of $54.8 million resolving claims brought in the class action *Mazzei v. The Money Store*, No. 01-cv-05694 (S.D.N.Y. Jun. 22, 2001).  The jury

determined that Wells Fargo, and its subsidiaries including HomEq Servicing Corporation, charged improper and excessive fees for default-related services. *See* Kurt Orzeck, *Wells Fargo Owes $55M in Mortgage Late Fee Suit, Jury Says*, Law360 (Dec. 19, 2014), *available at* http://www.law360.com/articles/606660/wells-fargo-owes-55m-in-mortgage-late-fee-suit-jury-says.

531.     Deutsche Bank is and was aware of all of the servicing misconduct alleged herein, which has been the subject of high profile government investigations, lawsuits and press coverage, including articles in banking industry publications like the *American Banker*, and yet has failed to act.

## IV.     DEUTSCHE BANK'S CONDUCT INJURED PLAINTIFFS

532.     Deutsche Bank's breaches of its contractual, statutory and fiduciary duties have caused Plaintiffs over $183 million in damages.

533.     If Deutsche Bank had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses. And if Deutsche Bank had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value as highly rated bonds with similar coupon rates are now trading at a very significant premium.

534.     Deutsche Bank's failure to address the Master Servicers' and Servicers' failure to adhere to prudent servicing practice also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically. The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, a decline in value of the underlying properties

and ultimately less sale proceeds for the Covered Trusts and Certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

535.    If Deutsche Bank had met its contractual, statutory and fiduciary duties to accept delivery of notes and mortgage loans files, inspect them, give notice as required and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Master Servicers, Servicers, Sponsors, Depositors and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default. Moreover, Deutsche Bank's failure to accept delivery of note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates. And Deutsche Bank's failure to commence damages actions against the Master Servicers and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

536.    Deutsche Bank's failure to meet its fiduciary duties and duties under the TIA, the Streit Act and the common law once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm. If Deutsche Bank had provided notice of defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans as they were required to do and

required the Master Servicers and Servicers to replace the assets they have looted from the Covered Trusts.

537.    All of the repurchase claims, described above, have lapsed due to the Deutsche Bank's inaction as New York courts have held that the underlying representation and warranty claims that Deutsche Bank failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 315(b) of the TIA (15 U.S.C. § 77ooo(b)))

538.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

539.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Deutsche Bank is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

540.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the TIA.

541.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

542.    Section 315(b) of the TIA provides that the indenture trustee must give Certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).  The term "default" includes any breach of the PSAs that after notice and lapse of time would constitute an Event of Default under the PSAs.

543.    The PSAs define an "Event of Default" to include:

> any failure by the Master Servicer to observe or perform in any
> material respect any other of the covenants or agreements on the
> part of the Master Servicer contained in this Agreement . . . which

> failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee.

Countrywide PSA § 7.01(ii).  The Sponsors, Master Servicers and Servicers materially breached numerous covenants and agreements they made in the PSAs, which, either constituted Events of Default or would have ripened into an Event of Default with notice from Deutsche Bank and passage of time.  Such covenants and agreements include the obligations to:

(a)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans;

(b)     deliver and maintain complete mortgage files;

(c)     comply with prudent mortgage servicing standards;

(d)     transmit mortgage documentation to the Trustee;

(e)     take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(f)     avoid unnecessary servicing fees and overcharging for services;

(g)     protect the interests of the beneficiaries of the Covered Trusts;

(h)     render accurate certifications under Regulation AB; and

(i)     enforce the repurchase obligations of the Sponsors and/or Originators.

544.    These breaches materially and adversely affected the interests of Certificateholders because they resulted in the Covered Trusts being saddled with large numbers of defective loans that should have been put back to the Sponsors and Originators and, further, resulted in very significant losses related to foreclosure irregularities such as

robo-signing, the inability to foreclose in a timely and efficient fashion, and servicer overcharges for default services and forced-placed insurance.

545.    Deutsche Bank is liable to Plaintiffs for damages incurred as a result of its violations of the TIA.

**SECOND CAUSE OF ACTION**
**(Violation of Section 315(c) of the TIA (15 U.S.C. § 77ooo(c)))**

546.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

547.    As Certificateholders, Plaintiffs are a trust beneficiary entitled to the protections afforded under the TIA.

548.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Deutsche Bank is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

549.    The TIA applies to the PSAs and the related certificates. 15 U.S.C. § 77ddd(a)(1).

550.    Section 315(c) of the TIA provides that upon the occurrence of a default the indenture trustee must exercise the rights and powers vested in it by the indenture and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).  Under Section 7.01(ii), any failure of the Master Servicer to observe or perform any covenants or agreements under the PSA, after notice and lapse of time, constitutes an Event of Default under the PSAs.

551.    As set forth above, Deutsche Bank failed to exercise its rights under the PSA after becoming aware of such breaches and Events of Default by failing to:

(a) take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

(b) identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

(c) make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification, the "Final Certification of the Trustee," and all schedules and attachments thereto;

(d) render accurate reports under Regulation AB;

(e) protect the interests of the beneficiaries of the Covered Trusts;

(f) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(g) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(h) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(i) take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

(j) enforce the repurchase obligations of the Sponsors and/or Originators.

552. Deutsche Bank is liable to Plaintiffs for damages incurred as a result of its violations of the TIA.

### **THIRD CAUSE OF ACTION**
**(Breach of Contract)**

553. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

554. The PSAs are valid and binding contracts entered into between Deutsche Bank, each Covered Trust, the Sponsors, the Master Servicers, the Servicers and Depositors.

555. The PSAs provide, among other things, the terms under which Deutsche Bank acts as trustee for the Covered Trusts.

556. As current holders of Certificates issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

557. Deutsche Bank breached several obligations that it undertook on behalf of Plaintiffs as Certificateholder including, without limitation, to:

    (a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

    (b)    identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

    (c)    make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification, the "Final Certification of the Trustee," and all schedules and attachments thereto;

    (d)    render accurate reports under Regulation AB;

    (e)    protect the interests of the beneficiaries of the Covered Trusts;

    (f)    take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

    (g)    investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

    (h)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs relating to repeated failures by the Master Servicer to require the repurchase or substitution of mortgage loans by the Sponsors or

172

Originators (1) under Section 2.03, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, where such loans were lacking proper documentation;

(i)    take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

(j)    enforce the repurchase obligations of the Sponsors and/or Originators.

558.    The specific provisions breached by Deutsche Bank are further detailed herein and in the Exhibits hereto.

559.    Deutsche Bank's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their Certificates and diminished their value.

560.    Plaintiffs have performed their obligations under the PSAs.

561.    Deutsche Bank is liable to Plaintiffs for the losses they suffered as a direct result of Deutsche Bank's failure to perform its contractual obligations under the PSAs.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

562.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

563.    As set forth in detail above, Deutsche Bank owed Certificateholders, including Plaintiffs, a fiduciary duty to act in good faith, and with due care and undivided loyalty when performing the obligations set forth in the PSAs, and to exercise all powers under the PSAs prudently once an Event of Default occurred or payments to Certificateholders became impaired.  These obligations included, without limitation, duties to:

(a)    take physical possession of the operative documents for the mortgage loans in the Covered Trusts;

(b)     identify those mortgage loans for which there was missing, defective, or incomplete documentation on the "Document Exception Report" attached to the "Final Certification of the Trustee";

(c)     make accurate representations in the "Initial Mortgage Certification," the "Delay Document Certification, the "Final Certification of the Trustee," and all schedules and attachments thereto;

(d)     render accurate reports under Regulation AB;

(e)     protect the interests of the beneficiaries of the Covered Trusts;

(f)     take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(g)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(h)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default under Section 7.01 of the PSAs relating to repeated failures by the Master Servicer to require the repurchase or substitution of mortgage loans by the Sponsors and Originators (1) under Section 2.03, where such loans breached representations and warranties, and (2) under Sections 2.01 and 2.02, where such loans were lacking proper documentation;

(i)     take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

(j)     enforce the repurchase obligations of the Sponsors and/or Originators.

564.    As set forth in detail above, Deutsche Bank breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

565.    The violations by Deutsche Bank of its fiduciary obligations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FIFTH CAUSE OF ACTION
### (Negligence and Gross Negligence)

566.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

567.    As set forth in detail above, Deutsche Bank owed the Certificateholders, including Plaintiffs, duties under the PSAs and as trustee for Covered Trusts to act in good faith, with undivided loyalty and with due care when performing its contractual obligations under the PSAs.  As described above, Deutsche Bank performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

568.    Deutsche Bank's negligence and gross negligence impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentations)

569.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

570.    This is a claim for negligent misrepresentation against Deutsche Bank.  As Deutsche Bank served in its capacity as Trustee for thousands of trusts sponsored by the Sponsors or including loans originated by the Originators from 2005–2007, it had unique and special knowledge about the mortgage loans in the Covered Trusts and the mortgage files for those loans.  In particular, Deutsche Bank had unique and special knowledge regarding: (i) whether the Master Servicer or Servicers had failed to perform its duties under the PSA; (ii) whether the operative documents for the mortgage loans had been transferred to the Trustee, and its interests perfected, for the benefit of Certificateholders in the Covered

Trusts; (iii) whether the mortgage files contained missing, defective, or incomplete information; (iv) whether the improperly documented loans were identified on the final exception report and whether the irregularities remained uncorrected; and (v) whether the statements in the various certifications provided by Deutsche Bank and described herein were accurate.

571.    Because Plaintiffs could not evaluate the mortgage files for the mortgage loans underlying the Certificates and because Plaintiffs could not examine whether those files contained complete and accurate documentation for the mortgage loans, they were heavily reliant on Deutsche Bank's unique and special knowledge regarding the mortgage loans and the mortgage files when determining whether or not to make each investment in the Certificates, and whether or not to demand that Deutsche Bank exercise its powers under the PSAs to require the other parties to the PSAs to satisfy their obligations, including to repurchase or substitute the defective loans.  Plaintiffs were entirely reliant on Deutsche Bank to provide accurate information regarding the loans and mortgage files with respect to these matters.

572.    Plaintiffs necessarily relied on Deutsche Bank's unique and special knowledge regarding the mortgage loans and mortgage files for those loans in the Covered Trusts.  Deutsche Bank's status as the trustee for the Covered Trusts, coupled with its unique and special knowledge about the underlying loans and the mortgage files, created a special relationship of trust, confidence and dependence between Deutsche Bank and Plaintiffs.

573.    Deutsche Bank, in the exercise of due care, should have been aware that Plaintiffs relied on its unique and special expertise and experience and depended upon

Deutsche Bank for accurate and truthful information.  Deutsche Bank also knew that the facts regarding the mortgage loans and the mortgage files were exclusively within its knowledge.

574.    Based on its expertise, superior knowledge and relationship with Plaintiffs, Deutsche Bank owed a duty to Plaintiffs to provide complete, accurate and timely information regarding the mortgage loans and mortgage files for the Certificates.  Deutsche Bank negligently breached its duty to provide such information to Plaintiffs.

575.    Deutsche Bank's negligent misrepresentations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## SEVENTH CAUSE OF ACTION
### (Violation of the Streit Act)

576.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

577.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

578.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

579.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Deutsche Bank is a "trustee," under the Streit Act.  N.Y. Real Prop. Law § 125(3).

580.     Prior to any Event of Default, as described above, Deutsche Bank violated the Streit Act by failing to discharge its pre-default obligations with due care.  Further, Events of Default occurred under each Covered Trust shortly after closing.

581.     Section 126(1) of the Streit Act provides that upon an event of default the indenture trustee must exercise such of the rights and powers vested in it by the indenture and must use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

582.     Section 124 of the Streit Act further imposes a duty upon trustees of mortgage trusts to discharge their duties under the applicable indenture with due care in order to ensure the orderly administration of the trust and protect trust beneficiary rights.

583.     As set forth above, Deutsche Bank failed to exercise its rights under the PSA after becoming aware of defaults and Events of Default by failing to:

> (a) take physical possession of the operative documents for the mortgage loans in the Covered Trusts;
>
> (b) identify all mortgage loans for which there was missing, defective, or incomplete documentation on the final exception reports;
>
> (c) make accurate representations in the final certifications;
>
> (d) render accurate reports under Regulation AB;
>
> (e) protect the interests of the beneficiaries of the Covered Trusts;
>
> (f) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;
>
> (g) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once they discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(h) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(i) take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards; and

(j) enforce the repurchase obligations of the Sponsors and/or Originators.

584.    Deutsche Bank is liable to Plaintiffs for damages incurred as a result of its violations of the Streit Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Plaintiffs against Deutsche Bank for breaches of its statutory, contractual and fiduciary duties, its gross negligence, ordinary negligence and its negligent misrepresentations in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:  December 23, 2014

By: _____

David H. Wollmuth
Randall R. Rainer
Michael C. Ledley
Steven S. Fitzgerald
Melissa A. Finkelstein
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300

Fax: (212) 382-0050
dwollmuth@wmd-law.com
rrainer@wmd-law.com
mledley@wmd-law.com
sfitzgerald@wmd-law.com
mfinkelstein@wmd-law.com

George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com
mdavies@ koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for Plaintiffs*