**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

PHOENIX LIGHT SF DAC, BLUE HERON
FUNDING V LTD., BLUE HERON FUNDING VI
LTD., BLUE HERON FUNDING VII LTD., BLUE
HERON FUNDING IX LTD., C-BASS CBO XIV
LTD., C-BASS CBO XVII LTD., KLEROS
PREFERRED FUNDING V PLC, SILVER ELMS CDO
PLC and SILVER ELMS CDO II LIMITED

                                        Plaintiffs,

              -against-

DEUTSCHE BANK NATIONAL TRUST COMPANY
and DEUTSCHE BANK TRUST COMPANY
AMERICAS

                                        Defendants.

----------------------------------------------------------- x

Index No. 14-cv-10103-JGK

Hon. John G. Koeltl

**THIRD AMENDED
COMPLAINT**

**DEMAND FOR JURY
TRIAL**

**TABLE OF CONTENTS**

Page

NATURE OF ACTION ..................................................................................................1

PARTIES .......................................................................................................................6

PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE .....................9

JURISDICTION AND VENUE ......................................................................................14

FACTUAL ALLEGATIONS .........................................................................................15

I.      THE SECURITIZATION PROCESS ................................................................15

II.     DEUTSCHE BANK'S DUTIES AND OBLIGATIONS ...................................17

        A.      Deutsche Bank's Duties Pertaining to the Delivery of Mortgage Files ................21

        B.      Deutsche Bank Had a Duty to Provide Notice of Defaults
                and Enforce Repurchase Obligations Triggered by Such Notice .........................27

        C.      Deutsche Bank's Duty to Act
                Prudently to Enforce Repurchase Obligations ......................................................29

        D.      Deutsche Bank Had a Duty to Address the Master Servicers'
                and Servicers' Failure to Meet Prudent Servicing Standards ...............................30

        E.      Deutsche Bank Is Liable for Negligence in Performing Its Duties ......................32

III.    DEUTSCHE BANK BREACHED ITS
        CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES ...................................34

        A.      Deutsche Bank Was Aware of But Failed to Provide Notice
                of Defaults Relating to the Sponsors' and Originators' Pervasive
                Representation and Warranty Breaches ................................................................34

                1.      The Originators' and Sponsors' Pervasive
                        Breaches of Representations and Warranties.............................................43

        B.      Deutsche Bank Failed to Act Prudently to Enforce Repurchase Obligations........50

                1.      Events of Default Under the PSAs Relating to
                        Document Delivery Failures in the Covered Trusts .................................51

                2.      Events of Default Under the Indentures.....................................................55

2

      3.     Events of Default Concerning False
Master Servicer and Servicer Certifications ...............................................57

      4.     Deutsche Bank Received Written Notice of Representation
and Warranty Violations Which Ripened into Events of Default..............59

      5.     Other Events of Default ..............................................................62

   C.    Deutsche Bank Failed to Address the Master
Servicers' and Servicers' Looting of Trust Assets .................................62

IV.    DEUTSCHE BANK SUFFERED FROM CONFLICTS OF INTEREST .......................67

V.    DEUTSCHE BANK'S CONDUCT INJURED PLAINTIFFS..........................................70

CAUSES OF ACTION .........................................................................................72

FIRST CAUSE OF ACTION (Violations of the TIA) ...............................................72

SECOND CAUSE OF ACTION (Breach of Contract) ...............................................74

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) .........................................75

FOURTH CAUSE OF ACTION (Negligence and Gross Negligence) ........................76

FIFTH CAUSE OF ACTION (Violation of the Streit Act)..........................................77

SIXTH CAUSE OF ACTION (Breach of Covenant of Good Faith) ...........................78

PRAYER FOR RELIEF ........................................................................................79

Phoenix Light SF DAC, Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC and Silver Elms CDO II Limited, as holders of residential mortgage-backed securities ("RMBS") issued by certain Covered Trusts (defined below) (collectively, "Plaintiffs"), by and through their attorneys, bring this action against Defendants Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA", together with DBNTC, "Deutsche Bank," "Defendants," or the "Trustee"), and allege as follows:

## NATURE OF ACTION

1.      This action arises out of Deutsche Bank's role as trustee for 43 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against Deutsche Bank for breach of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. §77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2.      The Covered Trusts were created to facilitate RMBS transactions introduced to investors from 2005 to 2007.  Eleven of the RMBS transactions were sponsored by Morgan Stanley Mortgage Capital Inc. (the "Morgan Stanley Trusts"), ten were sponsored by RBS Financial Products, Inc. or its affiliate Greenwich Capital Financial Products, Inc. (the "RBS Trusts"), five were sponsored by Ameriquest Mortgage Company (the "Ameriquest Trusts"), four were sponsored by IXIS Real Estate Capital Inc. (the "IXIS Trusts"), three were sponsored by Saxon Funding Management, Inc. (the "Saxon Trusts"), one was sponsored by HSBC Bank USA, National Association (the "HSBC Trust"), two were sponsored by Impac Mortgage Holdings, Inc. (the "Impac Trusts"), two were

sponsored by NovaStar Mortgage Inc. (the "NovaStar Trusts"), one was sponsored by Aegis

Mortgage Corporation (the "Aegis Trust"), one was sponsored by American Home

Mortgage Acceptance, Inc. (the "American Home Trust"), one was sponsored by First

Franklin Financial Corporation (the "First Franklin Trust"), one was sponsored by Merrill

Lynch Mortgage Lending, Inc. (the "Merrill Lynch Trust"), and one was sponsored by

Sutton Financing LLC (the "Sutton Trust") (Morgan Stanley Mortgage Capital Inc., RBS

Financial Products, Inc., Greenwich Capital Financial Products, Inc., Ameriquest Mortgage

Company, IXIS Real Estate Capital Inc., HSBC Bank USA, National Association, Impac

Mortgage Holdings, Inc., Aegis Mortgage Corporation, American Home Mortgage

Acceptance, Inc., First Franklin Financial Corporation, Merrill Lynch Mortgage Lending

Inc., NovaStar Mortgage Inc. and Sutton Financing LLC are referred to collectively as the

"Sponsors").

     3.     Plaintiffs purchased, and currently hold, RMBS certificates with an original

face value of over $750 million issued by the Covered Trusts identified in Exhibit B (the

"Certificates").

     4.     The Certificates represent interests in the cash flows associated with the

mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or

business partners.  The Certificateholders are the beneficiaries of the Covered Trusts.  The

performance of the RMBS depended on the Sponsors depositing properly underwritten

mortgage loans having complete documentation into the Covered Trusts.  The quality of the

mortgage loans is critical, and numerous provisions of the governing agreements assure that

only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the

securities were to be "mortgage-backed," numerous other provisions seek to assure that

complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to Deutsche Bank.

5.      The Certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, Deutsche Bank, to police the deal and protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, Deutsche Bank owes Plaintiffs and the other Certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts. Deutsche Bank, the Master Servicers and Servicers were required to provide notice of breaches of representation and warranties by the Sponsors and Originators concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending. Deutsche Bank had a duty to enforce the obligation of the responsive parties (typically the Sponsors, affiliates that served as the depositors (the "Depositors") or the party who originated the mortgage loans (the "Originators")) to repurchase loans that breached representation and warranty provisions or were missing required documentation.  And Deutsche Bank was required to address defaults by the Master Servicers and Servicers who were required to engage in prudent servicing practices.

7.      Deutsche Bank was actively involved in the origination and servicing of mortgage loans and typically had very close business relationships with the Sponsors, Originators and Depositors.  Nevertheless, as trustee, Deutsche Bank was obligated to act

against the financial interest of the Sponsors when demanded by the circumstances.
Deutsche Bank, however, abandoned its obligations to protect the rights of investors.

8.      Deutsche Bank's breaches of its contractual, fiduciary and statutory duties
gave rise to six distinct legal claims.

9.      <u>Breach of Contract</u>.  Deutsche Bank's contractual duties are set forth in
governing agreements, generally identified as pooling and servicing agreements ("PSAs"). [1]
Deutsche Bank breached the PSAs by failing to: (i) provide notice of representation and
warranty violations to the Sponsors and Originators; (ii) provide notice of the Servicers' and
Master Servicers' failure to give notice of those same representation and warranty
violations; (iii) cause the responsible parties to repurchase or substitute loans that were
subject to a breach of representation or warranty or missing documentation required to be
delivered under the PSAs; and (iv) exercise all rights and remedies available to Deutsche
Bank under the PSAs upon the occurrence of an Event of Default.

10.      <u>Breach of Fiduciary Duty</u>.  Under common law, after an "Event of Default"
an indenture trustee has a duty to exercise the powers and remedies available under the
PSAs with the degree of care and skill a prudent person would exercise in his own affairs to
protect the rights of Certificateholders.  This duty continues until the Event of Default is
cured.  Deutsche Bank failed to meet its fiduciary duties because it was aware Events of
Default had occurred, but failed to take action to force the responsible parties to repurchase

---

[1] Five of the Covered Trusts (AABST 2006-1, AHM 2006-1, IMM 2005-7, IMM 2005-8, and SAST 2006-3) were
structured using indentures, servicing agreements, trust agreements and mortgage loan purchase agreements
("MLPAs"), which together are the functional equivalent of a PSA.  Unless expressly noted herein, when the term
PSA is used it is also referring to the aforementioned governing agreements executed in connection with those
securitizations.

loans with representation and warranty violations or missing documentation and address breaches by the Servicers and Master Servicers.

11.     <u>Violations of the TIA</u>.  The TIA requires the trustee to provide Certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of Certificateholders during the period in which the default remains uncured.  Deutsche Bank violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the Certificateholders' interests by exercising all rights and remedies available to it under the PSAs.

12.     <u>Violation of the Streit Act</u>.  Deutsche Bank violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of Certificatholders during the pendency of an "event of default."  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.  Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments," the Streit Act provides a similar protection and remedy.

13.     <u>Negligence and Gross Negligence</u>.  Deutsche Bank had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest.  Deutsche Bank negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs.  Deutsche Bank violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors, Servicers and Master Servicers because if Deutsche Bank acted, it would have exposed its

systemic origination and servicing misconduct and would have jeopardized future lucrative engagements.

14.     Breach of Covenant of Good Faith and Fair Dealing.  Deutsche Bank violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform its duties, Deutsche Bank has caused Plaintiffs to suffer hundreds of millions of dollars in damages.

## PARTIES

16.     Plaintiff Phoenix Light SF DAC ("Phoenix Light") is a designated activity company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.[2]  Phoenix Light brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts and pursuant to rights assigned to Phoenix Light by the Indenture Trustee to bring claims in the name of Kleros Preferred Funding V PLC and Silver Elms CDO PLC.

17.     Plaintiff Blue Heron Funding V Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding V Ltd. brings this action in its own right as CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

18.     Plaintiff Blue Heron Funding VI Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of

---

[2] The original complaint in this action was filed by Phoenix Light SF LTD.  On September 20, 2016 Phoenix Light SF LTD changed its name to Phoenix Light SF DAC.

business in Grand Cayman, Cayman Islands.  Blue Heron Funding VI Ltd. brings this action in its own right as CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

19.     Plaintiff Blue Heron Funding VII Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding VII Ltd. brings this action in its own right as CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

20.     Plaintiff Blue Heron Funding IX Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding IX Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

21.     Plaintiff C-BASS CBO XIV Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XIV Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

22.     Plaintiff C-BASS CBO XVII Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XVII Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

23.     Plaintiff Kleros Preferred Funding V PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Kleros Preferred Funding V PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

24.     Plaintiff Silver Elms CDO PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

25.     Plaintiff Silver Elms CDO II Limited is a special purpose private limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO II Limited brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

26.     Each Plaintiff is a corporate entity with separate legal existence and with a board of directors that controls its operations, akin to a corporation formed under U.S. law.  Each Plaintiff entity was organized for the purpose of investing in RMBS and other securities and has investors holding debt and income securities.

27.     Defendant DBTCA is a New York State charted banking corporation with fiduciary powers duly organized and existing under the laws of New York. DBTCA's principal place of business is in New York, New York.  It serves as the CDO Trustee for Kleros Preferred Funding V PLC and Silver Elms CDO PLC and trustee for SAST 2006-3, one of the Covered Trusts.

28.     Defendant DBNTC is a national banking association organized and existing under the laws of the United States.  DBNTC does business throughout the United States, and its principal place of business is located in California.  It serves as the trustee for 42 of the Covered Trusts.

**PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE**

29.     Plaintiffs held the Certificates identified in Exhibit B and suffered damages as a result of Deutsche Bank's breaches.

30.     Plaintiffs acquired ownership to the Certificates in multiple ways.

31.     Each of the Plaintiffs, with the exception of Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd. and Blue Heron Funding IX Ltd., acquired Certificates pursuant to an asset purchase agreement or similar agreement with third-parties, including WestLB AG ("WestLB"), Harrier Finance Limited ("Harrier"), Kestrel Funding PLC ("Kestrel") and Greyhawk Funding, LLC ("Greyhawk"), and have held these Certificates continuously since the date of acquisition identified in Exhibit B.

32.     With the exception of the asset purchase agreement with Greyhawk, these asset purchase agreements contain choice of law provisions that incorporate New York law.  The Greyhawk agreement contains a choice of law provision that incorporates German law except for certain severability provisions, which are governed by New York law.

33.     Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC and Silver Elms CDO II Limited also acquired Certificates through direct purchases made after the CDO closing.  Exhibit B identifies which Certificates were acquired through such market purchases.  Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII

9

Ltd., Blue Heron Funding IX Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC and

Silver Elms CDO II Limited have held these Certificates continuously since the date of

acquisition identified in Exhibit B.

34.     Plaintiffs have suffered an injury in fact because they are Certificateholders and

were damaged as a result of Deutsche Bank's breaches as described herein.  Accordingly, they

have standing to sue under Article III of the Constitution of the United States.

35.     Plaintiffs also have contractual standing to pursue the claims set forth herein.

36.     Each of the Plaintiffs other than Phoenix Light (*i.e.*, Blue Heron Funding V

Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX

Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II

Limited, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.) entered into Indentures (the

"CDO Indentures") with a CDO Trustee.  The CDO Trustees are: (i) DBTCA for Kleros

Preferred Funding V PLC and Silver Elms CDO PLC; (ii) The Bank of New York Trust

Company, National Association ("BNY Trust Co."), in its own right or as successor trustee to

JPMorgan Chase Bank, for Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., and Blue

Heron Funding IX Ltd. and as trustee for C-BASS CBO XIV Ltd. and C-BASS CBO XVII

Ltd.; and (iii) Wells Fargo Bank, N.A. ("Wells Fargo Bank") for Silver Elms CDO II Limited

and Blue Heron Funding VII Ltd.

37.     The Granting Clause of the CDO Indentures conveys to the CDO Trustee a

security interest in the underlying collateral for the benefit of Secured Parties (defined below).

For example, the CDO Indenture for Silver Elms CDO II Limited provides:

> The Issuer hereby Grants to the Trustee, for the benefit and security
> of the Secured Parties, all of its right, title and interest in, to and
> under, in each case, whether now owned or existing, or hereafter
> acquired or arising, all accounts, chattel paper, commercial tort

> claims, deposit accounts, documents, general intangibles, goods,
> instruments, investment property and letter-of-credit rights,
> including but not limited to the . . . the Collateral Debt Securities . .
> . . Such Grants are made to the Trustee to hold in trust, to secure the
> Secured Notes.

The other CDO Indentures contain substantially similar grants.

38.     The "Secured Parties" under each of the CDO Indentures include the senior

noteholders.  Phoenix Light holds more than 50% of the senior notes and, thus, is the Controlling

Party and/or the Majority for, each of (i) Blue Heron Funding V Ltd.; (ii) Blue Heron Funding

VI Ltd.; (iii) Blue Heron Funding VII Ltd.; (iv) Blue Heron Funding IX Ltd.; (v) Kleros

Preferred Funding V PLC; (vi) Silver Elms CDO PLC; (vii) Silver Elms CDO II Limited; (viii)

C-BASS CBO XIV Ltd.; and (ix) C-BASS CBO XVII Ltd. under the CDO Indentures.

39.     Because only a security interest was conveyed to the CDO Trustees for the benefit

of the CDO senior noteholders and other Secured Parties, neither the CDO Issuers nor Phoenix

Light were divested of their right to bring claims.

40.     Nevertheless, the CDO Trustees have each assigned any right they have to bring

the claims herein to Plaintiffs to the extent that such an assignment is deemed necessary.

Phoenix Light directed them to do so on December 12, 2014.  Because these entities suffer from

conflicts of interest by virtue of the fact that they are being sued by Plaintiffs, the CDO Trustees

wrongfully refused to act until recently.

41.     On April 16, 2015, Deutsche Bank and Phoenix Light entered into a written

assignment agreement whereby Deutsche Bank assigned to Phoenix Light as controlling

noteholder "any and all rights that the Trustee may have to pursue and enforce the claims set

forth" in this action on behalf of Kleros Preferred Funding V PLC and Silver Elms CDO PLC

"including any claims which may be added to the Lawsuits by virtue of an amendment to the

Complaints or otherwise." Accordingly, if Deutsche Bank as CDO Trustee was the only party that could bring claims on behalf of, and in the name of, Kleros Preferred Funding V PLC and Silver Elms CDO PLC, Phoenix Light now has such authority. Alternatively, if Kleros Preferred Funding V PLC and Silver Elms CDO PLC retained the ability to bring claims, they do so in their own right here as they are parties to this action.

42. On June 19, 2015, BNY Trust Co., Phoenix Light, C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd., Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd. and Blue Heron Funding IX Ltd. (among others) entered into a written assignment agreement whereby BNY Trust Co. assigned to Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. "all right, title and interest in, to and under, in each case, that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf" of these entities in this action. Accordingly, to the extent BNY Trust Co. as CDO Trustee obtained the exclusive right to assert claims on behalf of Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd., that right has been assigned back to Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. Alternatively, if Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding IX, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. retained the ability to bring claims, they do so in their own right here as they are parties to this action.

43. On June 26, 2015, Wells Fargo Bank, Phoenix Light, Blue Heron Funding VII Ltd. and Silver Elms CDO II Limited (among others) entered into a written assignment agreement whereby Wells Fargo Bank assigned to Silver Elms CDO II Limited and Blue

Heron Funding VII Ltd.  "all right, title and interest that [Wells Fargo] may have, if any, with respect to the claims asserted by each CDO Issuer or which may hereafter be asserted by each CDO Issuer" in this action.  Accordingly, to the extent that Wells Fargo Bank as CDO Trustee obtained the exclusive right to assert claims on behalf of Silver Elms CDO II Limited and Blue Heron Funding VII Ltd., that right has been assigned back to Silver Elms CDO II Limited and Blue Heron Funding VII Ltd.  Alternatively, if Silver Elms CDO II Limited and Blue Heron Funding VII Ltd. retained the ability to bring claims, they do so in their own right here as they are parties to this action.

44.     Phoenix Light is structured differently than the other Plaintiffs and did not enter into an Indenture with a CDO trustee.  Instead, Phoenix Light entered into a Trust Agreement that provided to Deutsche Bank as Phoenix Light Trustee a security interest in the collateral by pledging in Section 3.2 of the Trust Agreement "all its present and future, actual and contingent claims and rights" with respect to the collateral.  Section 3.5 provides that the "pledges pursuant to Clause 3.2 are granted for the purpose of securing the Trustee Claim."

45.     Section 3.7 of the Phoenix Light Trust Agreement expressly authorizes the Issuer (*i.e.,* Phoenix Light) to take actions with respect to the pledged collateral as that section provides: "The Issuer shall be authorised (*ermächtigt*) to collect or have collected in the ordinary course of business or otherwise exercise or deal with (which terms shall, for the avoidance of doubt, include the enforcement of any security) the rights pledged under Clause 3.2."

46.     Phoenix Light also entered into an Amended Security Agreement with Deutsche Bank as Phoenix Light Trustee, which applies only to assets acquired from Harrier

13

and Kestrel, including the RMBS conveyed to Phoenix Light pursuant to the asset purchase agreements identified on Exhibit B.  Section 2.1 of that agreement provides for a "Grant of Security Interest" providing "the Issuer hereby Grants to the Trustee, for the benefit of the Transaction Creditors, all of the Issuer's right, title and interest in and to the" assets acquired from Harrier and Kestrel.  The term "grant" is defined as not including any of the "obligations" of the Issuer with respect to the collateral, including those obligations set forth in the Phoenix Light Trust Agreement.  The "obligations" of the Issuer include the obligation to protect the collateral found in Section 9.8 of the Phoenix Light Trust Agreement.  This provision expressly contemplates that Phoenix Light will act if there are breaches of covenants or obligations with respect to the collateral, including by enforcing rights as it is authorized to do under Section 3.7.  Accordingly, Phoenix Light clearly has contractual standing to bring claims with respect to the RMBS it holds directly as identified in Exhibit B.

47.     To the extent Deutsche Bank as Phoenix Light Trustee obtained any rights to bring the claims asserted herein, on June 17, 2015, Deutsche Bank assigned "all rights that [Deutsche Bank] may have to pursue and enforce the claims set forth in" this action "including any claims which may be added to the [action] by virtue of an amendment to the" complaints or otherwise.  As a result, to the extent that Deutsche Bank as Phoenix Light Trustee obtained the exclusive right to assert claims on behalf of Phoenix Light that right has been assigned back to Phoenix Light.

**JURISDICTION AND VENUE**

48.     This Court has jurisdiction over the common law claims asserted in this matter and the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has

jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has

jurisdiction pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship

between the parties and the amount in controversy, exclusive of interest and costs, exceeds

$75,000.

49.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as

Deutsche Bank resides and transacts business in this District and a substantial part of the

events and omissions giving rise to the claims asserted herein occurred in this District.

50.     This Court has personal jurisdiction over Deutsche Bank because a substantial

part of the administration of the Covered Trusts, out of which the claims asserted herein

arise, is performed in New York.  Additionally, the majority of the Covered Trusts are New

York trusts, with their governing agreements governed by New York law, and in certain of

the PSAs, Deutsche Bank expressly consented to this Court's jurisdiction.

## FACTUAL ALLEGATIONS

## I.     THE SECURITIZATION PROCESS

51.     The process through which RMBS are created and sold is known as mortgage

loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators

and pooled together in a trust, which issues securities representing interests in the cash flow

from principal and interest payments on the pool of loans after certain costs and fees are

deducted.

52.     The first step in each securitization is generally the acquisition of mortgage

loans by a sponsor (or "seller"), such as Morgan Stanley Mortgage Capital Inc., and the sale

of a large pool of such loans by the sponsor to a depositor, typically a special-purpose

affiliate of the sponsor.

15

53.     The depositor then conveys the pool of loans to a trustee, such as Deutsche
Bank, pursuant to a PSA that establishes various prioritized "tranches" of interests in
payments made by borrowers on the loans.  The trust issues certificates representing those
tranches; the certificates are sold to an underwriter; and the underwriter re-sells the
certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a
profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost
of purchasing the mortgage loans.  Here, Deutsche Bank acted as the trustee in connection
with the relevant RMBS transactions.

54.     Pursuant to the PSA for each trust, a "servicer" is appointed to manage the
collection of payments on the mortgage loans in return for a monthly fee.  The servicer's
duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring
compliance with representations and warranties regarding loan origination, tracking
mortgage documentation and managing and selling foreclosed properties.

55.     The trustee delivers monthly remittance reports to holders of certificates
describing the performance of underlying loans and compliance with the PSA.  The contents
of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17
C.F.R. 229.1121.  The servicer provides data to the trustee to include in these remittance
reports.

56.     Each tranche in a loan securitization has a different level of risk and reward,
and its own rating issued by a nationally recognized credit-rating agency such as Standard &
Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or
AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior
tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in

16

principal and interest payments are generally allocated first to junior tranches. This division of cash flows and losses is referred to as the "waterfall."

57.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

58.     Deutsche Bank earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. Deutsche Bank also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. Deutsche Bank maintained accounts for hundreds, if not thousands, of trusts and earned substantial sums from the aggregate balances of these accounts. The RMBS trustee engagements further deepened Deutsche Bank's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.     DEUTSCHE BANK'S DUTIES AND OBLIGATIONS

59.     Deutsche Bank's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs or, as was the case for the Aegis Trust, the American Home Trust, the Impac Trusts, and one of the Saxon Trusts (SAST 2006-3), an Indenture, and under applicable state and federal law. These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts. Deutsche Bank entered into the PSAs or Indentures with:

> (A)  For the Aegis Trust: an Indenture with (i) the Trust as Issuer; and (ii) Wells Fargo Bank, N.A. as Administrator;

(B)  For the American Home Trust: an Indenture with (i) the Trust as Issuing Entity; and (ii) Wells Fargo Bank, N.A. as Securities Administrator;

(C)  For three of the Ameriquest Trusts (ARSI 2006-M1, ARSI 2006-W2 and ARSI 2006-W3): (i) Argent Securities Inc. as Depositor; and (ii) Ameriquest Mortgage Company as Master Servicer;

(D)  For two of the Ameriquest Trusts (AMSI 2006-R1 and ARSI 2006-3): (i) Ameriquest Mortgage Securities Inc. as Depositor; and (ii) Ameriquest Mortgage Company as Master Servicer;

(E)  For the First Franklin Trust: (i) HSI Asset Securitization Corporation as Depositor; (ii) First Franklin Financial Corporation as Mortgage Loan Seller; and (iii) Wells Fargo Bank, N.A. as Servicer, Master Servicer, Securities Administrator and Custodian;

(F)  For the HSBC Trust (HASC 2006-HE1): (i) HSI Asset Securitization Corporation as Depositor; (ii) Wells Fargo Bank, N.A. as Master Servicer, Securities Administrator and Custodian; (iii) Deutsche Bank National Trust Company as Trustee; and (iv) Clayton Fixed Income Services, Inc. as Credit Risk Manager;

(G)  For the Impac Trusts: Indentures with the Trust as Issuer;

(H)  For two of the IXIS Trusts (IXIS 2006-HE1 and IXIS 2006-HE2): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) JPMorgan Chase Bank, National Association as Master Servicer, Backup Servicer and Securities Administrator; (iii) Saxon Mortgage Services Inc. as Servicer, (iv) Master Financial, Inc. as Servicer; and (v) IXIS Real Estate Capital Inc. as Unaffiliated Seller;

(I)  For one of the IXIS Trusts (IXIS 2007-HE1): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Wells Fargo Bank, National Association as Master Servicer and Securities Administrator; (iii) Saxon Mortgage Services, Inc. as Servicer; and (iv) IXIS Real Estate Capital Inc. as Unaffiliated Seller;

(J) For one of the IXIS Trusts (MSIX 2006-2)[3]: (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Saxon Mortgage, Inc. as Servicer; (iii) Countrywide Home Loans Servicing LP as Servicer; (iv) First NLC Financial Services as Responsible Party; and (v) IXIS Real Estate Capital Inc. as Sponsor;

(K)  For the Merrill Lynch Trust: (i) Merrill Lynch Mortgage Investors, Inc. as Depositor; and (ii)  Wilshire Credit Corporation as Servicer;

---

[3] MSIX 2006-2 was sponsored by both Morgan Stanley Mortgage Capital Inc. and IXIS Real Estate Capital Inc., and will be referred to herein as one of the IXIS Trusts.

(L)  For one of the Morgan Stanley Trusts (MSAC 2006-HE6): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Countrywide Home Loans Servicing LP as Servicer; (iii) Wells Fargo Bank, National Association as Servicer and Custodian; (iv) New Century Mortgage Corporation as Servicer; and (v) NC Capital Corporation as Responsible Party;

(M) For one of the Morgan Stanley Trusts (MSAC 2006-NC2): (i) Morgan Stanley Capital I Inc. as Depositor; (ii) Wells Fargo Bank, National Association as Servicer; and (iii) NC Capital Corporation as Responsible Party;

(N) For one of the Morgan Stanley Trusts (MSAC 2006-NC5): (i) Morgan Stanley ABS Capital Inc. as Depositor; (ii) Countrywide Home Loans Servicing as LP as Servicer; (iii) New Century Mortgage Corporation as Servicer; and (iv) NC Capital Corporation as Responsible Party;

(O) For one of the Morgan Stanley Trusts (MSAC 2006-WMC2): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Wells Fargo Bank, N.A. as the Servicer, Securities Administrator and Custodian; and (iii) WMC Mortgage Corp. as Responsible Party;

(P) For one of the Morgan Stanley Trusts (MSAC 2007-HE1): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Saxon Mortgage Services, Inc. as Servicer; (iii) NC Capital Corporation as Responsible Party; and (iv) Decision One Mortgage Company as Responsible Party;

(Q)  For one of the Morgan Stanley Trusts (MSAC 2007-HE2): (i) Morgan Stanley ABS Capital Inc. as Depositor; (ii) Saxon Mortgage Services, Inc. as Servicer; (iii) Countrywide Home Loans Servicing LP as Servicer; (iv) Wells Fargo Bank, National Association as Servicer and Custodian; (v) New Century Mortgage Corporation as Servicer; (vi) NC Capital Corporation as Responsible Party; and (vii) WMC Mortgage Corp. as Responsible Party;

(R) For one of the Morgan Stanley Trusts (MSAC 2007-HE5): (i) Morgan Stanley ABS Capital Inc. as Depositor; (ii) Wells Fargo Bank, National Association as Master Servicer, Securities Administrator and Custodian; (iii) Saxon Mortgage Services, Inc. as Servicer; (iv) Countrywide Home Loans Servicing LP as Servicer; (v) WMC Mortgage Corp. as Responsible Party; (vi) Decision One Mortgage Company, LLC as Responsible Party; and (vii) LaSalle Bank National Association as Custodian;

(S)  For one of the Morgan Stanley Trusts (MSAC 2007-NC1): (i) Morgan Stanley ABS Capital Inc. as Depositor; (ii) Countrywide Home Loans Servicing LP as Servicer; (iii) Saxon Mortgage Services, Inc. as Servicer; and (iv) NC Capital Corporation as Responsible Party;

(T) For one of the Morgan Stanley Trusts (MSAC 2007-NC4): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Wells Fargo Bank, National Association as Master Servicer and Securities Administration; and (iii) Saxon Mortgage Services, Inc. as Servicer;

(U)  For one of the Morgan Stanley Trusts (MSHEL 2006-3): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) HomEq Servicing Corporation as Servicer; (iii) Wells Fargo Bank, National Association as Servicer; (iv) JPMorgan Chase Bank as Servicer; and (v) First NLC Financial Services, LLC as Responsible Party;

(V) For one of the Morgan Stanley Trusts (MSHEL 2007-1): (i) Morgan Stanley ABS Capital I Inc. as Depositor; (ii) Saxon Mortgage Services, Inc. as Servicer; (iii) Wells Fargo Bank, National Association as Servicer and Custodian; and (iv) First NLC Financial Services, LLC as Responsible Party;

(W) For the NovaStar Trusts: (i) NovaStar Mortgage Funding Corporation as Depositor; (ii) NovaStar Mortgage, Inc. as Servicer and Sponsor; and (iii) U.S. Bank National Association as Custodian;

(X)  For four of the RBS Trusts (FHLT 2005-1, FHLT 2005-2, SVHE 2005-3 and SVHE 2006-1): (i) Financial Asset Securities Corp. as Depositor; and (ii) Litton Loan Servicing LP as Servicer;

(Y)  For two of the RBS Trusts (MMLT 2005-2 and SVHE 2006-EQ1): (i) Financial Asset Securities Corp. as Depositor; and (ii) Saxon Mortgage Services, Inc. as Servicer;

(Z) For one of the RBS Trusts (SVHE 2006-NLC1[4]): (i) Financial Asset Securities Corp., as Depositor; (ii) Wells Fargo Bank, N.A., as Servicer; and (iii) Ocwen Loan Servicing, LLC, as Servicer;

(AA) For two of the RBS Trusts (FHLT 2006-1 and FHLT 2006-3): (i) Financial Asset Securities Corp. as Depositor; and (ii) Wells Fargo Bank, N.A. as Servicer;

(BB)  For one of the RBS Trusts (FHLT 2006-2): (i) Financial Asset Securities Corp. as Depositor; (ii) Fremont Investment & Loan as Servicer; and (iii) Wells Fargo Bank, N.A. as Master Servicer and Trust Administrator;

(CC)  For two of the Saxon Trusts (SAST 2007-1 and SAST 2007-3, together, the "Saxon PSA Trusts"): (i) Saxon Asset Securities Company as Depositor; and (ii) Saxon Mortgage Services, Inc. as Servicer;

---

[4] The PSA for this deal is not publicly available.  The information was obtained from the PSA produced by Defendants.

(DD) For one of the Saxon Trusts (SAST 2006-3, the "Saxon Indenture Trust"): an Indenture with the Trust as Issuer; and

(EE)  For the Sutton Trust: (i) Securitized Asset Backed Receivables LLC as Depositor; (ii) Barclays Capital Real Estate Inc. d/b/a HomEq Servicing as Servicer; and (iii) NC Capital Corporation as Responsible Party.

### A.   Deutsche Bank's Duties Pertaining to the Delivery of Mortgage Files

60.     Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to Deutsche Bank in its capacity as trustee for the Covered Trusts to hold for the benefit of the Certificateholders.  This process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the Morgan Stanley PSA,[5] which provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § I.

61.     In addition, Section 2.02 of the Morgan Stanley PSA ("Acceptance by the Trustee of the Mortgage Loans") provides that Deutsche Bank is required to take physical

---

[5] Quotations to the Morgan Stanley PSA herein are to the PSA executed in connection with the MSAC 2006-HE6, MSAC 2006-NC2, MSAC 2006-NC5, MSAC 2006-WMC2, MSAC 2007-HE1, MSAC 2007-HE2, MSAC 2007-HE5, MSAC 2007-NC1, MSAC 2007-NC4, MSHEL 2006-3, and MSHEL 2007-1as well as the other trusts in this action, were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in the Third Amended Complaint.  The relevant provisions of the governing agreements for each trust are set forth in Exhibit C hereto and are substantially similar.

possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future Certificateholders.  It provides:

> The Trustee shall acknowledge, on the Closing Date, receipt by the Trustee, of the documents identified in the Initial Certification in the form annexed hereto as Exhibit E, and declares that it holds and will hold such documents and the other documents delivered to it pursuant to Section 2.01, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § II.

62.    Section 2.01 of the Morgan Stanley PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides:

> In connection with the transfer and assignment of each Mortgage Loan, ***the Depositor has delivered*** or caused to be delivered to the Trustee **for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:**
>
> (i) the ***original Mortgage Note bearing all intervening endorsements*** showing a complete chain of endorsement from the originator to the last endorsee, endorsed "Pay to the order of , without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer. To the extent that there is no room on the face of a Mortgage Note for endorsements, the endorsement may be contained on an allonge, unless the Trustee is advised in writing by the Responsible Party, that state law does not so allow;
>
> (ii) the ***original of any guaranty executed in connection with the Mortgage Note***;
>
> (iii) the ***original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording***. If, in connection with any Mortgage Loan, the original Mortgage

cannot be delivered with evidence of recording thereon on or prior to the Closing Date because of a delay caused by the public recording office where such Mortgage has been delivered for recordation or because such Mortgage has been lost or because such public recording office retains the original recorded Mortgage, the Responsible Party, shall deliver or cause to be delivered to the Trustee a photocopy of such Mortgage, together with (A) in the case of a delay caused by the public recording office, an officer's certificate of the Responsible Party or evidence of certification on the face of such photocopy of such Mortgage or a certificate from an escrow company, a title company or closing attorney stating that such Mortgage has been dispatched to the appropriate public recording office for recordation and that the original recorded Mortgage or a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage will be promptly delivered to the Trustee upon receipt thereof by the Responsible Party; or (B) in the case of a Mortgage where a public recording office retains the original recorded Mortgage or in the case where a Mortgage is lost after recordation in a public recording office, a copy of such Mortgage certified by such public recording office to be a true and complete copy of the original recorded Mortgage;

(iv) the *originals of all assumption, modification, consolidation or extension agreements*, with evidence of recording thereon or a certified true copy of such agreement submitted for recording;

(v) the *original Assignment of Mortgage for each Mortgage Loan endorsed in blank*;

(vi) *the originals of all intervening assignments of Mortgage* (if any) evidencing a complete chain of assignment from the applicable originator to the last endorsee with evidence of recording thereon or a certified true copy of such intervening assignments of Mortgage submitted for recording, or if any such intervening assignment has not been returned from the applicable recording office or has been lost or if such public recording office retains the original recorded assignments of Mortgage, the Responsible Party, shall deliver or cause to be delivered a photocopy of such intervening assignment, together with (A) in the case of a delay caused by the public recording office, an officer's certificate of the Responsible Party or evidence of certification on the face of such photocopy of such intervening assignment or a certificate from an escrow company, a title company or a closing attorney stating that such intervening assignment of Mortgage has been dispatched to the appropriate public recording office for recordation and that such original

23

recorded intervening assignment of Mortgage or a copy of such intervening assignment of Mortgage certified by the appropriate public recording office to be a true and complete copy of the original recorded intervening assignment of Mortgage will be promptly delivered to the Trustee upon receipt thereof by the Responsible Party; or (B) in the case of an intervening assignment where a public recording office retains the original recorded intervening assignment or in the case where an intervening assignment is lost after recordation in a public recording office, a copy of such intervening assignment certified by such public recording office to be a true and complete copy of the original recorded intervening assignment;

(vii) the ***original mortgagee title insurance policy*** or, in the event such original title policy is unavailable, a certified true copy of the related policy binder or commitment for title certified to be true and complete by the title insurance company; and

(viii) the ***original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage*** (if provided).

(Emphasis added.)  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § III.

63.     Physical possession of these documents by Deutsche Bank was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

64.     After a designated period, Deutsche Bank, or a Custodian on its behalf, was required to issue a Final Certification and Exception Report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C §§ V, VI.  The PSAs for the Aegis, HSBC and RBS Trusts contain language that makes clear that the Custodian is an agent of the Trustee and that if the Trustee chooses to act through a Custodian it remains liable for the acts of the Custodian.  *See* Ex. C § IV.

24

65.     The "Form of Final Certification of Trustee," which was attached to the

Morgan Stanley PSA as Exhibit E, provides:

> Ladies and Gentlemen:
>
> In accordance with Section 2.02 of the above-captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned, as ***Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received:***
>
> (i) The ***original Mortgage Note***, endorsed in the form provided in Section 2.01 of the Pooling and Servicing Agreement, with all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee.
>
> (ii) ***The original recorded Mortgage***.
> (iii) A ***duly executed assignment of the Mortgage*** in the form provided in Section 2.01 of the Pooling and Servicing Agreement; or, if the Responsible Party has certified or the Trustee otherwise knows that the related Mortgage has not been returned from the applicable recording office, a copy of the assignment of the Mortgage (excluding information to be provided by the recording office).
>
> (iv) The ***original or duplicate original recorded assignment or assignments of the Mortgage showing a complete chain of assignment from the originator to the last endorsee***.
>
> (v) The original or duplicate original ***lender's title policy*** and all riders thereto or, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company. Based on its review and examination and only as to the foregoing documents, (a) such documents appear regular on their face and related to such Mortgage Loan, and (b) the information set forth in items (1) solely with respect to the Mortgage Loan number, (2) and (7) of the Mortgage Loan Schedule and items (1), (9) and (17) of the Data Tape Information accurately reflects information set forth in the Custodial File.
>
>                     *        *        *
>
> DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee

(Emphasis added.)  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts set forth a substantially similar form of Final Certification.  *See* Ex. C § V.

66.     The Final Certification is the key certification that Deutsche Bank (or a Custodian on its behalf) was required to prepare for the Covered Trusts.  In this document, Deutsche Bank certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) Deutsche Bank had not obtained complete required documentation for those loans identified on the document exception report.  If there was a defect with any mortgage file, then Deutsche Bank was obligated to demand that the Sponsor cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans.  This is set forth in Section 2.03(e) of the Morgan Stanley PSA, which provides:

> Within 30 days of the earlier of either discovery by or notice to the Responsible Party that any Mortgage Loan does not conform to the requirements as determined in the Trustee's review of the related Custodial File or within 60 days of the earlier of either discovery by or notice to the Responsible Party of any breach of a representation or warranty, set forth in Section 2.03(b), that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the Responsible Party shall use its best efforts to cause to be remedied a material defect in a document constituting part of a Mortgage File or promptly to cure such breach in all material respects and, if such defect or breach cannot be remedied, the Responsible Party shall, at the Depositor's option as specified in writing and provided to the Responsible Party and the Trustee, (i) if such 30 or 60 day period, as applicable, expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a Deleted Mortgage Loan) from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section 2.03; or (ii) repurchase such Mortgage Loan at the Repurchase Price; provided, however, that any such substitution pursuant to clause (i) above shall

26

> not be effected prior to the delivery to the Trustee of a Request for
> Release substantially in the form of Exhibit J, and the delivery of
> the Mortgage File to the Trustee for any such Substitute Mortgage
> Loan.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts set forth substantially similar requirements.  *See* Ex. C § VI.

67.    In some of the Covered Trusts, after the passage of a specified period of time, the Trustee could not seek substitution of loans and could merely demand repurchase.  For example, Section 2.03 of the Morgan Stanley PSA provides that substitution is not an available remedy after two years from closing.  The PSAs for the Aegis, Ameriquest, First Franklin, HSBC, Impac, Merrill Lynch, NovaStar, RBS, and Sutton Trusts set forth similar cutoffs.  *See* Ex. C § VI.

## B.    Deutsche Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice

68.    Deutsche Bank had an obligation pursuant to the PSAs to provide notice to all parties of the Sponsors' or Originators' breaches of representations and warranties under the PSAs or MLPAs.  For example, Section 2.03(d) of the Morgan Stanley PSA provides:

> Upon discovery by any of the Responsible Party, the Depositor, the
> Trustee or the Servicer, of a breach of any of the foregoing
> representations and warranties, the party discovering such breach
> shall give prompt written notice to the others.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts contain substantially similar provisions.  *See* Ex. C § VI.

69.     In addition, the PSAs require that Deutsche Bank provide notice of breaches of covenants made by the Servicers or the Master Servicers.  For example, Section 7.01(b) of the Morgan Stanley PSA provides that most breaches by the Servicer ripen into an Event of Default if left unremedied for 60 days after "written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Depositor or the Trustee." *See* Ex. C § IX; *see also* Ex. C § VI.  This provision clearly contemplates that the Trustee "shall" provide notice of Servicer breaches upon becoming aware of such breaches, which makes sense as the Trustee was the party required to police the deal for investors.  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts contain substantially similar requirements. *See* Ex. C § IX; *see also* Ex. C § VI.

70.     A number of the PSAs have additional provisions requiring the Trustee to provide notice to all parties of breaches of representations and warranties made by the Servicers or Master Servicers.  For example, Section 2.03(d) of the Morgan Stanley PSA provides that: "Upon discovery by any of the Responsible Party, the Depositor, the Trustee or the Servicer, of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others."  The PSAs for the American Home, Ameriquest, First Franklin, Impac, IXIS, Merrill Lynch, NovaStar, RBS and Sutton Trusts contain substantially similar requirements.  *See* Ex. C § VI.

71.     In addition, after the occurrence of an Event of Default or a substantial breach of the PSA by the Trustee, the Trustee assumes the same duties as a common law trustee which includes, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

72.     Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

73.     Under Section 315(b) of the TIA, Deutsche Bank was required to give the Certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

74.     As set forth in Section III hereof, Deutsche Bank failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law and the TIA.

### C.     Deutsche Bank's Duty to Act Prudently to Enforce Repurchase Obligations

75.     Under the PSAs and applicable law, Deutsche Bank owed a fiduciary duty to Certificateholders upon the occurrence of an Event of Default.  Deutsche Bank's post-default fiduciary duty is described in Section 8.01 of the Morgan Stanley PSA, which provides in relevant part, "[i]n case an Event of Default has occurred and remains uncured, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts impose substantially similar obligations on Deutsche Bank. *See* Ex. C § VII.

76.     The duty to act prudently to protect the interests of Certificateholders is a continuing duty that remains in effect until the Event of Default is cured.

77.     In addition, Section 315(c) of the TIA provides that upon the occurrence of a default the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

78.     The Streit Act provides that upon the occurrence of an "Event of Default," an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

79.     Upon the occurrence of an Event of Default, a prudent trustee would have exercised all of its right under the PSAs to ensure that defaulted loans that were eligible for repurchase or substitution due to representation and warranty violations or because they were missing required documentation were put back to the responsible parties.  A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

80. As set forth in Section III hereof, Deutsche Bank failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.      Deutsche Bank Had a Duty to Address the Master Servicers'
         and Servicers' Failure to Meet Prudent Servicing Standards**

80.     Each PSA requires the Master Servicers or Servicers to service the loans underlying the Covered Trusts prudently.

81.     For example, Section 3.01 of the Morgan Stanley PSA provides:  "For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans . . . to the extent

consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans. The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts contain substantially similar requirements.  *See* Ex. C § VIII.

82. The Aegis, American Home, HSBC, Impac, Merrill Lynch, NovaStar and Saxon PSAs provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a specified period after notice of the default.  *See* Ex. C § IX.

83. Further, for the Aegis and Saxon Trusts, if the default relates to a failure to deliver mortgage files to the Covered Trust, the Event of Default is triggered immediately upon service of the exception report that identifies the document delivery failure.

84. For example, Section 7.1(ii) of the Saxon PSA provides that an Event of Default is triggered by:

> any failure by the Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders, which failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Servicer by the Trustee or the Depositor, or to the Servicer and the Trustee by the Holders of Certificates evidencing not less than 51% of the Voting Rights evidenced by the Certificates; provided, however, that the 60day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu thereof;

85. Further, the PSAs for the Ameriquest, First Franklin, IXIS, Morgan Stanley, RBS and Sutton Trusts provide that the failure to follow prudent servicing standards is an Event of Default if it remains uncured for a specified period after a Servicing Officer

31

becomes aware of such breach, without regard to whether notice was provided.  *See* Ex. C § IX.

86.    Upon a Master Servicer or Servicer default or Event of Default, Deutsche Bank was obligated to act.  As discussed above in Section II(B), Deutsche Bank had a duty to provide notice when it became aware of breaches of the PSAs by the Servicers or the Master Servicers.  If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults.  For example, the  Morgan Stanley PSA provides that once an Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations of the Servicer," *see* Morgan Stanley PSA § 7.01 (*see also* Ex. C § IX), and "subject to all the responsibilities, duties and liabilities relating thereto," *see* Morgan Stanley PSA § 7.02.  The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts impose substantially similar obligations on Deutsche Bank.  *See* Ex. C § X.  More generally, Deutsche Bank, as Trustee, had a duty to exercise all rights available under the PSAs to protect Certificateholders' interests and to do so with due care.

87.    As set forth in Section III hereof, Deutsche Bank breached its statutory, fiduciary and contractual duties by failing to take actions to address Master Servicer and Servicer defaults and Events of Default.

**E.    Deutsche Bank Is Liable for Negligence in Performing Its Duties**

88.    Under the plain language of the PSAs, the TIA, the Streit Act and applicable common law, Deutsche Bank had a duty to perform its duties under the PSAs competently

and is liable for its negligent failure to do so.  Section 8.01 of the Morgan Stanley  PSA
provides in relevant part:

> **No provision of this Agreement shall be construed to relieve the**
> **Trustee from liability for its own negligent action, its own**
> **negligent failure to act or its own willful misconduct.**
> Unless an Event of Default known to the Trustee has occurred and
> is continuing:
>
> (a) the duties and obligations of the Trustee shall be determined
> solely by the express provisions of this Agreement, the Trustee shall
> not be liable except for the performance of the duties and obligations
> specifically set forth in this Agreement, no implied covenants or
> obligations shall be read into this Agreement against the Trustee,
> and the Trustee may conclusively rely, as to the truth of the
> statements and the correctness of the opinions expressed therein,
> upon any certificates or opinions furnished to the Trustee and
> conforming on their face to the requirements of this Agreement
> which it believed in good faith to be genuine and to have been duly
> executed by the proper authorities respecting any matters arising
> hereunder;
>
> (b) the Trustee shall not be liable for an error of judgment made in
> good faith by a Responsible Officer or Responsible Officers of the
> Trustee, **unless it is finally proven that the Trustee was negligent**
> **in ascertaining the pertinent facts;** and
>
> (c) the Trustee shall not be liable with respect to any action taken,
> suffered, or omitted to be taken by it in good faith in accordance
> with the direction of the Holders of Certificates evidencing not less
> than 25% of the Voting Rights of Certificates relating to the time,
> method, and place of conducting any proceeding for any remedy
> available to the Trustee, or exercising any trust or power conferred
> upon the Trustee under this Agreement.

(Emphasis added.)  The PSAs for the Aegis, American Home, Ameriquest, First Franklin,
HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts contain
substantially similar provisions.  *See* Ex. C § VII.

89.     Every trustee also has a non-waivable duty to exercise due care in the
performance of ministerial acts required to be undertaken in the course of the administration

of the trust.  Deutsche Bank can be held liable for its own negligence in failing to perform

its requisite ministerial acts which include, among other things, its responsibilities to: (i)

give notice to all parties to the PSAs of the breach of representations and warranties relating

to the mortgage loans once it discovered the Sponsors' widespread practice of including in

securitization trusts loans that breached such representations and warranties; and (ii) provide

notices of servicing related breaches known to the Trustee.

90.     Every trustee—including Deutsche Bank—has an absolute duty to avoid

conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-

waivable and arises independently of the PSAs.

## III.   DEUTSCHE BANK BREACHED ITS CONTRACTUAL, FIDUCIARY AND STATUTORY DUTIES

### A.     Deutsche Bank Was Aware of but Failed to Provide Notice of Defaults Relating to the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

91.     Deutsche Bank failed to give notice of defaults that occurred when the Sponsors

or Originators breached representation and warranty provisions providing that all loans met

applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the

Sponsors and Originators regularly disregarded their underwriting guidelines and the

representations and warranties made to securitization trusts.

92.     For example, for the Morgan Stanley Trusts, the Responsible Party as to the

Mortgage Loans represented and warranted in the Morgan Stanley PSA that "[t]he Mortgage

Loan was underwritten in accordance with the Underwriting Guidelines" and "[e]ach

Mortgage Loan has been serviced in all material respects in strict compliance with Accepted

Servicing Practices." Morgan Stanley PSA Schedule III.  The Responsible Party  further

represented and warranted the following:

34

(1) Mortgage Loans as Described. NC Capital Corporation has delivered to the Sponsor, as of March 1, 2006, the Data Tape Information and that Data Tape Information and the information set forth on the Mortgage Loan Schedule (other than item (21) thereof, as to which NC Capital Corporation makes no representation or warranty) are true and correct, including, without limitation, the terms of the Prepayment Charges, if any, as of the Securitization Closing Date;

(2) Payments Current. All payments required to be made up to March 1, 2006 for the Mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30 days delinquent, have been made and credited. No payment required under the Mortgage Loan is 30 days or more delinquent nor has any payment under the Mortgage Loan been 30 days or more delinquent at any time since the origination of the Mortgage Loan. The first Scheduled Payment was or shall be made with respect to the Mortgage Loan on its Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note;

(3) No Outstanding Charges. There are no defaults in complying with the terms of the Mortgage, and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable . . . .

(4) Original Terms Unmodified. The terms of the Mortgage Note and Mortgage have not been impaired, waived, altered or modified in any respect from the date of origination, except by a written instrument which has been recorded, if necessary to protect the interests of the Sponsor, and which has been delivered to the Trustee and the terms of which are reflected in the Mortgage Loan Schedule. . . .

(5) No Defenses. The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including, without limitation, the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Mortgagor was a debtor in any state or federal

35

bankruptcy or insolvency proceeding at the time the Mortgage Loan was originated…

(8) No Satisfaction of Mortgage. Other than with respect to any Mortgage Loan that was subject to a Principal Prepayment in Full occurring after the Cut-off Date but prior to the Securitization Closing Date, the Mortgage has not been satisfied, cancelled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. NC Capital Corporation has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage Loan to be in default, nor has NC Capital Corporation waived any default resulting from any action or inaction by the Mortgagor…

(10) Valid First Lien. The Mortgage is a valid, subsisting, enforceable and perfected first lien (with respect to each First Lien Mortgage Loan) or second lien (with respect to each Second Lien Mortgage Loan) on the Mortgaged Property, including all buildings and improvements on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any time with respect to the foregoing. The lien of the Mortgage is subject only to: (i) with respect to a Second Lien Mortgage Loan only, the lien of the first mortgage on the Mortgaged Property; (ii) the lien of current real property taxes and assessments not yet due and payable; (iii) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to prudent mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and (a) specifically referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan or (b) which do not adversely affect the Appraised Value of the Mortgaged Property set forth in such appraisal; and (iv) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property; Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority (with respect to each First Lien Mortgage Loan) security interest on the property described therein

36

and NC Capital Corporation has full right to sell and assign the same to the Sponsor;

(11) Validity of Mortgage Documents. . .  No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan. . . .

(15) LTV. No First Lien Mortgage Loan has an LTV greater than 100%, and no Second Lien Mortgage Loan has a CLTV greater than 100%…

(17) No Defaults. Other than payments due but not yet 30 or more days delinquent, there is no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration, and neither NC Capital Corporation nor its Affiliates or any of their respective predecessors have waived any default, breach, violation or event which would permit acceleration…

(26) Delivery of Mortgage Documents. The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered under this Agreement for each Mortgage Loan have been delivered to the Sponsor;

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts contain substantially similar provisions.  *See* Ex. C § XI.

93.     As noted above in Section II(B), each party, including Deutsche Bank, had an obligation to provide notice of breaches of these representations and warranties, and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loans.

94.     Deutsche Bank knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before Certificateholders learned of such problems.

95.     Deutsche Bank served as trustee of thousands of RMBS trusts from 2004 to 2007, including many transactions involving the Sponsors and Originators.  In the course of administering these trusts, Deutsche Bank learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending and failed to ensure mortgage loans complied with state and federal laws.

96.     For example, while serving as trustee for various RMBS trusts, Deutsche Bank was presented with a large number of defaulted loans that were originated by the Sponsors and Originators and foreclosures were commenced often in Deutsche Bank's name.

97.     Indeed, foreclosure actions have been commenced in Deutsche Bank's name from 2005 to the present for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

(a)  Ameriquest Mortgage Company served as Originator.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. El-shabazz*, No. 06-cv-095831 (C.P. Summit Cnty. 2006); Compl., *Deutsche Bank Nat'l Trust Co. v. Moore*, No. 08-cv-021459 (C.P. Summit Cnty. 2008); Compl., *Deutsche Bank Nat'l Trust Co. v. Wilt*, No. 06-cv-106953 (C.P. Summit Cnty. 2006);

(b)  First Franklin Financial Corporation served as Originator.  *See, e.g.*, Compl., *Deutsche Bank National Trust Company v. Payne*, No. 06-cv-095922 (C.P. Summit Cnty. 2006);

(c)  HSBC Bank USA, National Association served as Sponsor.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Stevenson*, No. 06-cv-095613 (C.P. Summit Cnty. Sept. 8, 2006) Compl., *Deutsche Bank Nat'l Trust Co. v. Russo*, No. 07-cv-32384 (N.J. Super. Ct. Ch. Div. Nov. 27, 2007);

(d)  Option One Mortgage Corporation served as Originator.  *See, e.g.*, Compl., *Deutsche Bank National Trust Company v. Smith*, No. 06-cv-106858 (C.P. Summit Cnty 2006); and

(e) RBS Financial Products served as Sponsor. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Tylecek*, No. 08-cv-1666 (Fla. St. John's Cnty. Ct. July 31, 2008) (initiating action for loan included in MMLT 2005-2 Trust).

98.     Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, Deutsche Bank had a duty to examine foreclosure filings.  *See, e.g.*, Morgan Stanley PSA § 8.01 ("The Trustee, upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments furnished to the Trustee that are specifically required to be furnished pursuant to any provision of this Agreement shall examine them to determine whether they are in the form required by this Agreement.").  Having lent its name to the foreclosure proceedings, Deutsche Bank had a duty to review and approve filings.

99.     Through its review of these filings, Deutsche Bank knew or should have known that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

100.    Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed in Exhibit F, demonstrated that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans and failed to meet state and federal lending guidelines.  While investors such as Plaintiffs lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, Deutsche Bank had knowledge of specific problems with specific loans as well as access to the mortgage files.

At a minimum, in its role as trustee to more than a thousand RMBS trusts, Deutsche Bank was privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, Deutsche Bank had statutory and common law duties requiring it to "nose to the source."  This is a continuing duty that Deutsche Bank is still disregarding.

101.    For instance, in or around August 2009, Deutsche Bank, as trustee, filed a complaint and proof of claim against the Federal Deposit Insurance Company (the "FDIC"), as receiver for Washington Mutual Bank, for representation and warranty violations and servicing misconduct related to eight securitization trusts sponsored by Long Beach Mortgage Company (*formerly Ameriquest Mortgage Company*) and Washington Mutual Bank.  In April 2011, the court denied JPMorgan's motion to dismiss that action.  This demonstrates Deutsche Bank's knowledge of misconduct by Ameriquest Mortgage Company as well as the widespread breaches and systemic misconduct of the other Sponsors and Originators at issue, which Deutsche Bank failed to address.

102.    Deutsche Bank also commenced repurchase actions against the Sponsors or Originators at issue here.  For example, at the direction of certain Certificateholders, Deutsche Bank, in its role as trustee, commenced actions against, among others, HSBC Bank USA, National Association (the Sponsor of loans for one of the Covered Trusts) and WMC Mortgage, LLC (the Originator of loans for three of the Covered Trusts) to compel repurchase of loans that breached representations and warranties.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*, No. 12-cv-00933 (D. Conn. Mar. 31, 2014); Compl., *Deutsche Bank Nat'l Trust Co., solely as Trustee for HSI Asset Securitization Corp. Trust 2007-NC1 v. HSBC Bank USA, N.A.*, No. 13-cv-6520013 (N.Y.

Sup. Ct. Nov. 12, 2013). In each of the repurchase actions brought by Deutsche Bank, loan level reviews were conducted that identified breach rates in excess of 80% with respect to loans originated during the same period as the loans in the Covered Trusts. Additional repurchase actions brought by Deutsche Bank include *Deutsche Bank National Trust Co. v. Barclays Bank PLC, et al.*, No. 13-cv-651789 (N.Y. Sup. Ct. Dec. 11, 2013) and *Deutsche Bank National Trust Company, v. Equifirst Corporation*, No. 13-cv-651957 (N.Y. Sup. Ct. Nov. 18, 2013). While Deutsche Bank pursued Morgan Stanley Mortgage Capital Holdings LLC relating to the Covered Trust MSAC 2007-NC4, *see Deutsche Bank Nat'l Trust Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, No. 14-cv-652877 (N.Y. Sup. Ct. Jan. 23, 2015), that action is subject to significant timeliness defenses due to Deutsche Bank's inaction and fails to address most of the wrongdoing addressed herein.

103.   Deutsche Bank also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

104.   Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS. The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

105.   Monoline insurers have filed many complaints against the Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts. Prior to filing suit against the mortgage loan sponsors, the

monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

106.     For example, in *CIFG Assurance N.A., Inc. v. Goldman, Sachs & Co.*, No. 11-cv-652286 (N.Y. Sup. Ct. Aug. 16, 2011), the monoline insurer CIFG Assurance sued Goldman Sachs and GS Mortgage Securities, reporting that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  Of the 491 loan files that were reviewed by CIFG Assurance, 393, or approximately 80%, contained one or more breaches of the mortgage loan representations.  *Id.* ¶ 67.

107.     Deutsche Bank received notice of the Goldman Sachs monoline action as it was the trustee for the respective trusts in that action.

108.     Because the monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan sellers' systemic and pervasive violations of underwriting and securitization guidelines, Deutsche Bank discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

109.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties.  For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating

effect on the performance of the Covered Trusts. Many of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase. *See* Ex. D. Now most are "junk" bonds that do not qualify for any investment grade rating. *See id.* These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines. *See* Ex. E. A summary of the Covered Trusts' high default and delinquency rates and enormous cumulative losses is attached as Exhibit E. Deutsche Bank was aware of the high level of defaults and should have carefully investigated these issues, notified Certificateholders, including Plaintiffs, of the issues, and taken action to address these issues.

110.    If Deutsche Bank had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates. Deutsche Bank had a continuing duty to provide such notice but failed to do so throughout its tenure as trustee. Indeed, Deutsche Bank let the statute of limitations to bring repurchase claims lapse by failing to provide notice or take other action within six years of the closing of each Covered Trust.

### 1.    The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

111.    Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts with respect to the individual mortgage loans.

112.    The failure of the parties to the PSAs to provide notice of their breaches of representations and warranties constituted a default that would have ripened into Events of Default had Deutsche Bank provided notice of the defaults.

113.    The chart below identifies each of the entities disclosed to be the Sponsors, Originators and obligors of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 1 | AABST 2006-1 | Aegis Mortgage Corporation | Aegis Funding Corporation; Aegis Lending Corporation | Aegis REIT Corporation |
| 2 | AHM 2006-1 | American Home Mortgage Acceptance, Inc. | American Home Mortgage Investment Corporation | American Home Mortgage Acceptance, Inc. |
| 3 | AMSI 2006-R1 | Ameriquest Mortgage Company | Ameriquest Mortgage Company | Ameriquest Mortgage Securities Inc.; Ameriquest Mortgage Company |
| 4 | ARSI 2006-M1 | Ameriquest Mortgage Company | Argent Mortgage Company, L.L.C.; Ameriquest Mortgage Company | Argent Securities Inc.; Ameriquest Mortgage Company |
| 5 | ARSI 2006-M3 | Ameriquest Mortgage Company | Argent Mortgage Company, L.L.C.; Ameriquest Mortgage Company | Ameriquest Mortgage Securities Inc.; Ameriquest Mortgage Company |
| 6 | ARSI 2006-W2 | Ameriquest Mortgage Company | Argent Mortgage Company, L.L.C. | Ameriquest Mortgage Company |
| 7 | ARSI 2006-W3 | Ameriquest Mortgage Company | Argent Mortgage Company, L.L.C. | Argent Securities Inc.; Ameriquest Mortgage Company |
| 8 | FFML 2006-FF11 | First Franklin Financial Corporation | First Franklin Financial Corporation | First Franklin Financial Corporation |
| 9 | FHLT 2005-1 | RBS Financial Products, Inc. | Fremont Investment & Loan | Fremont Investment & Loan; RBS Financial Products, Inc. |

| | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 10 | FHLT 2005-2 | RBS Financial Products, Inc. | Fremont Investment & Loan | Fremont Investment & Loan; RBS Financial Products, Inc. |
| 11 | FHLT 2006-1 | Greenwich Capital Financial Products, Inc. | Fremont Investment & Loan | Greenwich Capital Financial Products, Inc.; Fremont Investment & Loan |
| 12 | FHLT 2006-2 | Greenwich Capital Financial Products, Inc. | Fremont Investment & Loan | Greenwich Capital Financial Products, Inc.; Fremont Investment & Loan |
| 13 | FHLT 2006-3 | Greenwich Capital Financial Products, Inc. | Fremont Investment & Loan | Greenwich Capital Financial Products, Inc.; Fremont Investment & Loan |
| 14 | HASC 2006-HE1 | HSBC Bank USA, National Association | Countrywide Home Loans, Inc.; WMC Mortgage Corporation | HSBC Bank USA, National Association; Countrywide Home Loans, Inc.; WMC Mortgage Corporation |
| 15 | IMM 2005-7 | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. |
| 16 | IMM 2005-8 | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. |
| 17 | IXIS 2006-HE1 | IXIS Real Estate Capital Inc. | First NLC Financial Services, LLC; Chapel Mortgage Corporation; Encore Credit Corporation; Lenders Direct Capital Corporation | IXIS Real Estate Capital Inc.; First NLC Financial Services, LLC; Chapel Mortgage Corporation; Encore Credit Corporation; Lenders Direct Capital Corporation |
| 18 | IXIS 2006-HE2 | IXIS Real Estate Capital Inc. | Accredited Home Lenders, Inc.; First NLC Financial Services, LLC; NC Capital Corporation; Master Financial, Inc. | IXIS Real Estate Capital Inc.; Accredited Home Lenders, Inc.; First NLC Financial Services, LLC; NC Capital Corporation; Master Financial, Inc. |

|  | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 19 | IXIS 2007-HE1 | IXIS Real Estate Capital Inc. | First NLC Financial Services, LLC; Master Financial, Inc. | IXIS Real Estate Capital Inc.; First NLC Financial Services, LLC; Master Financial, Inc. |
| 20 | MLMI 2007-MLN1 | Merrill Lynch Mortgage Lending, Inc. | Mortgage Lenders Network USA, Inc. | Merrill Lynch Mortgage Lending, Inc. |
| 21 | MMLT 2005-2 | RBS Financial Products, Inc. | Meritage Mortgage Corporation | Meritage Mortgage Corporation; RBS Financial Products, Inc. |
| 22 | MSAC 2006-HE6 | Morgan Stanley Mortgage Capital Inc. | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 23 | MSAC 2006-NC2 | Morgan Stanley Mortgage Capital Inc. | NC Capital Corporation | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation |
| 24 | MSAC 2006-NC5 | Morgan Stanley Mortgage Capital Inc. | NC Capital Corporation | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation |
| 25 | MSAC 2006-WMC2 | Morgan Stanley Mortgage Capital Inc. | WMC Mortgage Corporation | Morgan Stanley ABS Capital I Inc.; WMC Mortgage Corporation |
| 26 | MSAC 2007-HE1 | Morgan Stanley Mortgage Capital Inc. | NC Capital Corporation; Decision One Mortgage Company, LLC | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation; Decision One Mortgage Company, LLC |
| 27 | MSAC 2007-HE2 | Morgan Stanley Mortgage Capital Inc. | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 28 | MSAC 2007-HE5 | Morgan Stanley Mortgage Capital Inc. | WMC Mortgage Corp.; | Morgan Stanley ABS Capital I Inc.; |

46

|  | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
|  |  |  | Decision One Mortgage Company, LLC | WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 29 | MSAC 2007-NC1 | Morgan Stanley Mortgage Capital Inc. | NC Capital Corporation | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation |
| 30 | MSAC 2007-NC4 | Morgan Stanley Mortgage Capital Holdings LLC | New Century Mortgage Corporation | Morgan Stanley ABS Capital I Inc.; Saxon Mortgage Services, Inc. |
| 31 | MSHEL 2006-3 | Morgan Stanley Mortgage Capital Inc. | AIG Federal Saving Bank; Meritage Mortgage Corporation; ResMAE Mortgage Corporation; Accredited Home Lenders; Lime Financial Services, Ltd.; First NLC Financial Services, LLC | Morgan Stanley ABS Capital I Inc.; AIG Federal Saving Bank; Meritage Mortgage Corporation; ResMAE Mortgage Corporation; Accredited Home Lenders; Lime Financial Services, Ltd.; First NLC Financial Services, LLC |
| 32 | MSHEL 2007-1 | Morgan Stanley Mortgage Capital Inc. | Accredited Home Lenders, Inc.; Wilmington Finance Inc.; Fremont Investment & Loan; First NLC Financial Services, LLC | Morgan Stanley ABS Capital I Inc.; Morgan Stanley Mortgage Capital Inc.; Accredited Home Lenders, Inc.; Wilmington Finance Inc.; Fremont Investment & Loan; First NLC Financial Services, LLC |
| 33 | MSIX 2006-2 | IXIS Real Estate Capital Inc.; Morgan Stanley Mortgage Capital Inc. | First NLC Financial Services, LLC; Accredited Home Lenders, Inc.; Master Financial, Inc.; Wilmington Finance Inc. | Morgan Stanley ABS Capital Inc.; IXIS Real Estate Capital Inc.; First NLC Financial Services, LLC; Accredited Home Lenders, Inc.; |

|  | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
|  |  |  |  | Master Financial, Inc.; Wilmington Finance Inc.; NC Capital Corporation; Rose Mortgage, Inc.; Lime Financial Services, Ltd.; First Bank Mortgage, Inc.; Quick Loan Funding Inc.; Funding America Mortgage Warehouse Trust; Mandalay Mortgage, LLC; FlexPoint Funding Corporation; Meritage Mortgage Corporation; Maxim Mortgage Corp.; Ames Capital Corporation; ResMAE Mortgage Corporation; Countrywide Home Loans, Inc. |
| 34 | NHEL 2006-5 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. |
| 35 | NHEL 2006-6 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. |
| 36 | SABR 2007-NC2 | Sutton Funding LLC | NC Capital Corporation | NC Capital Corporation |
| 37 | SAST 2006-3 | Saxon Funding Management LLC | People's Choice Home Loan, Inc.; Saxon Funding Management, Inc. | Saxon Funding Management LLC |
| 38 | SAST 2007-1 | Saxon Funding Management LLC | Saxon Funding Management, Inc.; Saxon Mortgage, Inc. | Saxon Funding Management LLC |
| 39 | SAST 2007-2 | Saxon Funding Management LLC | Saxon Funding Management, Inc.; Saxon Mortgage, Inc. | Saxon Funding Management LLC |

|   | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 40 | SVHE 2005-3 | RBS Financial Products, Inc. | Finance America LLC; New Century Mortgage Corporation | Finance America LLC; New Century Mortgage Corporation |
| 41 | SVHE 2006-1 | RBS Financial Products, Inc. | Aames Capital Corporation; Finance America LLC | RBS Financial Products, Inc.; Aames Capital Corp.; Finance America LLC |
| 42 | SVHE 2006-EQ1 | Greenwich Capital Financial Products, Inc. | EquiFirst Corporation | Greenwich Capital Financial Products, Inc.; EquiFirst Corporation |
| 43 | SVHE 2006-NLC1 | Greenwich Capital Financial Products, Inc. | | |

114.    As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

115.    The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to Deutsche Bank that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.  Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan and

regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.

116.    These lawsuits, in conjunction with the poor performance of the underlying loans (which Deutsche Bank was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among all originators, were more than sufficient to provide Deutsche Bank with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

117.    Deutsche Bank was aware of these reports, investigations, and lawsuits, and it also had additional information concerning representation and warranty violations it learned of in the course of administering the Covered Trusts.  It also had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if Deutsche Bank had conducted even a limited investigation.  Thus, Deutsche Bank was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.    Deutsche Bank Failed to Act
     Prudently to Enforce Repurchase Obligations**

118.    When Deutsche Bank learned that the Master Servicers or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, Deutsche Bank should have acted like a prudent person would in the exercise of his own affairs and (i) taken action against the Master Servicers or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase the loans; and (iii) notified Certificateholders of the Master Servicers' or Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in

existence, Deutsche Bank had a continuing duty to enforce repurchase rights.  As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such loans.  Deutsche Bank continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

119.    Although certain Events of Default require formal notice and an opportunity to cure, Deutsche Bank cannot escape its duty of care by failing to provide the required notice.  As set forth in Section III(A), Deutsche Bank was aware (or would have been aware if it had carried out its duties) that that the Master Servicers, Servicers, Depositors, Sponsors, and Deutsche Bank, itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts. Deutsche Bank, however, did not provide notice of such defaults as it was required to do. Because these defaults would have seasoned into Events of Default if notice had been provided, Deutsche Bank had the duty to act prudently to enforce repurchase provisions once it learned of such defaults.

120.    As described below, additional Events of Default occurred under the terms of the PSAs.  Deutsche Bank has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.    Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

121.    As discussed above in Section II(A), Defendants had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically include documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  Deutsche Bank knew

of numerous instances where it did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

122.   Deutsche Bank provided final exception reports to the Sponsors, Depositors and Master Servicers (or Servicers) indicating many of these missing documents.  Deutsche Bank was aware that affected loans were not repurchased or substituted because the Trustee itself was required to take action each time a loan was substituted or repurchased.  For example, Section 2.03 of the Morgan Stanley PSA requires the trustee to execute documents, whenever a loan is substituted for or repurchased.  The Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts provide that it was the Trustee's duty to seek cure, repurchase or substitution remedies and, as a result, the Trustee knew that affected loans were not cured, repurchased or substituted because it did not seek such remedies.  *See* Ex. C § VI.

123.   Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, Deutsche Bank stood by while the Sponsors, Servicers and Master Servicers of the Covered Trusts engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  Deutsche Bank and the entities disclosed to be Sponsors, Servicers and Master Servicers of the Covered Trusts have been implicated in numerous

governmental reports, court orders and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal. This is powerful evidence of the systemic document delivery failures and Deutsche Bank's knowledge of such failures.

124.     Deutsche Bank's and the relevant Sponsors', Servicers' and Master Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

125.     Events of Default occurred shortly after the final exception reports were delivered to the Covered Trusts under multiple provisions of the PSAs. These Events of Default triggered Deutsche Bank's duty to act prudently to protect the interests of the Certificateholders in all respects, which duty continues to this date.

126.     First, Section 7.1(b) of the Saxon PSA provides that an event of default occurs if the Servicer fails to perform under the PSA and expressly provides that if the breach relates to "the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans [or] the failure to repurchase or substitute in lieu thereof," no notice or cure period applies. Under each of the Covered Trusts, an Event of Default occurred when the Master Servicers or Servicers received formal notice of their failure to prudently service mortgage loans in the form of the final exception report from the Trustee. For example, Section 3.1 of the Saxon PSA provides: "For and on behalf of the Certificateholders and the Certificate Insurer, the Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and customary and usual standards of practice of prudent mortgage loan servicers…." Each of the PSAs for the other Covered Trusts contained similar provisions. *See* Ex. C § VIII.

127.     Second, the PSAs for the Aegis, American Home, HSBC, Impac and Saxon Trusts each provide that an Event of Default occurs if the Servicer fails to prudently service

the mortgage loans and such breach remains un-remedied for a specified period after notice

of the breach.  For example, the Saxon PSA provides that an Event of Default occurs if the

Servicer fails to prudently service the mortgage loans and such breach is not remedied

within 60 days of notice of the breach.  *See* Ex. C § IX.

128.    As set forth above and in Exhibit H, when borrowers defaulted and the Servicers

or Master Servicers were required to commence foreclosures, they fabricated the documents

necessary to foreclose rather than cause the Sponsors, Depositors or Originators to repurchase or

substitute the affected loan.  Deutsche Bank was aware of this fact as it was aware of the

contents of the document exception reports and that properties with exceptions had defaulted and

not been repurchased or substituted.  However, Deutsche Bank did not provide notice as it was

required to do.  Both the Servicers and Deutsche Bank were aware that these loans were not put

back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-

signed the documentation required to foreclose.  These acts of robo-signing were breaches of the

applicable prudent servicing standard, as a prudent servicer would have insisted that the loans be

repurchased.  Having failed to provide the required notice, Deutsche Bank had an obligation to

act prudently to address all defaults.

129.    Third, the PSAs for the Ameriquest, First Franklin, IXIS, Morgan Stanley,

RBS and Sutton Trusts provide that the Servicers' failure to perform their covenant to

prudently service the mortgage loans ripened into a Servicer Event of Default if left uncured

for a specified period after a Servicing Officer learned of such failures—no formal notice is

required.  *See* Ex. C § IX.  Because the Servicers failed to act prudently and cause the

repurchase or substitution of loans with incomplete documentation rather than foreclose,

Events of Default were triggered under these PSAs without regard to the notice required to be given by the Trustee.

130. These Events of Default triggered Deutsche Bank's duty to act prudently to protect the interests of the Certificateholders in all respects and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased. Deutsche Bank had a continuing obligation to seek repurchase of loans missing required documentation through its tenure as Trustee, including as loans on the final exception report defaulted. Deutsche Bank also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred. Deutsche Bank has repeatedly breached these duties through its tenure as Trustee.

### 2. Events of Default Under the Indentures

131. As noted, five of the Covered Trusts were documented using an Indenture rather than a PSA. While the same type of Events of Default occurred under the Indentures as described in Section III(B)(1), the relevant provisions are slightly different in that the Issuer's (*i.e.*, the Trust's) breach of the Indenture gives rise to an Event of Default, rather than the Master Servicers' or Servicers' breaches.

132. For the Aegis Trust, the Issuer delegated all of its duties to Wells Fargo Bank, N.A., the Master Servicer.

133. Each Indenture required the Issuer to protect the collateral of the trust. For example, Section 3.05 of the Aegis Indenture provides in relevant part, "[t]he Issuer will . . . take such other action necessary or advisable to: . . . (iii) enforce any rights with respect to the Collateral; or (iv) preserve and defend title to the Collateral and the rights of the

Indenture Trustee and the Noteholders in such Collateral against the claims of all persons and parties." The Indentures for AHM 2006-1, IMM 2005-7, IMM 2005-8, and SAST 2006-3 all have similar provisions. *See* Ex. C § VIII.

134.    The failure to do so is an Event of Default. For example, Section 5.01 of the Aegis Indenture provides that an Event of Default occurs when the Issuer fails:

> to observe or perform any covenant or agreement of the Issuer made in this Indenture . . . and such default shall continue or not be cured, . . . for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the Outstanding Balance of the Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of Default hereunder.

The Indentures for AHM 2006-1, IMM 2005-7, IMM 2005-8, and SAST 2006-3 all have similar provisions. *See* Ex. C § IX.

135.    As discussed above, the Trustee provided written notice that the mortgage files were incomplete. The Issuers under the Indentures failed to protect the trust assets, a fact the Trustee was well aware of. As a result, an Event of Default occurred under the Indentures in the first year of the existence of the Aegis, AHM 2006-1, IMM 2005-7, IMM 2005-8, and SAST 2006-3 Trusts.

136.    In addition, Section 3.07(d) of the Aegis Indenture provides that the Issuer must give notice to the rating agencies and the Trustee of an Event of Default under the Transfer and Servicing Agreement. Section 7.1(a)(iii) of the Transfer and Servicing Agreement provides that defaults relating to document delivery failures or "the Mortgage File for Delay Delivery Mortgage Loans" are deemed Events of Default as soon as the Final Certification of the Trustee is provided and an obligation to repurchase or substitute arises.

The Indentures and related servicing agreements for the AHM 2006-1, IMM 2005-7, IMM 2005-8, and SAST 2006-3 trusts have similar provisions.  The Issuers were aware of these Events of Default, but did not give the required notice.  The Trustee was fully aware of this fact, but failed to act.  An Event of Default occurred under this provision as well and the Trustee failed to exercise due care.

137.    As detailed in Section III(A) and Exhibit F, the Trustee became aware of public information indicating that the Issuer failed to protect the trust assets by enforcing the Sponsors' or Originators' repurchase obligations triggered by representation and warranty violations.  Events of Default occurred as a result.  This triggered a continuing obligation to protect the interests of Certificateholders that Deutsche Bank breached throughout its tenure as Trustee.

> **3.    Events of Default Concerning False Master Servicer and Servicer Certifications**

138.    Each PSA obligated the Master Servicer or Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations.  For example, Section 3.17 of the Morgan Stanley PSA requires the Servicer to certify, among other things, that:

> (i)    a review of the activities of the Servicer or Subservicer, as applicable, during the preceding calendar year and of its performance under this Agreement or the applicable Subservicing Agreement, as the case may be, has been made under such officer's supervision, and

> (ii)    to the best of such officer's knowledge, based on such review, the Servicer or Subservicer, as applicable, has fulfilled all of its obligations under this Agreement or the applicable Subservicing Agreement, as the case may be, in all material respects, throughout such year, or, if there has been a default in the fulfillment of any such obligation in any material respect, specifying each such default known to such officers and the nature and status thereof.

The PSAs for the Aegis, American Home, Ameriquest, First Franklin, HSBC, Impac, IXIS, Merrill Lynch, NovaStar, RBS, Saxon and Sutton Trusts set forth a substantially similar process.  *See* Ex. C § XII.

139.    The failure to provide a conforming certification is an Event of Default under each of the PSAs.  *See* Ex. C §§ IX, XII.  Under the Ameriquest, First Franklin, IXIS, Morgan Stanley, RBS and Sutton Trusts, the Event of Default is triggered by the breach without regard to whether or not notice is provided.  Under the remaining PSAs, the Event of Default is triggered if the Servicer or Master Servicer fails to cure the breach within a designated period of time.

140.    The Trustee received certifications that it knew to be false because the Master Servicers and Servicers were not in fact meeting their obligations under the PSAs and failed to disclose numerous representation and warranty violations.  As discussed in Sections III(B) and III(C), the Master Servicers and Servicers breached the PSAs in many ways, including by attempting to foreclose on defective loans rather than tendering loans for repurchase or substitution and by looting trust assets through multiple servicing scams.  As discussed in Section III(A), Deutsche Bank was aware of numerous representation and warranty violations that were not disclosed in the required servicing certifications.  Deutsche Bank was aware of these breaches and therefore knew the required servicer certifications did not conform because they were false.  The PSAs only allowed Deutsche Bank to rely upon the certification if they had a good faith basis to believe the certifications to be true.  Events of Default were triggered as a result and Deutsche Bank had a continuing duty to act prudently to protect the Certificateholders' interests.

141.    In addition, under the PSAs for the Aegis and many of the RBS Trusts, the Servicers provide a representation and warranty and covenant that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete.  For example, Section 2.3(x) of the AABST 2006-1 Transfer and Servicing Agreement provides that "[t]he Servicer represents and warrants to the Issuer, the Master Servicer, the Administrator, the Depositor, the Seller and the Indenture Trustee, for the benefit of the Securityholders that, as of the Closing Date . . . neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue material statement of fact or omits to state a material fact necessary to make the statements contained therein not misleading."  *See* FHLT 2005-1 § 2.05(x).[6]  Deutsche Bank had a duty to provide notice of breaches of representations and warranties or covenants resulting from the Servicers' or Master Servicers' false certifications, but failed to do so despite being aware of them.  Because Deutsche Bank cannot avoid the duty to act prudently by failing to give notice of a default, these breaches ripened into an Event of Default triggering Deutsche Bank's duty to act prudently to protect the Certificateholders' interests

### 4.    Deutsche Bank Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

142.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors ("AMI") notified all major RMBS trustees (including Deutsche Bank) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS.  The letter set forth in detail the publicly available evidence

---

[6] Many of the RBS PSAs contain substantially similar provisions. *See* FHLT 2005-2; SVHE 2005-3; SVHE 2006-1; FHLT 2006-1; FHLT 2006-2; FHLT 2006-3; SVHE 2006-EQ1.

demonstrating that there was widespread evidence, including some of the evidence referenced in this Third Amended Complaint, that loan originators had systematically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systematically breached their obligations under applicable servicing agreements.  The letter cautioned, '[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the Certificateholders."

143.    Further, on or about December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts issued written instructions to Deutsche Bank, as Trustee, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans.  Less than two years later, Deutsche Bank and other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts.  The JPMorgan putback initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including Countrywide Home Loans, Inc., and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Wells Fargo Bank, N.A. and Countrywide Home Loan Servicing, LP.  Deutsche Bank accepted the settlement with JPMorgan with respect to certain trusts despite that the settlement would reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct.  *See* Compl. ¶¶ 9–10, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 14-cv-651866 (N.Y. Sup. Ct. June 18, 2014); Dawn Kopecki & Alexis Leondis, *JP Morgan Sets Tentative $45 Billion Accord for Mortgage Bonds*, Bloomberg

(Nov. 16, 2013 12:00 AM), http://www.bloomberg.com/news/ 2013-11-15/jpmorgan-reaches-4-5-billion-mortgage-bond-deal-with-investors.html.  None of the Covered Trusts are part of this settlement.

144.    Additionally, on January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley Mortgage Capital Inc. or its affiliates issued written instructions to Deutsche Bank to investigate large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans.  The Morgan Stanley putback initiative identified and seeks to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including New Century Mortgage Corporation and American Home Mortgage Corporation, and identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Wells Fargo Bank, N.A. and Saxon Mortgage Services, Inc.  *See* Compl. ¶ 397, *Blackrock Allocation Target Shares*, No. 14-cv-651866 (N.Y. Sup. Ct. June 18, 2014).

145.    To date, Deutsche Bank has not exercised due care to ensure that Certificateholders' interests are protected.

146.    Beginning in 2013, Deutsche Bank commenced lawsuits relating to RMBS trusts other than the Covered Trusts against certain Sponsors and Originators (including, among others, HSBC Bank USA, National Association) for breaches of representations and warranties.  *See supra* ¶ 102 (citing cases).  These lawsuits, which alleged pervasive and systemic breaches of representations and warranties, demonstrate that Deutsche Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Covered Trusts, but failed to exercise due care.

### 5.      Other Events of Default

147.    A number of other Events of Default occurred in connection with the Covered

Trusts.  For example:

- The PSAs for the ARSI 2006-W2, AMSI 2006-R1, NHEL 2006-5, NHEL 2006-6, SAST 2006-3, and SVHE 2006-1 provide that an Event of Default occurs when cumulative loss levels exceed specified levels in the PSA. These levels were exceeded in 2009 and 2010 for each of these trusts triggering Deutsche Bank's duty to act prudently.

- The PSAs for the IXIS 2006-HE1 and IXIS 2006-HE2 state that an Event of Default occurs when the ratings agency Fitch downgrades the Servicer below specified grades. In 2012 Fitch downgraded the Servicer to below the specified levels triggering Deutsche Bank's duty to act prudently.

- On August 29, 2013 the Trustee received notice from a law firm representing a party that held 25% of the Voting Rights requesting repurchase of 1,551 loans because they violated § 2.03 of the IXIS 2007-HE1 PSA because the loans breached the representations and warranties of the Mortgage Loan Purchase Agreements.  On information and belief, an event of default occurred forty five days after this notice was provided.

- For FFML 2006-F11 the Trustee failed to enforce the repurchase obligation of the Seller in regards to 1,926 repurchase claims made beginning in January of 2012.

### C.      Deutsche Bank Failed to Address the Master Servicers' and Servicers' Looting of Trust Assets

148.    In addition to the servicing related defaults and Events of Default described

above, the Master Servicers and Servicers have engaged in a variety of schemes to

overcharge borrowers in default.  These scams have dramatically increased loss severities on

defaulted mortgages and, as a result, dramatically increased Plaintiffs' losses.

149.    The chart below identifies each of the entities disclosed to be the Sponsors,

Servicers and Master Servicers of the loans included in the Covered Trusts.

| | **Trusts** | **Sponsor** | **Servicer(s)** | **Master Servicer** |
|---|---|---|---|---|
| 1 | AABST 2006-1 | Aegis Mortgage Corporation | Ocwen Loan Servicing, LLC | Wells Fargo Bank, N.A. |
| 2 | AHM 2006-1 | American Home Mortgage Acceptance, Inc. | American Home Mortgage Investment Corporation | Wells Fargo Bank, N.A. |
| 3 | AMSI 2006-R1 | Ameriquest Mortgage Company | AMC Mortgage Services, Inc. | Ameriquest Mortgage Company |
| 4 | ARSI 2006-M1 | Ameriquest Mortgage Company | AMC Mortgage Services, Inc. | Ameriquest Mortgage Company |
| 5 | ARSI 2006-M3 | Ameriquest Mortgage Company | AMC Mortgage Services, Inc. | Ameriquest Mortgage Company |
| 6 | ARSI 2006-W2 | Ameriquest Mortgage Company | AMC Mortgage Services, Inc. | Ameriquest Mortgage Company |
| 7 | ARSI 2006-W3 | Ameriquest Mortgage Company | AMC Mortgage Services, Inc. | Ameriquest Mortgage Company |
| 8 | FFML 2006-FF11 | First Franklin Financial Corporation | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 9 | FHLT 2005-1 | RBS Financial Products, Inc. | Litton Loan Servicing LP | Fremont Investment & Loan; RBS Financial Products, Inc. |
| 10 | FHLT 2005-2 | RBS Financial Products, Inc. | Litton Loan Servicing LP | Fremont Investment & Loan; RBS Financial Products, Inc. |
| 11 | FHLT 2006-1 | Greenwich Capital Financial Products, Inc. | Wells Fargo Bank, N.A. | |
| 12 | FHLT 2006-2 | Greenwich Capital Financial Products, Inc. | Fremont Investment & Loan | Wells Fargo Bank, N.A. |
| 13 | FHLT 2006-3 | Greenwich Capital Financial Products, Inc. | Wells Fargo Bank, N.A. | |
| 14 | HASC 2006-HE1 | HSBC Bank USA, National Association | Countrywide Home Loan Servicing, LP.; Wells Fargo Bank, N.A. | HSBC Bank USA, National Association; Countrywide Home Loans, LP |

|  | **Trusts** | **Sponsor** | **Servicer(s)** | **Master Servicer** |
|---|---|---|---|---|
| 15 | IMM 2005-7 | Impac Mortgage Holdings, Inc. | GMAC Mortgage Corporation | Impac Funding Corporation |
| 16 | IMM 2005-8 | Impac Mortgage Holdings, Inc. | GMAC Mortgage Corporation; Midland Loan Services, Inc. | Impac Funding Corporation |
| 17 | IXIS 2006-HE1 | IXIS Real Estate Capital Inc. | Saxon Mortgage Services, Inc. | JPMorgan Chase Bank, N.A. |
| 18 | IXIS 2006-HE2 | IXIS Real Estate Capital Inc. | Saxon Mortgage Services, Inc. | JPMorgan Chase Bank, N.A. |
| 19 | IXIS 2007-HE1 | IXIS Real Estate Capital Inc. | Saxon Mortgage Services, Inc. | Wells Fargo Bank, N.A. |
| 20 | MLMI 2007-MLN1 | Merrill Lynch Mortgage Lending, Inc. | Wilshire Credit Corporation | |
| 21 | MMLT 2005-2 | RBS Financial Products, Inc. | Saxon Mortgage Services, Inc. | |
| 22 | MSAC 2006-HE6 | Morgan Stanley Mortgage Capital Inc. | Countrywide Home Loans Servicing LP; Wells Fargo Bank, N.A.; New Century Mortgage Corporation | |
| 23 | MSAC 2006-NC2 | Morgan Stanley Mortgage Capital Inc. | Wells Fargo Bank, N.A. | |
| 24 | MSAC 2006-NC5 | Morgan Stanley Mortgage Capital Inc. | Countrywide Home Loans Servicing LP; Wells Fargo Bank, N.A. | |
| 25 | MSAC 2006-WMC2 | Morgan Stanley Mortgage Capital Inc. | Wells Fargo Bank, N.A. | |
| 26 | MSAC 2007-HE1 | Morgan Stanley Mortgage Capital Inc. | Saxon Mortgage Services, Inc.: Countrywide Home Loans Servicing LP | |
| 27 | MSAC 2007-HE2 | Morgan Stanley Mortgage Capital Inc. | Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP; | |

64

| | Trusts | Sponsor | Servicer(s) | Master Servicer |
|---|---|---|---|---|
| | | | Wells Fargo Bank, N.A.; New Century Mortgage Corporation | |
| 28 | MSAC 2007-HE5 | Morgan Stanley Mortgage Capital Inc. | Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP | |
| 29 | MSAC 2007-NC1 | Morgan Stanley Mortgage Capital Inc. | Countrywide Home Loans Servicing LP; Saxon Mortgage Services, Inc. | |
| 30 | MSAC 2007-NC4 | Morgan Stanley Mortgage Capital Holdings LLC | Saxon Mortgage Services, Inc. | |
| 31 | MSHEL 2006-3 | Morgan Stanley Mortgage Capital Inc. | HomEq Servicing Corporation; Wells Fargo Bank, N.A.; JPMorgan Chase Bank, N.A. | |
| 32 | MSHEL 2007-1 | Morgan Stanley Mortgage Capital Inc. | Saxon Mortgage Services, Inc.; Wells Fargo Bank, N.A.; Countrywide Home Loans Servicing LP | |
| 33 | MSIX 2006-2 | IXIS Real Estate Capital Inc.; Morgan Stanley Mortgage Capital Inc. | Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP | |
| 34 | NHEL 2006-5 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | |
| 35 | NHEL 2006-6 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | |
| 36 | SABR 2007-NC2 | Sutton Funding LLC | HomEq Servicing Corporation | |
| 37 | SAST 2006-3 | Saxon Funding Management LLC | Saxon Mortgage Services, Inc. | Saxon Funding Management LLC |
| 38 | SAST 2007-1 | Saxon Funding Management LLC | Saxon Mortgage Services, Inc. | |

|    | Trusts | Sponsor | Servicer(s) | Master Servicer |
|----|--------|---------|-------------|-----------------|
| 39 | SAST 2007-2 | Saxon Funding Management LLC | Saxon Mortgage Services, Inc. | |
| 40 | SVHE 2005-3 | RBS Financial Products, Inc. | Litton Loan Servicing LLC | |
| 41 | SVHE 2006-1 | RBS Financial Products, Inc. | Litton Loan Servicing LP | |
| 42 | SVHE 2006-EQ1 | Greenwich Capital Financial Products, Inc. | Saxon Mortgage Services, Inc. | |
| 43 | SVHE 2006-NLC1[7] | Greenwich Capital Financial Products, Inc. | Ocwen Loan Servicing, LLC; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |

150.    From 2005 until today, the Servicers and Master Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured.

151.    When a defaulting borrower's home is foreclosed upon and sold, the Servicers and Master Servicers deduct their fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

152.    These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard.  As noted in Sections III(B)(1) and

---

[7] The PSA for this deal is not publicly available.  The information was obtained from the PSA produced by Defendants.

III(B)(3), servicing related defaults known to Deutsche Bank triggered Deutsche Bank's duty to act prudently.  Deutsche Bank is and was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits and press coverage, including articles in banking industry publications like *American Banker*.

153.    Exhibit H summarizes servicing misconduct involving the relevant Servicers and Master Servicers.

## IV.    DEUTSCHE BANK SUFFERED FROM CONFLICTS OF INTEREST

154.    Deutsche Bank failed and unreasonably refused to take action to protect the Covered Trusts and Certificateholders against Originator and Servicer breaches because it would have exposed that Deutsche Bank was engaged in and facilitated the same misconduct in its role as originator and servicer for other mortgages and RMBS trusts.  In addition, Deutsche Bank conducted repeated business with the same Originators and Servicers and refused to take action in order to gain return favors when the roles were reversed.

155.    Evidence has come to light showing that Deutsche Bank was engaged in the same type of shoddy origination and securitization practices as the Sponsors, Originators and Servicers of the Covered Trusts.  For example, a bipartisan memorandum from Senators Carl Levin and Tom Conburn summarized the overwhelming evidence that Deutsche Bank-controlled originators did not comply with their stated underwriting guidelines: "Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world.  They also enabled the lenders to acquire new funds to originate still more high risk, poor

67

quality loans."  Permanent Subcomm. on Investigations, Wall Street and the Financial Crisis:

Anatomy of a Financial Collapse (2011) ("April 2011 Senate Report").

156.    Further, the April 2011 Senate Report describes how Deutsche Bank's top

global CDO trader, Greg Lippmann, repeatedly warned his Deutsche Bank colleagues and

clients about the poor quality of RMBS securities underlying many CDOs.  *Id.* at 10.

Lippmann referred to the CDO marketing efforts as a "CDO machine" or "ponzi scheme"

and predicted the mortgage market as a whole would plummet in value.  *Id.* at 320.

157.    In addition, Clayton Holdings ("Clayton"), a third-party due diligence vendor,

revealed in its Trending Reports that from the first quarter of 2006 to the second quarter of

2007, Clayton rejected 34.9% of the mortgage loans that Deutsche Bank submitted for

Clayton's review as falling outside of the applicable underwriting guidelines.  *See* Clayton,

All Clayton Trending Reports 1st Quarter 2006 – 2nd Quarter 2007 (2007), *available at*

http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-

crisissacramento#documents.  Deutsche Bank, however, waived in 50% of the loans that Clayton

found defective and falling outside the applicable underwriting guidelines.  *Id.*

158.    The obvious result of these poor practices was a spate of lawsuits.  Deutsche Bank

Securitized Products ("DBSP"), an affiliate of Deutsche Bank, has been sued by a number of

trustees who have sought to enforce DBSP's representations and warranties.  When trustees re-

examined the loans securitized by DBSP they found astonishingly high breach rates, sometimes

greater than 90%.  For instance, between March 2012 and May 2013, HSBC, as trustee, filed at

least 16 complaints against DBSP in its capacity as sponsor of 16 different trusts from the ACE

and DBALT shelves.  In each of these actions, HSBC cited forensic reviews of the loan files

which revealed that DSBP "dumped into the Trust a massive number of defective loans – loans

that blatantly breached DBSP's representations and warranties." HSBC asserted that Deutsche Bank's "*inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident.*" *See, e.g.*, Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-OA3, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 13-cv-02999 (S.D.N.Y. Apr. 30, 2013); Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP2, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-651936 (N.Y. Sup. Ct. Nov. 4, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-650949 (N.Y. Sup. Ct. Aug. 1, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-650310 (N.Y. Sup. Ct. June 3, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-650327 (N.Y. Sup. Ct. Jan. 29, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1 by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 13-cv-650312 (N.Y. Sup. Ct. Jan. 28, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2006-HE3, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 12-cv-652231 (N.Y. Sup. Ct. Dec. 21, 2012).

159.   Additionally, DBSP's complete disregard for proper loan underwriting has also spawned numerous private lawsuits where plaintiffs have performed forensic analyses and re-underwritten entire loan files and discovered a staggering number of loans breaching the associated representations and warranties. *See, e.g.*, Compl., *FHFA v. Deutsche Bank AG*, No.

69

11-cv-06192-DLC (S.D.N.Y. Sept. 2, 2011); Compl., *Sealink Funding Ltd. v. Deutsche Bank AG*, No. 12-cv-652174 (N.Y. Sup. Ct. May 1, 2013); Compl., *Royal Park Investments v. Merrill Lynch*, No. 12-cv-652607 (N.Y. Sup. Ct. Dec. 14, 2012); Compl., *Phoenix Light SF Ltd. v. Ace Sec. Corp.*, No. 12-cv-650422 (N.Y. Sup. Ct. May 14, 2012).

160.    Deutsche Bank failed and unreasonably refused to take action to protect the Covered Trusts and Certificateholders against Sponsor, Originator and Servicer breaches because doing so would have exposed that Deutsche Bank itself was engaged in the same servicing misconduct in its role as a sponsor, originator and servicer for other mortgages and RMBS trusts.

161.    Exhibits F and H contain additional details concerning Deutsche Bank's misconduct in servicing and originating residential mortgage loans.

## V.    DEUTSCHE BANK'S CONDUCT INJURED PLAINTIFFS

162.    Deutsche Bank's breaches of its contractual, statutory and fiduciary duties have caused Plaintiffs hundreds of millions of dollars in damages.

163.    If Deutsche Bank had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses.  Further, if Deutsche Bank had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value as highly rated bonds with similar coupon rates are now trading at a very significant premium.

164.    Deutsche Bank's failure to address the Master Servicers' and Servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended

70

foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property tax and utility expenditures which were borne by the Covered Trusts, a decline in value of the underlying properties and ultimately less sale proceeds for the Covered Trusts and Certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

165.    If Deutsche Bank had met its contractual, statutory and fiduciary duties to accept delivery of notes and mortgage loan files, inspect them, give notice as required and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Master Servicers, Servicers, Sponsors, Depositors and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default. Moreover, Deutsche Bank's failure to accept delivery of note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates. And Deutsche Bank's failure to commence damages actions against the Master Servicers and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

166.    Deutsche Bank's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm. If Deutsche

Bank had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Master Servicers and Servicers to replace the assets they have looted from the Covered Trusts.

167.     Many, if not all, of the repurchase claims, described above, have lapsed due to the Deutsche Bank's inaction as New York courts have held that the underlying representation and warranty claims that Deutsche Bank failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violations of the TIA)[8]

168.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

169.     The PSAs underlying and establishing the Covered Trusts are "indentures," and Deutsche Bank is an "indenture trustee," under the TIA.  15 U.S.C. § 77aaa(7), (10).

170.     As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the TIA.

171.     The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

172.     Deutsche Bank violated the TIA in at least three ways.

---

[8] Plaintiffs acknowledge that the Court in its March 29, 2016 order dismissed Plaintiffs' TIA claim and include this claim in the Third Amended Complaint to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

173.    First, TIA Section 315(b) provides that the indenture trustee must notify Certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above,  Deutsche Bank failed to carefully investigate serious known issues with the loans in the Covered Trusts, or to notify Certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.  Deutsche Bank failed to act prudently to address defaults and Events of Default by the Servicers or the Master Servicers.

174.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  Here, as set forth above Deutsche Bank did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties and servicer defaults and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  And with respect to all the Covered Trusts Deutsche Bank failed to act prudently to address defaults and Events of Default by the Servicers or the Master Servicers.

175.    Finally, the TIA states that "[n]otwithstanding any other provisions of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder."  15 U.S.C. § 77ppp(b).  Deutsche Bank has impaired the ability of the Covered Trusts, and consequently the Certificateholders, to receive payment in connection with defective

mortgage loans for which Deutsche Bank failed to take action to correct.  In addition, Deutsche Bank has impaired the ability of the Covered Trusts, and consequently the Certificateholders, to receive payment by failing to enforce the repurchase remedy.

176.    These breaches materially and adversely affected the interests of the Certificateholders, including Plaintiffs, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties and Originators.

177.    Deutsche Bank is liable to Plaintiffs for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Contract)[9]

178.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

179.    The PSAs are valid and binding contracts entered into between Deutsche Bank, each Covered Trust, the Sponsors, the Master Servicers, the Servicers and Depositors.

180.    The PSAs provide, among other things, the terms under which Deutsche Bank acts as Trustee for the Covered Trusts.

181.    As current holders of Certificates or Notes issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustee.

---

[9] Plaintiffs acknowledge that the Court in its March 29, 2016 order dismissed Plaintiffs' breach of contract claim (i) to the extent it is based upon "document delivery failures," and (ii) as to any trusts where the governing agreement contains a negating clause and Plaintiffs have not received authorization to file suit from Cede & Co.  Plaintiffs include their broader breach of contract claim in the Third Amended Complaint for purposes of preserving any rights on appeal.

182.     With respect to all Covered Trusts Deutsche Bank breached several obligations that it undertook on behalf of Plaintiffs as Certificateholder including, without limitation, to:

(a)     take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

(b)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(c)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d)     provide notice of and take steps to remedy the Master Servicers' and Servicers' failures to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e)     enforce the repurchase obligations of the Sponsors and/or Originators.

183.     The specific provisions breached by Deutsche Bank are further detailed herein and in the Exhibits hereto.

184.     Deutsche Bank's breach of its duties set forth in the PSAs, as described above, caused Plaintiffs losses on their Certificates and diminished their value.

185.     Plaintiffs have performed their obligations under the PSAs.

186.     Deutsche Bank is liable to Plaintiffs for the losses they suffered as a direct result of Deutsche Bank's failure to perform its contractual obligations under the PSAs.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

187.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

188.    As set forth in detail above, Deutsche Bank owed Certificateholders, including Plaintiffs, a fiduciary duty to act in good faith, avoid conflicts of interest when performing the obligations set forth in the PSAs and to exercise all powers under the PSAs prudently to protect Certificateholders' rights once an Event of Default occurred or payments to Certificateholders became impaired.  These obligations included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default and enforce the repurchase obligations of the Sponsors and/or Originators.

189.    As set forth in detail above, Deutsche Bank breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

190.    The violations by Deutsche Bank of its fiduciary obligations impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FOURTH CAUSE OF ACTION
### (Negligence and Gross Negligence)[10]

191.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

192.    Deutsche Bank owed the Certificateholders, including Plaintiffs, extra-contractual duties to perform ministerial acts with due care and avoid conflicts of interest.

---

[10] Plaintiffs acknowledge that the Court in its March 29, 2016 order dismissed Plaintiffs' Negligence and Gross Negligence claims, except as they relate to conflict of interest or failure to take due care in performing ministerial acts.  Plaintiffs include their broader Negligence and Gross Negligence claims in the Third Amended Complaint for purposes of preserving any rights on appeal.

As described above, Deutsche Bank performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

193.    Deutsche Bank's negligence and gross negligence impaired Certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of Plaintiffs' Certificates.

## FIFTH CAUSE OF ACTION
### (Violation of the Streit Act)[11]

194.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

195.    As Certificateholders, Plaintiffs are trust beneficiaries entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

196.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).  Deutsche Bank conducted business with respect to the mortgage investments in New York and many properties underlying the certificates are located in New York.

197.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Deutsche Bank is a "trustee," under the Streit Act.  N.Y. Real Prop. Law § 125(3).

198.    Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture

---

[11] Plaintiffs acknowledge that the Court in its March 29, 2016 order dismissed Plaintiffs' Streit Act claim and include this claim in the Third Amended Complaint to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

and must use the same degree of care and skill in their exercise, as a prudent man would

exercise or use under the circumstances in the conduct of his own affairs.

199.    With respect to all Covered Trusts Deutsche Bank failed to exercise its rights

under the PSA after becoming aware of "events of default" by failing to:

> (a) protect the interests of the beneficiaries of the Covered Trusts;
>
> (b) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;
>
> (c) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once they discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;
>
> (d) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;
>
> (e) provide notice of and take steps to remedy the Master Servicers' and Servicers' failures to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and
>
> (f) enforce the repurchase obligations of the Sponsors and/or Originators.

200.    Deutsche Bank is liable to Plaintiffs for damages incurred as a result of its

violations of the Streit Act.

### SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)[12]

201.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs above as if fully set forth herein.

202.    At all relevant times, Deutsche Bank owed Plaintiffs, as express, intended third

party beneficiaries under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs

---

[12] Plaintiffs acknowledge that the Court in its March 29, 2016 order dismissed Plaintiffs' Breach of the Covenant of Good Faith claim and include this claim in the Third Amended Complaint for purposes of preserving any rights on appeal.

that required Deutsche Bank to ensure that it did not, by act or omission, injure the rights of the Plaintiffs to receive the benefits and protections provided for under the PSAs.

203.    By the conduct described above, Deutsche Bank breached its duty of good faith and fair dealing under the PSAs.

204.    Deutsche Bank's breaches are material.

205.    As a result of these breaches, Plaintiffs have suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Plaintiffs against Deutsche Bank for breaches of its statutory, contractual and fiduciary duties, its gross negligence and ordinary negligence in an amount to be proven at trial, including interest thereon;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.


Dated:  September 27, 2017

By:    /s/ David H. Wollmuth

David H. Wollmuth
Randall R. Rainer
Michael C. Ledley
Steven S. Fitzgerald
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue

79

New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
rrainer@wmd-law.com
mledley@wmd-law.com
sfitzgerald@wmd-law.com

George A. Zelcs
John A. Libra
Max C. Gibbons
Matthew C. Davies
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mgibbons@koreintillery.com
mdavies@ koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for Plaintiffs*