## Exhibit G

**The Servicers' and Master Servicers'
Cover-up of the Sponsors' Document Delivery Failures**

A.  American Home Mortgage Investment Corporation, Ocwen Loan
    Servicing, LLC, HomEq Servicing Corporation and Sutton Funding LLC ......................1

B.  Ameriquest Mortgage Company and AMC Mortgage Services, Inc..................................6

C.  Countrywide Home Loan Servicing, LP, Merrill Lynch
    Mortgage Lending, Inc. and Wilshire Credit Corporation....................................9

D.  DB Structured Products, Inc. .......................................................14

E.  GMAC Mortgage Corporation...........................................................16

F.  Litton Loan Servicing LP............................................................23

G.  HSBC Bank USA, National Association ................................................25

H.  JPMorgan Chase Bank, N.A. ..........................................................27

I.  Midland Loan Services, Inc. ........................................................31

J.  Saxon Mortgage Services, Inc., Saxon Funding
    Management LLC, Morgan Stanley Mortgage Capital Inc.,
    Morgan Stanley Mortgage Capital Holdings and NovaStar Mortgage, Inc......................33

K.  Wells Fargo Bank, N.A...............................................................35

**A.    American Home Mortgage Investment Corporation, Ocwen Loan
Servicing, LLC, HomEq Servicing Corporation and Sutton Funding LLC**

1.     Prior to May 2010, HomEq Servicing ("HomEq") was Barclays Bank's U.S.
mortgage servicing business.  In or about May 2010, Barclays sold HomEq to Ocwen.  Sutton
Funding LLC ("Sutton") operates as a subsidiary of Barclays Group US Inc.  In or about
February 2012, Ocwen Loan Servicing ("Ocwen") acquired American Home and in 2013,
Ocwen acquired One West's mortgage servicing business.

2.     American Home, Ocwen, HomEq and Sutton have engaged in widespread
misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in
which American Home, Ocwen and HomEq were Servicer to properly assign the underlying
mortgage loans to the issuing trusts, including through the use of robo-signers.

3.     These Servicers utilized robo-signers who executed tens of thousands of
foreclosure affidavits a month, all necessarily false because they were purportedly based on
personal knowledge when the robo-signers lacked any such knowledge, and many of the false
affidavits lacked proper documentation including evidence of possession of the underlying
mortgage note.  These robo-signers sometimes attempted to execute assignments retroactive to
the closing date of the relevant securitization in an attempt to circumvent state laws governing
assignment.

4.     In Florida, one homeowner that was being foreclosed on decided to fight back and
investigate the practices of IndyMac and OneWest.  During the case, the borrower's attorneys
discovered that affidavits used to file foreclosures were signed by robo-signer Erica A. Johnson-
Seck, who routinely signed 6,000 documents per week related to foreclosures.  The court found
that Johnson-Seck could not have possibly thoroughly reviewed the facts of the homeowner's
foreclosure case, as required by law.

5.      At deposition during the foreclosure proceeding, Johnson-Seck admitted to signing approximately 750 documents per day.  She stated that she spent only 30 seconds signing documents and did not read them before she signed.  She also admitted that the witnesses and notaries were not in her office when she signed the documents and she never took an oath before signing.

6.      In October 2010, the Texas Attorney General ordered HomEq to stop all foreclosures in the state of Texas due to improprieties relating to HomEq's practice of using robo-signers.

7.      In November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearing in Foreclosure Proceedings (2010), *available at* http://www.lsnj.org/NewsAnnouncements/ Foreclosure/materials/LSNJReport.pdf (hereinafter "Report to the New Jersey Supreme Court"). The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents and other evidence of fraud concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings." *Id*.  The report specifically implicated OneWest.  *Id*. at 11.

8.      On December 20, 2010, Judge Jacobson of the Superior Court of New Jersey in Mercer County issued an order to show cause directed at OneWest Bank.  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. F-059553-10 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011).  Judge Jacobson ordered OneWest to show cause why Judge Jacobson

"should not suspend the processing of all foreclosure matters involving" them.  *Id*. at 2.  The order to show cause further held that OneWest was selected for scrutiny because of its "public record of questionable practices that this court must address now in its supervisory capacity over the processing of foreclosure matters."  *Id*.  ***The order was also directed at Deutsche Bank***, because it had been involved in numerous questionable foreclosures.  *Id*.

9.    The Office of Thrift Supervision ("OTS") issued a Consent Order dated April 13, 2011 finding that OneWest engaged in improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon underlying mortgage loans.  *In re OneWest Bank, FSB*, Consent Order, No. 18129 (Apr. 13, 2011), *available at* http://www.occ. gov/static/ots/misc-docs/consent-orders-97665.pdf.

10.    OneWest stipulated to the OTS's findings.  *Id*.  The Consent Order required OneWest to undertake a sweeping review of its foreclosure practices.  *Id*.  Upon information and belief, this review uncovered substantial additional evidence demonstrating that Deutsche Bank's representations concerning proper assignment of mortgages and delivery of mortgage files were false.

11.    Ocwen engaged in substantially similar misconduct.  In December of 2013, the Consumer Financial Protection Bureau ("CFPB") authorities in 49 states and the District of Columbia settled with Ocwen for $2 billion dollars.  *CFPB v. Ocwen Financial Corp.*, Consent Order (Dec. 11, 2013), *available at* http://files.consumerfinance.gov/f/201312_cfpb_consent-order_ocwen.pdf.  CFPB released a Consent Order which addressed systemic misconduct at every stage of the mortgage servicing process.  *Id*.  The Consent Order states that Ocwen robo-signed foreclosure documents, including preparing, executing, notarizing and filing affidavits in foreclosure suits with courts and government agencies without verifying any information.  The

order required Ocwen to stop robo-signing official documents and to ensure that facts asserted in its documents are accurate and reliable and that all affidavits and sworn statements are based on personal knowledge. *Id*. at A-1.

12.     In December 2010, a presentation titled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases" was given by the Florida Attorney General's office at a conference of the Florida Association of Court Clerks and Comptrollers.  This presentation documents cases of allegedly forged signatures, false notarizations, spurious witnesses and improper mortgage assignments.  Clarkson, et al., Office of the Attorney General: Economic Crimes Division, *Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases*, *available at* http://south floridalawblog.com/wp-content/uploads/2011/01/46278738-Florida-Attorney-General-Fraudclosure-Report-Unfair-Deceptive-and-Unconscionable-Acts-in-Foreclosure-Cases.pdf. Ocwen's robo-signing practices were highlighted in this presentation as numerous variations of former Ocwen employee Scott Anderson's signature appeared on mortgage assignments.  *Id.*

13.     Further, Lynn Szymoniak, a Florida attorney and fraud expert who reached a settlement on behalf of the government after investigating robo-signing, has stated that document mills operated by American Home produced phony documents that trusts used to foreclose.  In addition, American Home provided false assignments to at least 500 trusts.

14.     In November 2011, the New York Department of Financial Services entered into an agreement with American Home to redress its unlawful practices.  Press Release, Dep't of Fin., Superintendent Lawsky Announces Agreements with Morgan Stanley, Saxon, AHMSI & Vericrest on Groundbreaking New Mortgage Practices (Nov. 10, 2011), *available at* http://www. dfs.ny.gov/about/press/pr1111101.htm.  The agreement required American Home to cease robo-signing and impose staffing and training requirements to prevent future robo-signing.  *Id*.  The

agreement also required American Home to withdraw from any pending foreclosure proceedings

in which the filed affidavits were robo-signed or inaccurate.  *Id.*

B.    **Ameriquest Mortgage Company and AMC Mortgage Services, Inc.**

15.    AMC Mortgage Services, Inc., Ameriquest Mortgage Company and Argent

Mortgage Company, L.L.C, were subsidiaries of ACC Capital Holdings Corporation

(collectively, "Ameriquest").  Ameriquest was formerly known as Long Beach Mortgage

Company ("Long Beach"), which is a subsidiary of Washington Mutual Bank ("WaMu").  In or

about September 2008, JPMorgan Chase Bank, N.A. ("JPMorgan") acquired WaMu.

16.    Ameriquest and its affiliates or agents have engaged in widespread foreclosure

misconduct in an attempt to cover-up the fact that they failed to properly assign mortgages and

transfer notes and mortgage loan files to the issuing trusts.  This pervasive misconduct indicates

a systemic failure that infected many mortgage-backed securitizations, including the Covered

Trusts.

17.    Courts have concluded that Ameriquest, WaMu and their affiliates have

committed outright fraud to cover-up the fact that they failed to properly assign mortgages or

maintain mortgage documentation.  For example, in *JP Morgan Chase Bank, N.A. v. Pocopanni*,

No. 16-2008-CA-3989 (Fla. Cir. Ct. Aug. 9, 2010), the court stated the following:

> The Court finds by clear and convincing evidence that WAMU,
> Chase and [counsel for JPMC Bank] committed fraud on this Court.
> . . . Throughout the litigation, WAMU and Chase and [their counsel]
> have represented to this Court that plaintiff owns and holds the note
> and mortgage.  Moreover, WAMU and [counsel] created a false
> Assignment of Mortgage dated April 11, 2008 as evidence of these
> assertions. . . .  The Court finds by clear and convincing evidence
> that these acts committed by WAMU, Chase and [counsel] amount
> to a "knowing deception intended to prevent the defendants from
> discovery essential to defending the claim" and are therefore fraud.

18.    One of WaMu's robo-signers was a woman named Martha Kunkle.  Kunkle died

in 1995, but WaMu continued to use her name on robo-signed documents until 2010, foreclosing

upon many homes where WaMu or its affiliates served as the Servicer.  *See* Jessica Silver-

Greenberg, *Dead Soul Is a Debt Collector*, Wall St. J., http://online.wsj.com/news/articles/

SB10001424052970204204004576049902142690400?mod=WSJ_hp_LEFTWhatsNewsCollecti

on&mg=reno64-wsj&url=http%3A%2F%2Fonline. wsj.com%2Farticle%2FSB100014240529

7020420400457604990142690400.html%3Fmod%3DWSJ_hp_LEFTWhatsNewsCollection&f

pid=2,7,121,122,201,401,641,1009 (last updated Dec. 31, 2010 12:01 AM).

19.     A former Ameriquest employee commented on Ameriquest's business practices

in an excerpt from the book "The Monster," by Michael W. Hudson,

> A few weeks after he started working at Ameriquest Mortgage,
> Mark Glover looked up from his cubicle and saw a coworker do
> something odd.  The guy stood at his desk on the twenty-third floor
> of downtown Los Angeles's Union Bank Building.  He placed two
> sheets of paper against the window.  Then he used the light
> streaming through the window to trace something from one piece of
> paper to another.  Somebody's signature.

Michael W. Hudson, *The Monster* (2010), *available at* http://dailybail.com/home/how-to-forge-

a-clients-signature-and-other-lessons-from-insi.html.

20.     Another excerpt from "The Monster" provides that:

> [a]t the downtown L.A. branch, some of Glover's coworkers had a
> flair for creative documentation.  They used scissors, tape, Wite-
> Out, and a photocopier to fabricate W-2s, the tax forms that indicate
> how much a wage earner makes each year.  It was easy: Paste the
> name of a low-earning borrower onto a W-2 belonging to a higher-
> earning borrower and, like magic, a bad loan prospect suddenly
> looked much better.  Workers in the branch equipped the office's
> break room with all the tools they needed to manufacture and
> manipulate official documents.  They dubbed it the "Art
> Department."

*Id*.

21.     JPMorgan was one of five banks that agreed to a $25 billion settlement with

49 state Attorneys General as a result of its robo-signing misconduct.  The agreement

requires servicers to implement comprehensive new mortgage loan servicing standards to

remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

**C.    Countrywide Home Loan Servicing, LP, Merrill Lynch
        Mortgage Lending, Inc. and Wilshire Credit Corporation**

22.    In 2008, Bank of America Corporation ("BAC") acquired Countrywide Financial Corporation, including Countrywide Home Loans Servicing, LP and Countrywide Home Loans, Inc. and Countrywide Bank, N.A. (collectively, "Countrywide").  In September 2008, BAC acquired Merrill Lynch Mortgage Lending Inc. and its affiliates (collectively "Merrill Lynch"), including Wilshire Credit Corporation ("Wilshire").

23.    Countrywide, Merrill Lynch, Wilshire and their affiliates or agents, both before and after their acquisition by BAC, have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Countrywide and Wilshire were Servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

24.    The Board of Governors of the Federal Reserve System ("Federal Reserve"), Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC") and OTS issued a report finding that BAC, including its affiliates Countrywide and Merrill Lynch, routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions.  Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress /interagency/interagency.htm.  In the report, the regulators noted that their review of the mortgage servicers' loan files showed that there may be "disputes over note ownership or authority to foreclose."  *Id*. at 6.  The regulators also noted "concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages."  *Id*.

25.     As a direct result of this misconduct, in September 2010, BAC and its affiliates had to suspend foreclosures in 23 states to allow the company to undertake a review of internal procedures while publicly acknowledging that tens of thousands of foreclosure proceedings were improperly filed.  Robbie Whelan, *WSJ: Bank of America Suspends Foreclosures*, Wall St. J., http://online.wsj.com/articles/SB100014240 527487 0385920457552649 1393115712 (last updated Oct. 2, 2010 10:41 AM).  On October 9, 2010, BAC and its affiliates' documentation failures and lack of internal controls forced them to suspend foreclosures nationwide.  David Streitfeld & Nelson D. Schwartz, *Largest U.S. Bank Halts Foreclosures in All States*, N.Y. Times, Oct. 9, 2010, A1.

26.     In October 2010, the Texas Attorney General ordered Wilshire to stop all foreclosures, short sales and evictions in the state of Texas due to improprieties relating to Wilshire's practice of using robo-signers.  *Texas attorney general asks for pause in foreclosures*, Austin Business Journal (Oct. 7, 2010 8:16 AM), http://www.bizjournals.com/austin/stories/ 2010/10/04/daily51.html.  Wilshire's practices included signing thousands of documents each month without reading them, signing affidavits without reviewing facts, notarizing documents without the signer or before the documents were signed ,and filing documents that did not correctly reflect loan payments, charges and advances.

27.     On April 13, 2011, the OCC issued a Consent Order finding that Bank of America N.A., including in its role as successor to Countrywide, engaged in improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon underlying mortgage loans.  *In re Bank of Am., N.A.*, Consent Order, AA-EC-11-12 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

28.     On August 4, 2011, the New York State Attorney General ("NYAG") filed fraud claims against The Bank of New York Mellon ("BNY Mellon"), as trustee for securitizations created and serviced by BAC and its affiliates.

29.     The NYAG found that the blatant disregard for the rules governing assignment by Bank of America and its affiliates has caused, and is continuing to cause, serious harm to certificateholders.  As the NYAG stated in his petition in *In re Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures)*, No. 11-cv-651786 (N.Y. Sup. Ct. Aug. 5, 2011) (the "BNY Article 77 Proceeding"):

> [Assignment] provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse.  Any action to foreclose requires proof of ownership of the mortgage.  This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership.  Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon.  The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example, 'robo-signing.'

30.     The NYAG's petition reported that an extensive review of foreclosure proceedings commenced by BAC and its affiliates found widespread misconduct.  For example, BAC admitted in *Bank of N.Y. v. Kirkland*, No. 07-16839 (N.Y. Sup. Ct. Dec. 11, 2007) that an action to foreclose on a mortgage had been commenced despite the fact that the promissory note had not been assigned to the trust that purportedly owned the note.  Similarly, in *Bank of N.Y. v. Gioio*, No. 08-9865 (N.Y. Sup. Ct. Sept. 22, 2008), Bank of America admitted that a note assignment had been executed two days prior to commencement of the action, contrary to requirements of state law.

31.     The NYAG reported in documents filed in the BNY Article 77 Proceeding, that the "failure of Countrywide to transfer complete mortgage loan documentation to the trusts hampered the trusts' ability to foreclose on delinquent mortgages thereby impairing the value of the notes secured by those mortgages." Schneiderman Verified Pleading ¶ 23, *In re Bank of New York Mellon*, No. 11-cv-651786 (N.Y. Sup. Ct. Aug. 5, 2011).

32.     In 2012, BAC, including as successor to Countrywide and Merrill Lynch, was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of their robo-signing misconduct. The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law. These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork. *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

33.     On March 12, 2012, the U.S. Department of Housing and Urban Development ("HUD") Office of Inspector General issued a report of its examination of BAC's and its affiliates' foreclosure process from October 1, 2008 to September 30, 2010. Bank of America Corporation Foreclosure and Claims Process Review (2012), *available at* http://www.hudoig.gov/sites/default/files/Audit_Reports/2012-FW-1802.pdf. The inspector performed a review of loan foreclosure files and determined that they were "consistently" deficient because they were missing documentation. *Id.* at 5, 12. HUD found that Bank of America relied on "foreclosure mills" and "routinely signed foreclosure documents" that falsely claimed the affiant had personal knowledge of the facts contained therein. *Id.* at 5.

HUD also reported that Bank of America and Countrywide "significantly hindered" HUD's investigation by refusing to cooperate.  *Id*. at 4.

34.     As a result of Countrywide's systemic failure to transfer essential mortgage documentation to securitization trusts, Phillip R. Burnaman II, an expert retained by BNY Mellon in the BNY Article 77 Proceeding, issued an expert report revealing that BNY Mellon's exception reports for Countrywide securitizations as of June 2011 showed ***117,899*** loans lacking complete documentation.  Burnaman Expert Report at 50, *In re Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct. Mar. 14, 2013) (emphasis added).  The document cure provisions in the Countrywide-Bank of America Settlement Agreement apply to only 1,116 of the 117,899 loans with defective documentation.  *Id*.

D.      **DB Structured Products, Inc.**

35.     DB Structured Products, Inc. ("DBSP") is a wholly owned subsidiary of Deutsche Bank AG (collectively, "Deutsche Bank").

36.     Deutsche Bank and its affiliates or agents have engaged in widespread misconduct to cover-up the fact that they systemically failed to properly assign securitized mortgage loans to the issuing trusts, including through the use of robo-signers.

37.     For example, on October 10, 2007, in a set of 14 foreclosure cases brought by Deutsche Bank National Trust Company, Judge Christopher Boyko dismissed the foreclosure proceedings against the defendants finding that the mortgage lenders could not prove that they were the holders and owners of the mortgage notes at the time of the complaint.  Gretchen Morgenson, *Foreclosures Hit a Snag for Lenders*, N.Y. Times (Nov. 15, 2007), *available at* http://www.nytimes.com/2007/11/15/business/15lend.html?_r=0.

38.     Further, on August 12, 2011, Deutsche Bank improperly filed an action for foreclosure against Glenn and Ann Holden in Summit County Ohio, in which Deutsche Bank filed two different versions of the note with the court, each bearing a stamp affirming it as the "true and accurate copy."  *Deutsche Bank Nat'l Trust Co. v. Holden*, 2014-Ohio-1333 (Ohio Ct. App. 2014).  The Court found that "[d]ue to the inconsistencies between the copies of the note and the lack of an explanation based on personal knowledge as to how Deutsche Bank came to offer two different copies of the note into the record, this Court concludes that there is a genuine issue of material fact as to whether Deutsche Bank was the holder of the note at the time the complaint was filed."  *Id.* at ¶ 15.

39.     Thereafter, on May 1, 2014, the Court of Appeals of New Mexico found that Deutsche Bank lacked standing to bring a foreclosure action where it failed to show ownership

of the note at the time its complaint was filed. *See generally Deutsche Bank Nat'l Trust Co. v. Beneficial New Mexico Inc.*, No. 31,503, 2014 WL 1819300 (N.M. Ct. App. May 1, 2014).

40.     Additionally, on July 24, 2014, the Court of Appeals for the First District of Texas reversed the trial court's order granting summary judgment for Deutsche Bank, where plaintiff-appellant argued that the signature on the purported Assignment of the Deed of Trust from Argent Mortgage Company to Deutsche Bank was forged.  Plaintiff-appellant provided copies of documents purportedly bearing the signatory of Bryan Bly, the attorney-in-fact for Argent.  The signature on these documents reflected the existence of materially different versions of Bryan Bly's signature.  To further demonstrate the forgery, plaintiff-appellant also provided a copy of Bryan Bly's deposition where he stated that there were documents, including assignments, bearing his purported signature that he never saw or approved that could have been assigned to additional parties. *Vazquez v. Deutsche Bank Nat'l Trust Co.*, No. 13-cv-00220, 2014 WL 3672892 (Tex. App. 1st Dist. July 24, 2014).

E.      **GMAC Mortgage Corporation**

41.     GMAC Mortgage Corporation ("GMAC") was a subsidiary of GMAC, Inc.  In or

about 2010, GMAC, Inc. changed its name to Ally Financial Inc. ("Ally").  In or about 2013,

Ocwen acquired Ally's mortgage servicing portfolio.

42.     GMAC and its affiliates or agents have engaged in in widespread foreclosure

misconduct in an attempt to cover-up the fact that it failed to properly assign mortgages and

transfer notes and mortgage loan files to the issuing trusts.  This pervasive misconduct indicates

a systemic failure that infected many mortgage-backed securitizations including the Covered

Trusts.  GMAC utilized so-called robo-signers who execute tens of thousands of foreclosure

affidavits a month, all necessarily false because they are allegedly based on their own personal

knowledge, and many of them without proper documentation, including evidence of possession

of the underlying mortgage note.  The robo-signers sometimes attempted to execute assignments

retroactive to the closing date of the relevant securitization in order to circumvent state laws

governing assignment.

43.     On April 13, 2011, the Federal Reserve issued a Consent Order finding that

GMAC failed to document mortgage loans properly and attempted to cover-up this failure.  *In re*

*Ally Financial Inc., Ally Bank & GMAC Mortg., LLC*, Consent Order, 11-20-B-HC, 11-020-B-

DEO (Apr. 13, 2011), *available at* https://www.fdic.gov/bank/individual/ enforcement/2011-04-

77.pdf.  The Federal Reserve found that GMAC:

> Filed or caused to be filed in state courts and in connection with
> bankruptcy proceedings in federal courts numerous affidavits
> executed by employees of the Mortgage Servicing Companies or
> employees of third-party providers making various assertions, such
> as the ownership of the mortgage note and mortgage, the amount of
> principal and interest due, and the fees and expenses chargeable to
> the borrower, in which the affiant represented that the assertions in
> the affidavit were made based on personal knowledge or based on a

review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

Filed or caused to be filed in courts in various states and in connection with bankruptcy proceedings in federal courts or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; [and]

Litigated foreclosure and bankruptcy proceedings and initiated non-judicial foreclosures without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party . . . .

44.     GMAC stipulated to the Consent Order.  *Id.*

45.     One of GMAC's robo-signers, Jeffrey Stephan, is the leader of GMAC's document execution unit.  On December 10, 2009, in a deposition taken in a foreclosure proceeding commenced by GMAC in Circuit Court in Palm Beach County, Florida, Stephan testified that he robo-signed 10,000 foreclosure documents per month without reviewing them or verifying their accuracy.  Stephan Dep. at 7, *GMAC Mortg. LLC v. Ann M. Neu a/k/a Ann Michelle Perez*, No. 50 2008 CA 040805XXXX MB, (Fla. Cir. Ct. Dec. 10, 2009).  Stephan further testified under oath that the 13 individuals who reported to him similarly "do not go into the system and verify the information as accurate" before documents are executed in connection with foreclosures commenced by GMAC.  *Id.*

46.     An internal GMAC document containing a record of Stephan's discussions with outside counsel was publicly released.  Paul Kiel, *Internal Doc Reveals GMAC Filed False Document in Bid to Foreclose*, ProPublica (July 27, 2011 12:07 PM), http://www.propublica.org/article/gmac-mortgage-whistleblower-foreclosure.  The document provides additional evidence that GMAC committed acts of forgery or otherwise filed false

documentation in foreclosure proceedings nationwide in order to cover-up its monumental

failure to deliver valid title to the trusts.  The document establishes that on April 4, 2010,

Stephan explained to outside counsel that GMAC sought to foreclose upon a mortgage on a

property in New York City that was originated by Ameriquest and sold to a securitization trust.

The mortgage was never assigned to the trust and Ameriquest went bankrupt in 2007.  Stephan

explained that GMAC wanted Ameriquest to agree to a retroactive assignment, but it was

impossible to get Ameriquest to agree because it was defunct.  As Stephan put it:  "The problem

is we do not have signing authority—are there any other options?"

47.     Stephan and GMAC apparently concluded that their only option was to create

and file forged documentation.  On July 7, 2010, GMAC forged an assignment from Ameriquest

to the relevant trust which stated that it was "effective as of" August 2005.  This was a total

fabrication that GMAC filed in New York State court.  Stephan was purportedly the Ameriquest

officer who authorized the assignment.  ProPublica, a public watchdog group, performed a

review of hundreds of foreclosure cases in New York involving Ameriquest originated loans and

found that GMAC had prepared many other similar forgeries.

48.     In October 2010, the Ohio Attorney General commenced a lawsuit against GMAC

alleging the loan servicer and its agents filed fraudulent foreclosure affidavits to mislead courts

in hundreds of cases.  *See Ohio v. GMAC Mortg., LLC*, No. 10-cv-02537-JZ (N.D. Ohio 2010).

After an extensive inquiry, the Ohio Attorney General concluded that:

> GMAC has caused Assignments of Mortgage to be prepared and
> executed by agents of GMAC that improperly purport to assign
> the note from MERS to the trustee and falsely claim that the GMAC
> employee executing the Assignment has authority to assign the note
> on behalf of MERS.

18

49.     The Ohio Attorney General further found that GMAC conspired to specifically mislead Ohio courts noting:

> *The agents of GMAC Mortgage prepared these affidavits to mislead the courts in Ohio on such matters as who kept the applicable records, who the holder of the note was, the amount due to whoever the holder of the note was, and whether proper notice alleging default had been sent to the borrower.*

(Emphasis added.)  Brief for Petitioner at 15, *Blank v. GMAC Mortg., LLC*, No. 10-cv-02709 (Ohio Oct. 13, 2011).

50.     The Ohio Attorney General made it abundantly clear that Stephan's actions were not isolated incidents and instead reflected a pervasive pattern of practice within GMAC.  As the Ohio Attorney General put it:  "Ally and GMAC Mortgage had authority over and the right to control the actions of Stephan and benefited financially from the actions of Stephan.  The actions of Stephan . . . were part of the business plans of Ally and GMAC Mortgage." *Id*. at 16.

51.     GMAC's misconduct has been recognized by multiple courts.  For example, GMAC was sanctioned by a Maine court in *Federal National Mortgage Ass'n v. Bradbury*, No. BRI-RE-09-65 (Me. Dist. Ct. Sep. 24, 2010) for its robo-signing cover-up.  In awarding the sanctions, the Honorable Keith A. Powers wrote:

> The Court is particularly troubled by the fact that Stephan's deposition in this case is not the first time that GMAC's high-volume and careless approach to affidavit signing has been exposed. Stephan himself was deposed six months earlier, on December 10, 2009, in Florida.  His Florida testimony is consistent with the testimony given in this case: except for some limited checking of figures, he signs summary judgment affidavits without first reading them and without appearing before a notary.  Even more troubling, in addition to that Florida action, in May, 2006 another Florida court not only admonished GMAC, it sanctioned the Plaintiff lender for GMAC's affidavit signing practices.  As part of its order, the Florida court required GMAC to file a Notice of Compliance, indicating its commitment to modify its affidavit signing procedures to conform to proper practices.  The experience of this case reveals that, despite

the Florida Court's order, GMAC's flagrant disregard apparently persists.  It is well past the time for such practices to end.

52.     As a direct result of the aforementioned blatant misconduct, in September 2010, GMAC had to suspend foreclosures in 23 states and undertake a review of internal procedures, publicly acknowledging that it systemically commenced foreclosure proceedings based on forged or otherwise improper documentation.

53.     In November 2010, Legal Services of New Jersey provided the Report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearing in Foreclosure Proceedings (2010), *available at* http://www.lsnj.org/NewsAnnouncements/ Foreclosure/materials/LSNJReport.pdf.  The report, which was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents and other evidence of fraud concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings."  The report specifically implicated GMAC.  *Id.* at 9.

54.     Thereafter, on December 20, 2010, Judge Mary C. Jacobson of the Superior Court of New Jersey issued an order to show cause to GMAC.  The order to show cause required GMAC and the others to "show cause at a hearing scheduled for January 19, 2011, why the court should not suspend the processing of all foreclosure matters involving [the banks] and appoint a Special Master to review their past and proposed foreclosure practices."  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. F-059553-10 (Super. N.J. Dec. 20,

2011).  **The order was also directed at Deutsche Bank**, because it had been involved in numerous questionable foreclosures.

55.     A Special Master was subsequently appointed and GMAC and the other banks reportedly suspended foreclosures in New Jersey.  On August 17 and August 19, 2011, after considering submissions by the parties, the Special Master recommended that all of the banks except GMAC be allowed to resume foreclosures and that the proposed restrictions in the order to show cause should not be enacted as against them.  Judge Jacobson accepted the Special Master's reports.  GMAC's misconduct was so egregious the Special Master could not lift the suspension.  These events also caused Deutsche Bank to know that there were Events of Default by the Master Servicers and Servicers with respect to the mortgage loans in the Covered Trusts.

56.     Additionally, in January 2011, GMAC agreed to dismiss 10,000 foreclosure proceedings filed in the State of Maryland because they relied upon forged or false documentation.

57.     Finally, in 2012, Ally Financial (formerly GMAC) was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

58.     Ocwen engaged in substantially similar misconduct.  As discussed above, Ocwen engaged in systemic misconduct at every stage of the mortgage servicing process, including engaging in robo-signing, and preparing, executing, notarizing and filing affidavits in foreclosure suits without verifying any information.

**F.**     **Litton Loan Servicing LP**

59.     As of 2007, Litton Loan Servicing LP ("Litton") was a wholly owned
subsidiary of Credit-Based Asset Servicing and Securitization LLC ("C-BASS").  In or
around December 2007, Goldman Sachs Bank USA ("Goldman Sachs") acquired Litton
from C-BASS.  From January 2009 to December 31, 2010 alone, Litton initiated over
135,000 foreclosure actions.  Finally, in or around 2011, Ocwen acquired Litton from
Goldman Sachs.

60.     Goldman Sachs, Litton and their affiliates and agents have engaged in widespread
misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in
which Litton was Servicer to properly assign the underlying mortgage loans to the issuing trusts,
including through the use of robo-signers.

61.     For example, Litton utilized so-called robo-signers who executed tens of
thousands of foreclosure affidavits a month, all necessarily false because they were purportedly
based on personal knowledge when the robo-signers lacked any such knowledge, and many of
the false affidavits lacked proper documentation including evidence of possession of the
underlying mortgage note.

62.     In one proceeding, *MTGLQ Investors, L.P. v. Chasteen*, No. 09-cv-02726
(C.P. Montgomery Cnty. Apr. 3, 2009), Litton submitted an assignment purporting to
transfer a mortgage to MTGLQ Investors L.P. (a Goldman Sachs affiliate) c/o Avelo.  Litton
employee Marti Noriega falsely signed the assignment as an assistant secretary of MERS.

63.     Litton employee Denise Bailey testified in a deposition that she routinely
executed mortgage assignments as an officer of MERS, but could not explain how she came

to be an officer of MERS (which she never was) nor exactly what MERS did.  Bailey Dep. at

22–32, 41, *U.S. Bank Nat'l Ass'n v. Austin*, CACE0847335 (Fla. Cir. Ct. June 8, 2009).

64.      Again in *MTGLQ Investors, L.P. v. Chasteen*, No. 09-cv-02726 (C.P.

Montgomery Cnty. Apr. 3, 2009), Litton submitted an assignment purporting to transfer a

mortgage to MTGLQ Investors L.P., this time falsely signed by Bailey as a vice president of

MERS.

65.      On September 1, 2011, the Federal Reserve sanctioned Goldman Sachs for "a

pattern of misconduct and negligence relating to deficient practices," including robo-signing.

Press Release, Board of Governors of the Federal Reserve System Press Release (Apr. 13, 2011),

*available at* http://www.federalreserve.gov/newsevents/press/enforcement/20110413a.htm.

After an investigation undertaken by the Federal Reserve, Goldman Sachs entered into a

Consent Order that required Goldman Sachs to retain an independent consultant to review

foreclosure proceedings (commenced by Goldman Sachs or any of its affiliates and

subsidiaries including Litton) pending at any time in 2009 or 2010, and to compensate

borrowers who suffered financial injury as a result of wrongful foreclosures.  *In re Goldman*

*Sachs Grp., Inc. & Goldman Sachs Bank*, Consent Order, 11-112-B-HC, 11-112-B-SM (Sept. 1,

2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf201109

01f1.pdf.

66.      Ocwen engaged in substantially similar misconduct.  As discussed above,

Ocwen engaged in systematic misconduct at every stage of the mortgage servicing process,

including engaging in robo-signing, and preparing, executing, notarizing and filing affidavits in

foreclosure suits without verifying any information.

G.      **HSBC Bank USA, National Association**

67.     HSBC Bank USA, National Association ("HSBC") and its affiliates or agents have engaged in in widespread foreclosure misconduct in an attempt to cover-up the fact that it failed to properly assign mortgages and transfer notes and mortgage loan files to the issuing trusts.  This pervasive misconduct indicates a systemic failure that infected many mortgage-backed securitizations including the securitizations at issue in the present action.  HSBC utilized so-called robo-signers who execute tens of thousands of foreclosure affidavits a month, all necessarily false because they are allegedly based on their own personal knowledge, and many of them without proper documentation, including evidence of possession of the underlying mortgage note.  The robo-signers sometimes attempted to execute assignments retroactive to the closing date of the relevant securitization in order to circumvent state laws governing assignment.

68.     On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. 01-2010 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011).  The order was directed at HSBC.  ***The order was also directed at Deutsche Bank***, because it had been involved in numerous questionable foreclosures.

69.     HSBC stipulated to the OCC's April 13, 2011 Consent Order based upon the OCC's findings that HSBC tried to cover-up that issuing trusts did not have legal title sufficient to allow them to foreclose upon the underlying mortgage loans by engaging in fraudulent or

improper foreclosure practices.  *In re HSBC Bank USA, N.A.*, Consent Order, AA-EC-11-14 (Apr. 13, 2011).

**H.**     **JPMorgan Chase Bank, N.A.**

70.     JPMorgan Chase Bank, N.A. is the sole owner of J.P. Morgan Mortgage

Acquisition Corporation and is a subsidiary of J.P. Morgan Chase & Co. (collectively,

"JPMorgan").

71.     Courts have concluded that JPMorgan and its affiliates and agents have engaged

in widespread misconduct to cover-up the systemic failure of depositors and sponsors for

securitizations in which JPMorgan was servicer to properly assign the underlying mortgage loans

to the issuing trusts, including through the use of robo-signers.

72.     For example, in *JP Morgan Chase Bank v. Pocopanni*, No. 16-2008-CA-3989

(Fla. Cir. Ct. Aug. 9, 2010), the court stated as follows:

> The Court finds by clear and convincing evidence that WAMU,
> Chase and [counsel for JPMC Bank] committed fraud on this Court.
> . . . The Court finds that WAMU and Chase made representations to
> this Court during the course of the instant action that are known to
> be false. . . . Throughout the litigation, WAMU and Chase and [their
> counsel] have represented to this Court that plaintiff owns and holds
> the note and mortgage.  Moreover, WAMU and [counsel] created a
> false Assignment of Mortgage dated April 11, 2008 as evidence of
> these assertions. . . .   The Court finds by clear and convincing
> evidence that these acts committed by WAMU, Chase and [counsel]
> amount to a "knowing deception intended to prevent the defendants
> from discovery essential to defending the claim" and are therefore
> fraud.

*Wall Street and the Financial Crisis:  The Role of High Risk Home Loans: Hearing Before S.*

*Permanent Subcomm. On Investigations*, 112th Cong. (2010), Senate Ex. 30 "Significant

Incident Notification (SIN)" at 1 (Apr. 1, 2008).

73.     Beth Ann Cotrell, a JPMorgan robo-signer, based in Franklin County, Ohio,

testified that she signed 18,000 foreclosure related documents a month, candidly admitting that

she had absolutely no personal knowledge regarding assertions made in the documents she was

signing.  It was absolute fiction.  Cottrell Dep., *Chase Home Fin., LLC v. Fleming*, No. 50-2009-CA-026599 (Fla. Cir. Ct. May 17–18, 2010).

74.     Barbara Hindman is a JPMorgan robo-signer, based in Jacksonville, Florida.  In some foreclosure documents filed in state courts, Hindman represented that she was "Vice President of Mortgage Electronic Registration Systems, Inc."  Sometimes she represented she was "Vice President, Bank of America, N.A."  Other times she represented that she was "Vice President, JP Morgan Chase Bank, N.A., as successor-in-interest to Washington Mutual Bank."  Hindman works with Margaret Dalton, another JPMorgan robo-signer based in Jacksonville, Florida.

75.     Upon information and belief, other JPMorgan robo-signers include Whitney Cook, Christina Trowbridge and Stacy Spohn.

76.     As a direct result of this misconduct, in September 2010, JPMorgan and its affiliates had to suspend foreclosures in 23 states to undertake a review of internal procedures and publicly acknowledged that they systemically submitted forged or otherwise improper documentation in foreclosure proceedings.

77.     In November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Report to the New Jersey Supreme Court, at 1.  The report was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents, and other evidence of fraud.  *Id*.  The report concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings."  The report

specifically implicated JPMorgan. *Id*. at 9–10.

78.     On April 13, 2011, the OCC issued a Consent Order finding that JPMorgan

engaged in improper foreclosure practices to cover-up the fact that issuing trusts lacked

legal title sufficient to foreclosure upon underlying mortgage loans. *In re JP Morgan*,

Consent Order, AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-

issuances/news-releases/2011/nr-occ-2011-47e.pdf.

79.     On December 1, 2011, the Massachusetts Attorney General commenced an action

against JPMorgan, among others, alleging "rampant violations" of state law in foreclosure

proceedings.  Compl., *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct.

Dec. 1, 2011).

80.     Further, the complaint filed by the NYAG on February 3, 2012 ("NYAG

Complaint") charges various loan servicers, including JPMorgan, with persistent fraud and

deceptive acts in connection with mortgage foreclosure proceedings.  The NYAG Complaint

notes that servicers such as JPMorgan "have repeatedly submitted court documents containing

false and misleading information that made it appear that the foreclosing party had the authority

to bring a case when in fact it may not have."  Press Release, N.Y. Attorney Gen., A.G.

Schneiderman Announces Major Lawsuit Against Nation's Largest Banks For Deceptive &

Fraudulent Use Of Electronic Mortgage Registry (Feb. 3, 2012), *available at* http://www.ag.ny.

gov/press-release/ag-schneiderman-announces-major-lawsuit-against-nation%E2%80%99s-

largest-banks-deceptive.

81.     JPMorgan was one of five banks that agreed to a $25 billion settlement with

49 state Attorneys General as a result of its robo-signing misconduct.  The agreement

requires servicers to implement comprehensive new mortgage loan servicing standards to

remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  See Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

82.     On March 30, 2012, Jamie Dimon, CEO of JPMorgan, sent a letter to JPMorgan's shareholders admitting that JPMorgan engaged in robo-signing:  "Our servicing operations left a lot to be desired: There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes."  JP Morgan Chase & Co., 2011 Annual Report 27 (2011), *available at* http://files.shareholder.com/downloads/ONE/17661 91294x0x556139/75b4bd59-02e7-4495-a84c-06e0b19d6990/JPM_2011_annual_report_ complete.pdf.

## I.   Midland Loan Services, Inc.

83.    Midland Loan Services, Inc. ("Midland") is a division of PNC Real Estate, which is a subsidiary of PNC Financial Services Group, Inc. (collectively, "PNC").

84.    Midland, PNC and their affiliates and agents have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Midland was servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

85.    The Attorney General of the State of Minnesota sued Midland for using robo-signed affidavits in foreclosure actions against Minnesota residents.

86.    In an article from *The Washington Post*, "One Midland employee, Ivan Jimenez, testified in a 2009 civil lawsuit against the firm that he signed 200 to 400 affidavits a day. He said that 'very few' documents were checked for accuracy, a claim that mirrors accusations of mortgage servicers 'robo-signing' foreclosure documents."  Danielle Douglas, *Taking on the Country's Biggest Debt Buyer*, Washington Post, http://www.washingtonpost.com/business/economy/taking-on-the-countrys-biggest-debt-buyer/2014/05/09/fbd65a24-a94d-11e3-b61e-8051b8b52d06_story.html (last updated May 9, 2014).

87.    The OCC issued a Consent Order dated April 13, 2011, finding that PNC engaged in improper foreclosure practices, including by filing in state courts affidavits executed by its employees that were not based on personal knowledge and that were not properly notarized, as well as failing to devote adequate resources and oversight to its mortgage foreclosure practices and procedures.  *In re PNC Bank*, Consent Order, No. AA-EC-11-17 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf.

88.     PNC improperly commenced foreclosure proceedings without any evidence that the note and mortgage were physically delivered or assigned to PNC. PNC also submitted court documents containing false and misleading information that made it appear that PNC had the authority to bring a foreclosure action when in fact it did not.  *See, e.g.*, *PNC Bank Nat'l Ass'n v. Giovanni*, No. 11-cv-18963 (N.Y. Sup. Ct. Apr. 30, 2013).

89.     On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  *In re Residential Mortg. Foreclosure Pleading and Document Irregularities*, No. 01-2010 (N.J. Super. Ct. Ch. Div. Dec. 20, 2011).  The order was directed at PNC (and therefore Midland).  ***The order was also directed at Deutsche Bank*** because it had been involved in numerous questionable foreclosures.

**J.      Saxon Mortgage Services, Inc., Saxon Funding
Management LLC, Morgan Stanley Mortgage Capital, Inc.,
Morgan Stanley Mortgage Capital Holdings and NovaStar Mortgage, Inc.**

90.      Saxon Mortgage Services, Inc., Saxon Funding Management LLC (together,

"Saxon"), Morgan Stanley Mortgage Capital Holdings and Morgan Stanley Mortgage Capital

Inc. were each subsidiaries or affiliates of Morgan Stanley (collectively, "Morgan Stanley").

NovaStar Mortgage, Inc. operated as a subsidiary of NovaStar Financial Inc. (together,

"NovaStar").  In October 2007, Saxon acquired all of NovaStar's servicing rights.  Saxon was

acquired by Ocwen Financial Corp (collectively with its affiliates, "Ocwen") in April 2012.

91.      Morgan Stanley, Saxon and their affiliates and agents have engaged in widespread

misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in

which Morgan Stanley Saxon was Servicers to properly assign the underlying mortgage loans to

the issuing trusts, including through the use of robo-signers.

92.      In November 2011, the New York Department of Financial Services entered into

an agreement with Morgan Stanley and Saxon that redressed the unlawful practices that servicers

had been engaging in.  Press Release, Dep't of Fin., Superintendent Lawsky Announces

Agreements with Morgan Stanley, Saxon, AHMSI & Vericrest on Groundbreaking New

Mortgage Practices (Nov. 10, 2011), *available at*

http://www.dfs.ny.gov/about/press/pr1111101.htm.  The agreement required Morgan Stanley and

Saxon to cease robo-signing and impose staffing and training requirements to prevent future

robo-signing.  *Id*.  The agreement also required Morgan Stanley and Saxon to withdraw from any

pending foreclosure proceedings in which the filed affidavits were robo-signed or inaccurate.  *Id*.

93.      In April 2012, the Federal Reserve released a Consent Order against Morgan

Stanley to address patterns of misconduct and negligence in residential mortgage loan servicing

and foreclosure processing at Saxon. *In re Morgan Stanley*, Consent Order, No. 12-015-B-HC

(Apr. 2, 2012), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/

enf20120403a1.pdf.

94.     The Consent Order maintains that Morgan Stanley, through Saxon, filed or caused

to be filed in courts in various states numerous affidavits and other mortgage-related documents

that were not properly notarized, including those not signed or affirmed in the presence of a

notary. *Id*.  It also required Morgan Stanley to retain an independent consultant to review

foreclosure proceedings. *Id*.  The Consent Order was in response to allegations that Morgan

Stanley and Saxon engaged in robo-signing.

95.     In addition, in 2013, Morgan Stanley agreed to pay $97 million into a settlement

fund and $130 million for other assistance in a settlement between ten banks and federal

regulators.  The settlement stemmed from foreclosure abuses due to robo-signing.  James

O'Toole, *Goldman Sachs, Morgan Stanley in $557 Million Foreclosure Settlement*, CNN (Jan.

16, 2013), http://money.cnn.com/2013/01/16/news/companies/goldman-morgan-stanley/.

**K.      Wells Fargo Bank, N.A.**

96.      Wells Fargo Bank, N.A. and its affiliates (collectively "Wells Fargo") have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Wells Fargo was servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

97.      One of Wells Fargo's robo-signers is a woman named Xee Moua who admitted that she executed hundreds of foreclosure documents every day without reading them.  Marshall Eckblad, *"Signer" Issue Raised for Wells Fargo*, Wall St. J., http://online.wsj.com/articles/SB10001424052748704361504575552192790748342 (last updated Oct. 15, 2010 12:01 AM).  Moua admitted she reviewed up to 500 foreclosure documents on a daily basis.  *Id*.

98.      After Moua disclosed Wells Fargo's widespread practice of filing false mortgage documents, Wells Fargo admitted that it had filed false foreclosure documentation in approximately 55,000 foreclosure proceedings.

99.      The Ohio Attorney General commenced an investigation in the wake of Moua's admission and asked Wells Fargo to voluntarily vacate all foreclosures based on improper paperwork.

100.      Wells Fargo also utilized the forgery mill—DOCx.  60 Minutes reported that Wells Fargo and other servicers retained a firm named DOCx to falsify mortgage loan documentation in an effort to cover-up the fact that there was a systemic failure to deliver mortgage loan documents and assign mortgage notes to issuing trusts in connection with securitization transactions.  *The Next Housing Shock* (CBS 60 Minutes Apr. 3, 2011), *available at* http://www.cbsnews.com/videos/the-next-housing-shock.  Robo-signers

employed by DOCx were required to robo-sign 340 documents an hour and 4,000
documents per day for Wells Fargo and other bank clients.

101.    In April 13, 2011, the OCC filed a Consent Order based upon findings that
Wells Fargo engaged in fraudulent and improper foreclosure practices to cover-up the fact that
issuing trusts lacked legal title sufficient to foreclose upon the underlying mortgage loans.  *In re
Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011).  Wells Fargo stipulated
to the OCC consent order.  *Id.*

102.    On December 1, 2011, the Massachusetts Attorney General commenced an action
against Wells Fargo (and others) alleging "rampant violations" of state law in foreclosure
proceedings.  *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct. Dec. 1,
2011).

103.    Further, the NYAG charged various loan servicers, including Wells Fargo, with
persistent fraud and deceptive acts in connection with mortgage foreclosure proceedings.
Compl., *New York v. JP Morgan*, No. 12-cv-2768 (N.Y. Sup. Ct. July 12, 2012).  As the NYAG
Complaint points out: "[The defendant loan servicers] have repeatedly submitted court
documents containing false and misleading information that made it appear that the foreclosing
party had the authority to bring a case when in fact it may not have."  Press Release, N.Y.
Attorney Gen., A.G. Schneiderman Announces Major Lawsuit Against Nation's Largest Banks
for Deceptive & Fraudulent Use of Electronic Mortgage Registry (Feb. 3, 2012), *available at*
http://www.ag.ny.gov/press-release/ag-schneiderman-announces-major-lawsuit-against-
nation%E2%80%99s-largest-banks-deceptive.

104.    On March 17, 2014, *The Washington Post* reported on a foreclosure lawsuit filed
in the Southern District of New York in which an internal Wells Fargo "foreclosure manual" was

filed.  Danielle Douglas, *Wells Fargo Foreclosure Manual Under Fire*, Wash. Post (Mar. 17,

2014), http://www.washingtonpost.com/business/economy/wells-fargo-foreclosure-manual-

under-fire/2014/03/17/25cd383c-ae00-11e3-96dc-d6ea14c099f9_story.html.  According to *The*

*Washington Post*, "[t]he manual, reviewed by The Washington Post, outlines steps for obtaining

the missing [endorsement] after the bank has initiated foreclosure proceedings.  It also lays out

what lawyers must do in the event of a lost affidavit or if there is no documentation showing the

history of who owned the loan, paperwork the bank should already have."  *Id.*

    105.    On May 23, 2014, Wells Fargo agreed to pay $67 million to settle a derivative

action brought by its shareholders against Wells Fargo executives alleging they allowed

foreclosure abuses to occur, including improper robo-signing and the filing of false affidavits not

based on personal knowledge.  *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo*

*Bank*, No.10-cv-04372 (D. Minn. Aug. 18, 2014).

    106.    Wells Fargo was one of five banks that agreed to a $25 billion settlement with

49 state Attorneys General as a result of its robo-signing misconduct.  The agreement

requires servicers to implement comprehensive new mortgage loan servicing standards to

remedy violations of state and federal law.  These violations included servicers' use of robo-

signed affidavits, improper documentation and lost paperwork.  *See* Press Release, U.S. Dep't of

Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five

Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb.

9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.