**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHOENIX LIGHT SF DAC, BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., BLUE HERON FUNDING IX LTD., C-BASS CBO XIV LTD., C-BASS CBO XVII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC and SILVER ELMS CDO II LIMITED, | Case No. 14-cv-10103-JGK-DCF |
| Plaintiffs, | Hon. John G. Koeltl |
| v. | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY and DEUTSCHE BANK TRUST COMPANY AMERICAS, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Michael S. Kraut
Kevin J. Biron
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
Tel: +1.212.309.6000
Fax: +1.212.309.6001

*Attorneys for Defendants Deutsche Bank*
*National Trust Company and Deutsche*
*Bank Trust Company Americas, as Trustees*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS AND RELEVANT BACKGROUND ............................. 4

    A.    RMBS Transactions Generally ................................................................ 4

    B.    Overview of the Governing Agreements .............................................. 5

        1.    Defendant's Limited Duties Under the Governing Agreements................ 5

            a.    Defendant Had Limited Duties Relating to Mortgage/Collateral Files .............................................. 6

            b.    Defendant Did Not Make, and Is Not Responsible For, R&Ws Concerning the Nature and Quality of Loans in the Trusts.................................................................................... 6

            c.    Defendant Has No Duty to Monitor or Supervise Servicers.......... 7

            d.    Defendant's Post-EOD Duties ...................................................... 7

        2.    Investors' Rights Under the Governing Agreements................................. 8

    C.    Plaintiffs and Relevant WestLB Securitizations.................................... 9

    D.    Overview of Claims Asserted by Plaintiffs .......................................... 10

LEGAL STANDARD............................................................................................ 11

ARGUMENT ....................................................................................................... 12

I.      PLAINTIFFS LACK STANDING TO ASSERT CERTAIN CLAIMS ........................ 12

    A.    Plaintiffs Lack Standing to Assert Claims as to the Sold Certificates................. 12

    B.    Plaintiffs Also Lack Standing as to Certain Other Certificates .......................... 13

II.     MOST OF PLAINTIFFS' CLAIMS ARE TIME-BARRED ......................................... 14

    A.    Applicable Filing Dates for Plaintiffs' Claims .................................................. 14

    B.    Claims Relating to the Certificates in the Securitization Involving Plaintiff Phoenix Light SF DAC Are Untimely Under German Law............................... 16

        1.    Claims Relating to the Phoenix Certificates Accrued in Germany.......... 16

        2.    Germany's 3-year statute of limitations begins to run at the end of the year when the plaintiff either knew, or in the absence of gross negligence would have known, of the facts underlying its claims .......... 19

        3.    Germany's statute of limitations requires a plaintiff to investigate its potential claims ................................................................................. 22

        4.    The evidence establishes that the PL Advisors knew, or were grossly negligent in failing to know, of the factual circumstances underlying Defendant's alleged breaches before the German limitations cut-off.................................................................................. 23

            a.    Purported breaches arising from allegations of false R&Ws....... 23

# TABLE OF CONTENTS
## (continued)

Page

|   |   | b. | Purported breaches arising from allegations of incomplete mortgage files, servicer robo-signing and other misconduct ....... 24 |
|---|---|----|---|
|   |   | c. | Purported breaches arising from the Loss EODs and 2012 Downgrade EODs ........................................................................ 26 |
|   | C. | Many of Plaintiffs' Claims Are Also Untimely Under New York Law ............. 27 |
|   |   | 1. | Claims that Defendant breached its post-EOD duties relating to the Loss EODs are time-barred under New York law ................................... 27 |
|   |   | 2. | Claims that Defendant breached its pre-EOD duties relating to certain alleged R&W breaches are time-barred under New York law ...................................................................................................... 28 |
| III. | PLAINTIFFS' CLAIMS THAT DEFENDANT BREACHED ITS DUTIES BY NOT PURSUING REPURCHASE CLAIMS AGAINST THE BANKRUPT WARRANTORS FAIL ................................................................................................. 29 |
| IV. | PLAINTIFFS' CLAIMS THAT DEFENDANT BREACHED ITS DUTIES BY NOT PURSUING PREVIOUSLY SETTLED REPURCHASE CLAIMS FAIL ........... 30 |
| V. | PLAINTIFFS' CLAIMS THAT DEFENDANT BREACHED ITS DUTIES BY NOT PURSUING TIME-BARRED REPURCHASE CLAIMS FAIL ......................... 31 |
| VI. | PLAINTIFFS' TORT CLAIMS FAIL ................................................................................. 31 |
| VII. | PLAINTIFFS' PRE-EOD CLAIMS FAIL .......................................................................... 32 |
|   | A. | Defendant Had No Pre-EOD Duty to Investigate ................................................. 32 |
|   | B. | Defendant Did Not Breach a Pre-EOD Duty to Provide Notice of R&W Breaches or to Enforce Repurchase Obligations .................................................. 33 |
|   |   | 1. | Defendant complied with any notice obligations it had .......................... 34 |
|   |   | 2. | Defendant complied with any enforcement obligations it had ............... 36 |
|   | C. | In Any Event, Summary Judgment Should Be Granted on Plaintiffs' Pre-EOD Claims Concerning R&Ws Because Defendant Believed in Good Faith That Its Practices Complied with the Governing Agreements ........ 38 |
| VIII. | PLAINTIFFS' POST-EOD CLAIMS FAIL ........................................................................ 38 |
|   | A. | Plaintiffs Lack Evidence That Defendant's Post-EOD Duties Were Triggered by Purported Servicer or Issuer Breaches ............................................ 38 |
|   | B. | Defendant Is Entitled to Summary Judgment on Plaintiffs' Claims Relating to the Declared EODs ................................................................................. 40 |
| CONCLUSION ................................................................................................................................. 43 |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Am. Fid. Assurance Co. v. Bank of N.Y. Mellon*,
  No. Civ-11-1284-D (W.D. Okla. Oct. 31, 2018), ECF No. 282 .................................................3

*Appel v. Kidder, Peabody & Co.*,
  628 F. Supp. 153 (S.D.N.Y. 1986) ...........................................................................16, 17, 19

*Baker v. Latham Sparrowbush Assocs.*,
  72 F.3d 246 (2d Cir. 1995)..................................................................................................20

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*,
  No. 14 Civ 9371, 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) ...........................................33

*Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank N.A.*,
  165 A.D.3d 526 (1st Dep't 2018) ..........................................................................................32

*BlackRock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, No.
  14-CV-9367 (S.D.N.Y. Feb. 16, 2017), ECF No. 215............................................................29

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
  738 F. Supp. 2d 450 (S.D.N.Y. 2010)..............................................................................36, 38

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
  735 F.3d 114 (2d Cir. 2013).................................................................................................11

*Commerce Bank v. Bank of N.Y. Mellon*,
  35 N.Y.S.3d 63 (1st Dep't 2016) .....................................................................................33, 40

*Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*,
  234 F. Supp. 3d 462 (S.D.N.Y. 2017) (Koeltl, J.) ...........................................................14, 19

*Cruden v. Bank of N.Y.*,
  957 F.2d 961 (2d Cir. 1992)..................................................................................................27

*Deutsche Bank Nat'l Tr. Co. v. Flagstar Capital Mkts. Corp.*,
  No. 96, 2018 WL 4976777 (N.Y. Oct. 16, 2018) ..................................................................31

*Deutsche Bank Nat'l Trust Co. v. Barclays Bank PLC*,
  66 N.Y.S.3d 472 (1st Dep't 2017), *appeal filed* ..................................................................31

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
  837 F. Supp. 2d 162 (S.D.N.Y. 2011)....................................................................................2

*Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*,
    838 F.2d 66 (2d Cir. 1988)...................................................................................2, 33

*Espinosa v. Delgado Travel Agency, Inc.*,
    No. 05 Civ. 6917, 2006 WL 2792689 (S.D.N.Y. Sept. 27, 2006) ...........................16

*Fixed Income Shares: Series M v. Citibank N.A.*,
    314 F. Supp. 3d 552 (S.D.N.Y. 2018), *appeal filed*................................3, 28, 29, 30

*Glob. Fin. Corp. v. Triarc Corp.*,
    93 N.Y.2d 525 (1999) ...............................................................................................16

*Goldman v. Barrett*,
    733 F. App'x 568 (2d Cir. 2018) ..............................................................................16

*Gottlieb v. County of Orange*,
    84 F.3d 511 (2d Cir. 1996)........................................................................................42

*Hurley v. Tozzer, Ltd.*,
    No. 15 Civ 2785, 2018 WL 1087946 (S.D.N.Y. Feb. 26, 2018) ...............................13

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009) ...............................................................................................27

*IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*,
    634 F. App'x 19 (2d Cir. 2015) ...........................................................................19, 27

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. (Silver Elms CDO v.*
    *Bank of Am. Corp.)*,
    No. 2:11-ML-02265-MRP, 2014 WL 3529686 (C.D. Cal. July 14, 2014) .....................20, 27

*In re NXXI Inc.*,
    216 F. Supp. 3d 381 (S.D.N.Y. 2016)......................................................................29

*In re Rationis Enters., Inc. of Pan.*,
    45 F. Supp. 2d 365 (S.D.N.Y. 1999).........................................................................15

*In re Wireless Tel. Servs. Antitrust Litig.*,
    No. 02 CIV.2637, 2004 WL 2244502 (S.D.N.Y. Oct. 6, 2004) ...............................29

*Jaffer v. Hirji*,
    887 F.3d 111 (2d Cir. 2018)......................................................................................11

*Justinian Capital SPC v. WestLB AG*,
    28 N.Y.3d 160 (2016) ...............................................................................................14

*Lang v. Paine, Webber, Jackson & Curtis, Inc.*,
    582 F. Supp. 1421 (S.D.N.Y. 1984).........................................................................19

*Meckel v. Cont'l Res. Co.*,
   758 F.2d 811 (2d Cir. 1985).............................................................................2, 33

*Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*,
   898 F.3d 243 (2d Cir. 2018)...................................................................................17

*Okla. Police Pension & Ret. Sys. v. U.S. Bank N.A.*,
   986 F. Supp. 2d 412 (S.D.N.Y. 2013) (Koeltl, J.) ................................................12

*Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*,
   No. 98 CIV 6907 MBM, 2000 WL 877004 (S.D.N.Y. June 30, 2000)...................32

*Peak Partners, LP v. Republic Bank*,
   191 F. App'x 118 (3d Cir. 2006) ...........................................................................1

*Peterson v. McGladrey & Pullen, LLP*,
   676 F.3d 594 (7th Cir. 2012) ................................................................................20

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
   No. 14-cv-10104, 2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017) .......................2, 11, 34, 36, 40

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
   172 F. Supp. 3d 700 (S.D.N.Y. 2016)...........................................................2, 10, 28, 29

*Phoenix Light SF Ltd. v. U.S. Bank N.A.*,
   No. 14-cv-10116, 2015 WL 2359358 (S.D.N.Y. May 18, 2015) ........................9, 18

*Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., N.A.*,
   907 F. Supp. 2d 536 (S.D.N.Y. 2012) ..................................................................41

*Portfolio Recovery Assocs., LLC v. King*,
   14 N.Y.3d 410 (2010) ............................................................................................16

*Racepoint Partners, LLC v. JPMorgan Chase Bank*,
   06-cv-2500, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006).....................................13

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   No. 14-CV-04394, 2018 WL 4682220 (S.D.N.Y. Sept. 28, 2018)..............33, 35, 40

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   No. 14-CV-4394, 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016).................................35

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
   No. 14-CV-4394, 2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017) .........................12, 13

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*,
   109 F. Supp. 3d 587 (S.D.N.Y. 2015)....................................................................35

*Royal Park Invs. SA/NV v. HSBC Bank USA N.A.*,
  No. 14-CV-08175, 2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) ....................................34, 41

*Royal Park Invs. SA/NV v. U.S. Bank N.A.*,
  324 F. Supp. 3d 387 (S.D.N.Y. 2018).....................................................................................12

*Simon v. City of N.Y.*,
  893 F.3d 83 (2d Cir. 2018)......................................................................................................11

*Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*,
  575 F.3d 199 (2d Cir. 2009).....................................................................................................11

*Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*,
  No. 16 Civ. 1597, 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018), *aff'd*, 741 F.
  App'x 857 (2d Cir. 2018)....................................................................................................17, 32

*V.S. v. Muhammad*,
  595 F.3d 426 (2d Cir. 2010).....................................................................................................32

*VNB Realty, Inc. v. U.S. Bank, N.A.*,
  No. 2:13-04743, 2014 WL 1628441 (D.N.J. Apr. 23, 2014)....................................................33

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*,
  No. A1302490, 2017 WL 3392855 (Ohio C.P. Aug. 4, 2017) ..........................................34, 35

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*,
  No. A1302490, 2017 WL 3392856 (Ohio C.P. Aug. 4, 2017), *appeal filed* ............................2

*Yeager v. Fort Knox Sec. Prods.*,
  672 F. App'x 826 (10th Cir. 2016) ..........................................................................................13

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
  84 N.Y.2d 309 (1994) ...............................................................................................................12

## STATUTES

Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa–77bbbb)..............................................11, 27, 38

## OTHER AUTHORITIES

Fed. R. Civ. P. 44.1 .......................................................................................................................22

N.Y. C.P.L.R. § 213(2) ..................................................................................................................27

N.Y. C.P.L.R. § 214(4) ..................................................................................................................27

Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA"), each as trustee (together in such trustee capacities, "Defendant") of residential mortgage-backed securitization ("RMBS") trusts at issue in this action (the "Trusts"), submit this memorandum of law in support of their motion for summary judgment.[1]

## PRELIMINARY STATEMENT

This action stems from the 2008 financial crisis. Having failed previously to recover the full amount of their purported RMBS losses by suing the sponsors of the transactions, Plaintiffs went looking for another deep pocket and decided to sue the RMBS trustees, asserting they had, and breached, a duty "to police the deal."[2]

But an RMBS trustee and an ordinary trustee (*e.g.*, trustee of a testamentary trust) are "different legal animal[s]." *Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 122 (3d Cir.

---

[1] The Court entered a schedule with bifurcated expert discovery and dispositive motion practice. *See* ECF No. 205. "Phase 1" includes expert discovery and dispositive motion practice concerning any issue other than loan-level re-underwriting and damages. "Phase 2," if necessary, will include expert discovery and dispositive motion practice concerning loan-level re-underwriting, damages, and any remaining issues. Defendant submits this memorandum of law in support of its Phase 1 dispositive motion.

Unless otherwise indicated, any emphasis in quotations is added, and any internal quotation marks, citations, footnotes, brackets, and ellipses are omitted. Unless otherwise indicated, exhibits cited herein are attached to the Declaration of Kevin J. Biron submitted herewith (cited as "Ex. _"). Exhibits to the Declaration of Ronaldo Reyes submitted herewith are cited as "Reyes Ex. _". Defendant's Local Rule 56.1 Statement filed herewith is cited as "¶ _," and references to paragraphs include any subparts. The pertinent contract provisions are set forth herein and in the 56.1 statement. The relevant Governing Agreements are also being submitted herewith on a CD.

[2] *See* Third Amended Complaint ("TAC") ¶ 5 (ECF No. 189).

2006).  Unlike ordinary trustees, the duties of an RMBS trustee "are <u>exclusively defined</u> by the terms of the" contracts that govern the Trusts.  *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988); *see Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011).  Thus, an RMBS trustee "is not subject to the ordinary trustee's duty of undivided loyalty.  Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement."  *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985).  Defendant did not breach its limited duties under the governing agreements.

Courts, including this one, have consistently warned the investor-plaintiffs in these cases that "to prevail ultimately on the breach of contract claim, a plaintiff does have to demonstrate breach on a <u>loan-by-loan and trust-by-trust basis</u>."  *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 713 (S.D.N.Y. 2016) ("*Phoenix v. DB*") (quoting *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) ("*PABF v. BNYM*")).  In all four cases where the investor-plaintiffs' evidence has been tested, the courts entered judgment in favor of the trustees on all, or nearly all, of plaintiffs' claims because, *inter alia*, "the beliefs of the plaintiffs about the [contracts] are not supported by the actual language of the [contracts],"[3] and "Plaintiffs' lack of loan- or Trust-specific proof . . . is fatal to their claims."[4]  The same result is compelled here.

---

[3] *W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, No. A1302490, 2017 WL 3392856, at *1-2 (Ohio C.P. Aug. 4, 2017) (entering judgment for trustee on all claims after bench trial), *appeal filed*.

[4] *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14-cv-10104, 2017 WL 3973951, at *8 (S.D.N.Y. Sept. 7, 2017) (Caproni, J.) ("*Phoenix v. BNYM*") (granting summary judgment for trustee on nearly all claims);

As detailed below, Defendant is entitled to summary judgment on all of Plaintiffs' claims for the following reasons:

*First*, Plaintiffs lack standing to bring certain of their claims, including claims relating to RMBS certificates that were sold before Plaintiffs commenced this action.

*Second*, most of the claims asserted by Plaintiffs are time-barred under Germany's 3-year statute of limitations, New York's 6-year statute of limitations, or both.

*Third*, Plaintiffs' claims that Defendant breached its duties by not taking action against sponsors and originators that were bankrupt fail because the bankruptcy stay precluded Defendant from taking any such actions.

*Fourth*, Plaintiffs' claims that Defendant breached its duties by not asserting claims against certain sponsors and originators that are subject to prior investor- or court-approved settlements fail because the settlements released all such claims.

*Fifth*, Plaintiffs' claims that Defendant breached its duties by not pursuing time-barred claims against sponsors and originators fail as a matter of law.

*Sixth*, Plaintiffs' tort claims fail as a matter of law because—as New York's First Department recently held—those claims are barred by the economic loss doctrine.

*Seventh*, the Court should grant summary judgment dismissing Plaintiffs' claim that prior to a contractually-defined event of default ("EOD"), Defendant had, and breached, a duty to investigate whether loans in the Trusts breached the loan-level representations and warranties

---

*see also* Order at 13-15, *Am. Fid. Assurance Co. v. Bank of N.Y. Mellon*, No. Civ-11-1284-D (W.D. Okla. Oct. 31, 2018) ("*AFAC v. BNYM*"), ECF No. 282 (granting summary judgment for trustee on all claims); *Fixed Income Shares: Series M v. Citibank N.A.*, 314 F. Supp. 3d 552, 562 (S.D.N.Y. 2018) (Furman, J.) (granting summary judgment for trustee on all claims), *appeal filed*.

("R&Ws") made by sponsors and originators.  Defendant had no such duty.

*Eighth*, the Court should grant summary judgment dismissing Plaintiffs' claims that Defendant breached its duties by failing to provide notice of loans with alleged R&W breaches identified in communications that Defendant received, and to pursue the repurchase of those loans absent investor direction.  Plaintiffs have no evidence Defendant breached any such duties.

*Ninth*, the Court should grant summary judgment dismissing Plaintiffs' claim that Defendant breached its duties by not declaring EODs in every Trust due to alleged breaches by loan servicers.  Plaintiffs lack sufficient evidence that Defendant had the requisite "written notice" or "actual knowledge" of any such EOD to trigger its post-EOD duties.

*Tenth*, the Court should grant summary judgment dismissing Plaintiffs' claims that Defendant breached its post-EOD duty to act as "a prudent person" with respect to certain declared EODs, because Plaintiffs lack evidence that Defendant breached that duty.

## STATEMENT OF FACTS AND RELEVANT BACKGROUND

### A.    RMBS Transactions Generally

In an RMBS securitization, an entity that originated or acquired mortgage loans sells them into a trust created to receive interest and principal payments from borrowers.  ¶ 1.  The right to receive trust income is parceled into certificates and sold to investors, called certificateholders.  *Id.* The entities that underwrite and make the mortgage loans are typically called "originators."  *Id.* The entities that pool the mortgage loans are called "sellers" or "sponsors."  *Id.* A "depositor" conveys the mortgage loans to an RMBS trust or trustee.  *Id.* After the closing of the transaction creating the RMBS trust, "servicer(s)" enforce the loan terms and collect payments from borrowers.  *Id.* The terms of the securitization trust as well as the rights and duties of the trustee, sponsor, depositor, originator(s), certificateholders and servicer(s) are set forth in the trust's governing agreements (the governing agreements for the Trusts are referred to herein as the

"Governing Agreements" or "GAs").[5]  ¶ 6.

**B.      Overview of the Governing Agreements**

**1.      Defendant's Limited Duties Under the Governing Agreements**

The GAs provide that unless Defendant has actual knowledge or, under some GAs, "written notice" that a contractually-defined EOD has occurred and is continuing, Defendant's duties are limited to those "specifically set forth in the Agreement with respect to the Trustee and no implied covenants or obligations shall be read into this Agreement."  ¶ 10.  Defendant has only limited administrative and ministerial duties under the GAs.  ¶ 11.  Importantly, Defendant has no duty under any GA to investigate any facts or matters absent direction and indemnity from a contractually specified percentage of investors.  ¶ 12.  The GAs further provide that Defendant may "rely upon and shall be protected in acting or refraining from acting upon [any] certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties . . . ."  ¶ 13.

Defendant also has broad exculpations under the GAs.  ¶ 14.  For example, the GAs generally provide that (i) "the Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of the Holders of

---

[5] RMBS trusts often are created using either a pooling and servicing agreement ("PSA") or an indenture. There are 43 Trusts at issue here:  38 were created using a PSA or similar agreement (the "PSA Trusts") and five were created using an indenture (the "Indenture Trusts").  ¶¶ 7-8.  Certificates are issued by PSA Trusts and notes are issued by Indenture Trusts.  For ease of reference, we refer to both as "certificates." DBNTC is the trustee for 42 of the Trusts, and DBTCA is the trustee for the other Trust.  ¶¶ 3-4.  The PSAs, indentures and other relevant Governing Agreements for the Trusts are governed by New York law.  ¶ 9.

Certificates evidencing no less than [25%] of the Voting Rights of Certificates relating to the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement;" and (ii) "the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement." *Id.*

a.  Defendant Had Limited Duties
Relating to Mortgage/Collateral Files

When each RMBS transaction closed, the depositor was obligated to deliver mortgage/collateral files relating to the loans in the Trust to Defendant or a custodian.[6]  ¶ 15. Within a specified time-period after closing, Defendant or a custodian was required to issue a final certification with an "exception report" listing, for each mortgage/collateral file, whether any document was missing or nonconforming.  ¶ 16.

b.  Defendant Did Not Make, and Is Not Responsible For, R&Ws
Concerning the Nature and Quality of Loans in the Trusts

RMBS sponsors and/or loan originators made certain R&Ws concerning the characteristics of the loans to be conveyed to the Trusts (in such capacity, a "Warrantor").  ¶ 17.  Defendant is entitled to rely on the R&Ws and has no obligation to investigate their accuracy or reliability.  ¶ 18. Defendant did not make any R&Ws concerning the loans.  17.1.

Under the GAs, if Defendant or another enumerated party "discovers" (*i.e.*, first obtains actual knowledge of) – or, under some GAs, receives written notice of – an actual material loan-level R&W breach, it is required to notify other specified parties.  ¶¶ 90-91.  Under certain

---

[6] The mortgage/collateral file typically consists of the note, mortgage, title policy and assignments related to a particular loan.  ¶ 15.1.

circumstances, the Warrantor has a duty to substitute, cure or repurchase loans with material R&W breaches.  ¶ 92.

c.       Defendant Has No Duty to
<u>Monitor or Supervise Servicers</u>

Servicers—not Defendant—maintain the day-to-day relationships with the borrowers on loans in the Trusts.  ¶ 1.7.  The servicers' duties include collecting payments on the loans, and, upon borrower default, enforcing the terms of the loan, which may include foreclosing on the real property securing the loan.  ¶ 19.  In some transactions, a "master servicer" was appointed to monitor the performance of other servicers.[7]  ¶ 20.

Defendant is entitled to rely on certifications and other information provided by the servicers. ¶ 25.  Defendant has no duty under any GA to supervise or monitor any servicer.  ¶ 21.  Nor did Defendant have the servicing expertise to do so.   ¶ 22.  When Defendant received the requisite direction from investors to investigate servicing practices, a consultant with servicing expertise was retained to conduct the investigation.   ¶ 23.  Similarly, Defendant did not have the servicing expertise necessary to determine whether any missing or nonconforming mortgage/collateral file documents were necessary to properly service the loans, and, thus, whether those missing or nonconforming documents were material.   ¶ 24.

d.       <u>Defendant's Post-EOD Duties</u>

An EOD is an explicitly defined event that can trigger Defendant's duty to "act as a prudent person . . . under the circumstances."   ¶ 26.[8]  Specifically, the GAs provide that if an EOD is

---

[7] Except as expressly stated herein, the term "servicers" includes both servicers and master servicers.

[8] Some GAs define different types of "events" (*e.g.*, "Master Servicer Event of Default" and "Servicer Event of Default") that have different consequences. ¶ 26.1.  For example, under many of those GAs, only

-7-

continuing and Defendant has the contractually specified knowledge thereof (*e.g.*, "actual knowledge" or "written notice"), Defendant "shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." ¶ 27.

For all 38 PSA Trusts—subject to the terms and conditions of the GAs—EODs may arise from events such as: (i) the servicer materially breaching its obligations under the PSA and not curing the breach after notice, (ii) the servicer's ratings being downgraded by the rating agencies, (iii) the servicer filing for bankruptcy, or (iv) under a few PSAs, losses or delinquencies on loans in the Trust exceeding a specified threshold. ¶ 28. For the five Indenture Trusts—although EODs result from the same types of events as PSA Trusts (*e.g.*, uncured breach, bankruptcy)—those events concern the acts or omissions of the Delaware statutory trust, often called the "issuer," that issued the RMBS securities to investors, as opposed to the acts or omissions of the servicer of the underlying loans. ¶ 29.

### 2. Investors' Rights Under the Governing Agreements

The GAs provide that investors representing a contractually specified percentage of "Voting Rights" (often 25%) have certain rights, such as the right, depending on the Trust, to: (i) notify a servicer that it has materially breached its contractual obligations and demand cure, (ii) terminate a servicer following an EOD, (iii) direct Defendant to appoint a new servicer, (iv) direct Defendant to conduct an investigation, (v) initiate legal actions under the GA if, upon

---

a "Master Servicer Event of Default" can trigger Defendant's "prudent person" duty. ¶ 26.2. As used herein, "EOD" only refers to those events defined under each GA that can trigger Defendant's "prudent person" duty.

request, Defendant fails to do so, and (vi) remove the trustee and appoint a replacement. ¶¶ 30-35.

**C.      Plaintiffs and Relevant WestLB Securitizations**

Plaintiffs assert claims against Defendant purportedly arising from alleged losses on 87 interests (the "Certificates") in the 43 Trusts.  TAC ¶ 1, Ex. B.  According to Plaintiffs, the aggregate original par amount of the 87 Certificates is approximately $751 million.  *Id.*

Each Plaintiff is a so-called "special purpose entity" ("SPE") with no employees, formed to facilitate a securitization transaction structured by failed German bank WestLB AG ("WestLB").  ¶ 37.  Plaintiffs hold none of the Certificates.  Rather, at the closing of each securitization transaction, WestLB caused an asset portfolio, which included many Certificates, to be transferred to the relevant Plaintiff, which simultaneously issued notes and transferred the asset portfolio to an indenture trustee to hold for the benefit of the noteholders.  ¶ 38.

WestLB acquired most of the notes issued in the securitizations involving Plaintiffs.  ¶ 38.1.  As explained more fully below (*infra.* § II.B.1), WestLB failed as a result of the 2008 financial crisis, and in December 2009, the German government created an entity called Erste Abwicklungsanstalt ("EAA") to hold and wind-down certain of WestLB's assets, including the notes issued as part of the securitizations involving Plaintiffs.

In December 2014, EAA caused Plaintiffs to sue Defendant and other RMBS trustees.  *E.g.*, ECF No. 1.  Defendant and other RMBS trustees established that Plaintiffs lacked standing because the claims at issue belonged to the indenture trustees.[9]  At EAA's direction, the indenture trustees—to the extent permitted under the contracts governing the WestLB securitizations—

---

[9] ECF No. 29 at 13-16; *Phoenix Light SF Ltd. v. U.S. Bank N.A.*, No. 14-cv-10116, 2015 WL 2359358, at *2 (S.D.N.Y. May 18, 2015) ("*Phoenix v. USB*") (dismissing action for lack of standing because "such claims belong to the indenture trustees," not Plaintiffs).

assigned the claims to Plaintiffs in early 2015.  ¶ 60.4.9.

### D.    Overview of Claims Asserted by Plaintiffs

By no later than the end of 2010, EAA and its advisor, PIMCO Europe Limited ("PEL"), were well aware of allegations that RMBS sponsors, depositors and originators had made false R&Ws and failed to deliver complete mortgage/collateral files, and that servicers were allegedly "robo-signing" missing foreclosure related documents and engaging in other alleged misconduct after borrower defaults.  *Infra* § II.B.5.  In May 2012, several Plaintiffs, at EAA's direction, sought to recover RMBS losses by suing RMBS sponsors, depositors and underwriters based on allegations that, *inter alia*, the depositors/sponsors/originators had made false R&Ws and/or failed to deliver complete mortgage/collateral files.  ¶ 60.4.7.

In December 2014—while those lawsuits were pending—Plaintiffs, at EAA's direction, commenced actions seeking to recover the same alleged RMBS losses from Defendant and other RMBS trustees.  ¶ 60.4.8.  In this action (as in their other trustee actions), Plaintiffs allege that (i) sponsors, depositors and originators made false R&Ws and failed to deliver complete mortgage/collateral files;[10] and (ii) servicers breached their duties by failing to give notice of the R&W breaches, failing to address incomplete loan files and instead "robo-signing" missing documents, and engaging in schemes to "cheat[] borrowers and the Covered Trusts after default

---

[10] The Court has already held that Plaintiffs' pre-EOD "[c]laims for document delivery failures are barred by the statute of limitations," which includes claims relating to R&Ws by sponsors/originators concerning the delivery of complete mortgage/collateral files.  *See Phoenix v. DB*, 172 F. Supp. 3d at 709.  In any event, to the extent Plaintiffs somehow still attempt to assert such claims, they fail for at least three independently sufficient reasons:  they are time-barred, Plaintiffs abandoned them (ECF No. 40 at 12-15), and Plaintiffs lack supporting evidence.

[by borrowers on the underlying loans]." *See generally* TAC. Plaintiffs assert that Defendant violated contractual, tort and, with respect to the five Indenture Trusts, Trust Indenture Act ("TIA") duties by failing to investigate, give notice of, and cause the responsible parties to remedy, these alleged breaches. TAC ¶¶ 168-205. As demonstrated below, Defendant is entitled to summary judgment on all these claims.

## LEGAL STANDARD

"Summary judgment is appropriate if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Simon v. City of N.Y.*, 893 F.3d 83, 91-92 (2d Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). However, "where the burden of proof at trial would fall on the nonmoving party, the moving party can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

As courts, including this one, have consistently recognized, the Second Circuit has held that to prevail on claims against an RMBS trustee like those asserted here, a plaintiff must prove the trustee's alleged misconduct "loan-by-loan and trust-by-trust." *E.g.*, *Phoenix v. DB*, 172 F. Supp. 3d at 713 (quoting *PABF v. BNYM*, 775 F.3d at 162). Thus, to survive summary judgment, "plaintiffs cannot rely on generalized proof;" rather "[p]laintiffs must prove that they have evidence to support their claims loan-by-loan and trust-by-trust." *Phoenix v. BNYM*, 2017 WL 3973951 at *8-9.

## ARGUMENT

## I.  PLAINTIFFS LACK STANDING TO ASSERT CERTAIN CLAIMS

### A.  Plaintiffs Lack Standing to Assert Claims as to the Sold Certificates

Six of the Certificates were sold from the relevant WestLB securitizations before Plaintiffs commenced this action (such Certificates, the "Sold Certificates").  ¶ 39.  None of the buyers agreed that the relevant indenture trustees or Plaintiffs would retain litigation claims that may have arisen before the sale.  ¶ 40.  Thus, to survive summary judgment, Plaintiffs must come forward with evidence showing that—notwithstanding the absence of an agreement with the buyers—the relevant indenture trustees or Plaintiffs retained litigation claims relating to the Sold Certificates. Plaintiffs cannot do so.

"There is no uniform law controlling the assignment of the accompanying litigation rights when [RMBS] certificates are transferred."  *Royal Park Invs. SA/NV v. U.S. Bank N.A.*, 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018).  For example, under New York General Obligations Law § 13-107(1), unless the parties agree otherwise, any claims against a trustee that accrued while a seller held the certificates are automatically transferred to the buyer.  *See Okla. Police Pension & Ret. Sys. v. U.S. Bank N.A.*, 986 F. Supp. 2d 412, 417-18 (S.D.N.Y. 2013) (Koeltl, J.) (granting summary judgment for trustee on claims brought by former holder based on N.Y. Gen. Oblig. Law § 13-107).  When determining the jurisdiction whose law governs a sale, New York courts apply a "grouping of contacts" analysis to determine "which [jurisdiction] has 'the most significant relationship to the transaction and the parties.'"  *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994).  To perform the analysis, courts examine many factors, including:  (i) the place of contracting; (ii) the place of negotiation; (iii) the place of performance; (iv) the location of the subject matter; and (v) the domicile or place of business of the contracting parties. *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394, 2017 WL 1331288, at

*7 n.8 (S.D.N.Y. Apr. 4, 2017).  Plaintiffs have no evidence on these factors.  ¶ 41.

Indeed, although this case is nearly four years old and fact discovery is complete, <u>Plaintiffs do not know who bought the Sold Certificates</u>.  ¶¶ 41.1-41.2; *cf. Royal Park Invs.*, 2017 WL 1331288, at *6 (describing how RMBS are "traded over-the-counter among entities located in … different countries through geographically dispersed broker-dealers located in various parts of the world").  Plaintiffs did not seek that information in discovery.

Without at least evidence of who bought the Sold Certificates and where they were domiciled, Plaintiffs cannot show what law governs those sales, let alone that they were governed by the laws of a jurisdiction pursuant to which litigation claims are not automatically transferred to the buyer.  *See Racepoint Partners, LLC v. JPMorgan Chase Bank*, 06-cv-2500, 2006 WL 3044416, at *4 (S.D.N.Y. Oct. 26, 2006) (dismissing action because allegations insufficient to show whether New York law governed transfers).  Thus, the Court should grant Defendant summary judgment on all claims relating to the Sold Certificates. *See Hurley v. Tozzer, Ltd.*, No. 15 Civ 2785, 2018 WL 1087946, at *3 (S.D.N.Y. Feb. 26, 2018) (Daniels, J.) (granting defendant's motion for summary judgment because "[p]laintiff has not presented evidence . . . sufficient to raise a triable issue of fact as to his standing . . . ."); *cf. Yeager v. Fort Knox Sec. Prods.*, 672 F. App'x 826, 831 (10th Cir. 2016) (granting defendant's motion for summary judgment and rejecting plaintiff's argument that its assignment was limited and it retained certain rights:  "To prevent summary judgment, he must go beyond this bare assertion and cite actual evidence in the record supporting this statement.  He fails to do so here . . . .").

### B.   <u>Plaintiffs Also Lack Standing as to Certain Other Certificates</u>

No Plaintiff has standing to assert claims relating to the Certificate on Ex. 28 because Plaintiffs have no evidence that Certificate was ever held by a Plaintiff or in any WestLB securitization.  To the extent a Plaintiff claims it was assigned litigation claims relating to that

Certificate, any such assignment is void because it was champertous under New York Judiciary Law § 489. *See Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 170-71 (2016).

In addition, Plaintiffs have no standing to assert claims relating to the Certificates on Ex. 74 because the relevant GA provides that holders of those Certificates have no right to bring claims absent consent from the insurance company that guaranteed payments on those Certificates, and Plaintiffs have no evidence that the insurer authorized the claims asserted herein.  ¶¶ 43-44.

## II.   MOST OF PLAINTIFFS' CLAIMS ARE TIME-BARRED

Under New York's borrowing statute, CPLR § 202, Plaintiffs were required to file their claims "within the shorter of either: 1) the New York statute of limitations; or 2) the statute of limitations in the jurisdiction in which the claim accrued." *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 467 (S.D.N.Y. 2017) (Koeltl, J.) ("*Commerzbank v. DB*"). Most of Plaintiffs' claims are time-barred under one or both of those statutes of limitations.

### A.   Applicable Filing Dates for Plaintiffs' Claims

Plaintiffs have filed four complaints in this action:  (i) the original complaint on December 23, 2014 asserting claims relating to 35 Certificates; (ii) the First Amended Complaint ("FAC") on April 10, 2015 adding new claims relating to 52 more Certificates issued by different Trusts and governed by different GAs than the Certificates in the original complaint; (iii) the Second Amended Complaint ("SAC") on July 15, 2015 for the first time asserting standing based on the assignments from the indenture trustees; and (iv) the TAC on September 28, 2017 for the first time asserting new claims concerning certain EODs that were declared before the original complaint.

In the original complaint, the FAC and the SAC, Plaintiffs alleged that (i) based on widespread allegations of R&W breaches, Defendant had, and breached, duties to investigate whether there were R&W breaches in the Trusts and to declare EODs in every Trust, and (ii) based on widespread allegations that servicers were (a) failing to address incomplete mortgage/collateral

-14-

files and instead "robo-signing" missing loan documents to foreclose on mortgaged properties and (b)  engaging in other misconduct, Defendant had, and breached, a duty to declare EODs in every Trust.  *See generally* SAC.  The earliest operative date for measuring the timeliness of claims purportedly arising from those allegations is (i) December 23, 2014 for claims relating to the 35 Certificates asserted in the original complaint and (ii) April 10, 2015 for claims relating to the 52 additional Certificates first asserted in the FAC.  *See In re Rationis Enters., Inc. of Pan.*, 45 F. Supp. 2d 365, 367 (S.D.N.Y. 1999) (dismissing claims as time-barred because "[t]he fourth [contract] is a separate transaction which does not arise out of the same transaction asserted in [plaintiff]'s timely claims and therefore does not relate back under Rule 15(c)"). [11]

In the September 2017 TAC, Plaintiffs added new claims based on new allegations that Defendant breached its post-EOD duties arising from the following EODs that Defendant had declared before Plaintiffs filed the original complaint.  TAC ¶ 147.  First, between 2009 and 2011, Defendant notified investors that EODs occurred in 11 Trusts (affecting 34 Certificates) because losses or delinquencies on loans in the Trusts had exceeded the contractually specified threshold (the "Loss EODs").  ¶ 78.  Second, in 2012, Defendant notified investors that EODs occurred in two Trusts (affecting five Certificates) because a rating agency downgraded the ratings of one of those Trusts' loan servicers, Ocwen Loan Servicing LLC (the "2012 Downgrade EODs").  ¶¶ 73, 118.  In 2014, Defendant notified investors that a second EOD occurred in those two Trusts because Ocwen's ratings were downgraded by other rating agencies (the "2014 Downgrade EODs" and, with the Loss EODs and the 2012 Downgrade EODs, the "Declared EODs").  ¶ 118.

These new claims concerning Declared EODs do <u>not</u> relate back to the earlier pleadings

---

[11] For purposes of this motion only, Defendant assumes that the assignments resulted in Plaintiffs having standing and that the assigned claims first asserted in the SAC relate back to the earlier pleadings.

because those pleadings did not put Defendant on notice of any claims relating to the Declared EODs. *See*, *e.g.*, *Espinosa v. Delgado Travel Agency, Inc.*, No. 05 Civ. 6917, 2006 WL 2792689, at *3 (S.D.N.Y. Sept. 27, 2006) (no relation back where amended pleading contains "new factual allegations" that "focus on events, dates, and people that were never mentioned in the original complaint."); *see also Goldman v. Barrett*, 733 F. App'x 568, 570 (2d Cir. 2018) (affirming dismissal, "[a]n amendment will not relate back if it sets forth a new set of operational facts; it can only make more specific what has already been alleged.").

**B.      Claims Relating to the Certificates in the Securitization Involving Plaintiff Phoenix Light SF DAC Are Untimely Under German Law**

The asset portfolio for the securitization involving Plaintiff Phoenix Light SF DAC ("Phoenix") contains approximately $495 million original par amount of the Certificates at issue (the "Phoenix Certificates"). ¶ 45.  As demonstrated below, with the exception of the newly added claims arising from the 2014 Downgrade EODs, all claims relating to the Phoenix Certificates are time-barred under Germany's 3-year statute of limitations.

**1.      Claims Relating to the Phoenix Certificates Accrued in Germany**

For purposes of the borrowing statute, a cause of action typically accrues at the place of injury.  *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999).  The key question in this analysis is "who became poorer and where did they become poorer."  *Appel v. Kidder, Peabody & Co.*, 628 F. Supp. 153, 156 (S.D.N.Y. 1986).  Where a cause of action accrues to one person and then is assigned to another, the New York borrowing statute analysis looks to the statute of limitations of the jurisdiction where the claim accrued to the assignor.  *See Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010).  And, if the cause of action accrued to a trustee and all the trust beneficiaries reside in a single jurisdiction, then that jurisdiction is the place where the claims accrued, because that is the place where the economic injury is felt.  *Appel*, 628 F. Supp.

-16-

at 156.   Here, the claims asserted by Phoenix clearly accrued in Germany.

Like all Plaintiffs, Phoenix's story begins with the failed German bank WestLB.  When the financial crisis started to unfold in late 2007, the severe decline in the value of RMBS certificates and other asset classes held by WestLB jeopardized its ability to meet its regulatory capital requirements.  ¶¶ 48-49.  In an attempt to stabilize WestLB, its owners (all German governmental entities and state-sponsored financial institutions) agreed to provide a EUR 5 billion "risk shield" to insulate WestLB from expected losses on its RMBS and other high risk assets.  ¶¶ 47, 50.  Phoenix was the SPE formed to facilitate the "risk shield."  ¶ 51.  Specifically:

- WestLB formed Phoenix.  ¶ 51.1.

- WestLB caused a portfolio of its distressed assets (including Phoenix Certificates) with a nominal value of approximately EUR 23 billion to be transferred to Phoenix, which simultaneously issued notes to WestLB and transferred the asset portfolio to an indenture trustee[12] to hold for the benefit of the sole noteholder, WestLB.  ¶ 51.2.

---

[12] Phoenix transferred to the indenture trustee "all of [Phoenix's] right, title and interest in and to [the securitized asset portfolio (including the Phoenix Certificates)] whether now owned or existing or hereafter arising or acquired."  Ex. 96 at PL_DB007912401–402 (Phoenix Security Agreement).  The Second Circuit has held that such clauses effect a "complete transfer" to an indenture trustee and thus any claims relating to RMBS certificates in the securitized asset portfolio are held by the indenture trustee in trust for the trust beneficiaries.  *See*, *e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*, 898 F.3d 243, 253 (2d Cir. 2018) (affirming dismissal of claims by securitization SPE for lack of standing because "[the indenture trustee] currently holds the RMBS Trust certificates and any claims based on those certificates"); *Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*, No. 16 Civ. 1597, 2018 WL 1417850, *4 (S.D.N.Y. Mar. 8, 2018) (dismissing claims by SPE for lack of standing), *aff'd*, 741 F. App'x 857 (2d Cir. 2018); *see also*

- The notes issued to WestLB were entitled to receive cash flows generated by the asset portfolio held by the indenture trustee.  ¶ 51.3.

- The German entities that owned WestLB provided a EUR 5 billion guarantee (the "risk shield") on the notes held by WestLB; thereby insulating WestLB from the first EUR 5 billion of losses on the underlying distressed asset portfolio.  ¶ 51.4.

- WestLB appointed PEL as collateral manager of the securitized asset portfolio.  ¶ 51.5.  As the parties with the economic interest, WestLB and its German owners had various rights concerning the management of the asset portfolio.  ¶ 51.6.

The WestLB risk shield transaction closed in March 2008.  ¶ 52.  The European Commission, which supervises EU banks, determined that the risk shield constituted state aid from the German government to WestLB and ultimately required that WestLB be wound up.  ¶ 53.

In December 2009, the German government established EAA "to take over and dispose of or wind up assets, liabilities and other risk exposures of WestLB AG."[13]  ¶ 54.  The assets that WestLB transferred to EAA included the Phoenix notes.  ¶ 55.  EAA recognized that "[a]s the owner of the Phoenix notes, the EAA alone bears the economic risk of [the securitized asset portfolio (including the Phoenix Certificates)] in the event that the actual losses exceed the [EUR 5 billion risk shield] provided by the [German] federal state and the savings banks."  ¶ 58.  Thus, at all times, any losses on the securitized asset portfolio held by the Phoenix indenture trustee were borne by German entities located in Germany (*i.e.*, WestLB/EAA, as sole noteholder, and their

---

*Phoenix v. USB*, 2015 WL 2359358, at *2 (dismissing pre-assignment claims brought by Phoenix for lack of standing).  DBTCA is the indenture trustee for the Phoenix securitization.  ¶ 38.2.

[13] EAA is owned by the same German entities that owned WestLB and arranged the risk shield.  ¶ 57.  EAA, like WestLB, is based in Dusseldorf, Germany.  ¶¶ 46, 56.

owners, as guarantors).  ¶ 59.  After EAA caused Phoenix to commence this lawsuit, the indenture

trustee, at EAA's direction, assigned claims asserted herein to Phoenix.  ¶ 60.4.9.

Thus, under New York's borrowing statute, claims relating to the Phoenix Certificates

accrued in Germany because they accrued to the Phoenix indenture trustee, and the trust

beneficiaries reside in Germany. *See Appel*, 628 F. Supp. at 156.[14]

### 2. Germany's 3-year statute of limitations begins to run at the end of the year when the plaintiff either knew, or in the absence of gross negligence would have known, of the facts underlying its claims

Under German law, all claims relating to the Phoenix Certificates are governed by a 3-year

limitations period, which "begins to run at the end of the calendar year in which 1) the claim arose

and 2) the plaintiff either has knowledge of the circumstances giving rise to the claim and the

identity of the defendant, or would have had such knowledge but for gross negligence."

*Commerzbank v. DB*, 234 F. Supp. 3d  at 472 (quoting *IKB Deutsche Industriebank AG v. McGraw

Hill Fin., Inc.*, 634 F. App'x 19, 22 (2d Cir. 2015)).  "[T]he standard requires that the plaintiff

possess sufficient information to 'be able to formulate a consistent and coherent statement of the

claim.'"  *Id.*  Thus, to trigger the running of the German statute of limitations, "a plaintiff need not

know [(or be grossly negligent in failing to know)] all the relevant details or have conclusive proof

available; knowledge of the factual circumstances underlying the claim [(or gross negligence in

---

[14] Defendant expects that Phoenix may contend that the claims relating to the Phoenix Certificates belonged to it, and not the indenture trustee, and thus, those claims accrued in the tax neutral jurisdiction where Phoenix was formed.  As shown above, that argument is baseless.  But, even if Phoenix had held the claims, they still would have accrued in Germany for purposes of the borrowing statute because that was clearly where any alleged injury was felt.  *See, e.g., Lang v. Paine, Webber, Jackson & Curtis, Inc.*, 582 F. Supp. 1421, 1426 (S.D.N.Y. 1984).

failing to have such knowledge)] is sufficient." *Id.*

Here, Phoenix is a shell company with no employees, and all decisions concerning the asset portfolio held in trust by the Phoenix indenture trustee were made by PEL, as collateral manager, WestLB and later EAA, as sole noteholder, and the owners of WestLB/EAA, as guarantors (collectively, the "PL Advisors").   ¶¶ 37, 60.  The knowledge of the PL Advisors can be imputed to the underlying investment vehicle for statute of limitation purposes.  *See, e.g., In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. (Silver Elms CDO v. Bank of Am. Corp.)*, No. 2:11-ML-02265-MRP, 2014 WL 3529686, at *5 (C.D. Cal. July 14, 2014) (imputing knowledge of collateral manager to SPE Plaintiff); *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255-56 (2d Cir. 1995) (knowledge of "sole shareholder or controlling person of a corporation is imputable to that corporation"); *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012) (imputing investment adviser's knowledge to funds).

Claims concerning the Phoenix Certificates are time-barred under German law because the PL Advisors had (or were grossly negligent in failing to have) knowledge of the factual circumstances underlying (i) all claims asserted in the SAC and concerning the Loss EODs before January 1, 2011 (*i.e.*, beginning of the third calendar year before the original complaint was filed),[15] and (ii) all claims concerning 2012 Downgrade EODs before January 1, 2014 (*i.e.*, beginning of the third calendar year before the TAC was filed).

---

[15] As Phoenix first asserted claims concerning $255 million of the $495 million Phoenix Certificates in the FAC and claims concerning Loss EODs in the TAC, those claims are untimely if the PL Advisors had the requisite knowledge before January 1, 2012 and January 1, 2014, respectively.  In any event, the evidence shows the PL Advisors had the requisite knowledge by January 1, 2011 and thus, those claims were untimely when Plaintiffs filed the original complaint (and certainly when they filed the FAC and the TAC).

Plaintiffs contend that Defendant's alleged breaches caused "hundreds of millions of dollars in damages."  TAC ¶ 15.  According to Plaintiffs, the losses supposedly caused by Defendant's alleged breaches include losses due to the decline in market value of the Certificates, and all realized, and projected future, losses of principal and interest on the Certificates.  ¶ 61.  The PL Advisors knew of these losses before January 1, 2011—indeed, by the end of 2010, the PL Advisors knew that (i) ████████████████████████████████████████████████ ████████; (ii) there were a significant amount of delinquent and defaulted mortgage loans in every Trust; (iii) there were realized losses on many of the Phoenix Certificates; and (iv) future losses were projected, ████████████████████ and/or the major rating agencies, on all the Phoenix Certificates.  ¶ 62.

And Plaintiffs' complaint, itself, demonstrates that Phoenix could have "formulate[d] a consistent and coherent statement of [its] claim" before January 1, 2011 because most allegations are based on news articles, lawsuits, and government investigations that were publicly available before January 1, 2011.  ¶¶ 66.15, 67.8.  Indeed, in 2011, some investors commenced actions against RMBS trustees based on the same types of allegations made in this action (*i.e.*, based on widespread allegations, the trustee was supposedly required to take action).[16]  ¶¶ 76-77.

Thus, because the PL Advisors knew of the losses on the Phoenix Certificates and could have formulated a coherent statement of claims against Defendant before 2011, the only remaining question is whether—by January 1, 2011—the PL Advisors also knew (or were grossly negligent in failing to know) of the factual circumstances underlying the purported breaches that Plaintiffs now allege caused losses on the Certificates.  As demonstrated below, the answer is clearly yes.

---

[16] The court granted the trustee summary judgment in one of those actions, two were voluntarily dismissed, and one is still pending in New York state court (although most claims have been dismissed).  ¶ 76.

### 3. Germany's statute of limitations requires a plaintiff to investigate its potential claims

As set forth in the Affidavit of Prof. Dr. Mathias Rohe submitted herewith ("Rohe Aff."), Germany's statute of limitations imposes an affirmative duty on a plaintiff to investigate its potential claims. *See* Rohe Aff. ¶¶ 45-48.[17]  This duty is triggered when (i) the plaintiff is presented with evidence, including circumstantial evidence, that suggests a potential claim; (ii) there is a readily available means of gaining further information regarding the claim; and (iii) the investigation would yield sufficient information to state the claim and could be conducted without disproportionate cost. *Id.*  Once this duty has been triggered, the plaintiff must consult sources of relevant information that are reasonably available to it. *Id.*  Where the plaintiff is a sophisticated investor, German law imposes a heightened duty to investigate. *Id.* Similarly, as the value of the potential claims increases, so does the thoroughness of the investigation the plaintiff is obligated to perform. *Id.*

Here, there can be no reasonable dispute that the PL Advisors are sophisticated.  ¶ 63. Furthermore, this action seeks to hold Defendant responsible for "hundreds of millions dollars in damages."  TAC ¶ 15.  As set forth below—before 2011—the PL Advisors knew Defendant was not taking the actions Phoenix now alleges were required.  ¶¶ 66-69.  And, to the extent Phoenix disingenuously contends otherwise, its claims are still untimely because the PL Advisors easily could have confirmed Defendant was not taking those actions by simply asking.  ¶¶ 65, 66.17, 67.12, 71, 75.

---

[17] The Rohe affidavit addresses the German law relevant to this motion.  *See* Fed. R. Civ. P. 44.1

**4.    The evidence establishes that the PL Advisors knew, or were grossly negligent in failing to know, of the factual circumstances underlying Defendant's alleged breaches before the German limitations cut-off**

The evidence and Plaintiffs' own allegations conclusively establish that before 2011 (and 2014 for the 2012 Downgrade EODs), the PL Advisors knew, or were grossly negligent in failing to know, of the factual circumstances underlying Defendant's purported breaches.  They fall into three categories.

a.    Purported breaches arising from allegations of false R&Ws

Plaintiffs allege that "[b]eginning in 2009 or 2010, facts began to emerge publicly demonstrating that Sponsors and Originators had violated [R&Ws] provided in connection with the Covered Trusts. . . [h]aving caught wind of the problem, [Defendant] had statutory and common law duties requiring them to 'nose to the source' [(*i.e.*, investigate)]" and put back any defective loans.  TAC ¶ 100-01, 111-17, Ex. F.  Similarly, Plaintiffs contend that the high rate of defaults on loans in the Trusts and the rating downgrades on the Certificates triggered an obligation on Defendant to "carefully investigate[] these issues . . . and take[] action to address these issues." *Id.* ¶ 109-10.  Plaintiffs also assert that, in light of the allegations of widespread R&W breaches, Defendant was required to declare EODs in every Trust.  *Id.* ¶¶ 118-19, 137-41.

The record is clear that, before 2011, the PL Advisors were aware of the allegations of widespread R&W breaches, the defaults in the Trusts and the rating downgrades on the Certificates.  ¶¶ 62, 66.  Indeed, Plaintiffs have stated that by "late September 2010," they believed Warrantors "knowingly included large numbers of [] defective loans" in RMBS offerings that breached R&Ws.  ¶ 66.7.[18]  The record is equally clear that, before 2011, the PL Advisors knew

---

[18] According to Plaintiffs, there were pre-2011 government reports, lawsuits and news articles regarding allegations of widespread R&W breaches.  TAC ¶¶ 100, 114, Ex. F.  In addition, the defaults were reported

that—absent direction from the contractually specified percentage of investors—Defendant was neither investigating R&W breaches nor pursuing repurchase actions against Warrantors. ¶¶ 66.10-66.14.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████   ¶¶ 66.8-66.13.  And every month investors received remittance reports, which disclosed that virtually no loans had been repurchased by Warrantors.   ¶ 66.14.   Finally, to the extent Plaintiffs disingenuously claim the PL Advisors did not know that—absent investor direction—Defendant was neither investigating whether loans breached R&Ws nor pursuing repurchase actions, they could have confirmed that was the case by simply asking Defendant.  ¶¶ 66.16-66.17.

The PL Advisors also clearly knew that Defendant had not declared any EODs relating to alleged R&W breaches, because neither Defendant nor any other deal party ever notified investors that any such EOD had occurred.  ¶¶ 66.18-66.19.  Thus, the evidence shows that before 2011, the PL Advisors knew, or were grossly negligent in not knowing, of the factual circumstances underlying Defendant's purported breaches relating to alleged R&W breaches.

    b. <u>Purported breaches arising from allegations of incomplete mortgage files, servicer robo-signing and other misconduct</u>

Plaintiffs contend that—due to widespread allegations that servicers (i) "failed to . . . cause the repurchase or substitution of loans with incomplete documentation" and instead "fabricated

---

in the monthly remittance reports sent to investors and the rating agencies publicly announced the downgrades. Ex. 61; ¶ 62.

the documents necessary to foreclose" (*i.e.*, "robo-signing") and (ii) were "cheat[ing] borrowers and the Covered Trusts after default [by borrowers on the loans]," including by not properly maintaining homes that the servicers had foreclosed upon (such homes, "REO properties")—Defendant was required to declare EODs.  TAC ¶¶ 121-41, 148-53, Exs. G-H.  The record is clear that, before 2011, the PL Advisors were aware of these allegations.  ¶ 67.  This is not surprising as Defendant notified investors of them in October 2010.  ¶ 67.5.  Specifically, Defendant sent memoranda to servicers of RMBS trusts, including the Trusts, in August 2007, July 2008 and October 2010 regarding the widespread allegations of robo-signing, inadequate REO property maintenance and/or other post-borrower default servicer conduct. ¶ 67.5.2.  <u>On October 25, 2010, Defendant sent a notice to investors in RMBS trusts, including the Trusts, advising them of the servicing allegations and attaching the three memoranda Defendant had sent to servicers.</u>  ¶ 67.5. Defendant also posted that notice, with all attachments, on its investor reporting website where it has remained available for review by investors ever since.  ¶¶ 67.5.4-67.5.5.  The October 25, 2010 notice expressly informed investors that if they wanted Defendant to take any action concerning the servicing allegations (*e.g.*, investigate), they should direct Defendant to do so in accordance with the GAs. ¶ 67.5.3.[19]

And the PL Advisors clearly knew that Defendant had not declared any EODs relating to the alleged servicing misconduct, because neither Defendant nor any other deal party ever notified investors that any such EOD had occurred.  ¶ 68.  Accordingly, the evidence shows that before 2011, the PL Advisors knew, or were grossly negligent in not knowing, of the factual

---

[19] According to Plaintiffs, allegations concerning robo-signing and the other purported servicing issues were also publicly disclosed before 2011 in government reports, lawsuits and press coverage.  TAC ¶¶ 123-24, 152-53, Ex. G-H; *see also* ¶ 67.9.

circumstances underlying Defendant's purported breaches relating to allegations of incomplete mortgage loan files, servicer robo-signing and other post-borrower default misconduct.

<blockquote>
c.   <u>Purported breaches arising from the Loss EODs and 2012 Downgrade EODs</u>
</blockquote>

Following the occurrence of each Declared EOD, Defendant informed investors that they could direct Defendant to take further action with respect to the EOD.   ¶¶ 69, 73, 78.   Although there is no evidence that any investor informed Defendant that it disagreed with Defendant's decisions to seek investor direction with respect to the Declared EODs (¶¶ 71-72, 75), Plaintiffs now allege those decisions breached Defendant's post-EOD "prudent person" duty.  TAC ¶¶ 147, 174.   Specifically, Plaintiffs now contend that, as a result of each Declared EOD and without any investor approval, Defendant purportedly had, and breached, a duty to expend significant Trust funds to (i) investigate each servicer and then "provide notice of and take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards" and (ii) investigate all defaulted loans in the Trust to "determine[] whether a responsible party was required to repurchase such loans" and, with respect to any defective loan uncovered by the investigation, "enforce the repurchase obligations of the Sponsors and/or Originators."   TAC ¶¶ 118, 174, 182.

Defendant notified investors of the two Loss EODs concerning Phoenix Certificates in November 2009 and March 2010, respectively.  ¶ 69.  The EOD notices, themselves, indicated that Defendant was not taking further action absent investor direction.  *Id.*  Even putting that aside, the record is clear—as set forth above—that the PL Advisors knew, or were grossly negligent in not knowing, that after the Loss EODs Defendant was not investigating alleged R&W breaches or servicing conduct absent a direction from the contractually specified percentage of investors. Again, if they were unsure, the PL Advisors could have simply asked Defendant.  ¶¶ 65, 66.17,

67.12, 71, 75.  Thus, there can be no reasonable dispute that before 2011, the PL Advisors knew, or were grossly negligent in not knowing, that as a result of the Loss EODs, Defendant was not taking the actions Plaintiffs now assert were required.  For the same reasons, before 2014, the PL Advisors knew, or were grossly negligent in not knowing, that Defendant did not take those actions after the 2012 Downgrade EOD relating to a Phoenix Certificate.  ¶ 74.

Accordingly, with the exception of the claims concerning the 2014 Downgrade EODs, all claims relating to the Phoenix Certificates are time-barred.  *See, e.g.*, *IKB*, 634 F. App'x at 22 (affirming dismissal of claims as untimely under German law); *In re Countrywide,* 2014 WL 3529686, at *5 (C.D. Cal. July 14, 2014) (dismissing claims as untimely under German law based on knowledge of collateral manager); Rohe Aff. ¶¶ 38-44, 54.[20]

### C.   Many of Plaintiffs' Claims Are Also Untimely Under New York Law

Many of Plaintiffs' claims are also untimely under New York's six-year statute of limitations, which begins to run on the date of alleged breach.[21]

### 1.   Claims that Defendant breached its post-EOD duties relating to the Loss EODs are time-barred under New York law

Plaintiffs' claims relating to the Loss EODs, which were first asserted in the TAC, are untimely under New York law because those claims accrued before September 28, 2011 (*i.e.*, more than 6 years before the TAC).  Plaintiffs contend Defendant breached its prudent person duty

---

[20] Defendant reserves the right to demonstrate that the claims asserted by the non-Phoenix Plaintiffs are time-barred under the laws of the jurisdictions where those claims accrued.

[21] New York's statutes of limitations for Plaintiffs' claims are: (i) six years for breach of contract (N.Y. C.P.L.R. § 213(2)) and violation of the TIA (*Cruden v. Bank of N.Y.*, 957 F.2d 961, 967 (2d Cir. 1992)); and (ii) three years for breach of fiduciary duty (*IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132 (2009)) and negligence (N.Y. C.P.L.R. § 214(4)).

arising from the Loss EODs by deciding to seek investor direction before taking further action with respect to those EODs.  Defendant notified investors of the Loss EODs between March 2009 and March 2011, and its decision to seek investor direction as to each Loss EOD was reflected in those notices.  ¶ 78.  Accordingly, as Defendant's alleged breaches relating to the Loss EODs occurred before September 2011, Plaintiffs' claims based on those purported breaches are time-barred under New York law.  *See Phoenix v. DB*, 172 F. Supp. 3d at 708 (dismissing claims as time-barred).

> ## 2. Claims that Defendant breached its pre-EOD duties relating to certain alleged R&W breaches are time-barred under New York law

On occasion, Defendant received letters from other parties identifying specific loans in a Trust that allegedly breached one or more R&Ws (the "Alleged R&W Loans").  ¶ 79.  Plaintiffs contend that Defendant breached its contractual duties following its receipt of those letters.  Those claims are meritless.  *See infra* § VII.  And many are also time-barred under both German law (*see supra* § II.B) and, as set forth below, New York law.

Defendant received notice of (i) the Alleged R&W Loans on Reyes Ex. I that were held in Trusts identified in the original complaint before December 23, 2008 (*i.e.*, 6 years before the original complaint), and (ii) the Alleged R&W Loans on Reyes Ex. I that were held in Trusts first identified in the FAC before April 11, 2009 (*i.e.*, 6 years before the FAC).  Accordingly, any claim that Defendant breached its pre-EOD contractual duties to give notice of those Alleged R&W Loans or take enforcement action with respect thereto is time-barred under New York law.  *See Fixed Income*, 314 F. Supp. 3d at 558 ("Plaintiffs' claims would be time barred if [the trustee] acquired knowledge of the alleged [R&W] breaches . . . six years before they filed their

Complaint").[22]

### III. PLAINTIFFS' CLAIMS THAT DEFENDANT BREACHED ITS DUTIES BY NOT PURSUING REPURCHASE CLAIMS AGAINST THE BANKRUPT WARRANTORS FAIL

RMBS trustees cannot be liable for failing to enforce R&W claims if the Warrantor filed for bankruptcy more than six years before plaintiff sued, because (i) any claims premised on trustee discovery of R&W breaches *before a bankruptcy bar date* would be time-barred under New York's 6-year contract statute of limitations, and (ii) the trustee would have been precluded from pursuing R&W breaches it discovered *after a bankruptcy bar date*, making it impossible to prove breach, causation, or damages for the trustee's failure to act. *See Fixed Income*, 314 F. Supp. 3d at 557–58; *BlackRock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-9367 (S.D.N.Y. Feb. 16, 2017), ECF No. 215; *Phoenix v. DB*, 172 F. Supp. at 707-08.  Here, each of the eleven Warrantors on Ex. 31 filed for bankruptcy more than six years before this case was filed on December 23, 2014 (¶ 82), and therefore claims that Defendant failed to enforce R&W breaches against those Warrantors fail.

Moreover, Plaintiffs cannot escape these limitations by challenging Defendant's handling of R&W claims asserted in the bankruptcies.  Claims challenging the sufficiency of proofs of claim that Defendant filed before the 2007-2008 bankruptcy bar dates (see Ex. 31) would be time-barred,

---

[22] Plaintiffs have made clear to both the Court and Defendant that their "claims arise out of Deutsche Bank's breaches that occurred *after* Plaintiffs acquired the relevant certificates."  ECF No. 139 (emphasis in original).  This precludes Plaintiffs from asserting any claims that purportedly accrued before the Certificates were transferred to Plaintiffs.  *See, e.g., In re NXXI Inc.*, 216 F. Supp. 3d 381, 399 (S.D.N.Y. 2016) (Karas, J.) (holding that abandonment discontinues claims); *In re Wireless Tel. Servs. Antitrust Litig.*, No. 02 CIV.2637, 2004 WL 2244502, at *6-7 (S.D.N.Y. Oct. 6, 2004).

and claims challenging Defendant's decisions to settle those bankruptcy claims necessarily would be based upon speculative evidence, and would be insulated from challenge because approved by a bankruptcy court. *See Fixed Income*, 314 F. Supp. 3d at 559-60.

## IV.   PLAINTIFFS' CLAIMS THAT DEFENDANT BREACHED ITS DUTIES BY NOT PURSUING PREVIOUSLY SETTLED REPURCHASE CLAIMS FAIL

The two Trusts on Ex. 64 and the three Trusts on Ex. 77 contain loans originated by Fremont Investment & Loan ("Fremont"). ¶ 83. On June 18, 2008, Fremont's parent company filed for bankruptcy. ¶¶ 83-85.

With respect to the two Trusts on Ex. 64, any claims that Defendant breached its duties by not pursuing repurchase claims against Fremont fail as a matter of law because on July 17, 2008, Defendant and Fremont entered into a settlement agreement pursuant to which Defendant released any such claims. ¶ 84. That settlement was approved by investors holding more than 66 2/3% of the voting rights in those Trusts, and the GAs for those Trusts state that Defendant shall not be liable for any action taken or omitted by it in good faith at the direction of investors holding at least 51% of the voting rights. *Id.* In addition, any claim concerning the settlement is time-barred under New York law because it occurred in 2008, more than 6 years before the original complaint.

With respect to the three Trusts on Ex. 77, any claims that Defendant breached its duties by not pursuing repurchase claims against Fremont fail as a matter of law because on March 24, 2010, the bankruptcy court approved and ordered stipulations pursuant to which Defendant settled any such claims. ¶ 85. The bankruptcy court held that the settlements were "fair and reasonable to all interested parties," including "Certificateholders." *Id.*

Thus, summary judgment should be granted on claims that Defendant breached its duties by not pursuing repurchase claims for Trusts on Exs. 64 and 77.

## V.   PLAINTIFFS' CLAIMS THAT DEFENDANT BREACHED ITS DUTIES BY NOT PURSUING TIME-BARRED REPURCHASE CLAIMS FAIL

It is well settled that claims by an RMBS trustee against warrantors relating to R&W breaches accrue on the closing date of the RMBS transaction.  *See Deutsche Bank Nat'l Tr. Co. v. Flagstar Capital Mkts. Corp.*, No. 96, 2018 WL 4976777, at *3, 7-8 (N.Y. Oct. 16, 2018).  New York's First Department has held that, under New York's borrowing statute, claims asserted by DBNTC, as RMBS trustee, against a warrantor must be timely under California's 4-year statute of limitations.[23]  *See Deutsche Bank Nat'l Trust Co. v. Barclays Bank PLC*, 66 N.Y.S.3d 472, 474 (1st Dep't 2017), *appeal filed*.  Accordingly, any claims that DBNTC breached its duties by not pursuing repurchase claims after the fourth anniversary of a Trust's closing date fail.

In particular, all claims that DBNTC breached its duties by not pursuing repurchase claims with respect to the Alleged R&W Loans on Reyes Ex. J fail because DBNTC received notice of those alleged R&W breaches more than 4 years after the relevant Trust closing date.  ¶ 87. Similarly, Plaintiffs' claim that after the Declared EOD on Ex. 32, DBNTC breached its post-EOD duties by not pursuing repurchase claims as to loans in the relevant Trust fails because that EOD occurred more than 4 years after the Trust's closing date.  ¶ 89.  Finally, even if New York's 6-year (as opposed to California's 4-year) statute of limitations were applicable to DBNTC's claims against Warrantors, Plaintiffs' claims that DBNTC breached its duties by not pursuing repurchase claims with respect to the Alleged R&W Loans on Reyes Ex. K would still fail because DBNTC received the relevant notices more than 6 years after the relevant Trust closing date. ¶ 88.

## VI.   PLAINTIFFS' TORT CLAIMS FAIL

Recent dispositive authority confirms that Plaintiffs' tort claims fail as a matter of law.  In

---

[23] DBNTC administers RMBS trusts, including the Trusts, from California.  ¶ 86.

October 2018, New York's First Department issued a controlling decision on New York law, affirming the lower court's holding that the economic loss doctrine bars fiduciary duty and conflict of interest claims against an RMBS trustee like those asserted here because the damages sought arise from the trustee's contractual obligations. *See Blackrock Balanced Capital Portfolio (FI) v U.S. Bank N.A.*, No. 652204/2015, 2018 WL 452001, at *5 (N.Y. Sup. Ct. N.Y. Cty. Jan. 17, 2018), *aff'd* 165 A.D.3d 526, 528 (1st Dep't 2018); *see also V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) (federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion."). Similarly, the Second Circuit recently affirmed a decision by Judge Buchwald ruling that fiduciary duty claims against an RMBS trustee like those asserted here "are barred by the economic loss doctrine." *Triaxx*, 2018 WL 1417850, *7, *aff'd*, 741 F. App'x 857. Thus, Defendant is entitled to summary judgment dismissing Plaintiffs' tort claims.

Even if those claims were not barred by the economic loss doctrine, they would still fail because Plaintiffs lack sufficient evidence to support them. *See infra* § VIII; *see also Page Mill Asset Mgmt. v. Credit Suisse First Bos. Corp.*, No. 98 CIV 6907 MBM, 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000) (granting summary judgment for trustee, "the existence of a conflict of interest cannot be inferred solely from a relationship between an issuer and an indenture trustee that is mutually beneficial and increasingly lucrative").

## VII.   PLAINTIFFS' PRE-EOD CLAIMS FAIL

### A.   Defendant Had No Pre-EOD Duty to Investigate

Plaintiffs incorrectly contend that Defendant breached a pre-EOD contractual duty to investigate whether loans in the Trusts breached loan-level R&Ws when, according to Plaintiffs, "facts began to emerge that demonstrated that the Sponsors and Originators regularly included loans in securitizations that [breached R&Ws]." SAC ¶¶ 100, 110, 115-17. Before an EOD, the

duties of an RMBS trustee are strictly limited to those explicitly found in the agreements governing the trust.  ¶ 10; *see also Elliott*, 838 F.2d at 70-71; *Meckel*, 758 F.2d at 816.  And none of the GAs require Defendant to investigate anything absent direction and indemnity from a specified percentage of investors.  ¶ 12.

Here, Plaintiffs have no evidence that Defendant received any such direction and indemnity requiring Defendant to investigate whether loans in a Trust contained R&W breaches.  Defendant did receive the requisite direction and indemnity to institute repurchase litigation relating to the Trusts listed on Ex. N, and Defendant initiated those repurchase actions.  ¶ 100.  Accordingly, summary judgment should be granted dismissing Plaintiffs' claim that Defendant breached a pre-EOD duty to investigate.  *See Commerce Bank v. Bank of N.Y. Mellon*, 35 N.Y.S.3d 63, 65 (1st Dep't 2016) ("[T]he trustee of an RMBS . . . trust does <u>not</u> have a duty to 'nose to the source'").[24]

### B.    Defendant Did Not Breach a Pre-EOD Duty to Provide Notice of R&W Breaches or to Enforce Repurchase Obligations

Plaintiffs allege Defendant breached pre-EOD contractual duties to provide notice of

---

[24] *See also BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, N.A.*, No. 14 Civ 9371, 2017 WL 3610511, at *7 (S.D.N.Y. Aug. 21, 2017) ("[B]ecause Defendant cannot be required to investigate under the parties' contracts, Defendant cannot be held liable for breach on the basis of constructive knowledge.") (Failla, J.); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394, 2018 WL 4682220, at *13 (S.D.N.Y. Sept. 28, 2018) ("all of the PSAs assure the Trustee that prior to an EOD it is not required to 'make any investigation' into the R&Ws unless it is formally requested to do so by one or more Certificate-holders") (Moses, M.J.); *VNB Realty, Inc. v. U.S. Bank, N.A.*, No. 2:13-04743, 2014 WL 1628441, at *6 n.3 (D.N.J. Apr. 23, 2014) (RMBS trustee has no duty to "nose to the source").

loan-level R&W breaches and to enforce the Warrantors' repurchase obligations.  *See* TAC ¶ 182.

For the Trusts on Ex. 54 (the "Discovery-Only Trusts"), Defendant and other enumerated parties

had a duty to provide notice of a loan-specific R&W breach to contractually specified parties only

upon "discovery" of that breach.  ¶ 90.  For the Trusts on Ex. 55 (the "Discovery/Notice Trusts"),

Defendant and other enumerated parties had a duty to provide notice upon either "discovery" or

"receipt of written notice" of a loan-level R&W breach.  ¶ 91.  Accordingly, to survive summary

judgment on its pre-EOD contract claims relating to R&Ws, Plaintiffs must come forward with

loan-specific evidence that Defendant discovered (or, for the Discovery/Notice Trusts, discovered

or received written notice of) a material, loan-level R&W breach and failed to comply with its

resultant contractual obligations.  *See Phoenix v. BNYM*, 2017 WL 3973951 at *7-9 (granting

summary judgment on pre-EOD claims and recognizing that "Plaintiffs' lack of loan- or Trust-

specific proof relative to [trustee's] knowledge of any breach is fatal to their claims"); *W. & S. Life

Ins. Co. v. Bank of N.Y. Mellon*, No. A1302490, 2017 WL 3392855, at *11 (Ohio C.P. Aug. 4,

2017) ("*W&S v. BNYM II*") ("poor loan performance . . . and other publicly available information

do not provide a basis for 'discovery' of a loan-specific breach").  Plaintiffs cannot do so.  Plaintiffs

are likely to argue that the "breach notices" that the Defendant received were "written notice" of

R&W breaches.  Not so.  The breach notices received by Defendant contained ***allegations*** of

breaches of R&Ws, and Defendant did not conduct any independent evaluation of whether such

R&Ws were breached, nor was it required to do so.

### 1.    Defendant complied with any notice obligations it had

For all Discovery-Only Trusts, Defendant is entitled to summary judgment on Plaintiffs'

claims that Defendant breached pre-EOD contractual duties to provide notice of R&W breaches

because Plaintiffs have no loan-specific evidence that Defendant "discovered" (*i.e.*, first obtained

actual knowledge of) an R&W breach in any Trust.  ¶ 93.  *See, e.g., Royal Park Invs. SA/NV v.*

*HSBC Bank USA N.A.*, No. 14-CV-08175, 2017 WL 945099, at *6 (S.D.N.Y. Mar. 10, 2017) (Netburn, M.J.) ("The Court, however, reads 'discovery' as used in Section 2.03 to mean <u>actual knowledge</u>"); *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394, 2016 WL 439020, at *6 (S.D.N.Y. Feb. 3, 2016) (Nathan, J.) ("Without <u>actual knowledge</u> of non-conforming loans, [Defendant] would have no obligation to require a Seller to substitute or repurchase the defective loan."); *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 603 (S.D.N.Y. 2015) (Scheindlin, J.) ("If, after discovery, plaintiffs cannot prove that HSBC had <u>actual knowledge</u> regarding the loans at issue here, HSBC may move for summary judgment."); *W&S v. BNYM II*, 2017 WL 3392855, at *9 ("discovery as used in [RMBS governing agreements] means <u>actual knowledge</u>"); *see also Royal Park Invs.*, 2018 WL 4682220, at *9 (Moses, M.J.) (recognizing that "discovery" in PSAs means "<u>actual knowledge</u>" and observing that "no such case has interpreted the term 'discovery,' as used in the PSAs, to mean either constructive knowledge or inquiry notice").

With respect to the Discovery-Only Trusts on Reyes Ex. L, Plaintiffs may contend that Defendant's receipt of letters from other parties alleging loan-specific R&W breaches constituted "discovery" by Defendant of breaches.  But those letters only show, at most, that Defendant "discovered" allegations made by another party; they do not show that Defendant had actual knowledge of an R&W breach.  In any event, even if Plaintiffs were correct that receipt of letters alleging R&W breaches constituted "discovery," Defendant would still be entitled to summary judgment because, in such instances, Defendant notified the relevant parties.  ¶ 94.  The evidence shows that when Defendant received a letter identifying one or more loans in a Trust that allegedly breached R&Ws (*i.e.*, the "Alleged R&W Loans"), Defendant notified the parties specified under the relevant GA—regardless of whether the Alleged R&W Loans were in a Discovery-Only or a

Discovery/Notice Trust.[25]   ¶ 94.   Accordingly, Plaintiffs' claim that Defendant breached a pre-EOD contractual duty to provide notice of R&W breaches fails.  *See Phoenix v. BNYM*, 2017 WL 3973951, at *9 (granting summary judgment on pre-EOD claims).

### 2.      Defendant complied with any enforcement obligations it had

As a threshold matter, with respect to the Trusts on Reyes Ex. G, Plaintiffs' claims that Defendant breached a pre-EOD contractual duty to enforce the Warrantors' repurchase obligations fail for the same reason as Plaintiffs' pre-EOD notice claims relating to those Trusts:  Plaintiffs have no loan-specific evidence that Defendant ever "discovered" or received written notice of, or even received a letter alleging, any R&W breach in those Trusts. ¶ 95.   Any claim that Defendant breached a pre-EOD duty to enforce repurchase obligations relating to the Alleged R&W Loans fares no better.

Under the GAs for the Trusts on Ex 56, Defendant had no duty to enforce any repurchase obligations.  ¶ 96.  Under the GAs for the Trusts on Ex. 57, Defendant had an enforcement duty only if certain conditions occurred (*e.g.*, "if the Trustee has received written notice from the Depositor directing the Trustee to pursue such remedies"), and there is no evidence these conditions were met.  ¶ 97.  Accordingly, the Court should grant Defendant summary judgment on Plaintiffs' pre-EOD R&W enforcement claims concerning the Trusts on Exs. 56 and 57.  *See CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 471-75 (S.D.N.Y. 2010) (granting summary judgment for trustee).

Any remaining pre-EOD R&W enforcement claims relating to Alleged R&W Loans fail

---

[25] With respect to Bankrupt Warrantors, there were instances when the bankruptcy/insolvency proceeding precluded Defendant from providing notice of alleged R&W breaches.  *See infra* III.

for other reasons:[26]

- The Alleged R&W Loans on Reyes Ex. U were paid in full.  ¶ 99.

- For the Alleged R&W Loans on Reyes Ex. N, Defendant commenced repurchase lawsuits against the Warrantors after receiving the requisite direction from investors. ¶ 100.

- For the Alleged R&W Loans on Reyes Ex. T, after the Warrantor did not repurchase those loans, the parties that made the R&W breach allegations, which held sufficient certificates to direct Defendant, directed Defendant to enter into a tolling agreement with the relevant Warrantors.  Defendant did so, and the statute of limitations on those potential claims remains tolled.  ¶ 101.  The GAs provide that "the Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of the Holders of Certificates evidencing not less than [25.00%] of the Voting Rights of Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee." ¶ 101.2.

As set forth above, Defendant's receipt of letters from other parties alleging loan-specific R&W breaches did not provide Defendant actual knowledge that the alleged breaches in fact occurred.  Absent direction and indemnity from a contractually specified percentage of investors, Defendant did not – and was not obligated to – (i) examine or re-underwrite Alleged R&W Loans to evaluate whether R&Ws were breached or (ii) institute repurchase litigation.  ¶¶ 102-03.

---

[26] For the sake of completeness, the Alleged R&W Loans identified in each category below include loans in the Trusts with respect to which Defendant had no duty to enforce repurchase obligations.

**C.** **In Any Event, Summary Judgment Should Be Granted on Plaintiffs'**
**Pre-EOD Claims Concerning R&Ws Because Defendant Believed in Good**
**Faith That Its Practices Complied with the Governing Agreements**

The GAs provide that "the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within its discretion or rights or power conferred upon it by this Agreement." ¶ 104. Here, it is undisputed that Defendant believed in good faith: (i) it had no duty to investigate whether loans in RMBS trusts breached R&Ws absent direction and indemnity, and (ii) it had no duty to commence repurchase litigation absent direction and indemnity permitting it to rely on unconfirmed allegations of an R&W breach. ¶¶ 106-07. Given the pertinent contract language and the numerous decisions holding that Defendant's interpretation is correct, it is apparent that Defendant's belief at the time was reasonable and in good faith. *See infra* VII.A-B. Indeed, Plaintiffs' and their investment advisors' own actions and statements show that they agreed with Defendant's interpretation. ¶¶ 66.12, 108-09, 110-11. Accordingly, Defendant's good faith belief independently requires summary judgment dismissing Plaintiffs' pre-EOD R&W claims. *See CFIP*, 738 F. Supp. 2d at 473.

**VIII.** **PLAINTIFFS' POST-EOD CLAIMS FAIL**

**A.** **Plaintiffs Lack Evidence That Defendant's Post-EOD Duties Were Triggered**
**by Purported Servicer or Issuer Breaches**

Plaintiffs contend Defendant breached its duties for every Trust by not declaring EODs purportedly resulting from alleged breaches by servicers or issuers and thereafter acting as a "prudent person."[27] These claims fail because Plaintiffs lack admissible, loan- or Trust-specific

---

[27] Plaintiffs allege that Defendant breached a contractual duty, and, with respect to the Indenture Trusts, TIA § 315(b), by not giving notice of certain purported EODs. TAC ¶¶ 168-90. Plaintiffs further allege that Defendant breached contractual and tort duties and, with respect to the Indenture Trusts, TIA § 315(c), by supposedly failing to act as a "prudent person . . . under the circumstances" after purported EODs. *Id.*

evidence that Defendant had "written notice" or "actual knowledge" of any such purported EOD, as necessary to trigger Defendant's post-EOD duties.

With respect to the PSA Trusts, the PSAs generally define an EOD, insofar as relevant here, as having three elements: (i) material breach by a contractually specified servicer of its contractual duties;[28] (ii) written notice requesting that the material breach be cured or, under some GAs, a "Servicing Officer" of the servicer acquires actual knowledge of the material breach; and (iii) the material breach is not cured within a specified number of days after such notice or knowledge.  ¶ 112.  Under the GAs for the Indenture Trusts, an uncured breach by the issuer (*i.e.*, the statutory trust that issued the securities to investors), as opposed to a servicer, triggers the EOD. ¶ 113.  The GAs provide that Defendant's post-EOD duties arise, depending on the Trust, <u>only if</u> a "Responsible Officer" of Defendant has "actual knowledge" that the EOD occurred and/or if Defendant receives "written notice" thereof.  ¶ 116.

As set forth above, Plaintiffs allege that EODs occurred in every Trust because (i) the servicer of each PSA Trust breached its contractual duties by supposedly failing to give notice of R&W breaches, "robo-signing" instead of taking steps to remedy incomplete loan files and "cheat[ing] borrowers and the [Trusts] after default [by borrowers];" and (ii) the issuer of each Indenture Trust breached its duties by "fail[ing] to protect the trust estate" after supposedly learning that loans in those Trusts had materially incomplete loan files and breached R&Ws. TAC ¶¶ 100-01, 109-41, 148-53.

Plaintiffs' claims that Defendant had, and breached, post-EOD duties supposedly arising from the alleged servicer or issuer breaches fail because Plaintiffs lack sufficient admissible, loan-

---

[28] For example, many GAs specify that the material breach must be on the part of the master servicer, not the servicer, to trigger an EOD.  ¶ 112.3.

or Trust-specific evidence showing (i) that an EOD occurred because a contractually specified servicer or issuer engaged in the alleged misconduct with respect to loans in any Trust,[29] <u>and</u> (ii) that Defendant had "actual knowledge" or "written notice" of any such EOD, as required to trigger its post-EOD duties.  *See Phoenix v. BNYM*, 2017 WL 3973951, at *16-18 ("Because there is no evidence that [the trustee] received written notice or had actual knowledge of any Event of Default relative to these . . . [t]rusts, [the trustee] was not subject to a prudent person duty," and its "motion relative to these [t]rusts is GRANTED."); *Commerce Bank*, 35 N.Y.S.3d at 64-65 (dismissing post-EOD claims against RMBS trustee where court determined written notice received by trustee "was not a notice of Event of Default; rather, it was a notice of events that, with time, might ripen into Events of Default").

### B.   Defendant Is Entitled to Summary Judgment on Plaintiffs' Claims Relating to the Declared EODs

As set forth above, Plaintiffs amended their complaint in September 2017 to allege that Defendant supposedly breached its post-EOD prudent person duties arising from the Declared EODs.  Plaintiffs also incorrectly alleged for the first time in the TAC that the occurrence of other specified events, which are identified on Ex. 33 (the "Alleged Trigger Events"), purportedly triggered Defendant's post-EOD prudent person duty in certain Trusts.  TAC ¶ 147.  All these recently contrived claims fail as a matter of law.

<u>First</u>, the Alleged Trigger Events did <u>not</u> trigger Defendant's prudent person duties. ¶ 119.1.  Under the GAs for the relevant Trusts, only a contractually defined "Master Servicer Event of Default" triggers Defendant's prudent person duty, and the Alleged Trigger Events do not fall within that definition.  *Id.*; *see also Royal Park Invs.*, 2018 WL 4682220, at *14 n.33

---

[29] Plaintiffs have not deposed a single current/former employee of any servicer or issuer.

(recognizing that "most of the PSAs require the Trustee to exercise its prudent-person rights and powers only when it has actual knowledge of a 'Master Servicer' EOD").  As Defendant cannot breach duties that never arose, Plaintiffs' post-EOD claims relating to the non-EOD events on Ex. 33 fail.

       <u>Second</u>, Plaintiffs' claims relating to the Loss EODs are time-barred.  *See supra* § II.

       <u>Third</u>, Plaintiffs' post-EOD fiduciary duty claim is barred by the economic loss doctrine. *See supra* § VI.

       <u>Fourth</u>, with respect to Plaintiffs' claims that Defendant breached its "prudent person" duty arising from the Declared EODs, Defendant is also entitled to summary judgment because Plaintiffs have no evidence that Defendant breached those duties.

       As set forth above, Plaintiffs' newfound theory is that, as a result of the Declared EODs and without any investor approval, Defendant was required to expend significant trust funds to (i) investigate whether there was a basis to put back any defaulted loan to a Warrantor and enforce the Warrantor's related repurchase obligations, and (ii) investigate whether the servicers were complying with their duties and take steps to remedy any breaches.  But courts have been unwilling to find that an RMBS trustee had a post-EOD duty to conduct expensive investigations absent evidence that other trustees have "taken similar action in similar circumstances."  *Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., N.A.*, 907 F. Supp. 2d 536, 555 (S.D.N.Y. 2012) (dismissing claim that after an EOD, "the Trustee should (or would) have taken it upon itself to force the Seller to repurchase any defective or deficient Mortgage Loans [because] [t]hat is simply <u>too distant a leap</u> for this Court to make without plausible allegations that other MBS trusts' trustees have taken similar action in similar circumstances (bolstering the actions a 'prudent person' would have taken)"); *Royal Park Invs.*, 2017 WL 945099, at *9 (finding "[t]he argument

that [post-EOD, the trustee] should have performed an extensive sampling review of the loans at issue [unavailing absent evidence other trustees did so]").

Here, Plaintiffs have no evidence that any indenture/securitization trustee has taken the type of actions proposed by Plaintiffs under similar circumstances, let alone that any RMBS trustee has taken the actions proposed by Plaintiffs under similar circumstances. ¶ 121.  Indeed—based on Plaintiffs' allegations in their lawsuits against other RMBS trustees—it appears no RMBS trustee has done so.  ¶ 121.1.  Accordingly, the Court should grant Defendant summary judgment on these claims.  *See, e.g.*, *Gottlieb v. County of Orange*, 84 F.3d 511, 519 (2d Cir. 1996).[30]

---

[30] Defendant expects that Plaintiffs may attempt to support their post-EOD claims with opinions offered by their purported experts, Mark Adelson and Ingrid Beckles.  Defendant reserves the right to move to exclude those opinions because they are inadmissible.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant summary judgment dismissing all of Plaintiffs' claims.

Dated: New York, New York
       December 7, 2018

Respectfully submitted,
MORGAN, LEWIS & BOCKIUS, LLP

By: _____
    Michael S. Kraut (mkraut@morganlewis.com)
    Kevin J. Biron (kbiron@morganlewis.com)
101 Park Avenue
New York, New York 10178
Tel:  +1.212.309.6000
Fax:  +1.212.309.6001

*Attorneys for Defendants Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, as Trustee*

## CERTIFICATION OF COMPLIANCE

Pursuant to Judge Koeltl's Individual Practice Rule 2.D., I, Kevin J. Biron, hereby certify that this Memorandum of Law in Support of Defendant's Motion for Summary Judgment consists of 13,214 words, which does not exceed the word limit in Individual Practice Rule 2.D. as modified by Magistrate Judge Freeman's Order dated October 11, 2018 (ECF 262), and otherwise complies with Judge Koeltl's Individual Practice formatting rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of December 2018, at New York, New York.

Kevin J. Biron

## CERTIFICATE OF SERVICE

I, Kevin J. Biron, certify that on December 7, 2018, I caused the following documents to be filed with the Clerk of the Court in redacted form and to be served on all counsel of record by secure file transfer: (i) Notice of Defendants' Motion for Summary Judgement; (ii) Memorandum of Law in Support of Defendants' Motion for Summary Judgement; (iii) Statement of Undisputed Material Facts Pursuant to Rule 56.1 of the Local Civil Rules for the Southern District of New York; (iii) the Declaration of Ronaldo Reyes, dated December 6, 2018, and the exhibits thereto; (iv) the Declaration of David Co, dated December 7, 2018; (v) the affidavit of Mathias Rohe, dated December 4, 2018, and the exhibits thereto; (vi) the Declaration of Kevin J. Biron, dated December 7, 2018, and the exhibits thereto, including the Declaration of Edmond Esses and list attached thereto.

By: _____
Kevin J. Biron