```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────────

PHOENIX LIGHT SF LTD., ET AL.,

                        Plaintiffs,

    - against-                              14-cv-10103 (JGK)

DEUTSCHE BANK NATIONAL TRUST CO. and
DEUTSCHE BANK TRUST COMPANY
AMERICAS,

                        Defendants.

─────────────────────────────────────────

COMMERZBANK AG,

                        Plaintiff,
                                            15-cv-10031 (JGK)
    - against-

DEUTSCHE BANK NATIONAL TRUST CO. and
DEUTSCHE BANK TRUST COMPANY                 OPINION AND ORDER
AMERICAS,

                        Defendants.

─────────────────────────────────────────
```

**JOHN G. KOELTL, District Judge:**

These actions, like others before them, were brought by investors in residential mortgage-backed securities ("RMBS") seeking to recover losses sustained following the collapse of the United States real estate market more than a decade ago. In this case, RMBS certificateholders brought claims against RMBS trustees alleging that the trustees breached their contractual, fiduciary, statutory, and common law duties. Specifically, Phoenix Light SF DAC ("Phoenix Light"), Blue Heron Funding V

Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX Ltd., C-Bass CBO XVII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, and Silver Elms CDO II Limited (collectively, "Phoenix Light Plaintiffs") and Commerzbank (together with the Phoenix Light Plaintiffs, the "Plaintiffs"), as certificateholders of RMBS, brought claims against RMBS trustees, Deutsche Bank National Trust Co. ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA," together with DBNTC, "DB"), asserting claims for violations of the Trust Indenture Act of 1939 ("TIA") and the New York Streit Act, breaches of contractual and fiduciary duties and the covenant of good faith, as well as negligence and gross negligence. The Plaintiffs' claims arise out of certificates (the "Certificates") issued by 85 RMBS trusts (the "Trusts") for which DB was the trustee. The Phoenix Light Plaintiffs' claims are based on RMBS Certificates issued by 43 Trusts; Commerzbank's claims are based on Certificates issued by 50 Trusts, with Certificates from eight Trusts in common with the Phoenix Light Plaintiffs. After the Court granted in part and denied in part motions to dismiss by DB in both cases, the Phoenix Light Plaintiffs submitted a Third Amended Complaint, Commerzbank submitted a Second Amended Complaint, and the parties proceeded to the first phase of discovery.

DB then filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 in each action. The Plaintiffs filed a single, joint motion for partial summary judgment in both actions.[1] DB also filed a supplemental motion for summary judgment in the Phoenix Light Action following the decision by the Court of Appeals for the Second Circuit in Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n, 2021 WL 4515256 (2d Cir. Oct. 4, 2021). For the following reasons, DB's motions for summary judgment are **granted in part and denied in part.** DB's supplemental motion for summary judgment is **granted.** The Plaintiffs' motion for partial summary judgment is **denied.**

## I.   Background

The following facts are based on the parties' Local Civil Rule 56.1 statements, counterstatements, and supporting papers, and are undisputed unless otherwise noted. The Court assumes familiarity with RMBS in general, the RMBS securitization process, and the roles of the various entities (such as the sponsor, seller, servicer, and trustee) in RMBS trusts, as well as its prior opinions in both actions. See Commerzbank AG v. Deutsche Bank Nat'l Tr. Co., 234 F. Supp. 3d 462 (S.D.N.Y. 2017)

---

[1] In this Opinion and Order, the "Phoenix Light Action" refers to case number 14-cv-10103 and citations in the form of "PL ECF No. __" are citations to the docket in the Phoenix Light Action. Similarly, the "Commerzbank Action" refers to case number 15-cv-10031 and citations in the form of "CB ECF No. __" are citations to the docket in the Commerzbank Action.

("CB MTD Order"); Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co., 172 F. Supp. 3d 700 (S.D.N.Y. 2016) ("PL MTD Order").[2]

### A. RMBS

RMBS are certificates or notes that provide investors with returns depending on the performance of the underlying mortgage loan pool, often held in an RMBS trust.[3] Plaintiffs' Combined Statement of Undisputed Facts ("P-CSUF") ¶¶ 10, 20. Generally, in an RMBS securitization transaction, mortgage loans, underwritten and made by "originators," are conveyed to a "sponsor" or "seller" who collects the mortgage loans into a "pool," which is then conveyed to a "depositor." DB's Reply to the Phoenix Light Plaintiffs' Responses to DB's Statement of Undisputed Facts ¶ 1 ("PL-RSUF"). The depositor then conveys the loan portfolio to a trust or RMBS trustee and the right to receive income from the principal and interest payments from the portfolio is parceled into certificates and sold to investors. Id. In connection with the conveyance of the pool of mortgage loans, originators and/or sponsors make representations and warranties ("R&Ws") regarding the quality and character of the

---

[2] Unless otherwise noted, this Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

[3] Although trusts governed by indentures (and related agreements) issue notes rather than certificates, for purposes of this Opinion and Order, the RMBS certificates or notes at issue are uniformly referred to as "certificates" and investors in RMBS trusts are referred to as "certificateholders." See DB's Reply to Commerzbank's Responses to DB's Statement of Undisputed Facts ¶ 5 n.3 ("CB-RSUF").

mortgage loan pools and the nature of their underwriting. P-CSUF ¶ 30. Finally, servicers are tasked with collecting payments on the mortgages and enforcing loan terms, including foreclosing on the property that secures the underlying mortgage loans if a borrower defaults. <u>See</u> Plaintiffs' Revised Responses to DB's Counter-Statement of Undisputed Facts ¶¶ 50-51 ("P-CSUF-Reply"); Biron PL-Ex. 43; Biron CB-Ex. 43. For 12 of the Phoenix Light Plaintiffs Trusts and 21 of the Commerzbank Trusts, a "Master Servicer" was appointed and tasked with monitoring the performance of other servicers. Biron PL-Ex. 44; Biron CB-Ex. 44.

## B. The Trusts

The terms of an RMBS securitization trust, including the powers and duties of the trustees and certificateholders, are set forth in the trust's governing agreements. Most of the Trusts are governed by pooling and servicing agreements ("PSAs"), while the remainder are governed by indentures and related agreements (together with the PSAs, the "Governing Agreements" or "GAs"). Biron PL-Exs. 25 (PSA Trusts), 26 (indenture Trusts); Biron CB-Exs. 25 (PSA Trusts), 26 (indenture Trusts).

Each Trust is governed by its own GA that sets out the rights and duties of various parties, including DB.[4] Unless an Event of Default ("EOD") occurs and DB has a contractually specified level of knowledge of that EOD, DB's obligations are limited to those explicitly laid out in the GAs. See Biron PL-Ex. 35; Biron CB-Ex. 35.[5] The parties dispute the scope and nature of DB's obligations prior to the occurrence of an EOD and whether DB was obligated to investigate potential EODs. Nevertheless, the parties generally agree that after DB has the contractually specified knowledge of an ongoing EOD, DB is obligated to exercise the rights and powers vested in it under the GAs to "use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstance in the conduct of such person's own affairs." Biron PL-Ex. 2 § 8.01; Handlin Ex. 390.

The GAs define the circumstances that trigger an EOD; however, depending on the specific Trust's GA, different default

---

[4] Unlike those of an ordinary trustee at common law, the duties of an RMBS trustee are "exclusively defined by the terms of the" contracts that govern the trusts. Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co., 838 F.2d 66, 71 (2d Cir. 1988); Blackrock Core Bond Portfolio v. U.S. Bank Nat'l Ass'n, 165 F. Supp. 3d 80, 91 (S.D.N.Y. 2016).

[5] See, e.g., Biron PL-Ex. 2 §§ 8.01 ("The Trustee, before the occurrence of a Master Servicer Event of Default and after the curing of all Master Servicer Events of Default that may have occurred, shall under take to perform such duties and only such duties as are specifically set forth in this Agreement."), 8.02(h) ("[U]nless a Responsible Officer of the Trustee has actual knowledge of the occurrence of a Master Servicer Event of Default or an Event of Default, the Trustee shall not be deemed to have knowledge of a Master Servicer Event of Default or an Event of Default until a Responsible Officer of the Trustee shall have received written notice thereof.").

events may trigger different consequences. See, e.g., P-CSUF-Reply ¶ 52.[6] Under the GAs for 12 of the Phoenix Light Plaintiffs Trusts and 21 of the Commerzbank Trusts, DB was required to provide notice to other specified parties if DB or another enumerated party "discover[ed]" a material loan-level R&W breach. Biron PL-Ex. 54; Biron CB-Ex. 54. Under the GAs for 31 of the Phoenix Light Plaintiffs Trusts and 29 of the Commerzbank Trusts, DB was required to provide notice to other specified parties if DB or another enumerated party received written notice of, or otherwise discovered, a material loan-level representation and warranty breach. Biron PL-Ex. 55; Biron CB-Ex. 55. However, DB contends that the GAs for 23 of the Trusts at issue (8 Trusts for the Phoenix Light Plaintiffs, 17 for Commerzbank, with 2 Trusts in common) do not require DB to provide notice following an EOD. Goff Reply Ex. 11.

### C. The Plaintiffs' Claims

The Plaintiffs argue that certain defects in the mortgage loan documentation, breaches of the R&Ws made by sellers or originators regarding the underlying loans, and failures by Servicers or Master Servicers to carry out their

---

[6] GAs for different Trusts contemplate different consequences or triggers depending on the specific default events. For example, under certain GAs, only a default by a "Master Servicer" is sufficient to trigger DB's "prudent person" duties. P-CSUF-Reply ¶ 52. For purposes of this Opinion and Order, "Event of Default" or "EOD" means those events that trigger DB's "prudent person" duties.

responsibilities for underlying mortgage loan portfolios constituted EODs under the GAs. The Plaintiffs further contend that DB had knowledge of such EODs and was obliged to notify certain parties and take other specific actions that DB failed to take.

Under the GAs for all the Trusts, within a specified time period after closing, DB (or a custodian) was required to issue a final certification with an "exception report" listing, for each mortgage custody file, whether any 0document was missing and/or defective. Biron PL-Ex. 42; Biron CB-Ex. 42. The last of the deadlines for DB or a custodian to issue an exception report for Trusts with Certificates held by Phoenix Light Plaintiffs was April 24, 2008, Biron PL-Ex. 42, and December 26, 2007 for Trusts with Certificates held by CB. Biron CB-Ex. 42. Under certain GAs, if missing or non-conforming mortgage documentation remained uncured, or if certain seller or originator R&Ws were materially breached, DB had the right to request that the originator or seller substitute or repurchase loans as a remedy for the defective loans or breached R&Ws. P-CSUF-Reply ¶ 46. The Plaintiffs assert that DB had the duty and ability under each GA to require sellers of the underlying mortgage loans to repurchase loans that breached the R&Ws provided by the sellers and to force servicers to foreclose on properties for underlying mortgages in default. P-CSUF-Reply ¶ 22. DB contends that while

it had the authority under certain Trusts to take such actions, the obligations to enforce R&Ws breaches or remedy servicer errors were not triggered until DB had "actual knowledge" of the breach or default. Id. DB presents evidence that forcing sponsors or other warrantors to repurchase mortgages would have involved practical difficulties and costs. See, e.g., Biron PL-Ex. 39, 40; Goff Reply Ex. 31; P-CSUF-Reply ¶¶ 22, 33, 35. Moreover, evidence in the record suggests that circumstances could arise where different investors may have divergent interests following an alleged breach. See, e.g., P-CSUF-Reply ¶ 35.

Generally, under the GAs, certificateholders are unable to force DB to take specific actions unless the certificateholders control 25% or more of the voting rights in the Trust. The parties dispute the extent to which the certificateholders had access to underlying loan documentation, and therefore whether the certificateholders had the ability to confirm the creditworthiness of the mortgage borrowers for the underlying loans or whether breaches of individual loan terms had occurred. P-CSUF-Reply ¶ 21. Similarly, the parties dispute the degree to which the Plaintiffs had access to the identities of other certificateholders, such that the Plaintiffs could organize certificateholder support to direct DB's actions. P-CSUF-Reply ¶ 38.

DB, as trustee, was also entitled to certain exculpatory limitations on its liability under the GAs. See, e.g., Biron PL-Exs. 37-40; Biron CB-Exs. 37-40. For example, the GAs for all Trusts at issue contained clauses providing, in substance, that DB was entitled to rely on information provided to it that it believed to be genuine. Biron PL-Exs. 37-38; Biron CB-Exs. 37-38; see also Biron PL-Ex. 2 § 8.01 ("The Trustee shall not be responsible for the accuracy or content of any resolution, certificate, statement opinion, report, order, document, or other instrument."). The GAs for all Trusts also included a clause providing in substance that DB cannot be held liable for actions taken in good faith at the direction of holders of a specified percentage of Certificates. Biron PL-Ex. 39; Biron CB-Ex. 39.

Although the parties dispute whether DB failed to take appropriate action following events that allegedly constituted EODs, it is undisputed that between 2008 and 2010, DB notified investors that an EOD occurred in several Commerzbank Trusts and Phoenix Light Plaintiffs Trusts, which was triggered by the Trusts falling below certain quantitative thresholds (the "Loss EODs"). CB-RSUF ¶ 58; PL-RSUF ¶ 69. Similarly, it is undisputed that in 2012, DB declared EODs for certain Commerzbank Trusts and Phoenix Light Trusts because a rating agency downgraded the ratings of the loan servicer for those Trusts, namely Ocwen Loan

Servicing LLC ("Ocwen") (the "2012 Downgrade EODs"). CB-RSUF ¶ 62; PL-RSUF ¶ 73. Further, it is undisputed that DB declared an EOD after two other credit rating agencies downgraded Ocwen in 2014 (the "2014 Downgrade EOD"). CB-RSUF ¶ 101; PL-RSUF ¶ 118.

### D. The Parties

DBNTC is a national banking association, with its principal place of business in California. Both DBNTC and DBTCA administer RMBS trusts, including the Trusts at issue in this case, from offices in Santa Ana, California. PL-RSUF ¶ 86.

Commerzbank is a bank organized under the laws of Germany, and, as of 2011, was Germany's second largest bank with over €660 billion in assets. CB-RSUF ¶¶ 51-52. Commerzbank is the successor to the interests of Dresdner Bank AG ("Dresdner") following a merger in May 2009. P-CSUF ¶¶ 118-19. Commerzbank asserts that it acquired the 74 Certificates at issue as legacy Dresdner assets or through transfers from Eurohypo AG New York Branch ("Eurohypo") or Barrington II CDO Ltd. ("Barrington II"). CB-RSUF-Reply ¶¶ 40-41. Commerzbank further asserts that Barrington II assigned certain legal claims relating to Certificates previously held by Barrington II to Commerzbank in 2012. P-CSUF ¶¶ 123-29. The parties agree that at some point, Commerzbank possessed interests in 72 of the Certificates. CB-RSUF ¶¶ 40. However, DB asserts that Commerzbank never held or

had interests in two Certificates. CB-RSUF ¶ 45. Further, it is undisputed that, prior to commencing these actions, Commerzbank sold 27 of the Certificates at issue in this case. CB-RSUF ¶ 42.

In December 2013, Commerzbank commenced a lawsuit against the depositors, sponsors, and underwriters for 51 of the 74 Certificates, alleging that the depositors, sponsors, and underwriters had made false R&Ws. Commerzbank AG London Branch v. UBS AG, No. 654464/2013, 2015 WL 3857321 (N.Y. Sup. Ct. June 17, 2015); PL-RSUF ¶ 33. On June 17, 2015, the New York State Supreme Court dismissed these claims as untimely. The court reasoned that Commerzbank's fraud claims were "barred under [New York's] two-year discovery rule" because "all of the certificates in question were downgraded by August 2009." Id. at *2. The court explained that Commerzbank should have discovered any underlying fraud two years prior to commencing the suit based on publicly available information regarding the poor quality and management of mortgage loans underlying RMBS securitizations. Id. The court further explained "that by December 2011, investors had commenced such lawsuits involving 105 of the 146 offerings at issue here." Id.

The Phoenix Light Plaintiffs are special purpose entities created under Irish or Cayman law and have principal places of business in Ireland or the Cayman Islands. P-CSUF ¶¶ 90-95. The Phoenix Light Plaintiffs were formed to facilitate a

securitization transaction, structured by WestLB AG ("WestLB"),
a failed German bank, to spin off certain non-performing assets.
PL-RSUF ¶ 37. At the closing of the WestLB transactions, a
portfolio of assets, including certain of the Certificates at
issue in this case, were transferred to the relevant Phoenix
Light Plaintiff; the Phoenix Light Plaintiffs simultaneously
issued notes back to WestLB and transferred the assets to one of
three indenture trustees. PL-RSUF ¶ 38; DB's Reply to the
Phoenix Light Plaintiffs' Response to DB's Supplemental
Statement of Undisputed Material Facts ¶¶ 5-7 ("Supp. PL-RSUF").
WestLB closed the securitization transactions involving all
Phoenix Light Plaintiffs other than Phoenix Light between 2005
and 2007. Supp. PL-RSUF ¶ 9.

The following undisputed facts are relevant to a single
plaintiff, Phoenix Light. At the relevant times, WestLB was
owned by several German entities, including the German State of
North Rhine-Westphalia ("NRW"). P-CSUF-Reply ¶ 92. When the
financial crisis began to unfold in 2007, the value of RMBS and
other asset classes to which WestLB had exposure sharply
declined. Id. To stabilize WestLB, NRW agreed to provide a €5
billion "risk shield" that would insulate WestLB from losses on
its RMBS and other high-risk assets. Id. In the risk shield
transaction, WestLB formed Phoenix Light and caused a portfolio
of its distressed assets to be transferred to Phoenix Light. Id.

Phoenix Light simultaneously issued notes to WestLB and transferred the asset portfolio to an indenture trustee. Id. The notes issued to WestLB were entitled to receive cash flows generated by the asset portfolio held by the indenture trustee. WestLB's other owners also agreed to bear a portion of any losses covered by NRW's risk shield. Id. The Phoenix Light risk shield transaction closed on March 31, 2008.

After the closing of the risk shield transaction, the European Commission determined the transaction constituted "state aid" to WestLB and required that WestLB be wound up. Id. In December 2009, the German Financial Market Stabilization Authority established a German public entity ("EAA") to "take over and dispose of or wind up assets, liabilities and other risk exposures of West LB AG." Id. Following the asset transfer to EAA, EAA recognized that "[a]s the owner of the Phoenix [Light] notes, the EAA alone bears the economic risk of [the Phoenix Light] portfolio in the event that the actual losses exceed the guarantee commitments provided by the [German] federal state and the savings banks." Id.

In 2012 and 2013, EAA caused Phoenix Light and certain other Phoenix Light Plaintiffs to commence legal actions against sponsors, originators, and underwriters for numerous RMBS trusts, including 33 of the Trusts at issue in this case. Biron PL-Ex. 75. In December 2014, EAA caused eight of the ten Phoenix

14

Light Plaintiffs to file an action in this district against U.S.
Bank National Association ("U.S. Bank") who, like DB, served as
the RMBS trustee for certain certificates to which the Phoenix
Light Plaintiffs claim an interest. See Phoenix Light SF Ltd. v.
U.S. Bank N.A. Nat'l Ass'n, No. 14-cv-10116 (S.D.N.Y., filed
December 24, 2014) (the "PL v. U.S. Bank Action").[7] In the PL v.
U.S. Bank Action, Judge Forrest dismissed the plaintiffs' claims
for lack of standing because under the relevant agreements, only
the indenture trustees, not the certificateholder-plaintiffs,
had the right to pursue claims arising out of the certificates.
Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n, No. 14-cv-10116,
2015 WL 2359358, at *2-3 (S.D.N.Y. May 18, 2015). Following
Judge Forrest's decision, EAA caused the indenture trustees to
assign the claims at issue in the PL v. U.S. Bank Action and in
the Phoenix Light Action to the Phoenix Light Plaintiffs. Supp.
PL-RSUF ¶ 18; PL-RSUF ¶ 60.4.9.

### E. Procedural History

The Phoenix Light Plaintiffs have filed four complaints in the
Phoenix Light Action: an original complaint on December 23, 2014

---

[7] All the Phoenix Light Plaintiffs except for Blue Heron V and Blue Heron IX
were plaintiffs in the PL v. U.S. Bank Action. Certain Phoenix Light
Plaintiffs also filed other lawsuits in this district around this same time,
including this action. Phoenix Light SF Ltd. v. Bank of New York-Mellon, No.
14-cv-10104 (S.D.N.Y., filed December 23, 2014); Phoenix Light SF Ltd. v.
Wells Fargo Bank, No. 14-cv-10102 (S.D.N.Y., filed December 23, 2014);
Phoenix Light SF Ltd. v. HSBC Bank USA, N.A., No. 14-cv-10101 (S.D.N.Y.,
filed December 23, 2014); Supp. PL-RSUF ¶ 16.

asserting claims relating to 35 Certificates; a First Amended Complaint ("PL FAC") on April 10, 2015, adding new claims relating to 52 additional Certificates, including those issued by different Trusts with different GAs; a Second Amended Complaint ("PL SAC") on July 15, 2015, following the assignments of the right to sue from the indenture trustees; and a Third Amended Complaint ("PL TAC") on September 28, 2017, which asserted new claims concerning certain EODs that DB had declared.

Commerzbank commenced the Commerzbank Action on December 23, 2015. Commerzbank subsequently filed a First Amended Complaint ("CB FAC") on April 15, 2016, and a Second Amended Complaint on December 1, 2017 ("CB SAC").

DB filed motions to dismiss portions of PL SAC and CB SAC, which the Court granted in part and denied in part. In relevant part, the Court dismissed (1) the Plaintiffs' claims for violations of the Streit Act with prejudice; (2) the Plaintiffs' TIA claims arising out of the PSA Trusts with prejudice; and (3) the Phoenix Light Plaintiffs' claims relating to "document delivery failures" as time-barred. See CB MTD Order, 234 F. Supp. 3d at 474; PL MTD Order, 172 F. Supp. 3d at 709, 722-23.[8]

---

[8] The Plaintiffs asserted TIA claims as to the PSA Trusts and Streit Act claims in the subsequently filed PL TAC and CB SAC for the purposes of preserving those issues for appeal. PL TAC ¶¶ 168-77, 194-200 & n.8, 11; CB SAC ¶¶ 172-82, 203-10 & n.9, 10. In the PL TAC, the Phoenix Light Plaintiffs also preserved for appeal claims relating to document delivery failures. PL

In the PL TAC, the Phoenix Light Plaintiffs brought claims based on Certificates issued by 43 Trusts, with an original face value of over $750 million. In the CB SAC, Commerzbank brought claims based on Certificates issued by 50 Trusts, with a purchase value of approximately $600 million.

At the parties' request, the Court entered a bifurcated schedule for expert discovery and dispositive motions in these actions. In "Phase 1," expert discovery and the parties' dispositive motions focused on issues other than loan-level re-underwriting and damages, leaving such issues for a "Phase 2" of expert discovery and dispositive motions, if necessary. PL ECF No. 205.

## II.  Legal Standard

The standard applicable to a motion for summary judgment is well established. "The court should grant a summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Cartrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them."

---

TAC ¶¶ 178-86 n.9. All those claims are dismissed for the reasons previously explained in the CB MTD Order and the PL MTD Order.

Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The Court's "duty, in short, is confined at this point to issue-finding," and "does not extend to issue-resolution." Id.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Summary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely

simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

Claims alleging violations of the TIA, breach of contract, breach of the covenant of good faith, and breach of fiduciary duty arising out of RMBS trusts "must be proved loan-by-loan and trust-by-trust," and not based on generalized, non-specific evidence of breaches. See Retirement Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon, 775 F.3d 154, 162 (2d Cir. 2014); Phoenix Light SF Ltd. v. Bank of N.Y. Mellon, No. 14-cv-10104, 2017 WL 3973951, at *7-8 (S.D.N.Y. Sept. 7, 2017) ("[B]y summary judgment or trial the plaintiffs must present evidence that proves a specific breach of a [R&W] as to any loan or trust for which plaintiffs allege there was a breach.").

### III.

DB moves for summary judgment dismissing all the Plaintiffs' claims, arguing that (1) the Plaintiffs lack standing to raise claims related to certain Certificates; (2) many of the Plaintiffs' claims are time-barred; and (3) the Plaintiffs' claims fail on the merits as a matter of law. As explained below, the Plaintiffs have failed to demonstrate that they have Article III or prudential standing to assert claims arising out of certain Certificates. Moreover, many of the

Plaintiffs' claims are time-barred and other claims fail on their merits as a matter of law.

### A. Standing

DB argues that the Phoenix Light Plaintiffs lack Article III and prudential standing because the assignments of all the claims that the Phoenix Light Plaintiffs are pursuing in this action violate New York's prohibition on champerty and accordingly are void. DB also contends that the Phoenix Light Plaintiffs and Commerzbank lack standing to assert claims arising out of specific Certificates because (1) the Certificates were sold prior to the commencement of these actions; (2) there is no evidence that the Plaintiffs ever held the Certificates; or (3) Phoenix Light failed to satisfy relevant contractual conditions precedent prior to bringing its suit.

### 1. Champerty

While the parties' cross-motions for summary judgment were pending, the Court of Appeals for the Second Circuit issued a summary order affirming Judge Broderick's grant of summary judgment dismissing the PL v. U.S. Bank Action.[9] See Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) ("PL v. U.S. Bank III"), aff'g Phoenix Light SF

---

[9] After Judge Forrest dismissed the PL v. U.S. Bank Action without prejudice because the plaintiffs lacked standing, the case was reassigned to Judge Broderick.

Ltd. v. U.S. Bank Nat'l Ass'n, No. 14-cv-10116, 2020 WL 1285783 (S.D.N.Y. Mar. 18, 2020) ("PL v. U.S. Bank I"), reconsideration denied, No. 14-cv-10116, 2020 WL 4699043 (S.D.N.Y. Aug. 12, 2020) ("PL v. U.S. Bank II").

In PL v. U.S. Bank I, Judge Broderick found that there was no genuine material factual dispute that the assignments of the claims in that action from the indenture trustees to the eight Phoenix Light Plaintiffs were executed "for the sole purpose of pursuing [the PL v. U.S. Bank Action], and for no other reason." 2020 WL 1285783, at *12. Accordingly, Judge Broderick concluded that the assignments were void as champertous under New York Judiciary Law § 489 and that consequently, the eight Phoenix Light Plaintiffs lacked Article III and prudential standing to assert claims arising out of those certificates. Id. at *12-13, 16. Judge Broderick also explained that because the eight Phoenix Light Plaintiffs had previously executed a complete transfer of their interests in the relevant certificates to the indenture trustees, the eight Phoenix Light Plaintiffs lacked any "preexisting proprietary interest" in the certificates and therefore could not take advantage of the so-called Love Funding

exception to New York's prohibition on champerty. Id. at *13-15.[10]

After Judge Broderick denied the eight Phoenix Light Plaintiffs' motion for reconsideration, PL v. U.S. Bank II, 2020 WL 4699043, the plaintiffs appealed to the Court of Appeals for the Second Circuit. The court of appeals affirmed Judge Broderick's decisions in a summary order dated October 4, 2021. "Based on the factual findings of the District Court," the court of appeals concluded that the assignments at issue were champertous and that the eight Phoenix Light Plaintiffs lacked prudential standing. PL v. U.S. Bank III, 2021 WL 4515256, at *1-2. The Court also rejected the eight Phoenix Light Plaintiffs' arguments that the Love Funding exception applied and affirmed Judge Broderick's finding that the plaintiffs did not have a "preexisting proprietary interest" in the certificates. Id. at *2.[11]

On October 13, 2021, this Court directed the parties in the Phoenix Light Action to submit supplemental summary judgment

---

[10] In Tr. for the Certificate Holders of Merrill Lynch Mortg. Invs., Inc. v. Love Funding Corp., 918 N.E.2d 889 (N.Y. 2009), in response to a certified question from the Court of Appeals for the Second Circuit, the New York Court of Appeals explained that "a corporation or association that takes an assignment of a claim does not violate [New York's statutory prohibition on champerty] if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument in which it holds a preexisting proprietary interest." Id. at 891.

[11] The court of appeals "assum[ed] Article III standing" in order to address prudential standing but did not analyze whether the plaintiffs actually had Article III standing to pursue their claims. See id. at *1.

briefing addressing PL v. U.S. Bank III. PL ECF No. 419. The
court of appeals denied the eight Phoenix Light Plaintiffs'
petition for panel rehearing and rehearing en banc on November
19, 2021 and issued its mandate on November 29, 2021.

### a. Collateral Estoppel

In its supplemental motion for summary judgment, DB
contends that the Phoenix Light Action should be dismissed
because the Phoenix Light Plaintiffs are collaterally estopped
by the PL v. U.S. Bank Action from relitigating the issues of
prudential standing and champerty.

"Collateral estoppel, or issue preclusion, prevents parties
or their privies from relitigating in a subsequent action an
issue of fact or law that was fully and fairly litigated in a
prior proceeding." M.O.C.H.A. Soc'y, Inc. v. City of Buffalo,
689 F.3d 263, 284 (2d Cir. 2012). "The preclusive effect of a
judgment rendered by a federal court sitting in diversity," such
as the court in the PL v. U.S. Bank Action, "is determined by
the law of state in which the rendering court sat." See Stinnett
v. Dela Air Lines, Inc., 803 F. App'x 505, 508 n.3 (2d Cir.
2020) (citing Semtek Int'l Inc. v. Lockheed Martin Corp., 531
U.S. 497, 508 (2001)). Under New York law, collateral estoppel
applies to an issue that is (1) identical to an issue already
decided (2) in a previous proceeding in which that party had a
full and fair opportunity to litigate and (3) the issue

previously raised is decisive of the present action. <u>Curry v. City of Syracuse</u>, 316 F.3d 324, 331 (2d Cir. 2003).[12]

Although lack of subject matter jurisdiction is not a merits-based decision and therefore is not afforded preclusive effect, "the factual issues the prior court decided in reaching a determination regarding subject[]matter jurisdiction do have preclusive effect." <u>Phoenix Light SF Ltd v. Bank of N.Y. Mellon</u>, No. 14-cv-10104, 2022 WL 92213, at *2 (S.D.N.Y. Jan. 7, 2022) (concluding that certain of the Phoenix Light Plaintiffs were collaterally estopped by <u>PL v. U.S. Bank III</u> and lacked prudential standing to maintain claims against an RMBS trustee) ("<u>PL v. BNYM</u>"). Accordingly, courts in this district have "applied collateral estoppel to the issue of standing." <u>Hollander v. Members of Bd. of Regents of Univ.</u>, No. 10-cv-9277, 2011 WL 5222912, at *2 (S.D.N.Y. Oct. 31, 2011), <u>aff'd</u>, 524 F. App'x 727 (2d Cir. 2013).

The Phoenix Light Plaintiffs are collaterally estopped from relitigating the issues of prudential standing and champerty because all the requirements for collateral estoppel are met and the arguments advanced against the application of collateral estoppel are without merit. First, the issues of champerty and

---

[12] Cases applying collateral estoppel under federal common law are relevant here because "there is no material difference between federal and New York State preclusion principles." <u>Twersky v. Yeshiva Univ.</u>, 112 F. Supp. 3d 173, 179 (S.D.N.Y. 2015), <u>aff'd sub nom. Gutman v. Yeshiva Univ.</u>, 637 F. App'x 48 (2d Cir. 2016).

prudential standing presented here are identical to the issues decided in the PL v. U.S. Bank Action. It is undisputed that the assignments that the Phoenix Light Plaintiffs rely on to assert their claims here are the exact same assignments that Judge Broderick and the court of appeals found to be invalid and champertous. Supp. PL-RSUF ¶ 23. It is further undisputed that the deposition testimony in the record here includes the exact same testimony that Judge Broderick and the court of appeals relied on when determining that the assignments at issue were executed with champertous intent. Id. ¶¶ 21, 25. Finally, it is undisputed that the granting clauses in the agreements between the Phoenix Light Plaintiffs and the indenture trustees at issue in the PL v. U.S. Bank Action are either identical or materially identical to the granting clauses at issue here. Id. ¶¶ 25-26.

Second, the Phoenix Light Plaintiffs had a full and fair opportunity to litigate the issues of prudential standing and champerty in the PL v. U.S. Bank Action. The eight Phoenix Light Plaintiffs that were parties in the PL v. U.S. Bank Action took full advantage of the opportunity to pursue vigorously their claims before the district court and court of appeals.[13] Although

---

[13] This requirement is satisfied even though the Phoenix Light Plaintiffs advance additional arguments here that they undoubtedly could have raised before Judge Broderick and the court of appeals. See PL v. BNYM, 2022 WL 92213, at *5 n.14 ("That Plaintiffs failed to take advantage of the opportunity to present [additional arguments] to Judge Broderick does not mean they were not given the opportunity to do so.").

Blue Heron V and Blue Heron IX (the "Blue Heron Plaintiffs")
were not parties to PL v. U.S. Bank Action, the opportunity-to-
litigate factor can be satisfied where, as here, "the part[ies]
in question [are] controlled by a party in a related action. The
Second Circuit applies the doctrine of privity with flexibility
when it comes to issue preclusion; so long as the interests of
the nonpart[ies] were adequately represented," the application
of collateral estoppel is permissible. See PL v. BNYM, 2022 WL
92213, at *4-5 (concluding that Blue Heron V was collaterally
estopped by the PL v. U.S. Bank Action); see also Buechel v.
Bain, 766 N.E.2d 914, 920 (N.Y. 2001) (explaining that privity
in the context of collateral estoppel includes "those who
control an action although not formal parties to it [and] those
whose interests are represented by a party to the action").

Privity is satisfied with respect to the Blue Heron
Plaintiffs because it is undisputed that: (1) EAA, through
Phoenix Light, is the controlling noteholder of all the Phoenix
Light Plaintiffs, has an economic stake in the Phoenix Light
Plaintiffs' litigation, and exercises some measure of control
over all the Phoenix Light Plaintiffs, Supp. PL-RSUF ¶¶ 27-28,
PL SAC ¶ 38; (2) the Blue Heron Plaintiffs were parties to one
of the assignment agreements that was found to be champertous in
PL v. U.S. Bank Action, Supp. PL-RSUF ¶ 29; (3) all the
directors of the Blue Heron Plaintiffs served as directors for

plaintiffs that participated in the PL v. U.S. Bank Action, id. ¶ 28; and (4) the Phoenix Light Action and the PL v. U.S. Bank Action are prosecuted by the same counsel. Id. These facts conclusively establish that the Blue Heron Plaintiffs' interests were adequately protected in the PL v. U.S. Bank Action and demonstrate that there is "sufficient privity" between the Blue Heron Plaintiffs and the eight other Phoenix Light Plaintiffs. See PL v. BNYM, 2022 WL 92213, at *4-5; see also Phoenix Light SF Ltd v. Wells Fargo Bank, N.A., No. 14-cv-10102, ECF No. 645 at 16 (S.D.N.Y. Dec. 6, 2021) (report and recommendation; finding that both Blue Heron Plaintiffs are in privity with the plaintiffs in the PL v. U.S. Bank Action and subject to collateral estoppel).

Third, the issues decided by the court of appeals relating to champerty and prudential standing are dispositive of the present action. Without prudential standing, the Phoenix Light Plaintiffs cannot assert claims arising out of the Certificates and the entire Phoenix Light Action must be dismissed.

Although the requirements for the application for collateral estoppel are met, the Phoenix Light Plaintiffs contend that they should not be precluded by the PL v. U.S. Bank Action for several unpersuasive reasons. First, they argue that DBTCA is not entitled to invoke the equitable defense of collateral estoppel because it was a party, in the capacity as

27

indenture trustee, to two of the champertous assignments at issue and therefore has unclean hands. "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is directly related to the subject matter in litigation and has injured the party attempting to invoke the doctrine." PenneCom B.V. v. Merrill Lynch & Co., Inc., 372 F.3d 488, 493 (2d Cir. 2004) (citing Weiss v. Mayflower Doughnut Corp., 135 N.E.2d 208, 210 (N.Y. 1956)). The Phoenix Light Plaintiffs' argument fails because there is no evidence that DBTCA committed any unconscionable act or engaged in any relevant conduct involving "fraud, deceit," or "bad faith." See Marathon Outdoor, LLC v. Vesconti, 107 F. Supp. 2d 355, 360 n.9 (S.D.N.Y. 2000). It is undisputed that EAA or Phoenix Light directed DBTCA to assign the relevant claims to the Phoenix Light Plaintiffs and that EAA or Phoenix Light agreed to indemnify DBTCA against any losses to DBTCA arising from DBTCA's following their directions. Supp. PL-RSUF ¶¶ 18-20. DBTCA's compliance with the express directions of EAA/Phoenix Light, which exercised their power as controlling parties under the GAs, is in no way unconscionable, fraudulent, or deceitful, and cannot now be relied on by the

Phoenix Light Plaintiffs to avoid the consequences of the champertous assignments that EAA/Phoenix Light orchestrated.[14]

Second, the Phoenix Light Plaintiffs argue that the issues decided in the Phoenix Light Action are purely legal and cannot be subject to collateral estoppel. However, this argument fails because Judge Broderick explained that the question of champertous intent, an essential element of champerty, is a "factual question" and discussed the record evidence before him at length before finally concluding that the assignments were void. See PL v. U.S. Bank, 2020 WL 1285783, at *11-13; see also Justinian Capital SPC v. WestLB AG, 65 N.E.3d 218, 221 (N.Y. 2016) (conduct cannot be champertous unless the intent and purpose of that conduct was to bring a suit). The court of appeals likewise concluded, "[b]ased on the factual findings of the District Court," that the assignments "were indeed champertous" and that the plaintiffs therefore lacked prudential

---

[14] The Phoenix Light Plaintiffs contend that their unclean hands argument is supported by the New York Court of Appeals' decision in Irwin v. Curie, 64 N.E. 161 (N.Y. 1902). In Irwin, a breach of contract action, the court did not allow a defendant-attorney to invoke the defense that the contract was void because the defendant (but not the plaintiff) was prohibited by statute from having entered into the contract in the first place. Id. at 161-62 (the "statute was leveled against attorneys and counselors, to the ranks of which this defendant belonged . . . but did not prohibit plaintiff from making such a contract."). The court reasoned that although the contract was illegal, the plaintiff, as "the more innocent party," was entitled to enforce the contract against the defendant. Id. But Irwin does not save the Phoenix Light Plaintiffs' claims because they are not innocent parties to the assignments that EAA/Phoenix Light directed and brought about. It is undisputed that DBTCA simply followed EAA/Phoenix Light's directions and did not otherwise engage in any inequitable conduct.

standing. PL v. U.S. Bank III, 2021 4515256 at *1; see also
Rosenberg v. Shemiran Co., LLC, No. 20-cv-2259, 2020 WL 1953627,
at *3 (S.D.N.Y. Apr. 22, 2020) (the "doctrine of issue
preclusion bars relitigation of the specific issues that the
prior court decided in reaching its jurisdictional
determination").

Third, the Phoenix Light Plaintiffs contend that collateral
estoppel should not apply here because the holding in PL v. U.S.
Bank III was "supported by alternate grounds." This argument is
without merit because the court of appeals' decision was based
solely on a finding that the plaintiffs lacked prudential
standing because the assignments were champertous. The court of
appeals did not reach the issue of Article III standing or
support its ruling by any other alternative ground.[15]

Finally, the Phoenix Light Plaintiffs argue that Fund
Liquidation Holdings LLC v. Bank of Am. Corp, 991 F.3d 370 (2d
Cir. 2021), which was decided during the pendency of the appeal
in the PL v. U.S. Bank Action, undermines the decision in PL v.
U.S. Bank III. However, the eight Phoenix Light Plaintiffs

---

[15] The court of appeals resolved whether the plaintiffs had prudential
standing without addressing whether the plaintiffs have Article III standing.
This demonstrates that it is proper to "assume Article III standing and
address the alternative threshold question of whether a party has prudential
standing." PL v. U.S. Bank III, 2021 WL 4515256, at *1 (quoting Hillside
Metro Assocs., LLC v. JPMorgan Chase Bank, Nat'l Ass'n, 747 F.3d 44, 48 (2d
Cir. 2014)). Accordingly, arguments to the contrary advanced by the Phoenix
Light Plaintiffs are without merit.

raised arguments based on Fund Liquidation to the court of
appeals before it rendered its decision in a Federal Rule of
Appellate Procedure 28(j) letter. PL v. U.S. Bank III, No. 20-
1312-cv, ECF No. 133 (2d Cir., filed Mar. 22, 2021). Because the
court of appeals rendered its decision in PL v. U.S. Bank III
despite being made aware of the plaintiffs' Fund Liquidation
arguments, that case does not strip PL v. U.S. Bank III of its
preclusive effect.

    For these reasons, the Phoenix Light Plaintiffs are
collaterally estopped from relitigating the issues of champerty
and prudential standing. Under PL v. U.S. Bank III, the
assignment of all the claims advanced in the Phoenix Light
Actions are void as champertous and the Phoenix Light Plaintiffs
lack prudential standing to pursue their claims.[16] Accordingly,
DB's supplemental motion for summary judgment dismissing all the
claims in the Phoenix Light Action is granted.[17]

---

[16] All the Phoenix Light Plaintiffs would lack prudential standing to pursue
their claims here even if they were afforded an opportunity to relitigate the
issues from the PL v. U.S. Bank Action. See PL v. BNYM, 2022 WL 92213, at *5
n.15 ("The Court also notes that it need not rely on issue preclusion . . . .
because the Second Circuit's reasoning in [PL v. U.S. Bank III] would
necessitate the same outcome under a fresh analysis."). Although PL v. U.S.
Bank III is a summary order, it dealt with identical or materially identical
parties, issues, and facts to those presented here. See L.O. v. N.Y.C. Dep't
of Educ., 822 F.3d 95, 123 n.17 (2d Cir. 2016) ("[D]enying summary orders
precedential effect does not mean that the court considers itself free to
rule differently in similar cases."). The Phoenix Light Plaintiffs have
offered no persuasive reason for this Court to depart from the well-reasoned
conclusions in PL v. U.S. Bank I and PL v. U.S. Bank III, which applied
established precedent from this Circuit and the New York state courts. See PL
v. BNYM, 2022 WL 92213, at *5 n.15.

[17] Because the Phoenix Light Plaintiffs lack prudential standing to pursue any
claims in the Phoenix Light Action, the entire action is dismissed on that

**2. Sold Certificates**

It is undisputed that Commerzbank is asserting claims arising out of 27 Certificates that it sold prior to commencing the Commerzbank Action and that the Phoenix Light Plaintiffs are asserting claims arising out of six Certificates that they sold prior to commencing the Phoenix Light Action (the "Sold Certificates"). See Biron CB-Ex. 27 (Commerzbank Sold Certificates); Biron PL-Ex. 27 (Phoenix Light Plaintiffs Sold Certificates). For the six Phoenix Light Plaintiffs Sold Certificates, the sales contracts did not provide that the relevant indenture trustee for the Phoenix Light Plaintiff would retain claims that may have accrued before the sale of the Sold Certificates. PL-RSUF ¶ 40. For the 27 Commerzbank Sold Certificates, the Plaintiffs have presented no evidence that any sales contract provided that Commerzbank would retain claims that may have arisen before the sale of the Sold Certificates. CB-RSUF ¶ 43. DB argues that the Plaintiffs therefore lack standing to assert claims relating to the Sold Certificates.

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies." See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992). To

---

basis alone. However, DB advanced numerous arguments in its original motion for summary judgment as to why the Phoenix Light Plaintiffs' claims should be dismissed. Those arguments are addressed below and constitute alternative holdings supporting the dismissal of those claims.

satisfy the requirements of Article III standing, a plaintiff must show that (1) the plaintiff has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and defendant's actions; and (3) it is likely that a favorable decision in the case will redress the injury. See id. at 560-61. "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561; see also Springer v. U.S. Bank Nat'l Ass'n, No. 15-cv-1107, 2015 WL 9462083, at *3 (S.D.N.Y. Dec. 23, 2015). The Plaintiffs bear the burden of establishing "standing for each claim [they] seek[] to press and for each form of relief that is sought." PL v. U.S. Bank I, 2020 WL 1285783, at *10 (quoting Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008)). Generally, in breach of contract cases, "the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim [at issue]." Cortlandt St. Recovery Corp. v. Hellas Telecommunications S.a.r.L., 790 F.3d 411, 420 (2d Cir. 2015). However, courts have recognized that a valid assignment to a plaintiff of the right at issue allows the plaintiff to "stand in the place of the injured party" and can be sufficient to satisfy standing. Id. at 418; see also PL v. U.S. Bank I, 2020 WL 1285783, at *9-10.

Because "[t]here is no uniform law controlling the assignment of the accompanying litigation rights when [RMBS] certificates are transferred," Royal Park Invs. SA/NV v. U.S. Bank N.A., 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018), the parties agree that the question of which jurisdiction's law applied to the Sold Certificates' sales transactions may determine whether the Plaintiffs have standing to pursue claims relating to the Sold Certificates. The Plaintiffs argue, and DB does not appear to dispute, that under Irish, Cayman, or English law, sellers retain litigation rights in sold securities even if the sales contracts do not contain express provisions so stating. The parties also do not dispute that "under New York law, claims travel with the security unless expressly reserved in writing." Commerzbank AG v. U.S. Bank Nat'l Ass'n, 457 F. Supp. 3d 233, 243 (S.D.N.Y. 2020) (applying New York law; concluding Commerzbank lacked standing to pursue claims related to certificates sold prior to commencement of the suit); see N.Y. Gen. Oblig. Law § 13-107.

A federal court sitting in diversity applies the choice of law rules of the forum state. Klaxon Co. v. Stentor Co., 313 U.S. 487 (1941); Kinsey v. New York Times Co., 991 F.3d 171, 176 (2d Cir. 2021). Accordingly, New York's choice of law rules apply to the Sold Certificate transactions.

To determine which jurisdiction's law governs a contract, courts applying New York choice of law rules employ a "center of gravity" or "grouping of contacts" analysis to determine which jurisdiction has "the most significant relationship to the transaction and the parties," based on a consideration of several factors including: "the place of contracting," "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 642 N.E.2d 1065, 1068 (N.Y. 1994). Both parties acknowledge that under this test, the location of the actual contracting parties to a sale carries more weight than the location of a broker involved with the transaction. Opp'n at 5; Reply at 2-3; see Royal Park Invs. SA/NV v. Bank of New York Mellon, No. 14-cv-6502, 2019 WL 652841, at *7 (S.D.N.Y. Feb. 15, 2019) (under New York's center of gravity test, inquiry into the identity of a sold certificate's beneficial owner is necessary to determine whether a party has standing to assert claims relating to that security).

The Plaintiffs have failed to produce evidence regarding the identity and location of the ultimate purchasers of the Sold Certificates. Biron CB-Ex. 22; CB-RSUF ¶¶ 42-44; PL-RSUF ¶¶ 40-41. The Plaintiffs did produce trade tickets listing the counterparties for certain sales, e.g., Handlin Exs. 122, 124,

35

128, 130, 134, but do not have any information regarding whether those counterparties purchased the Certificates for their own accounts or on behalf of their clients.

The Plaintiffs argue that even though the identities of the ultimate purchasers of the Sold Certificates are unknown, application of Irish, English, or Cayman law to the Sold Certificates transactions is proper under the center of gravity test. The Plaintiffs note that Phoenix Light is an Irish company with a Board of Directors in Ireland and that Blue Heron is incorporated in the Cayman Islands with a Board of Directors in Grand Cayman. The Plaintiffs also argue that Phoenix Light and Blue Heron held, administrated, and sold the relevant Certificates in Ireland and the Cayman Islands, respectively. With respect to Commerzbank, the Plaintiffs argue that English law applies, in part because the Sold Certificates were sold with the involvement of staff from Commerzbank's London branch.

The Plaintiffs' arguments are without merit. It is the Plaintiffs' burden to demonstrate their standing to sue for claims related to each Certificate. See Commerzbank AG, 457 F. Supp. 3d at 243. However, the Plaintiffs have not come forward with the evidence necessary to demonstrate what law applies under New York's center of gravity test and therefore cannot demonstrate that they retained claims relating to the Sold Certificates. See BlackRock Balanced Cap. Portfolio (FI) v.

36

Deutsche Bank Nat'l Tr. Co., No. 14-cv-09367, 2018 WL 5619957,
at *11 (S.D.N.Y. Aug. 7, 2018) (noting that to establish
standing to pursue claims arising out of RMBS certificates,
"tracing [the chain of title] is only the first step in learning
who retains the litigation rights," because an "individualized
inquiry to learn who retained the litigation rights for each
security" is required).[18]

As discussed above, the identity and location of the
ultimate buyers of the Sold Certificates are unknown. The fact
that Phoenix Light and Blue Heron are incorporated in the
Ireland and the Cayman Islands, respectively, does not remedy
this failure of proof.[19] Moreover, the fact that Commerzbank's
London branch was involved in the Sold Certificates transactions
is not dispositive. Branches are not juridical entities distinct
from their bank and courts in this district have consistently
rejected arguments that a branch should be treated as a separate

---

[18] The Plaintiffs argue that because DB moved for summary judgment, the burden
is on DB to establish what law applies to the Sold Certificates transactions.
This misconstrues DB's burden at summary judgment and the need for the
Plaintiffs to demonstrate standing for each claim they pursue. Having
demonstrated "the absence of evidence to support the nonmoving party's case,"
DB has discharged its burden, and the Plaintiffs, as the nonmoving parties,
must produce evidence in the record to support their standing without relying
"simply on conclusory statements." Ying Jing Gan, 996 F.2d at 532. The
Plaintiffs have failed to do so.

[19] The Plaintiffs' own evidence demonstrates that Phoenix Light's and Blue
Heron's collateral managers, who "executed the sales" of the Sold
Certificates, were located in Germany, London, California, or New York, not
the Cayman Islands or Ireland. PL-RSUF ¶ 41; see also id. ¶ 60.1.1 ("The key
personnel dedicated to managing the [Phoenix Light] asset portfolio were
located in New York"). This further undermines any argument for the
application of Irish or Cayman law under the center of gravity test.

entity for choice of law analysis. See, e.g., Commerzbank AG, 457 F. Supp. 3d at 243 (rejecting a similar argument by Commerzbank).

Alternatively, to the extent that a center of gravity analysis can be conducted with the limited evidence presented by the Plaintiffs, that evidence demonstrates that New York law governed the Sold Certificates transactions because each Sold Certificate was registered in the Depository Trust Company ("DTC") securities depository at the time of sale, which is located in New York. PL-RSUF ¶ 41; CB-RSUF ¶ 44.[20] Commerzbank AG, 457 F. Supp. 3d 233, is instructive. In that case, Judge Pauley, applying Ohio choice of law principles, found that New York law governed the sale of certain certificates, in part because those certificates were registered with the DTC. Id. at 243. Judge Pauley explained that "the actual transactions did not occur in London; they occurred in New York through DTC, a clearing house. . . . The fact that DTC actually holds the certificates and effectuates the transactions means that the

---

[20] The parties in the Commerzbank Action do not specifically address in their 56.1 Statements whether the Sold Certificates in that action were registered with the DTC. However, the trade tickets for the Commerzbank Sold Certificate transactions do appear to indicate that DTC played at least some role in those transactions. Additionally, at the oral argument on the present motions, counsel for DB contended that the Commerzbank Sold Certificates were registered with the DTC and counsel for Commerzbank did not contest that representation. And in post-oral argument letters addressing supplemental authority on this issue, Commerzbank again did not dispute DTC's involvement in the Commerzbank Sold Certificate transactions, and indeed conceded that DTC played a "settlement function" with respect to the Sold Certificates. CB ECF No. 290.

transactions actually occurred in New York and are governed by New York law." Id. This reasoning is apposite here and lends further support to the conclusion that New York law applies in the absence of evidence regarding the location and identity of the buyers of the Sold Certificates. Because there is no evidence that the Plaintiffs explicitly retained claims related to the Sold Certificates, application of New York law to the Sold Certification transactions is fatal to the Plaintiffs' standing as to the Sold Certificates. See id.; N.Y. Gen. Oblig. Law § 13-107.

In sum, there is no evidence in the record that the Plaintiffs have standing to pursue claims relating to the Sold Certificates. DB is entitled to summary judgment dismissing all claims relating to the Sold Certificates.

### 3. Unpossessed Certificates

DB argues that the Plaintiffs have failed to demonstrate that the Plaintiffs ever held three Certificates and therefore lack standing to assert claims based on those Certificates.

First, DB asserts that there is no evidence that Phoenix Light ever held the IXIS 2007-HE1 M2 Certificate. Phoenix Light contends that it acquired the IXIS 2007-HE1 M2 Certificate in 2009 from Harrier Finance Limited ("Harrier"). Phoenix Light points to evidence including a trade ticket relating to the purchase of the IXIS 2007-HE1 M2 Certificate by Harrier in 2007,

Fitzgerald Ex. 44, and an "Assignment Agreement" from 2012 that states that Harrier "sold, transferred and delivered" to Phoenix Light over 100 specified securities (including the IXIS 2007-HE1 M2 Certificate) in 2009. See Fitzgerald Ex. 39. However, the Assignment Agreement only purports to transfer litigation claims relating to the securities, not the securities themselves, and merely assumes that the transfer of the Certificates took place in 2009. Part Two of DB's Reply and Response to the Phoenix Light Plaintiffs' Counter-Statement of Undisputed Material Facts ("PL-RSUF-2") ¶ 973. Although a collateral manager maintained ledgers of Phoenix Light's securities assets, the Plaintiffs have not provided any ledger referencing the IXIS 2007-HE1 M2 Certificate or any trade ticket or exercise notice referencing that Certificate. Id. Moreover, despite Phoenix Light's representation in interrogatories that it acquired IXIS 2007-HE1 M2 Certificate in January 2007 and never sold it, that Certificate does not appear in a Phoenix Light December 2010 asset report. See Biron PL-Exs. 22 (line 38 of Ex. A thereto), 86. Additionally, Phoenix Light has failed to submitted evidence that Harrier retained any legal claims to transfer to Phoenix Light at the time of the Assignment Agreement, even if Harrier had acquired the IXIS 2007-HE1 M2 Certificate. Accordingly, Phoenix Light has failed to establish that it has standing to assert claims related to the IXIS 2007-HE1 M2 Certificate.

40

Similarly, DB argues that there is no evidence that Commerzbank ever held the FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates. Commerzbank asserts that it acquired the FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates through an assignment agreement in connection with Commerzbank's purchase of 239 certificates from Barrington II, which included the preexisting legal claims held by Barrington II for certificates that it had already sold to third parties. Part Two of DB's Reply and Response to the Commerzbank's Counter-Statement of Undisputed Material Facts ("CB-RSUF-2") ¶ 1307. However, the assignment agreement on which Commerzbank relies does not purport to assign the actual FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates. It only transfers the assets contained in its Exhibit B to the assignment agreement and those Certificates are not listed in that exhibit. Instead, the assignment agreement only purports to assign "any and all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to" such Certificates, as designated in Exhibit A. Handlin Ex. 673 §§ 1, 2, Exs. A, B. Additionally, Commerzbank previously stated in response to DB's interrogatories that Barrington II sold the FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates to unknown buyers in 2012 — prior to the 2013 assignment on which Commerzbank relies. CB-RSUF-2 ¶ 1307.

Commerzbank has not provided information about the 2012 sale by Barrington II to unknown purchasers and has not otherwise provided evidence to establish that Barrington II retained any legal claims in connection with its prior ownership of the FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates at the time of the relevant assignment agreement. Accordingly, Commerzbank has failed to establish its standing to assert claims related to the FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates, or that it otherwise acquired claims from Barrington II at the time of the 2013 assignment agreement.

Therefore, all claims asserted by Phoenix Light relating to the IXIS 2007-HE1 M2 Certificate and all claims asserted by Commerzbank relating to the FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2 Certificates are dismissed.

### 4. Bond Issuer Consent

DB contends that Phoenix Light does not have standing to assert claims for the two tranches of Certificates issued by the IMM 2005-7 Trust, arguing that pursuant to the relevant GA for that Trust, investors may not initiate litigation without the written consent of the "Bond Issuer." See Biron PL-Ex. 74. In relevant part, the GA governing the IMM 2005-7 Certificates provides that certificateholders may not "institute any Proceeding, judicial or otherwise, with respect to this Indenture, . . . unless . . . such [certificateholders] have the

written consent of the Bond Issuer or a Bond Issuer Default exists." Id.

The Plaintiffs do not dispute that this consent provision appears in the relevant GA or that the Plaintiffs failed to receive written consent from Ambac Assurance Corporation ("Ambac"), the Bond Issuer, prior to commencement of this action. PL-RSUF ¶ 44; PL-RSUF-2 ¶ 976. However, after oral argument on the current motions, the Plaintiffs submitted the Declaration of Susan J. Lobel, Managing Director and General Counsel of Structured Finance at Ambac.[21] Ms. Lobel declared that Ambac "ratifies and authorizes Plaintiffs' actions, and consents to Plaintiffs asserting claims, as to the IMM 2005-7 Certificates against Defendants" in this case. Lobel Decl. ¶ 4.

The Plaintiffs argue that Ms. Lobel's declaration alleviates any standing issues with respect to the relevant claims. The Plaintiffs further argue that these newly viable claims are timely because they relate back to Phoenix Light's earlier complaints. DB contends that because Phoenix Light did not

---

[21] The Plaintiffs also moved for leave to supplement the summary judgment record with the Lobel Declaration. Courts in this Circuit look favorably on efforts to supplement the record absent prejudice or bad faith. Katz v. Metro. Transp. Auth., No. 17-cv-472, 2017 WL 6734185, at *12 (E.D.N.Y. Dec. 29, 2017) (collecting cases). There is no evidence that the Plaintiffs submitted the Lobel Declaration in bad faith or that supplementing the record would prejudice DB. Moreover, the parties will be best served by the Court deciding the issues presented to it on the most complete factual basis possible. Accordingly, the Court grants the Plaintiffs' motion and accepts the Lobel declaration into the summary judgment record.

receive consent from Ambac — a condition precedent to Phoenix Light's ability and standing to pursue these claims — until August 2021, any claims relating to the IMM 2005-7 Certificates cannot relate back and are time-barred.

Under New York law, "[r]elation-back applies to the amendment of claims and parties and is dependent upon the existence of a valid preexisting action." Nomura Asset Acceptance Corp. Alt. Loan Tr., Series 2005-S4 v. Nomura Credit & Cap., Inc., No. 653541/2011, 2013 WL 2072817, at *7 (N.Y. Sup. Ct. May 10, 2013) (quoting S. Wine & Spirits of Am., Inc. v. Impact Envt'l Eng'g, PLLC, 915 N.Y.S.2d 541, 542 (App. Div. 2011)). Where a contractual condition precedent to asserting a claim is satisfied only after that claim has been asserted, the subsequent satisfaction of the condition precedent "cannot 'relate back' because the inherent nature of a condition precedent to bringing suit is that it actually precedes the action." U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc., 45 N.Y.S.3d 11, 17 (App. Div. 2016) (explaining that permitting relation back in such circumstances would "simply eviscerate the condition precedent"); S. Wine & Spirits, 915 N.Y.S.2d at 541 ("Here, however, the original complaint was brought by plaintiffs in violation of the condition precedent, and the plaintiffs cannot rely upon [the New York relation back statute] to cure such failure to comply.").

Although the Plaintiffs' claims arising from the IMM 2005-7 Certificates were first asserted in earlier complaints, the Plaintiffs did not have standing to assert these claims until the condition precedent was satisfied in August 2021. These claims, as initially asserted, were not valid causes of action because the condition precedent was not yet satisfied. Accordingly, there is nothing that the newly consented-to claims can properly relate back to. Because relation back is foreclosed under New York law and there is no dispute that the relevant claims accrued years ago, all claims arising out of the IMM 2005-7 Certificates are time-barred.[22] See infra Section III.B.

### B. Statute of Limitations

DB argues that the majority of the Plaintiffs' claims are time-barred because those claims accrued in Germany and are untimely under the applicable German three-year statute of limitations. The parties agree, and the Court previously found, that most of Commerzbank's claims are subject to the German statute of limitations. CB MTD Order, 234 F. Supp. 3d at 468-71.

---

[22] The Plaintiffs' invocation of Davis v. Scottish Re Group Ltd., No. 654027/2013, 2019 N.Y. Misc. LEXIS 1820 (N.Y. Sup. Ct. Apr. 10, 2019), is without merit. The Plaintiffs cite Davis to argue that relation back is foreclosed in these circumstances only if the plaintiff initially lacked standing for every claim asserted in its complaint. To the extent that Davis applied such a rule, it appears to conflict with the Appellate Division's decision in U.S. Bank, which foreclosed relation back of certain contract claims even though the plaintiffs' complaint was not entirely dismissed. 45 N.Y.S.3d at 18. In this case, only the claims relating to two tranches of Certificates from one Trust are barred because it is only those certificates which are alleged to have required Ambac's consent prior to suit and which Phoenix Light failed to obtain.

The parties dispute which statute of limitations applies to the claims arising out of 29 Certificates held by Phoenix Light.[23] The Plaintiffs also argue that regardless of what statute of limitations period applies, their claims are still timely.

## 1. Statute of Limitations Applicable to Phoenix Light's Claims

"When a nonresident sues on a cause of action accruing outside New York, [N.Y. C.P.L.R.] § 202 requires the cause of action to be timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." Global Fin. Corp. v. Triarc Corp., 715 N.E.2d 482, 484 (N.Y. 1999). When a cause of action has been assigned, the question of where and when the cause of action accrued focuses on the original assignor. See Portfolio Recovery Assocs., LLC v. King, 927 N.E.2d 1059, 1061 (N.Y. 2010).

In general, absent unusual circumstances, when the injury of a nonresident plaintiff is purely economic, the cause of action accrues where the plaintiff resides and sustains the economic impact of the loss, see Glob. Fin., 715 N.E.2d at 485, rather than where the defendant committed the wrongful act. See Gordon & Co. v. Ross, 63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999). "If the injured party is a corporation, then the place of

---

[23] DB does not contend that claims asserted by any other Phoenix Light Plaintiff accrued in Germany or otherwise argue that they are untimely under the German statute of limitations.

residence for the purposes of [N.Y. C.P.L.R. § 202] is traditionally the state of incorporation or the corporation's principal place of business." HSN Nordbank AG v. RBS Holdings USA Inc., No. 13-cv-3303, 2015 WL 1307189, at *5 (S.D.N.Y. Mar. 23, 2015). When an injury accrues to a trustee, courts applying New York law look to the jurisdiction of the trust beneficiaries, or, if the trust beneficiaries are too geographically scattered to provide a workable basis to determine a location, to the trust itself. See, e.g., Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC, 140 N.E.3d 511, 518 (N.Y. 2019). Ultimately, "the thrust of the inquiry is who became poorer, and where did they become poorer as a result" of the challenged conduct. HSN Nordbank AG, 2015 WL 1307189, at *5.

As discussed above, Phoenix Light is a special purpose vehicle, formed by WestLB to facilitate a transaction designed to spin off WestLB's distressed assets. At the closing of relevant structured finance transactions, WestLB transferred assets to Phoenix Light, which simultaneously transferred Certificates to an indenture trustee that held the Certificates "for the benefit of" WestLB and its risk shield Guarantors (and, subsequently, EAA) – all Germany entities. PL-RSUF ¶¶ 38, 51-57. The transfer to the indenture trustee granted the indenture trustee "all of [Phoenix Light's] right, title and interest in and to [the assets, including the Certificates] whether now

owned or existing or hereafter arising or acquired." Biron PL-Ex. 96 § 2.1 (agreement governing the Phoenix Light securitization transaction); PL-RSUF ¶ 38.

Courts in this Circuit interpreting identical and substantially similar granting clauses have found that such clauses effect a true and complete transfer of rights and claims to the indenture trustee. See PL v. U.S. Bank III, 2021 WL 4515256, at *2;[24] see also Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon, No. 16-cv-1597, 2017 WL 1103033, at *3 (S.D.N.Y. Mar. 21, 2017). Because the indenture trustee held the assets for the benefit of known and easily identifiable beneficiaries when the claims accrued with respect to the relevant Certificates, it was the trust's beneficiaries (the Phoenix Light noteholders and risk shield guarantors) who were injured. Accordingly, Phoenix Light's claims arising out of its 29 Certificates (see Biron PL-Ex. 73) accrued in Germany and are governed by the German statute of limitations.

The German statute of limitations applies because Phoenix Light's claims are based upon alleged breaches of contractual obligations and other duties that were owed to the indenture

---

[24] In PL v. U.S. Bank III, the court of appeals found that Phoenix Light's grant of its interests to the indenture trustee constituted a "complete transfer" and "conveyed in toto all interest" that Phoenix Light had in the certificates. PL v. U.S. Bank III, 2021 WL 4515256, at *2. Accordingly, Phoenix Light is also collaterally estopped from relitigating this issue. See supra Section II.A.1.a.

trustee at the time of the alleged breaches, for the benefit of the WestLB, its guarantors, and EAA. In these circumstances, Phoenix Light, to the extent that it can assert claims at all, can do so only as the assignee of rights conveyed to it by the indenture trustee and the trust's beneficiaries. Accordingly, Phoenix Light cannot "stand in a better position than that of" the indenture trustee and trust beneficiaries for purposes of statute of limitations. See Portfolio Recovery Assocs., LLC v King, 927 N.E.2d 1059 (N.Y. 2010).

For these same reasons, Phoenix Light's arguments based on Judge Sullivan's decision in House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A., No. 13-cv-519, 2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014), are without merit. Phoenix Light argues that the House of Europe stands for the proposition that Phoenix Light's place of incorporation must be the location where its claims accrued. See id. at *15 (rejecting the argument that the plaintiff corporation's injury accrued where its investors resided). But in House of Europe, Judge Sullivan recognized that where a plaintiff assigns its rights through a granting clause (as Phoenix Light did), that plaintiff is not a real party in interest to any claims that arise from those rights when those claims accrue. Id. at *15-16. Because Phoenix Light's claims are based on alleged injuries caused while the indenture trustee, WestLB, its guarantors, and EAA were the real parties in

interest to the relevant claims, those claims accrued to those entities in Germany, not to Phoenix Light. See id.; see also Triaxx Prime, 2017 WL 1103033, at *5.

Because Phoenix Light's claims accrued in Germany, to be timely under N.Y. C.P.L.R. § 202, Phoenix Light's claims must be timely under both New York and German law.

## 2. German Statute of Limitations

The parties agree that Section 195 of the German Civil Code provides the relevant statute of limitations for the Plaintiffs' claims. Section 195 establishes a three-year limitations period that "begins to run at the end of the calendar year in which 1) the claim arose and 2) the plaintiff either has knowledge of the circumstances giving rise to the claim and the identity of the defendant, or would have had such knowledge but for gross negligence." IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc., 634 F. App'x 19, 22 (2d Cir. 2015); Commerzbank AG, 457 F. Supp. 3d at 246; see also Rohe PL Decl. ¶¶ 9-21.[25]

A "plaintiff has knowledge of the circumstances giving rise to the claim when [the plaintiff] obtains knowledge of the facts

---

[25] The parties have submitted dueling expert reports — from Doctor Heinz-Peter Mansel on behalf the Plaintiffs, and Doctor Mathias Rohe on behalf of DB, respectively — regarding the application of German law to this case. Pursuant to Federal Rules of Civil Procedure 44.1, questions of foreign law are treated as questions of law and the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; CB MTD Order, 234 F. Supp. 3d at 472.

necessary to commence an action in Germany with an expectation
of success or some prospect of success, though not without risk
and even if the prospects of success are uncertain." IKB, 634 F.
App'x at 22. "To satisfy this standard, a plaintiff need not
know all the relevant details or have conclusive proof
available; knowledge of the factual circumstances underlying the
claim is sufficient." CB MTD Order, 234 F. Supp. 3d at 472; see
also IKB, 634 F. App'x at 22.

Further, as DB's German law expert, Dr. Rohe, persuasively
opined, German law imposes an affirmative "duty to investigate"
on a potential plaintiff that arises when (1) the plaintiff is
presented with evidence that suggests a particular claim against
a particular defendant; (2) there is a readily available means
of gaining further knowledge of the claim; and (3) the
investigation would yield sufficient information necessary to
state the claim and could be conducted without disproportionate
expense. Rohe PL Decl. ¶¶ 45-46. Dr. Rohe opined that the German
Federal Supreme Court has "held repeatedly that commercial
actors who are engaged in the business of investing are
obligated to review respected business publications." Id. ¶ 45;
see also Commerzbank AG, 457 F. Supp. 3d at 248
("[S]ophisticated investors are charged with a heightened duty
to investigate possible claims under German law" (quoting In re

<u>Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.</u>, No. 11-ml-2265, 2014 WL 4162382, at *7 (C.D. Cal. June 18, 2014))).

DB contends that under this standard, certain of the Plaintiffs' claims are time-barred and should be dismissed.

### a. Relation Back of Commerzbank's Claims

DB argues that all of Commerzbank's claims relating to the 10 "Commerzbank Certificates" are time-barred under German law. <u>See</u> Kraut Ex. A; Biron CB-Ex. 69. DB also seeks summary judgment dismissing all of Commerzbank's claims relating to the 20 "Palmer-3 Certificates" that accrued after they were transferred to Dresdner/Commerzbank, and summary judgment dismissing all claims relating to the 22 "Eurohypo Certificates" other than post-EOD claims arising from the 2014 Downgrade EOD relating to the MSAC 2005-HE7 B1 and MSHEL 2005-4 B1 Certificates.[26] <u>Id.</u>

---

[26] DB concedes that Commerzbank's claims relating to the Palmer 3 Certificates that accrued before their transfer to Commerzbank did not accrue in Germany and are not subject to the German statute of limitations. CB MSJ at 16. It is unclear what DB's position is with respect to the Barrington II Certificates. DB incorrectly contends that the Court determined in the <u>CB MTD Order</u> that claims arising out of the Barrington II Certificates that accrued after their transfer to Commerzbank are subject to the German statute of limitations. <u>Id.</u> The Court did not discuss the Barrington II Certificates in the <u>CB MTD Order</u> and made no such finding. <u>See generally</u> <u>CB MTD Order</u>, 234 F. Supp. 3d at 468-71. Moreover, in its opening brief, DB argued that claims relating to the Barrington II Certificates that accrued after their transfer to Commerzbank are time-barred under German law, CB MSJ at 24, but in the argument summary chart that DB submitted with its reply brief, DB appears to have abandoned that argument. Kraut Ex. A at A-2. In a letter to the Court after oral argument, DB reaffirmed that DB set forth its statute of limitations arguments in the argument summary chart. CB ECF No. 275. In any event, even if post-transfer claims relating to the Barrington II Certificates were subject to the German statute of limitations, those claims would be timely under German law. Claims arising out of these Certificates were first asserted in Commerzbank's original complaint in 2015 and so would be untimely under German law only if Commerzbank had sufficient knowledge of these claims before January 1, 2012. Because all Barrington II Certificates were

Whether Commerzbank's claims are time-barred depends in part on the applicable filing dates for its claims. There is no dispute that in Commerzbank's original complaint (filed December 23, 2015) and the CB FAC (filed April 15, 2016), Commerzbank advanced (1) claims that DB failed to investigate and seek to cure breaches of R&Ws by RMBS sponsors and originators; and (2) claims based on incomplete mortgage files, servicer robo-signing, and real estate foreclosure issues. There is also no dispute that these claims are time-barred if Commerzbank had the requisite knowledge of these claims by January 1, 2012 (the start of the third calendar year before the original complaint was filed).

In the November 2017 CB SAC, Commerzbank included additional claims based on allegations that DB breached its post-EOD "prudent person" duties arising from the Loss EODs, the 2012 Downgrade EODs, and the 2014 Downgrade EOD (collectively, the "Declared EODs"). The parties dispute whether these claims relate back to Commerzbank's original complaint and therefore what the applicable filing date for these claims should be.

Commerzbank argues that claims relating to the Declared EODs arise "out of the same conduct, transaction, or occurrence set out — or attempted to be set out — in the" original

transferred to Commerzbank after January 1, 2012, none of the post-transfer claims can be time-barred under German law. See Biron CB-Ex. 69.

complaint. See Fed. R. Civ. P. 15(c)(1)(B). But the allegations in the CB TAC relating to the Declared EODs are factually distinct from the transactions and occurrences discussed in the earlier complaints, which did not mention or reference any Declared EOD or DB's alleged failure to act prudently following a Declared EOD. See, e.g., Rochester v. Sixth Precinct Police Station, 370 F. App'x 244, 246 (2d Cir. 2010) ("[E]ven where an amended complaint tracks the legal theory of the first complaint, claims that are based on an entirely distinct set of factual allegations will not relate back."); Espinosa v. The Delgado Travel Agency, Inc., No. 05-cv-6917, 2006 WL 2792689, at *3 (S.D.N.Y. Sept. 27, 2006) (no relation back where "new factual allegations focus on events, dates, and people that were never mentioned in the original complaint"). Accordingly, claims relating to the Declared EODs do not relate back to the earlier complaints and are time-barred under German law if Commerzbank had the requisite knowledge of these claims by January 1, 2014 (the start of the third calendar year before the CB SAC was filed).

### b. Relation Back of Phoenix Light's Claims

DB seeks summary judgment dismissing all claims relating to the 29 Phoenix Light Certificates as time-barred, except for post-EOD claims arising from the 2014 Downgrade EOD relating to

the SABR 2007-NC2 M2 and A2B Certificates. <u>See</u> Kraut Ex. A;
Biron PL-Ex. 73.

As with Commerzbank, the parties dispute the applicable
filing date of certain of Phoenix Light's claims. There is no
dispute that the Phoenix Light Plaintiffs filed four complaints
in this action: (1) the original complaint asserting claims
relating to 35 Certificates (filed December 23, 2014); (2) the
PL FAC, adding claims relating to 52 additional Certificates
issued by different Trusts and governed by different GAs than
the Certificates in the original complaint (filed April 10,
2015); (3) the PL SAC, asserting, for the first time, standing
based on assignments from the indenture trustee (filed July 15,
2015); and (4) the PL TAC, asserting new claims arising from
alleged breaches relating to the Declared EODs (filed September
28, 2017).

Phoenix Light does not dispute that the claims related to
the 52 additional Certificates first advanced in the PL FAC do
not relate back to the original complaint. However, like
Commerzbank, Phoenix Light argues that claims related to the
Declared EODs (other than the 2014 Downgrade EOD) relate back to
its earlier pleadings. However, Phoenix Light did not discuss
the Declared EODs or DB's conduct following any Declared EOD in
its original complaints. Phoenix Light's argument therefore

fails for the same reasons that Commerzbank's parallel argument failed.

Accordingly, claims advanced in the original complaint and the PL FAC are time barred if Phoenix Light had the requisite knowledge of these claims by January 1, 2011, and January 1, 2012, respectively. Claims related to the Declared EODs are untimely under German law if Phoenix Light had the requisite knowledge of those claims by January 1, 2014.

### c. Application of German Statute of Limitations

DB argues that the Plaintiffs had knowledge of their claims by 2011 and 2012, which triggered the German statute of limitations period and renders many of the Plaintiffs' claims untimely. The Plaintiffs contend that dismissal on this basis is inappropriate because there are genuine disputes of material fact relating to when the Plaintiffs had sufficient knowledge of their claims and therefore when the German statute of limitations started to run. DB's arguments prevail for several reasons.

First, there is no genuine dispute of material fact that the Plaintiffs, before the relevant limitations periods, knew of allegations of misconduct by warrantors and knew that DB had not declared any EODs relating to R&W breaches or pursued the repurchase remedies provided for in the GAs. See, e.g., PL-RSUF ¶¶ 62.2, 66; CB-RSUF ¶¶ 50.2, 56; see also Biron PL-Exs. 138-40;

Biron CB-Ex. 78. The evidence in the record establishes that the Plaintiffs received monthly remittance reports showing that few, if any, loans had been put back to warrantors. By 2010 and 2011, the Plaintiffs had become sufficiently concerned about possible R&W breaches that they sought to coalesce support among other investors to direct DB to take action. See, e.g., PL-RSUF ¶¶ 66.7-14; CB-RSUF ¶¶ 56.16-19; Biron CB-Exs. 58-60; Biron PL-Exs. 58-60.

The record is also clear that Commerzbank was aware of the likelihood of significant declines in the market value of certain Certificates based on the analyses of internal and third-party valuation specialists. Commerzbank had marked the value of at least 34 Certificates as "fully written off" or $0 by January 1, 2012. See CB-RSUF ¶¶ 49-50; Biron CB-Ex. 84. And by 2011, Commerzbank was in communication with legal counsel and other RMBS certificateholders to develop an understanding of their options to pursue legal actions relating to alleged R&Ws breaches relating to underlying mortgages. CB-RSUF ¶¶ 56.17-19. Further, Commerzbank alleged in its SAC that when it began to sell the Sold Certificates in November 2011, DB's alleged breaches, including its failure to cause "the sponsors or originators to substitute or repurchase" loans with R&W breaches, "significantly reduced the sales price Commerzbank ultimately received when it divested itself of the certificates"

because "it was apparent that [DB] had breached its duties and would not take steps to remedy its failures." CB SAC ¶¶ 167-68. Consistent with this evidence and Commerzbank's allegations, when the New York State Supreme Court dismissed Commerzbank's prior action relating to 51 of the 74 Certificates at issue in this case, the court specifically stated that "the plaintiffs could with reasonable diligence have discovered [fraud relating to the certificates] prior to 2011," in no small part because, as Commerzbank admitted in that case, "forensic loan level analysis was available [for the loans underlying the certificates at issue] in 2010 and 2011." Commerzbank AG London Branch v. UBS AG, No. 654464/2013, 2015 WL 3857321, at *2-3 (N.Y. Sup. Ct. June 17, 2015); CB-RSUF ¶¶ 46-47.

Second, the record clearly establishes that prior to 2011, the Plaintiffs had sufficient knowledge of their claims relating to DB's alleged failure to follow up on incomplete or defective mortgage files or servicer failures and to provide notice to other transaction parties of EODs. It is undisputed that DB publicly disseminated allegations of servicer robo-signing and real estate owned ("REO") property and foreclosure issues, and that DB reminded certificateholders of their power to direct DB to take action, including in letters from October 2010. PL-RSUF

¶ 67.5; CB-RSUF ¶ 57.5.[27] It is also clear that the Plaintiffs were aware that DB did not declare EODs based on such servicer issues. PL-RSUF ¶ 68; CB-RSUF ¶ 57. For example, Commerzbank joined with a group of investors in requesting that DB take steps to remedy failures by a specific servicer. A letter to DB dated January 31, 2012 from Gibbs & Brunns on behalf of Commerzbank and a group of other investors noted specific and ongoing issues with servicers and mentioned that the group had informed a servicer in October 2011 that the group believed the servicer "had failed to meet its ongoing duties as Servicer and/or Master Servicer." Biron CB-Ex. 102 at 2; see also Biron CB-Ex. 120 at 54-58. All this evidence demonstrates that the Plaintiffs had sufficient knowledge to trigger the German statute of limitations period with respect to these alleged breaches.

Finally, with respect to the Plaintiffs' claims that DB breached its "prudent person" duties following certain Declared EODs, there can be no genuine dispute that the Plaintiffs had sufficient knowledge of any purported breaches prior to 2014. The parties do not appear to dispute that DB had declared EODs for the Loss EODs and 2012 Downgrade EODs. Further, it appears

---

[27] Allegations of servicer misconduct had already been the topic of public news reports, high profile government investigations, and lawsuits before 2012. CB SAC ¶ 133; CB-RSUF ¶ 57.6; Biron CB-Ex. 63.

undisputed that DB did not take action other than sending
notices to the relevant certificateholders to inform them of the
EODs. Indeed, the crux of the Plaintiffs' claims related to the
Declared EODs is that DB failed to do anything after they
declared these EODs and failed to pursue remedies in a manner
consistent with that of a "prudent person." However, given that
the Plaintiffs received notice from DB of the Loss EODs in 2010
and the Downgrade EODs in 2012, the Plaintiffs clearly had
sufficient knowledge — or were grossly negligent in failing to
acquire knowledge — of the fact that despite the declared EOD,
DB was not taking the steps that the Plaintiffs would have
preferred DB to take. Accordingly, any claim based on the Loss
EODs and the 2012 Downgrade EODs are time-barred under German
law.

The Plaintiffs contend that DB's statute of limitations
arguments fail because DB failed to show that the Plaintiffs had
trust-by-trust and loan-by-loan knowledge. However, this
argument confuses the Plaintiffs' burden at summary judgment or
trial with the level of knowledge sufficient to commence the
German statute of limitations period and is unsupported by
federal court precedent applying Germany's statute of
limitations. See Commerzbank AG, 457 F. Supp. 3d at 247
(rejecting identical argument from Commerzbank); IKB, 634 F.
App'x at 22 ("[A] plaintiff need not know all the relevant

details or have conclusive proof available" to trigger the German statute of limitations, rather, "knowledge of the factual circumstances underlying the claim is sufficient."). Moreover, German law contemplates that plaintiffs, particularly those as sophisticated as the Plaintiffs in this case, exercise reasonable care in investigating potential claims. Rohe PL Decl. ¶¶ 45-46; Rohe CB Decl. ¶¶ 39-42; see also Deutsche Zentral-Genossenschaftsbank AG v. HSC N. Am. Holdings, Inc., No. 12-cv-4025, 2013 WL 6667601, at *8 (S.D.N.Y. Dec. 17, 2013) (rejecting Dr. Mansel's testimony to the contrary and concluding that "under German law, sophisticated plaintiffs have a heightened duty to investigate possible claims.").[28] Despite this duty to investigate, the Plaintiffs did not contact DB to ask what action, if any, it was taking with respect to alleged breaches, misconduct, and defective loan files. See, e.g., Rohe PL Decl. ¶ 54; Rohe CB Decl. ¶ 48. Further, although the Plaintiffs had discovery mechanisms available to them had they pursued German litigation, they failed to take advantage of any of them. Rohe PL Reply Decl. ¶¶ 24-27; see also 28 U.S.C. § 1782. In any event, Commerzbank conceded in an earlier action that relevant

---

[28] Based on the available news coverage in the United States and Germany, Dr. Rohe opined that a German court would conclude that by December 31, 2011, the Phoenix Light Plaintiffs were grossly negligent in failing to acquire knowledge sufficient to bring their claims. Rohe PL Decl. ¶¶ 49-59. Similarly, Dr. Rohe opined that Commerzbank either had knowledge or was grossly negligent in failing to acquire knowledge sufficient to bring claims by the end of 2012. Rohe CB Decl. ¶¶ 43-48.

"forensic loan level analysis was available in 2010 and 2011."
Commerzbank AG London Branch, 2015 WL 3857321, at *3.

Additionally, any argument that the Plaintiffs were aware
of sponsor, originator, or servicer breaches, but not breaches
by DB as the trustee, is unpersuasive. The logical inference to
be drawn from the Plaintiffs' observed issues with sponsors,
originators, and servicers, the monthly remittance reports, the
few notices of EOD received from DB, and the lack of reported
steps to remediate such issues is, or should have been, clear.
As Judge Pauley found relating to similar claims brought by
Commerzbank, in light of known facts relating to servicer
failures, "Commerzbank logically should have targeted actions
against the Trustee . . . it is hard to fathom how — but for
gross negligence — [the Plaintiffs] did not learn of facts
sufficient to bring their claim." Commerzbank AG, 457 F. Supp.
3d at 248. If the Plaintiffs were aware of the alleged breaches
of R&Ws and following the monthly reports, then the Plaintiffs
were aware — or were grossly negligent in not knowing — that DB
was not pursuing such breaches. Similarly, once the Plaintiffs
were aware of servicer issues and the fact that DB was not
taking action after declaring EODs, the Plaintiffs had knowledge
of facts sufficient to bring their claims.

Finally, the Plaintiffs' argument that additional or
successive breaches restarted the statute of limitations clock

under German law is unpersuasive. It is clear that German law
applies the principal of "unity of damages," pursuant to which
ongoing breaches do not restart or toll the Plaintiffs' statute
of limitations period. <u>See, e.g.</u>, Rohe Pl-Decl. ¶¶ 22-28;
<u>Commerzbank AG v. U.S. Bank Nat'l Ass'n</u>, No. 16-cv-4569, 2021 WL
603045, at *5 (S.D.N.Y. Feb. 16, 2021) (rejecting Commerzbank's
argument that under German law, "each successive breach should
restart the statute of limitations.").

Accordingly, all of Phoenix Light's claims related to the
29 Phoenix Certificates listed in Biron PL-Ex. 73 are time-
barred, except post-EOD claims arising from the 2014 Downgrade
EOD that affected SABR 2007-NC2 M2 and A2B. Similarly, all of
Commerzbank's claims relating to the 10 Commerzbank Certificates
identified in Biron CB-Ex. 69 and the 20 Palmer-3 Certificates
(for claims after the merger of Dresner and Commerzbank)
identified in Biron CB-Ex. 69 are dismissed. In addition, all
Commerzbank claims relating to the 22 Eurohypo Certificates
identified in Biron CB-Ex. 69 are time-barred, except for post-
EOD claims relating to the 2014 Downgrade EOD affecting MSAC
2005-HE7 B1 and MSHEL 2005-4 B1.

### 3. New York Statute of Limitations

DB also argues that certain of the Plaintiffs' claims are
untimely under the New York statute of limitations. DB's New
York statute of limitations arguments concern three categories

of claims: (1) claims that DB breached its "prudent person" duties following the Loss EODs for 19 trusts (Biron PL-Ex. 29 (listing the 11 relevant Phoenix Light Plaintiffs trusts); Biron CB-Ex. 29 (listing the eight relevant Commerzbank trusts)); (2) claims that DB breached duties relating to alleged R&W breaches in certain loans (Reyes PL-Ex. I (listing relevant Phoenix Light Plaintiffs loans); Reyes CB-Ex. I (listing relevant Commerzbank loans)); and (3) claims relating to the 20 Palmer-3 Certificates that accrued before those Certificates were transferred to Dresdner/Commerzbank in 2008 (Biron CB-Ex. 69 (listing the Palmer-3 Certificates)). Under New York law, the longest statute of limitations governing the Plaintiffs' claims is six years. See N.Y. C.P.L.R. §§ 214(4), 213(2) (breach of contract and tort statute of limitations); IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 273 (N.Y. 2009) (breach of fiduciary duty statute of limitations); Cruden v. Bank of N.Y., 957 F.2d 961, 967 (2d Cir. 1992) (TIA statute of limitations).

### a. Loss EOD Claims

There is no genuine dispute that DB notified investors of the Loss EODs relating to 11 Phoenix Light Plaintiffs trusts ("PL Loss EOD Trusts") between March 2009 and March 2011 and of the Loss EODs in the eight Commerzbank trusts ("CB Loss EOD Trusts") between August 2008 and September 2010. PL-RSUF ¶ 78; CB-RSUF ¶ 58.

As discussed above, claims relating to the Loss EODs were first raised in 2017 in the CB SAC and PL TAC and do not relate back to any earlier pleading. DB argues that Loss EOD claims related to the PL and CB Loss EOD Trusts accrued more than six years before the CB SAC and PL TAC were filed and are therefore untimely under New York law.

Under New York law, the limitations period on a claim for breach of contract begins to run when the cause of action accrues. A cause of action for breach of contract ordinarily accrues and the limitations period begins when breach occurs, regardless of whether the plaintiff has knowledge of the breach. Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007); Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co., 967 N.E.2d 1187, 1190 (N.Y. 2012) (claim for breach of contract accrues "when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court"). However, if "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." Guilbert, 480 F.3d at 150. "Under New York law the continuing breach exception is narrow, restricted to continuing wrongs, not a single wrong that has continuing effects." BlackRock Balanced Cap. Portfolio (FI), 2018 WL 5619957, at *12.

With respect to the PL Loss EOD Trusts, DB argues that any alleged breach accrued before September 2011 (six years before the PL TAC was filed). DB relies on notices that it circulated to investors between March 2009 and March 2011 in which DB apprised investors of the Loss EODs. PL-RSUF ¶ 78. While the exact language varies across the notices, in substance each notice advised recipients of the fact that under the relevant GA, a majority bloc of investors has the power to direct DB to terminate servicers or take other remedial actions:

> We call your attention to Section [sic] Article VII of the Agreement, which provides that if the Servicer Event of Default then [sic], and in each and every case, so long as such Servicer Event of Default shall not have been remedied, the Trustee shall at the direction of the Holders of each Class of Regular Certificates evidencing Percentage Interests aggregating not less than 51 % by notice then given in writing to the Servicer and to the Trustee if given by Holders of certificates, shall terminate all of the rights and obligations of the Servicer as servicer under the Agreement.

See, e.g., Biron PL-Ex. 111. Some but not all of the notices also included a reservation of rights and a recommendation that investors consult with their financial, tax, and/or legal advisors in connection with the Loss EODs.[29]

---

[29] See, e.g., Biron PL-Ex. 111 ("The Trustee expressly reserves any and all rights and remedies which it may now or hereafter be entitled to exercise in connection with the Certificates or the Agreement. The Trustee makes no recommendations and gives no investment, legal or tax advice to Holders. EACH HOLDER IS STRONGLY ADVISED TO CONSULT WITH ITS OWN FINANCIAL, TAX AND/OR LEGAL ADVISORS REGARDING THESE MATTERS.").

DB argues that the notices apprised investors that DB would not take further action with respect to the Loss EODs without investor direction. Therefore, according to DB, any post-EOD failure to act as a prudent person or take any action other than simply wait for investor direction accrued when the notices were circulated.

The Plaintiffs argue that the exact time when DB failed to act prudently post-EOD, and therefore when the breaches accrued, cannot be resolved on summary judgment. The Plaintiffs also argue that because prudence post-EOD is a continuing duty and that under New York law, DB's successive breaches repeatedly restarted the statute of limitations clock.

On this record, there is no genuine dispute of fact that any alleged breach by DB occurred and accrued when the notices were circulated between 2009 and 2011. The notices apprised investors of the Loss EODs and reminded recipients that investors could direct DB to terminate the servicers or take other actions. Conspicuously absent from the notices was any indication that DB intended to take any further action absent investor direction. The Plaintiffs' own mortgage-backed securities expert opined that the "notices merely stated that [DB] would terminate the servicer or take any other unspecified actions, if directed to do so. Such a statement is tantamount to disclaiming [DB's] duty to act as a prudent person." Fitzgerald

Ex. 236 ¶ 189 (emphasis added). Moreover, to the extent that
recipients were left wondering what, if anything, DB was going
to do following the Loss EODs, they could have contacted DB and
asked using the contact information provided in the notices.
E.g., Biron PL-Ex. 111 (recipients could contact "[phone number]
or [email address] with any questions you may have regarding
this notice.").

Moreover, the Plaintiffs' argument that DB's failure to act
following the Loss EODs constituted repeated, successive
breaches is without merit. New York contract law distinguishes
between "a single wrong that has continuing effects and a series
of independent, distinct wrongs," and allows an exception to the
typical accrual rules only in the latter case. See Maloul v. New
Columbia Res., Inc., No. 15-cv-8710, 2017 WL 2992202, at *5
(S.D.N.Y. July 13, 2017). Here, DB's decision to take no action
absent investor direction is single, discrete decision, and any
alleged harm sustained by the Plaintiffs was caused by that
decision. See BlackRock Balanced Cap. Portfolio, 2018 WL
5619957, at *12 (observing that a similar argument regarding
alleged continuous breaches by the same defendants was "unlikely
to succeed" under New York's "narrow" continuing breach
exception). To hold otherwise would eviscerate the statute of
limitations in these circumstances by allowing the clock to

perpetually restart even though any alleged injury is traceable to a decision, that DB announced to investors, to do nothing.

As to the CB Loss EOD Trusts, the relevant claims are untimely under New York law because they are untimely under German law. See Global Fin. Corp., 715 N.E.2d at 484 (N.Y. C.P.L.R. § 202 requires claims to be timely under the limitation periods of both New York and the jurisdiction where the claims accrued).

### b. Pre-EOD R&W Breaches

It is undisputed that in and before 2009, DB received letters from third parties identifying specific loans in Trusts that allegedly breached one or more R&Ws. PL-RSUF ¶ 79; CB-RSUF ¶ 67. As to the Phoenix Light Plaintiffs, DB received notice regarding loans that were held in Trusts identified in the Phoenix Light Plaintiffs' original complaint before December 23, 2008 (six years before the original complaint) and notice regarding loans that were held in Trusts identified in the PL FAC before April 11, 2009 (six years before the PL FAC). As to Commerzbank, DB received notice regarding loans that were held in Trusts identified in Commerzbank's original complaint before December 23, 2009 (six years before the original complaint). In view of these undisputed facts, DB argues that any claim that it breached its pre-EOD contractual duties to give notice, enforce repurchase obligations, or take any other action concerning

these loans accrued shortly after it received these notices and are time-barred under the New York statute of limitations.[30]

DB first argues that under the GAs for 37 of the 45 relevant Trusts with alleged loan-level R&W breaches, DB had no duty to enforce repurchase obligations. As discussed below (see infra Section IV.A.4), where a GA did not explicitly provide that DB had a duty to enforce repurchase obligations, DB was under no contractual duty to do so. Because DB could not have breached repurchase obligations for those Trusts, DB's statute of limitations arguments for those claims are moot.

As to four additional Trusts, DB concedes that it had a contractual duty to enforce repurchase obligations. However, DB argues that any claim that it breached those duties is untimely

---

[30] If the Court found that certain of these claims accrued in Germany and are untimely under German law, then those claims need not also be untimely under the New York statute of limitations to be time-barred. However, the extent of overlap between the claims subject to DB's German statute of limitations arguments and those subject to this New York statute of limitations argument is unclear and not addressed in the parties' papers. As discussed above, claims relating to 29 Phoenix Light Certificates are subject to the German statute of limitations. Certain of those Certificates were issued by Trusts that are subject to DB's New York statute of limitations arguments. Compare Reyes PL-Ex. I, with Biron PL-Ex. 73. Other Phoenix Light Plaintiffs hold different Certificates issued by those same Trusts. On this record, there does not appear to be a way to determine whether the alleged R&W notices concerned loans that were related to the relevant Certificates that Phoenix Light held (making claims subject to the German statute of limitations), rather a Certificate held by another Plaintiff. As to Commerzbank, claims related to Certificates other than the Barrington II or Palmer 3 Certificates are time-barred under German law and need not also be untimely under New York law. However, DB appears to have received allegations of breaches of R&Ws related to certain Barrington II and Palmer 3 Certificates before they were assigned to Commerzbank. Compare Biron CB-Ex. 69, with Reyes CB-Ex. I; see also, e.g., Goff Reply Ex. 26 at row 3676. Accordingly, those claims are not subject to the German statute of limitations and so cannot be time-barred unless they are untimely under New York law.

under New York law because the GAs specified that those duties
arose 60 or 90 days after DB sent notices to the relevant
parties. See Goff Reply Ex. 9 (collecting the relevant GA
provisions for these four trusts). Those GAs contain provisions
that each in substance provide as follows:

> In the event that the Trustee receives notice of a breach
> by the Depositor of any representations and warranties
> set forth in paragraphs (b), (c), (d) and (e) of Schedule
> V, the Trustee shall notify the Depositor to repurchase
> the Mortgage Loan at the Repurchase Price within sixty
> (60) [or, for some Trusts, 90] days of the Depositor's
> receipt of such notice. If, by the end of such sixty
> (60) [or, for some Trusts, 90] day period, the Depositor
> fails to repurchase such Mortgage Loan, the Trustee
> shall pursue all legal remedies available to the Trustee
> against the Depositor under this Agreement.

Id.

There does not appear to be a genuine dispute that DB sent
notices to the relevant parties pursuant to these provisions
when it received notice of alleged R&W breaches. See generally
Reyes CB Decl. ¶¶ 18-23; Reyes CB Decl. ¶¶ 18-23; infra Section
IV.A.3. Therefore, for these Trusts, DB is correct that claims
that it failed to enforce repurchase obligations accrued at the
end of the 60- or 90-day period following the relevant party's
receipt of DB's notice, because that is when any alleged breach
of DB's repurchase obligations accrued. See Chelsea Piers L.P.
v. Hudson River Park Tr., 964 N.Y.S.2d 147, 149 (App. Div.
2013). Accordingly, any claim that DB failed to enforce
repurchase obligations for loans in these four Trusts is time-

barred to the extent that the relevant 60- or 90-day period expired six years before the Plaintiffs first asserted claims related to that Trust.

Finally, as to four remaining Commerzbank Trusts, DB appears to concede that it had contractual repurchase obligations and that the relevant GA did not specify a time for performance. DB argues that it received "the vast majority of the R&W notices" for these Trusts "over a year before" December 23, 2009 (six years before Commerzbank filed its original complaint). See Reply at 20.

"Where a contract does not specify a date or time for performance, New York law implies a reasonable time period." Guilbert, 480 F.3d at 149. What constitutes a reasonable time is "ordinarily a question for a jury." Tedeschi v. Northland Builders, LLC, 904 N.Y.S.2d 786, 788 (N.Y. 2010). However, depending on the circumstances presented in each case, a court may conclude as a matter of law that the reasonable time for performance has expired by a certain date. Id.

Courts have rejected arguments similar to those advanced by DB from RMBS trustees at the motion to dismiss stage, emphasizing that "[w]hat constitutes a reasonable time period for performance depends on the facts and circumstances of the particular case" and cannot be resolved without a developed record. See, e.g., W. & S. Life Ins. Co. v. U.S. Bank Nat'l

72

Ass'n, No. 650259/2019, 2020 WL 6534496, at *7 (N.Y. Sup. Ct. 2020). Here, DB raises this argument on a motion for summary judgment. However, DB does not point to any evidence in the record that supports its argument that waiting a year or more to enforce repurchase obligations is unreasonable as a matter of law in view of the relevant facts and circumstances. Accordingly, to the extent that repurchase claims as to these four Trusts were not dismissed as untimely under German law, DB failed to demonstrate that these claims are time-barred under New York law.

### c. Palmer 3 Certificates

It is undisputed that the Palmer 3 Certificates were transferred to Commerzbank (or Dresdner) more than six years before it filed its original complaint. CB-RSUF ¶ 69. DB cursorily argues that it is entitled to summary judgment that "any claims that accrued while those certificates were in the Palmer 3 asset portfolio" are time-barred under New York law. CB MSJ at 27. However, neither party analyzed which claims, if any, in fact accrued under New York law before the Palmer 3 Certificates were transferred to Commerzbank. To the extent that the parties dispute whether certain claims accrued before or after the Certificates were transferred and the relevant statute of limitations date, DB has not, as the moving party, satisfied its burden of demonstrating that there are no disputes of

material fact. Accordingly, DB is not entitled to summary
judgment on any such claims. See Commerzbank AG, 457 F. Supp. 3d
at 248-49 (denying summary judgment where the plaintiff "only
dedicated seven lines in its brief to the timeliness of
[certain] claims").

### C. Claims Relating to Specific Warrantors

DB argues that it is entitled to summary judgment on the
Plaintiffs' claims relating to DB's alleged failure to pursue
claims for breaches of R&Ws against certain warrantors.
Specifically, DB argues that certain of the Plaintiffs' claims
are premised on DB's alleged failure to pursue claims that would
have been precluded by bankruptcy proceedings, were released
under settlement agreements, or are otherwise time-barred.

### 1. Bankrupt Warrantors

DB argues that the Plaintiffs' claims based on DB's failure to
pursue repurchase claims against warrantors for breaches of R&Ws
are time-barred if the relevant warrantors filed for bankruptcy
more than six years before the Plaintiffs initiated these
actions. DB points to 11 warrantors that filed for bankruptcy
more than six years before the Phoenix Light Plaintiffs filed
suit and 17 warrantors that filed for bankruptcy more than six
years before Commerzbank filed suit (collectively, the "Bankrupt
Warrantors"). See Biron PL-Ex. 31; Biron CB-Ex. 31.

Claims that DB should have pursued repurchase claims against any Bankrupt Warrantor suffer from a fatal timing defect. As a result of the bankruptcy filings, the Bankrupt Warrantors' bankruptcy stays preclude DB from taking any action outside of the bankruptcy proceedings against any Bankrupt Warrantor or bringing any new claims after the bankruptcy bar dates had passed. See 11 U.S.C. § 362(a); Fed. R. Bankr. P. 3003(c)(2); see also Fixed Income Shares: Series M v. Citibank N.A., 314 F. Supp. 3d 552, 557-58 (S.D.N.Y. 2018) (noting that attempts by an RMBS trustee to seek contractual remedies against warrantors would likely have required bankruptcy court approval as "executory contracts"). Accordingly, for these claims, the Plaintiffs "cannot establish breach, causation, or damages — all necessary elements for their claims." See Fixed Income Shares, 314 F. Supp. 3d at 557-58.[31]

The Plaintiffs do not appear to dispute that DB is entitled to summary judgment dismissing any claim that DB should have pursued repurchase claims against any of the Bankrupt Warrantors. Moreover, the Plaintiffs concede that DB is entitled to summary judgment dismissing all repurchase claims for the eight Trusts listed in Goff Reply Ex. 10 because those Trusts

---

[31] Moreover, any argument that DB should have taken action before the relevant bankruptcy stays fails, because such claims would have accrued more than six years prior to the relevant complaints and would be time-barred.

only had Bankrupt Warrantors. See Opp'n at 22. Accordingly, DB's motion for summary judgment dismissing these claims is granted.

However, the Plaintiffs argue that DB is not entitled to summary judgment dismissing Trust-level repurchase claims for any Trust that had additional warrantors that did not go bankrupt. In its reply brief and at oral argument, DB conceded that it is not seeking summary judgment on those claims on this basis. See Reply at 20-21; PL ECF No. 407 at 22-23. Accordingly, summary judgment dismissing those claims is denied.

### 2. Certain Repurchase Claims

DB moves for summary judgment dismissing any claim that DBNTC breached its duty as trustee by not pursuing repurchase demands after the fourth anniversary of a Trust's closing date, arguing that pursuit of such claims would have been futile because they were time-barred under N.Y. C.P.L.R. § 202 and California's statute of limitations.

The parties agree that DBNTC is a resident of California. DB argues, and the Plaintiffs appear to concede, that any claims that DB may have had against the sponsors or originators for breaches of R&Ws regarding the underlying mortgages arose at the closing of the RMBS transactions. See, e.g., ACE Sec. Corp. v. DB Structured Prod., Inc., 36 N.E.3d 623, 631 (N.Y. 2015).[32]

---

[32] Any argument that the cure or repurchase obligation was a substantive condition precedent to suit that delayed accrual of any causes of action fails under ACE Sec. Corp. As in Ace Sec. Corp., the causes of action in this

However, the parties dispute where these claims accrued for statute of limitations purposes. Under N.Y. C.P.L.R. § 202, claims accrue "at the time and in the place of the injury." Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC ("Barclays"), 140 N.E.3d 511, 517 (N.Y. 2019). DB argues that any causes of action accrued to DBNTC in California; the Plaintiffs argue that most of the claims accrued in New York.

During the pendency of this action, the New York Court of Appeals considered whether DBNTC could bring claims against warrantors for breaches of R&Ws more than four years after the closing of an RMBS transaction. Id. at 518. The New York Court of Appeals determined that where a trustee seeks to bring claims in its capacity as trustee against a warrantor, it is the trustee's residence that controls for statute of limitations

---

case accrued as the result of breaches of the R&Ws by the originator or sponsor. Substitution or repurchase were among the remedies available to DBNTC and were not conditions precedent to a claim accruing. DBNTC "suffered a legal wrong at the moment [the sponsors and originators] allegedly breached the representations and warranties," id. at 630, and thus any claims available to DBNTC for breaches of R&Ws arose at the time of the closing of the transactions, rather than when the relevant warrantor declined to cure the defect.

purposes. Id. at 518-19.[33] Accordingly, the court of appeals concluded that under N.Y. C.P.L.R. § 202, claims for R&W breaches brought by DBNTC, as RMBS trustee, against warrantors must be timely under California's 4-year statute of limitations. Id.

The Plaintiffs argue that the claims accrued in the location of the depositors, not DBNTC, in part because R&Ws were made to the depositors, not to DBNTC. But under the GAs for most of the relevant trusts, R&Ws were in fact made directly to the trust or trustee. Goff Reply Ex. 15; PL-RSUF-2 ¶ 1124; CB-RSUF-2 ¶ 1450. Regardless, the Plaintiffs have identified no legal authority in support of their position, which appears to be foreclosed by Barclays because there is no dispute that DBNTC had the authority to enforce any alleged R&W breaches. Barclays, 140 N.E.3d at 519 ("As trustee, plaintiff is authorized to enforce, on behalf of the certificateholders, the representations and warranties in the relevant agreements. Accordingly, it is appropriate for us to look to plaintiff's

---

[33] Barclays does not disturb the Court's finding above that claims arising from the Phoenix Light Certificates accrued in Germany. The court of appeals explained that it was not "foreclos[ing] the possibility that an economic loss may be sustained in a place other than where the plaintiffs reside," and that "courts may, in appropriate cases, conclude that an economic loss was sustained in a place other than were the plaintiff resides." Id. at 517-18. For the reasons explained above, including because the record with respect to the Phoenix Light Certificates provides a "workable basis" to conclude that those claims accrued in Germany, see id. at 518, the questions of where DBNTC's claims and Phoenix Light's claims accrued are distinct inquires that turn on different facts and compel different results.

residence as the place where the economic injury was sustained and, consequently, where plaintiff's causes of action accrued for purposes of CPLR 202.").

The Plaintiffs also assert that DB failed to identify which loans had repurchase demands more than four years after the close of a Trust, but DB appears to have provided such information. See Goff Reply Exs. 25-26. The Plaintiffs further argue that questions of fact exist regarding whether DB could have pursued claims after the statute of limitations period or entered into a tolling agreement. However, the Plaintiffs do not point to any evidence or legal authority to support the contention that DBNTC was under an obligation to negotiate a tolling agreement. The Plaintiffs have also failed to provide any basis to conclude that DBNTC's failure to pursue repurchase demands received after California's four-year statute of limitations would be a breach of DBNTC's duties.

Accordingly, DB is entitled to summary judgment dismissing any claims that DBNTC breached its duties by not pursuing repurchase claims after the fourth anniversary of a Trust's closing date.

### 3. Settlement Agreements

DB argues that it is entitled to summary judgment dismissing the Plaintiffs' claims relating to DB's alleged failure to pursue claims in connection with loans originated by Fremont and

sold to certain Trusts because such claims were released by DB through settlement agreements. Specifically, DB seeks summary judgment dismissing Commerzbank's claims for failure to pursue claims relating to three Trusts and the Phoenix Light Plaintiffs claims for failure to pursue claims relating to five Trusts. See Biron PL-Exs. 64, 77; Biron CB-Ex. 64.

On July 17, 2018, Fremont and DB entered into a settlement agreement regarding certain loans, pursuant to which DB released Freemont, "on behalf of itself [and] on behalf of each Settling Trust," "from all Seller Breach Claims, including without limitation any Repurchase Claims." Biron CB-Ex. 65 § 3(a). Also on July 17, 2018, DB entered into a settlement agreement that released claims relating to loans in two Phoenix Light Trusts. Biron PL-Exs. 64-65. Both of these settlement agreements were approved by investors holding more than two-thirds of the voting rights in these Trusts, and under the GAs for the Trusts, DB cannot be held liable for actions taken in good faith at the direction of investors holding 25% or more of the voting rights. CB-RSUF ¶ 72; PL-RSUF ¶ 84.

The Phoenix Light Plaintiffs assert claims related to three other Trusts with Freemont loans. As to these three Trusts, a bankruptcy court approved and ordered stipulations pursuant to which DB settled and released "any and all past, present or future" repurchase claims, "whether asserted or unasserted." PL-

RSUF ¶ 85. The stipulation appears to preserve the ability for DB to pursue limited claims, but only if it is properly instructed to do so by a requisite number of certicateholders. Id.

The Plaintiffs argue that summary judgment dismissing repurchase claims relating to Fremont is not warranted for certain Trusts because the terms of the settlement agreements did not encompass all repurchase claims against Fremont. The Plaintiffs rely on Cahill v. Regan, in which the New York Court of Appeals noted that "[a]lthough the effect of a general release, in the absence of fraud or mutual mistake, cannot be limited or curtailed, . . . a release may not be read to cover matters which the parties did not desire or intend to dispose of." 157 N.E.2d 505, 509-10 (N.Y. 1959). But the Plaintiffs' argument fails because the language in the releases is unambiguous, broad, and clearly encompasses the Plaintiffs' claims. See, e.g., Biron PL-Ex. 67 at 50 (DB releases "any Repurchase Claims, against any Seller Party"); id. at 49 ("'Repurchase Claims' shall mean any and all past, present or future claims, whether asserted or unasserted, by any Trust

against Seller seeking the repurchase of any Mortgage Loan on the basis of any Seller Breach Claim.").[34]

The Plaintiffs next argue that genuine issues of material fact exist regarding whether the settlement agreements and the agreement approved by the bankruptcy court are void as the products of fraud, bad faith, or involving material misstatements. The Plaintiffs' arguments are not supported by any allegation in their complaints and were raised for the first time in their opposition brief. Regardless, DB's notices to the certificateholders explaining the Fremont settlement are clear, attached the settlement agreements, and encouraged certificateholders to review the agreement with advisors and to vote. CB-RSUF-2 ¶¶ 1428-38; PL-RSUF-2 ¶¶ 1075-89. The Plaintiffs, like other certificateholders, had the opportunity to vote on the settlements or present their arguments to the bankruptcy judge.[35] Moreover, the Plaintiffs have presented

---

[34] The Plaintiffs' argument that the settlements did not address document defect claims also fails in view of the similarly broad language of the releases. See PL-RSUF-2 ¶ 1070; CB-RSUF-2 ¶ 1425.

[35] Any argument that DB lacked the authority to negotiate and settle any potential claims against Fremont is unpersuasive. As discussed above and recognized by other courts interpreting similar provisions, the GAs for the trusts at issue assign the rights, title, and interest in the mortgage loans, which would include the authority to commence and settle litigation. Moreover, the Plaintiffs' suggestion that DB, as trustee, lacked the authority to negotiate and settle potential claims on behalf of the trust's beneficiaries seems to be in significant tension with the Plaintiffs' claims that DB failed to do enough to pursue claims against other warrantors.

nothing more than conclusory speculation to support their
argument that any agreements were the product of fraud.

Accordingly, DB is entitled to summary judgment dismissing the
Plaintiffs' claims that DB failed to pursue claims against
Freemont for the eight Trusts listed in Biron PL-Exs. 64 and 77
and Biron CB-Ex. 64.

### D. Tort Claims and the Economic Loss Doctrine

DB moves for summary judgment dismissing all the
Plaintiffs' tort claims on the basis that such claims are
precluded by New York's economic loss doctrine. Under the
economic loss doctrine, "a tort action for economic loss will
not lie where the parties' relationship is governed by an
express contract." Ambac Assurance Corp. v. U.S. Bank Nat'l
Ass'n, 328 F. Supp. 3d 141, 157–58 (S.D.N.Y. 2018). This Court
previously dismissed certain of the Phoenix Light Plaintiffs'
tort claims as "duplicative" of other contractual claims,
because the "claims [were] not distinct from the duties in the
[GAs]." PL MTD Order, 172 F. Supp. 3d at 718. However, the Court
found that tort claims based on conflicts of interest,
allegations that DB "breached its fiduciary duty after an Event
of Default and did not take due care in performing ministerial

acts" were not duplicative and thus were not appropriately dismissed at the motion to dismiss stage. Id.[36]

The New York Court of Appeals instructs that courts should evaluate whether tort claims arise out of a "legal duty independent of contractual obligations [that] may be imposed by law as an incident to the parties' relationship," as well as "the nature of the injury, how the injury occurred and the harm it caused." Dormitory Auth. v. Samson Constr. Co., 94 N.E.3d 456, 460-61 (N.Y. 2018). Under the economic loss doctrine, "where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." Id. In the intervening years since the PL MTD Order, courts in this district, faced with claims by RMBS certificateholders against trustees, have reached different conclusions regarding whether the economic loss doctrine precludes the Plaintiffs' tort claims. See BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n, 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017) (collecting cases). "Dispositive in each case has been the nature of the plaintiff's claims: Does [the] plaintiff allege damages that flow from the violation of a professional duty, or merely from the violation of the governing agreements?" Id.

---

[36] Commerzbank also advances similar tort claims, but those claims were not addressed in the CB MTD Order.

With the benefit of factual discovery and further developments from New York courts and courts in this district, this Court agrees with those judges who have found the economic loss doctrine to apply to claims against RMBS trustees, including claims based on alleged failures to carry out administrative tasks and to avoid conflicts of interest. Courts in this district have been particularly skeptical of attempts to label duties as "extracontractual" as a means to "avoid the economic loss doctrine." See Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon, No. 16-cv-1597, 2018 WL 1417850, at *6 (S.D.N.Y. Mar. 8, 2018) ("[P]laintiffs seem to contend that merely labeling these claims 'extra-contractual' will somehow transmogrify them into extracontractual claims. It does not."); see also Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co., 410 F. Supp. 3d 662, 688-89 (S.D.N.Y. 2019) (dismissing tort claims because "the consistent references to the PSAs reveal how reliant [the plaintiff's] tort claims are on the contracts at issue"; explaining that the argument to the contrary is "an inherently untenable position seemingly taken purely to avoid the economic loss doctrine"); Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 439 F. Supp. 3d 275, 283 (S.D.N.Y. 2020) (same).

To be clear, the above-cited authorities do not stand for the principle that every claim by an RMBS certificateholder

against a trustee always sounds in contract. In this case, the Plaintiffs have pointed to a variety of alleged conflicts of interest by DB that were inconsistent with DB's role as a trustee and were potentially detrimental to certificateholders. The Plaintiffs suggest that DB had a duty to avoid conflicts of interest and that its failure to avoid such "positional" conflicts swayed DB's decision to the Plaintiffs' detriment. For example, the Plaintiffs argue that DB was reluctant to highlight conduct by RMBS sellers or servicers, because doing so might highlight DB's or its affiliates' own failures.

Nevertheless, the Plaintiffs' arguments are largely speculative and without merit. The injury and damages allegedly arising from DB's conflicts of interest are DB's alleged failure to uphold duties that DB was allegedly already required to perform under the GAs, such as failing to enforce repurchase obligations for loans with R&W breaches and defective mortgage files or failing to appropriately monitor servicers. Accordingly, it is clear that the "injury" or "damages arising from conflict of interest sound in defendants' failure to take contractual actions — that is, losses due to failures to take action in response to servicer violations and to alert the certificateholders to the servicers' misconduct." See Nat'l Credit Union Admin. Bd., 439 F. Supp. 3d at 283–84.

Accordingly, because the Plaintiffs' claims for breach of fiduciary duty, negligence, and gross negligence in this case are precluded by the economic loss doctrine, DB is entitled to summary judgment dismissing those claims.

**IV.**

Finally, DB argues that it is entitled to summary judgment on the merits of the Plaintiffs' claims because there is no evidence in the record that DB breached its duties. DB moves for summary judgment dismissing claims that it failed to act in accordance with its statutory and contractual obligations both before and after declared and alleged EODs.[37]

**A. Pre-EOD Claims**

The Plaintiffs assert claims based on DB's alleged failure to carry out certain duties prior to the occurrence of an ongoing EOD. In particular, the Plaintiffs argue that DB breached its because DB failed to (1) investigate whether loans in the Trust breached R&Ws; (2) notify other transaction parties of R&W breaches; and (3) enforce repurchase obligations. The parties generally refer to such claims as "pre-EOD" claims. The

---

[37] For the avoidance of doubt, many of the claims discussed below were already dismissed on other grounds, including grounds relating to standing and timeliness. Nonetheless, the Court considers the merits-based arguments below for these claims and finds that certain of them should be dismissed for the alternative, additional reason that they lack substantive merit.

Plaintiffs advance pre-EOD claims for 59 out of the 85 Trusts at issue.[38]

### 1. Claims Related to Document Delivery Failures

As an initial matter, the parties dispute the scope of the PL MTD Order and whether and to what extent certain of the Phoenix Light Plaintiffs' pre-EOD claims have already been dismissed. In its motion to dismiss, DB argued that all of the Phoenix Light Plaintiffs' claims concerning incomplete mortgage files, including claims arising from DB's failure to repurchase loans with defective documentation, should be dismissed as time-barred. PL ECF No. 36 at 15-16. The Phoenix Light Plaintiffs conceded that they were not pursuing claims related to any "pre-[EOD] failure to adhere to [DB's] document delivery and certification obligations." PL ECF No. 40 at 12-13; PL MTD Order, 172 F. Supp. 3d at 708-09 (the parties agreed that "any claims arising from the faulty deposit of the initial documentation of the loans would be time barred").

The Phoenix Light Plaintiffs now argue that the PL MTD Order did not dismiss its pre-EOD claims based on DB's alleged failure to enforce repurchase obligations for loans identified in the exception reports of 14 Trusts. See Goff Reply Ex. 12.

---

[38] To the extent that the Plaintiffs previously asserted pre-EOD claims as to the remaining 26 Trusts, those claims are dismissed because the Plaintiffs abandoned them. See Opp'n at 39.

But the Plaintiffs' argument misconstrues the PL MTD Order. The PL MTD Order explained that "[c]laims for document delivery failures are barred by the statute of limitations," referring to and citing allegations in the PL SAC that explicitly discussed claims directed to repurchase obligations relating to document delivery issues. PL MTD Order, 172 F. Supp. 3d at 709 (citing PL SAC ¶¶ 121-22, 164-65); see also id. ("Any claims arising from facts prior to December 23, 2008, the longest statute of limitations applicable to any of the claims, would be time barred.").

Accordingly, all pre-EOD claims for the 14 Trusts listed in Goff Reply Ex. 12 are without merit. Because the Plaintiffs abandoned pre-EOD claims for 26 Trusts and the Court dismissed pre-EOD claims for another 14 Trusts on the merits, the Court now addresses merits-based arguments concerning pre-EOD claims relating to the remaining 45 Trusts.

### 2. Pre-EOD Duty to Investigate

DB first argues that it is entitled to summary judgment dismissing the Plaintiffs' claims that DB breached a pre-EOD contractual duty to investigate whether loans breached R&Ws. DB contends that under the GAs, it had no duty to investigate absent direction from investors holding more than 25% of the voting rights in the Trust at issue. The Plaintiffs concede that their pre-EOD claims "overwhelmingly concern DB's breaches of

89

express enforcement obligations where DB discovered or had actual knowledge of R&W breaches and document defects, as opposed to DB's failure to 'investigate.'" Opp'n at 40. Still, the Plaintiffs argue that DB had a duty to investigate whether loans breached R&Ws regardless of whether it had investor direction and indemnification based on the information that DB had regarding widespread R&W breaches, poor loan performance, and industry-wide misconduct.

The parties' dispute regarding DB's duties centers on two clauses that the parties agree are found in substantively identical forms in nearly all of the GAs. Section 8.01 of an exemplary GA provides:

> No provision of this Agreement shall be construed to relieve the Trustee from liability for . . . its own negligent failure to act or its own willful misconduct. Unless an Event of Default known to the Trustee has occurred and is continuing: (a) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for performance of the duties and obligations specifically set forth in the Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee; (b) the Trustee shall not be liable for an error of judgment made in good faith . . . unless it is finally proven that the Trustee was negligent in ascertaining the pertinent facts . . . .

Biron PL-Ex. 2 § 8.01. Section 8.02 of the same GA provides:

> Except as otherwise provided in Section 8.01: . . . the Trustee shall not be bound to make any investigation . . . unless requested in writing to do so by the Holders of Certificates evidencing not less than 25% of the Voting Rights."

Id. § 8.02.

The Plaintiffs read these provisions to mean that, prior to an EOD, DB cannot be compelled ("bound") by a certificateholder without control of 25% of the requisite voting rights, and that DB is liable for its "negligent failures to act" unless it demonstrates it was not "negligent in ascertaining the facts" and made any judgment of error in good faith. By contrast, DB argues that these provisions make clear that DB only has the "duties and obligations set forth in this Agreement," which do not include any freestanding duty to investigate absent direction from investors controlling greater than 25% of voting rights. DB further contends that the specificity of "no duty to investigate" controls over the general references to "negligent" actions in the provisions of Section 8.01.

It is clear that under Sections 8.01 and 8.02, DB has no freestanding obligations to investigate absent instructions from investors with control of 25% of the required voting rights — until DB "know[s]" of an EOD. Therefore, to the extent that the Plaintiffs truly sought to claim that DB has a freestanding duty to actively investigate loans absent any evidence, knowledge, or notice, that argument fails. But this does not foreclose the possibility that DB had and breached a duty to investigate

either because it "knew" of an EOD or, as discussed below, "discover[ed]" loan-level R&W breaches.

As Judge Failla has explained, when a trustee's duties are triggered by its "discovery" or "knowledge" of a breach, just "because [a defendant trustee] cannot be required to investigate under the parties' contracts" does not mean that a trustee can "avoid liability by willfully blinding itself for the purpose of disclaiming knowledge." BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n, No. 14-cv-10067, 2017 WL 3610511, at *9 (S.D.N.Y. Aug. 21, 2017). While DB does not have an ever-present obligation to "nose to the source," if DB "suspected a fact and realized its probability, but refrained from confirming it in order [to] later deny knowledge," then something akin to duty to investigate arose. Id. at *10.

As discussed above and below, the Plaintiffs have developed evidence of DB's knowledge of specific loan-level R&W breaches and of potential EODs. Whether and to what extent this knowledge was so widespread and compelling that it apprised DB of potential breaches relating to other loans or of EODs in other Trusts, and whether DB chose to be willfully blind of and refused to investigate those potential issues, cannot be resolved on this record at the summary judgment stage.

Accordingly, summary judgment dismissing these claims on this basis is denied.

### 3. Pre-EOD Notice Obligations

DB seeks summary judgment dismissing the Plaintiffs' contractual and, for the indenture trusts, TIA Section 315(b) claims that DB breached pre-EOD duties to provide notice of loan-level R&W breaches to other enumerated parties.

It is undisputed that for the Trusts listed on Biron CB-Ex. 54 and Biron PL-Ex. 54, DB had a duty to provide notice of loan-specific R&W breaches to contractually specified parties only upon DB's "discovery" of any such breach (the "Discovery-Only Trusts"). It is further undisputed that for the trusts on Biron CB-Ex. 55 and Biron PL-Ex. 55, DB had a duty to provide notice of a loan-specific R&W breaches to contractually specified parties upon either "discovery" or "receipt of written notice" of any such breach (the "Discovery/Notice Trusts"). However, the parties dispute the meaning of "discovery" and "receipt of written notice" as used in the GAs and whether DB obtained the level of knowledge required to trigger its notice obligations. The parties further dispute whether, if DB's duties to provide notice to other parties were triggered, DB satisfied those duties.

At the summary judgment stage, a Plaintiff advancing claims arising from alleged pre-EOD breaches of notice and repurchase

obligations must come forward with "loan- or Trust-specific proof relative to [the trustees] knowledge of any breach." See Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14-cv-10104, 2017 WL 3973951, at *8 (S.D.N.Y. Sept. 7, 2017) (collecting cases). There is undisputed evidence in the record that DB received letters from third parties alleging that loans in the majority of Discovery-Only and Discovery/Notice Trusts breached R&W's.[39] See, e.g., Lucht Ex. 131 ("This letter serves as written notification of the underlying causes of the mortgage insurance rescissions which are direct breaches of the representations and warranties made by the Seller . . . ."). The Plaintiffs argue that by receiving these letters, DB "discover[ed]" and was put on "written notice" of loan-level R&W breaches within the meaning of the GAs. DB counters that these letters constituted mere allegations of R&W breaches that did not give DB "actual knowledge" of any breaches, which DB argues is required under the GAs to trigger its notice obligations.

DB's arguments are without merit. Regardless of whether "discovery" in the GAs is interpreted as requiring "actual knowledge" or some lower standard, a reasonable jury could conclude that the letters that DB received afforded DB the

---

[39] The Plaintiffs concede that DB did not receive any notice for loans in the following Trusts: IMM 2005-7, IMM 2005-8, ECR 2005-3, GSAMP 2005-HE4, and WAMU 2005-AR13. PL-RSUF ¶¶ 93-94; CB-RSUF ¶¶ 80-81.

requisite knowledge under the GAs to trigger its duties.[40] See
Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co., No. 14-
cv-4394, 2016 WL 439020, at *4 (S.D.N.Y. Feb. 3, 2016) (the
trustee's "obligation to enforce breaches of R&Ws upon receipt
of 'notice' may be triggered both when it receives notice of a
breach from another party and when it independently discovers
such a breach").

Nonetheless, DB argues that even if its notice duties were
triggered by these letters, it is entitled to summary judgment
dismissing these claims because it complied with any notice
obligations. See CB-RSUF ¶ 81; PL-RSUF ¶ 94. The GAs generally
provide that once DB discovers or receives written notice of a
loan-level R&W breach, DB must "notify [other parties] of such
. . . breach." See Fitzgerald Ex. 10; Kane Ex. 363. It is
undisputed that when DB received letters alleging R&W breaches,
it forwarded copies of those letter to the relevant contractual
parties, along with a form cover letter known as a "First
Letter." Reyes PL Decl. ¶¶ 18-19; Reyes CB Decl. ¶¶ 18-19. If DB
did not receive a response to the First Letter within a certain
time period, DB sent out another form cover letter known as a
"Second Letter," which again attached the alleged R&W breach

---

[40] Because the letters create a genuine dispute of material fact as to whether
DB had "actual knowledge" of loan-level R&W breaches, the Court need not
resolve at this stage whether "discovery" under the GAs is limited to actual
knowledge or some lower level of knowledge, such as inquiry notice.

notice. Id. ¶ 20; see also id. at Exs. D, E (exemplary First and Second Letters); Lucht Ex. 131.

The Plaintiffs argue that the First and Second Letters did not satisfy DB's notice obligations under the GAs. The Plaintiffs quibble with the wording employed in certain First and Second Letters, arguing that the language was not direct or specific enough to apprise recipients of potential R&W breaches. However, it is undisputed that each First and Second Letter was sent along with the alleged R&W breach letters that DB received. The Plaintiffs cannot have it both ways: if the alleged R&W breach letters were sufficient to have put DB on notice of R&W breaches, then DB forwarding these letters along to the relevant contractual parties must have satisfied its notice obligations under the GAs.

Accordingly, the Plaintiffs' pre-EOD notice claims for these Trusts are without merit and are dismissed on this basis.

### 4. Pre-EOD Repurchase Obligations

DB argues that it is entitled to summary judgment on the Plaintiffs' claims that it breached pre-EOD duties to enforce repurchase obligations. DB advances different arguments as to different Trusts.

First, DB argues that pre-EOD repurchase claims for the Trusts on PL Reyes-Ex. G and CB Reyes-Ex. G should be dismissed because there is no evidence that DB discovered or received any

written notice alleging any R&W breach in those trusts. The Plaintiffs do not contest that for eight Phoenix Light trusts and three Commerzbank trusts, there is no evidence that DB discovered or received notice of any alleged R&W breach. Goff Reply Ex. 13; see also PL RSUF-2 ¶ 1433; CB RSUF-2 ¶ 1756. Because there is no dispute that DB's repurchase obligations are triggered only when DB discovers or receives written notice of R&W breaches, DB is entitled to summary judgment dismissing the pre-EOD enforcement claims for these Trusts.

For one Trust on PL Reyes-Ex. G, the Plaintiffs point to a loan-specific notice that DB received. However, it is undisputed that the relevant notice was rescinded. PL-RSUF-2 ¶ 597.[41] Accordingly, summary judgment dismissing pre-EOD repurchase claims for this Trust is granted.

As to the remaining Trusts on PL Reyes-Ex. G and CB Reyes-Ex. G, the Plaintiffs argue that DB breached its duty to enforce repurchase of loans with defective mortgage files. See Goff Reply Ex. 12. But any such claims are time-barred for the reasons discussed in the PL MTD Order and restated above. DB is therefore entitled to summary judgment dismissing pre-EOD repurchase claims for these trusts.

---

[41] See Goff Reply Ex. 19 ("Our repurchase claims at the time were based upon, what were believed to be breaches of various representation and warranties made by the Responsible Party to the various trusts who own the Mortgage Loans. Upon further review of the repurchase claims, it has been determined that our repurchase claims against the Responsible Party are not valid.").

Second, DB argues that it could not have breached any pre-EOD enforcement duties for the Trusts on Biron PL-Ex. 56 and Biron CB-Ex. 56 because DB had no such duties under those GAs. It is undisputed that these GAs lack any provision expressly stating that DB has repurchase duties. Instead, the Plaintiffs rely on clauses in the GAs that generally provide as follows:

> Section 2.04 Execution and Delivery of Certificates. The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed and delivered to or upon the order of the Depositor, the Certificates in authorized Denominations evidencing directly or indirectly the entire ownership of the Trust Fund. The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates.

Handlin Ex. 23; see also CB-RSUF ¶ 83; PL-RSUF ¶ 96.

According to the Plaintiffs, because these GAs afford DB the "right" to enforce repurchase obligations in provisions "above" these clauses, this language creates an affirmative duty to enforce repurchase obligations in certain circumstances.

Courts confronted with the question of whether substantially similar clauses create an affirmative duty to enforce repurchase obligations have come to different conclusions. Compare, e.g., Commerzbank AG v. U.S. Bank Nat'l Ass'n, 457 F. Supp. 3d 233, 258 (S.D.N.Y. 2020) (concluding that a similar provision "does not require [the trustee] to enforce the obligations of other deal parties to repurchase loans"), and

98

W. & S. Life Ins. Co. v. Bank of N.Y. Mellon, 129 N.E.3d 1085,
1093-94 (Ct. App. Ohio 2019) (applying New York law; finding
that similar language "does not clearly set out the detail
required to impose a duty on [the trustee]. If the trustee's
duties included the obligation to require [the originator] to
substitute or repurchase mortgage loans, those duties would have
had to have been specifically set forth in the PSA."), with W. &
S. Life Ins. Co. v. U.S. Bank N.A., No. 650259/2019, 2020 WL
6534496, at *4 (N.Y. Sup. Ct. Nov. 5, 2020) (finding that the
trustee, in agreeing to "exercise the rights referred to above
. . . assumed an affirmative duty to enforce the repurchase
obligation"), and Royal Park, 2016 WL 439020, at *4 (same).[42]

   Reading each GA as a whole in view of well-established law
recognizing the limited nature of the duties of an indenture
trustee, DB's interpretation prevails. The duties and
obligations of an indenture trustee "are exclusively defined by
the terms of the indenture agreement." Meckel v. Cont'l Res.
Co., 758 F.2d 811, 816 (2d Cir. 1985); CFIP Master Fund, Ltd. v.
Citibank, N.A., 738 F. Supp. 2d 450, 472 (S.D.N.Y. 2010).

---

[42] The Plaintiffs' argument that DB is collaterally estopped on this issue by
Royal Park is without merit. Royal Park was an order denying a motion to
dismiss, which is not a "valid and final judgment on the merits." See Wills
v. RadioShack Corp., 981 F. Supp. 2d 245, 265 (S.D.N.Y. 2013); see also Flood
v. Just Energy Marketing Corp., 904 F.3d 219, 236-37 (2d Cir. 2018).
Moreover, the GAs and precise contract language at issue in Royal Park are
not identical to the GAs and language at issue in this case. Accordingly, DB
is not precluded from arguing in this case for its favored interpretation of
these clauses.

Moreover, each GA in substance provides that before an EOD, the "duties and obligations of" DB "shall be determined <u>solely by the express provisions of this Agreement</u>, and [DB] shall not be liable except for the performance and obligations specifically set forth in this agreement." Biron PL-Ex. 35 (emphasis added); Biron CB-Ex. 35. Each GA further provides in substance that "no implied covenants or obligations shall be read into this agreement against" DB. <u>Id.</u>

This clear and specific language, read in view of the law governing the duties of an indenture trustee, demonstrates that it would be improper to interpret the vague, general language of the "rights referred to above" clauses to create an implied repurchase duty in direct contravention of the GAs' other provisions. <u>See</u> <u>Commerzbank AG</u>, 457 F. Supp 3d at 258 ("The PSAs are complicated and intricate agreements that impose numerous obligations. Engrafting a generalized good faith obligation that creates additional undefined duties is a bridge too far."); <u>CFIP</u>, 738 F. Supp. 2d at 471-75 (contract language requiring the trustee to "discharge its responsibilities 'for the benefit of the holders of the Certificates,'" does not create obligations beyond "the narrowly circumscribed responsibilities identified in the trust agreement"). The "rights referred to above" language is properly understood to "delineate that the trustee holds the trust fund for the benefit of the investor rather than

for the trustee's own benefit or the benefit of any other party
to the PSA," rather than to generate any implied duties. W. & S.
Life Ins., 129 N.E.3d at 1094 (citing LNC Inv., Inc. v. First
Fid. Bank, Nat. Ass'n, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996));
see also Restatement (Third) of Trusts § 2 ("[A] trust involves
three elements: (1) a trustee, who holds the trust property and
is subject to duties to deal with it for the benefit of one or
more others . . . .").

Because DB was not under any contractual duty to enforce
repurchase obligations for the Trusts in Biron PL-Ex. 56 and
Biron CB-Ex. 56, all pre-EOD repurchase claims related to those
Trusts are without merit and dismissed on this basis.

Third, DB moves for summary judgment dismissing pre-EOD
enforcement claims for the Trusts listed in Biron PL-Ex. 57 and
Biron CB-Ex. 57. DB argues that for these Trusts, the relevant
GAs provide that DB had a duty to enforce loan repurchases only
if directed to do so by the depositor of the Trusts, and that
there is no evidence that these conditions were ever satisfied.
In support of its argument, DB relies on declarations from
Ronaldo Reyes, Vice President in Trust Administration at DBNTC.
Mr. Reyes declared that DB's internal documents do not reflect
"that [DB] received any communication demonstrating that the
conditions necessary for enforcement existed." Reyes PL Decl. ¶
29; Reyes CB Decl. ¶ 29.

The Plaintiffs do not dispute that there is no evidence in the record that these conditions were ever satisfied. Instead, the Plaintiffs argue that DB failed to come forward with evidence that it gave the depositors notice of the R&W breaches that it discovered. The Plaintiffs invoke the prevention doctrine, contending that DB's alleged failure to provide the depositors notice renders DB's repurchase duties enforceable despite the fact that DB did not receive direction from the depositors. See, e.g., Royal Park, 2016 WL 439020, at *5 (under the prevention doctrine, "a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party itself").

The Plaintiffs' invocation of the prevention doctrine fails. Under New York law, the Plaintiffs bear the burden of proving that DB caused the depositors' failure to direct it to enforce repurchase obligations by not notifying the depositors of R&W breaches. See, e.g., Lindenbaum v. Royco Prop. Corp., 567 N.Y.S.2d 218, 221 (App. Div. 1991); WorldCo Petroleum NY Corp. v. Keshtgar, No. 011390/08, 2011 WL 5840078, at *4-5 (N.Y. Sup. Ct. Oct. 31, 2011). The Plaintiffs point to no evidence that DB failed to notify depositors of R&W breaches. Indeed, as discussed above, the uncontroverted evidence establishes that after receipt of a breach notice, DB sent First Letter notices to "the parties identified in the respective" GAs. Reyes PL

Decl. ¶¶ 18-19; Reyes CB Decl. ¶¶ 18-19. In any event, "a defendant's failure to send a notice to cure to the servicers is not 'active conduct' within the meaning of the prevention doctrine." BlackRock Balanced Capital Portfolio (FI) v. U.S. Bank Nat'l Ass'n, 86 N.Y.S.3d 484, 486 (App. Div. 2018); Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co., 410 F. Supp. 3d 662, 685 (S.D.N.Y. 2019). Accordingly, DB is entitled to summary judgment dismissing pre-EOD enforcement claims on this basis for the Trusts on Biron PL-Ex. 57 and Biron CB-Ex. 57.[43]

Fourth, DB moves for summary judgment on pre-EOD repurchase claims relating to the loans on Reyes PL-Ex. U and Reyes CB-Ex. U on the basis that those loans paid off without a loss. However, the Plaintiffs point to evidence that raises a genuine dispute of fact as to whether these loans were in fact paid off without a loss. See, e.g., Beckles Decl. Table 2; CB-RSUF ¶ 86; PL-RSUF ¶ 99. Accordingly, summary judgment dismissing the

---

[43] The Plaintiffs' reliance on Royal Park fails. As noted above, Royal Park was a decision on a motion to dismiss. In denying DBNTC's motion to dismiss certain pre-EOD enforcement claims, Judge Nathan accepted the plaintiff's allegation that DBNTC did not provide the depositor with notice of discovered breaches as true. Royal Park, 2016 WL 439020, at *5 ("Assuming that the Defendant did not provide the Depositor with notice of discovered breaches, the Depositor was unable to direct the Defendant to pursue any remedies.") (emphasis added). Royal Park is inapposite here, where on a motion for summary judgment, the Plaintiffs have failed to satisfy their burden of showing that DB failed to provide depositors with the relevant notices.

Plaintiffs' repurchase claims on this basis for these loans (and their associated Trusts) is denied.

Fifth, DB moves for summary judgement dismissing pre-EOD repurchase claims relating to the loans on Reyes PL-Ex. N and Reyes CB-Ex. N on the basis that DB did in fact commence repurchase lawsuits against the warrantors after receiving direction from investors. Relying on the complaints in those lawsuits, the Plaintiffs argue that there is a genuine dispute of material fact as to whether the loans on Reyes PL-Ex. N and Reyes CB-Ex. N completely overlap with the loans at issue in those lawsuits. Compare, e.g., Reyes CB-Ex. N (identifying 1,970 repurchase log rows for the HVMLT 2007-2 Certificate), with Reyes CB-Ex. P ¶¶ 63-66 (repurchase action complaint regarding the HVMLT 2007-2 Certificate; identifying only 85 loans). DB is not entitled to summary judgment regarding loans that were not actually subject to a repurchase action. Accordingly, summary judgment dismissing pre-EOD repurchase claims on this basis is granted to the extent that the relevant loans in Reyes PL-Ex. N and Reyes CB-Ex. N were identified in repurchase action complaints; summary judgment is denied on this basis to the extent that they were not.

Sixth, DB moves for summary judgment dismissing pre-EOD repurchase claims relating to the loans on Reyes PL-Ex. T and Reyes CB-Ex. T on the basis that DB was directed by

certificateholders to enter into tolling agreements with the relevant warrantors. DB relies on the declaration of Mr. Reyes, who declared in relevant part that "the Trusts where a tolling agreement was executed are set forth in the Biron Declaration." Reyes CB Decl. ¶ 32; Reyes PL Decl. ¶ 32. Mr. Biron in turn declared that he "understand[s] that Defendant entered into and subsequently extended, an agreement with certain Warrantors relating to the prosecution of" relevant repurchase claims. Biron CB Decl. ¶ 154, Biron PL Decl. ¶ 186.

However, as the Plaintiffs correctly note, the actual tolling agreements relied on by DB are not in the record. Without the actual agreements, there exist genuine questions of material fact as to whether DB fully discharged its duties by entering these agreements. For example, Mr. Biron's statement that DB entered into agreements with "certain Warrantors" leaves open the possibility that the agreements omitted other responsible parties under the GAs. Accordingly, summary judgment dismissing repurchase claims for these Trusts on this basis is denied.

Seventh, DB moves for summary judgement dismissing the pre-EOD repurchase claims relating to the loans on Reyes CB Ex. V, arguing that by the time DB received notice of any breaches, Commerzbank no longer owned any Certificates issued by the Trust holding those loans. Commerzbank contends that DB's argument is

not supported by the evidence that DB submitted in connection with its motion for summary judgment, the repurchase log, which did not contain row numbers. However, DB submitted a version of the repurchase log with row numbers with its reply brief and represented that it produced a native version of the repurchase log with row numbers to Commerzbank during discovery. See Goff Reply Ex. 26; CB-RSUF ¶ 91; see also Handlin Ex. 558. This evidence demonstrates that Commerzbank sold the relevant certificates before DB received notice of breaches in these loans. Accordingly, summary judgment dismissing pre-EOD repurchase claims relating to the loans on Reyes CB Ex. V is granted on this basis.

Finally, DB moves for summary judgment on any remaining pre-EOD repurchase claims on the basis that DB did not have actual knowledge of any R&W breaches. However, that argument fails for the reasons explained above: a genuine dispute of material fact exists as to whether DB had knowledge of R&W breaches sufficient to trigger its repurchase obligations under the GAs. See supra Sections IV.A.2-3. Accordingly, summary judgment on the remaining pre-EOD repurchase claims on this basis is denied.[44]

---

[44] DB's fallback position — that all pre-EOD repurchase claims should be dismissed because of its purported good faith belief that it acted in accordance with the GAs — is without merit. "[W]hether a party to a contract has acted in good faith generally presents a question of fact for a jury." Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Telos CLO 1006-1 Ltd., 274 F.

**B. Post-EOD Claims**

DB argues that it is entitled to summary judgment dismissing the Plaintiffs' claims that DB breached its duties to act as a "prudent person" following the Declared EODs and other events that the Plaintiffs contend constituted EODs ("Alleged EODs").

**1. Alleged EOD Claims**

The Plaintiffs claim that DB breached its contractual and, for the indenture trusts, statutory duties relating to every Trust by not declaring EODs that purportedly resulted from alleged breaches by servicers or issuers and then not acting as a prudent person. DB contends that it is entitled to summary judgment on these claims, arguing that the Plaintiffs lack admissible, loan- or Trust-specific evidence that DB had "written notice" or "actual knowledge" of any such purported EOD, which is necessary to trigger DB's prudent person duties.

The Plaintiffs set forth a number of theories as to why DB should have declared EODs for various Trusts, including because DB allegedly knew of (1) misconduct by servicers related to

---

Supp. 3d 191, 215 (S.D.N.Y. 2017). There is certainly evidence in the record in support of DB's argument. However, the Plaintiffs highlight other evidence, including DB employee deposition testimony, that raises genuine questions as to whether DB believed in good faith that it was not obligated to take certain actions, or instead failed to act for some other reason, including because it failed to properly investigate and appreciate the scope of its obligations under the GAs. See Opp'n at 65-67 (collecting record cites).

robo-signing; (2) misconduct by servicers related to real estate owned ("REO") properties and foreclosures in a number of municipalities; (3) servicers' non-compliance with various aspects of Regulation AB ("Reg AB"); and (4) issuers' failure enforce loan repurchase obligations.

The Plaintiffs, in turn, move for summary judgment that these same events constituted EODs and that DB had sufficient knowledge of them. It is plain from the parties' Local Rule 56.1 statements and counterstatements, submitted in support of the Plaintiffs' and DB's respective motions for summary judgment, that issues relating to whether EODs occurred and whether DB knew of them are riddled with genuine disputes of material fact. The record is replete with conflicting evidence relating to these issues, making it far from clear that either party is entitled to summary judgment on these issues. See Commerzbank AG, 457 F. Supp. 3d at 255-56 (denying summary judgment where "material issues of fact abound as to whether EODs occurred").

Take, for example, the parties' dispute as to whether DB had sufficient knowledge of servicer robo-signing violations. The Plaintiffs point to DB witness testimony and communications between DB and servicers that the Plaintiffs contend demonstrate DB's knowledge of loan and Trust specific robo-signing misconduct. See, e.g., PL-RSUF-2 ¶¶ 1303-57, CB-RSUF-2 ¶¶ 1618-71. DB disputes the Plaintiffs' characterization of the

communications between DB and the servicers and points to other testimony that DB argues forecloses any inference that DB had the requisite loan-level knowledge of any misconduct. Id. Similar disputes over the proper interpretation of certain pieces of evidence and which cherry-picked deposition excerpts should prevail underpin each of the parties' arguments as to whether EODs did or did not occur and whether DB had sufficient knowledge of those EODs.

Accordingly, summary judgment dismissing the Alleged EOD Claims on this basis is denied.

### 2. Prudent Person Duties

DB moves for summary judgment that it satisfied its prudent person duties following the Declared and Alleged EODs. As discussed below, the Plaintiffs also move for summary judgment that DB did breach its post-EOD prudent person duties.

The Plaintiffs contend that DB breached its prudent person duties because DB (1) did not educate its employees about DB's post-EOD prudent person duties; (2) took no deliberative action in response to EODs; (3) sat on its hands after sending out EOD notices; and (4) did nothing differently after EODs occurred. See P-CSUF-Reply ¶¶ 546-49. DB argues that it satisfied any prudent person duties by deciding not to commence expensive investigations into EODs absent investor direction. Moreover, DB argues that there is no evidence in the record that DB's post-

EOD behavior failed to comply with any industry custom or established standard of care.

On this record, neither party is entitled to summary judgment on these claims on this basis. A reasonable factfinder could conclude that DB's failure to take certain actions post-EOD breached its prudent person duties. A reasonable factfinder could also determine that further investigation and other actions by DB following an EOD would have been imprudently expensive and that the most sensible course of action would have been to await further instructions from certificateholders before expending additional resources. The Plaintiffs' failure to present evidence that other RMBS trustees took the steps that they claim were mandated is informative, though not necessarily dispositive. Although the scope of an RMBS trustee's duties is informed by industry standards, those duties are not entirely governed by how other trustees act. Cf. Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 873 F.3d 85, 134 (2d Cir. 2017).

Because there are genuine disputes of material fact as to whether DB satisfied its post-EOD duties to act prudently, summary judgment dismissing these claims on this basis is denied.

### 3. Remaining EOD Claims

DB moves for summary judgment dismissing two remaining categories of post-EOD claims.

First, DB argues that it is entitled to summary judgment dismissing any claims that it breached post-EOD duties following the 2012 and 2014 Downgrade EODs affecting one of the Sold Certificates, MSAC 2006-HE5. It is undisputed that the Downgrade EODs occurred after Commerzbank sold its holding in the relevant Trust. CB-RSUF ¶ 103. Because, as explained above, Commerzbank did not retain any claims to the Sold Certificates after the sale, summary judgment dismissing these claims is granted.

Second, DB argues that the occurrence of certain events ("Alleged Trigger Events") did not trigger DB's prudent person duties as to the Trusts in Biron PL-Ex. 33 and Biron CB-Ex. 33. The GAs for six of these Trusts provide that DB's prudent person duties are triggered only if a "Master Servicer Event of Default" occurs. The Plaintiffs argue that the GAs for these Trusts require the Master Servicer to "use its reasonable good faith efforts to cause the Servicers to duly and punctually perform their duties and obligations hereunder," and that if a Master Servicer knew of the Alleged Trigger Events, it had a duty to act. See, e.g., Handlin Ex. 19. The Plaintiffs contend that because the Master Servicer knew of the Alleged Trigger Events yet failed to do anything, a Master Servicer EOD was triggered and DB was required to act prudently. PL-RSUF-2 ¶ 1397, CB-RSUF-2 ¶¶ 1715-19.

DB does not appear to dispute that the Master Servicers knew of the Alleged Trigger Events and that there is no evidence that Master Servicers did anything to address these events. Accordingly, summary judgment on post-EOD prudent person claims for these Trusts on this basis is denied.

### V. The Plaintiffs' Motion for Summary Judgment

The Plaintiffs have cross-moved for partial summary judgment. The Plaintiffs primarily seek declarations that (1) EODs occurred in the trusts and that DB failed to declare EODs, (2) DB had a pre-EOD obligation to enforce breaches of R&Ws and to have sufficient policies and procedures in place to detect the occurrences of EODs, (3) DB had knowledge of missing or non-conforming documents, (4) DB breached its post-EOD prudent person duties both for EODs that DB actually declared and EODs that it should have declared, and (5) DB had a duty to monitor servicers and failed to do so.

First, in view of the conclusions above, including that the Phoenix Light Plaintiffs lack prudential standing to assert any claims, many of the Plaintiffs' arguments are moot.

Second, with respect to the Plaintiffs' motion for summary judgment declaring that certain EODs occurred, it is notable that whether an EOD occurred in a particular Trust is not dispositive of any claim without a further finding that DB breached some post-EOD duty. As with DB's request that the Court

find that EODs did not occur, the Plaintiffs' request that the Court find that EODs did occur should be rejected in view of the disputed material facts in the record.

Third, as discussed above, even assuming that EODs were triggered in certain trusts, whether DB's conduct was "prudent" cannot be resolved on this motion for summary judgment. DB reasonably argues that pursuing remedies against warrantors or servicers would be costly, and that such costs would ultimately be borne by the certificateholders and thus could potentially depress certificateholders' returns. And evidence in the record demonstrates that circumstances could arise where investors (particularly with Certificates from different tranches) might have divergent interests. See, e.g., P-CSUF-Reply ¶ 35.

The Plaintiffs must show at trial that EODs (other than the Declared EODs) occurred. The Plaintiffs must also prove that DB's actions fell below those of a prudent person for each Trust, under the circumstances of that Trust. That burden has not been met at this stage, and the Court declines the Plaintiffs' request to issue advisory rulings on whether certain GA provisions were triggered, breached, or satisfied as a matter of law.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the

remaining arguments are either moot or without merit. For the reasons explained above, DB's supplemental motion for summary judgment is **granted.** DB's motions for summary judgment in the Phoenix Light Action and in the Commerzbank Action are **granted in part and denied in part.** The Plaintiffs' motion for partial summary judgment is **denied.**

The Clerk is directed to enter judgment dismissing the Phoenix Light Action (14-cv-10103). The Clerk is directed to close all pending motions in the Phoenix Light Action (14-cv-10103).

The Clerk is directed to close all pending motions in the Commerzbank Action (15-cv-10031) and to lift the stay in that action. The parties in the Commerzbank Action are directed to submit a proposed Phase 2 scheduling order with respect to the outstanding claims in that action by February 25, 2022.

**SO ORDERED.**

**Dated:    New York, New York**
**February 8, 2022**

                                    John G. Koeltl
                             **United States District Judge**